IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINIOS,
EASTERN DIVISION

| | | |
|---|---|---|
| Protect Our Parks, Inc.; Charlotte Adelman; | ) | |
| Maria Valencia and Jeremiah Jurevis; | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. |
| | ) | |
| Chicago Park District and City of Chicago, | ) | Jury Demanded |
| Defendants. | ) | |

## **COMPLAINT**

Now come the Plaintiffs, Protect Our Parks, Inc.; Charlotte Adelman; Maria Valencia and

Jeremiah Jurevis, through their attorneys, Mark Roth, Robert Fioretti and Kenneth Hurst of Roth

Fioretti, LLC, and complaining of the Defendants, Chicago Park District ("Chicago Park

District" or "Park District") and City of Chicago ("City of Chicago" or "City"), state:

### **INTRODUCTION**

1.      This is an action to enjoin a contrived collaboration involving the City of Chicago and the

Chicago Park District, in which the Park District deceptively transfers unique historic Jackson

Park public park land to the City of Chicago for the token payment of $1.00.  The sole purpose

of the transfer is so that the City may then re-convey the land to a private entity, the Obama

Foundation (the "Foundation"), a not for profit Washington DC corporation, for the Foundation's

to be independently determined use.  The attempted "sale" of this much used, enjoyed, and

locally needed open, clear and free recreational public park land is in violation of the relevant

controlling statutes; and upon objective examination is openly exposed to be, by design, a

conscious scheme to negate these existing protective laws.

2.      The original purported purpose of the City and Park District's transfer of public Jackson

Park land to a private Foundation was widely proclaimed by the City and Park District to be to

1

enable construction of an official federal Presidential Library, pursuant to The Presidential Libraries Act of 1955, as amended in 1986 (44 U.S.C. § 2112) and the Presidential Records Act of 1978. These Acts establish that the Presidential records that document the constitutional, statutory, and ceremonial duties of the President are the property of the United States Government, and that after a President leaves office, the Archivist of the United States assumes custody of the records. The Acts permit duly established private presidential libraries to serve as the repository for presidential records under National Archives and Records Administration ("NARA") supervision.

3.      The private Foundation contended that the public purpose of the Obama Presidential Library would be to provide all former President Obama's administration's presidential documents, records and artifacts conveniently available locally for close public examination. The Foundation also proposed that the former President's records would be available to facilitate professional research, analysis and study by historians, academics, and investigative journalists. The City of Chicago accordingly passed an Ordinance reciting these exact reasons for approving the construction of a desired national "Presidential Library" on what was known to all to be irreplaceable lake front public park land. A true and correct copy of the Ordinance is attached as Exhibit A.  Further, the City of Chicago announced plans to enter into a long term ground lease for the Jackson Park site with this nongovernmental entity, for a term of 99 years with the right to indefinitely renew the lease.

4.      In August 2016, the City and the Park District publically announced that the Obama Presidential Library, promised to include all of the former President's official records, would be built in Jackson Park.  Then, in May 2017, after the Defendants' public announcement that a true "Presidential Library" would be built, the Obamas did an about face on their commitment to a

2

Presidential Library. Former President Barack Obama and his wife publicly announced there had been a total change in the proposed "Presidential Library's" intended purpose and use. The Obamas announced that, instead, the Foundation had decided to forego and relinquish all custody and control of the former president's records to NARA, and abandoned all plans for building a "Presidential Library." Rather, there would NOT be a government managed NARA Presidential Library facility, and it would NOT be a local repository for the official presidential records of the former president's administration being made available for public examination, research and study. The new, renamed "Presidential Center" would instead be privately owned, managed and operated in ways that the private Foundation itself would decide.

5. Among the critical reactions to this institutional bait and switch is an article that appeared in American Thinker which put it succinctly as: "The so-called 'Obama Presidential Center' in Chicago is not a presidential library, and it is not part of the National Archives. It will contain no collections of presidential papers and therefore will have little if any value to historians and scholars of his presidency. It is a private building, financed by private donations. Its function appears to be serving as a monument to the man himself [to replace] a treasured legacy of the Chicago World's Fair that defines the surrounding neighborhoods."

6. The controlling law relating to transfer of valuable public park property to a non-government private entity, and the statute most immediately applicable to this attempted "gifting" of dedicated Jackson Park public parkland to a nongovernmental private entity, is the Park District Code, 70 ILCS 1205/10-7 (which, notably, Defendants have never publicly acknowledged in any public discussion or formally addressed in any way to comply). It specifically provides, in relevant part:

> Any park district owning or holding any real estate is authorized to convey such property to a nongovernmental entity in exchange for other real property of substantially equal or greater value as determined by 2 appraisals of the property and of substantially the same or greater suitability for park purposes without additional cost to such district.

In all their proceedings, Defendants have simply held this Park District Code provision secret, as if it did not exist, and have consciously failed and refused to enforce or comply with its requirements, in direct violation of the express mandates and due process required under the Park District Code, the U.S. Constitution and the Illinois Constitution, a duty that the Defendants and their Officers have sworn to protect.

7.      The City and the Park District clearly realize and fully understand that this established law precludes the Park District from arbitrarily transferring possession, use and control of this dedicated "open, clear and free" public parkland in Jackson Park to a private nongovernmental private entity's self-determined use.  Defendants have chosen to deal with it in a classic Chicago political way, known as a short con shell game, a corrupt scheme to deceive and seemingly legitimize an illegal land grab, one that will endure for centuries to come, regardless of future changing public park needs and increasingly consequential environmental conditions. Furthermore, as the scheme has been designed, it is the public taxpayers of the already overtaxed and budget deficit saddled State of Illinois and City of Chicago who will be required to now pay, together with all the resulting and escalating high costs for changes in street and public utility infrastructure demanded by the Foundation, an egregious new special add-on Park District real estate tax to pay for the Presidential Center's upkeep, and to further accommodate and enable this private nongovernmental entity to exist  in  the  public  Jackson  Park. Notably, by law, the "charitable" Foundation itself is not subject to real estate taxes payable to the Park District and

will apparently, at most, pay only token rental for its acquired control of this priceless lakefront public park land.

8.     Plans for the Presidential Center also include, and require, the vacation of roads for the Midway Pleasance southeast of Stony Island Avenue, and vacation of a portion of Cornell Drive. Further, it is believed that the City will be permanently closing Marquette Drive, and the State of Illinois will be widening Lake Shore Drive from 57th Street to Hayes Drive in order to accommodate the Presidential Center.

9.     On information and belief, the Park District and the City of Chicago will not receive any direct compensation in cash or in kind, other than potentially very nominal consideration, in exchange for transferring their rights, including the right to control the Jackson Park site, to the Foundation.  In addition, on information and belief, neither the Park District, the City, nor the State will receive compensation from the Foundation for the costly changes in infrastructure required for the Foundation to occupy the Jackson Park site and to operate the Presidential Center.

10.    It is telling that, belatedly, the City of Chicago discovered a need to have the Illinois legislature enact an amendment to the existing Illinois Aquarium and Museum Act, which became effective on January 1, 2016 ("2016 Amendment"). A true and correct copy of the 2016 Amendment is attached hereto as Exhibit B.   This Amendment to the Museum Act, for the first time and only after the City had approved the Presidential Center, added new language, *inter alia*, allowing edifices to be used as aquariums or as museums of art, industry, science, or natural or other history, including a new category of presidential libraries, centers, and museums, such aquariums and museums "consisting of all facilities for their collections, exhibitions, programming and associated initiatives…"

5

11.     It is an admission of Defendants' *mens rea* that the 2016 Amendment to the Museum Act has a brazen need to declare: "The changes made to this Section by this amendatory Act of the 99th General Assembly are declaratory of existing law and shall not be construed as a new enactment." In other words, a self-conscious illegal *ex post facto* act.

12.     Any "Amendment" by its very existence, cannot be declaratory of prior existing law. Further a determination of whether an amendment to a statute is declarative of existing law constitutionally exists solely within the jurisdiction of the Judicial branch of government. Further, for this 2016 Amendment to be deliberately applied retroactively to legalize a prior illegal land transfer would be an admitted unconstitutional and illegal *ex post facto* act.

13.     The 2016 Amendment to the Museum Act, moreover, is not declaratory of existing law, and was enacted after both the City of Chicago approved the Presidential Center and after the Park District approved the transfer of the Jackson Park site to the Foundation. Further, the 2016 Amendment cannot be applied retroactively to allow the Presidential Center at the Jackson Park site.

14.     Although that original stated purpose of an official Presidential Library no longer exists, Defendants continue to forge ahead to advance a totally different private nongovernmental project on public parkland. The existing design plans for this new Presidential Center call for defacing the public park by building a monumental 12 story 235-foot tall obelisk tower that the Foundation describes as a personal "Museum," together with a "forum building" for meetings, a now misnamed "library building", an "athletic center" building, a 450 car "parking garage" and other satellite physical structures, and an outdoor plaza to host food trucks in the historic formerly pristine park.

15.     For undisclosed reasons, the existing and readily available choice lake shore location of the South Shore Cultural Center, which is already providing essentially all the same social service programs being proposed for the Obama Center, was mysteriously and summarily excluded in the Ordinance passed by the City on January 21, 2015, as a demonstration of the City's "robust commitment to bringing the Presidential Center to Chicago." As stated in the Ordinance: "The City and the Park District have eliminated the South Shore Cultural Center from consideration as a potential location for the Presidential Center, but strongly support the location of the Presidential Center in either of the other two proposed [public park] locations in UChicago's proposal". *See,* Exhibit A at ¶ 13. Although UChicago itself already owns private land in Woodlawn and Hyde Park being used and available for a development of a presidential center, it instead volunteered confiscation of land which it doesn't own, and which will now require a significant zoning change to permit private construction on recreational public park land.  On January 10, 2018 the Foundation filed an application to rezone the Jackson Park site from its current zoning of "POS-1," Regional or Community Park, to "IPD," Institutional Planned Development.  A true and correct copy of the request for zoning change is attached hereto as Group Exhibit C.

16.     Illinois had deeded the Jackson Park site to the Park District with the express restriction that the land "be held, managed and controlled by them and their park, for the recreation, health and benefit of the public, and free to all." Construction of the various proposed buildings in the park destroys the public park's recreational purpose of open space, "free to all persons forever." That deprives each citizen of their fractional interest in the public trust land, although there is an abundance of readily available neighborhood locations that are non-public park, privately owned,

in prime locations, but currently depressed, ignored, and left impatiently waiting for productive and much needed investment and development.

17.     This lawsuit seeks, among other remedies, to permanently enjoin the Park District from "selling" the Jackson Park site to the City of Chicago and the City then transferring control over this public park land to the Foundation, and the Foundation being given authority to erect its private Presidential Center on what is nationally recognized as invaluable, critically needed historic and dedicated public parkland.

## PARTIES

18.     Protect Our Parks, Inc. ("Protect Our Parks") is a nonprofit park advocacy organization, dedicated to preserving, protecting, and improving Chicago's parks and forest preserves for all citizens.

19.     Protect Our Parks is an Illinois not for profit corporation. Protect Our Parks' principal place of business is located in Chicago, Illinois.

20.     Charlotte Adelman is a resident of the Village of Wilmette, State of Illinois.

21.     Maria Valencia is a resident of the City of Chicago, State of Illinois.

22.     Jeremiah Jurevis is a resident of the City of Chicago, State of Illinois. Protect Our Parks, Charlotte Adelman, Maria Valencia and Jeremiah Jurevis are collectively referred to as the "Plaintiffs."

23.     The Chicago Park District ("Park District") is a body politic and a corporate entity established by State law pursuant to what is now known as the Chicago Park District Act, 70 ILCS 1505/3 ("Park District Act").

24.     The City of Chicago ("City of Chicago" or "City") is a body politic and a municipal corporation.  Chicago Mayor Rahm Emanuel, who had served as former President Obama's

personal Chief of Staff in his time in office, in his present position as Mayor of Chicago has acted as the Chief Executive moving party and intermediary negotiating with the Foundation and arranging the details of the proposed public park land transfer arrangements taking place between the City, the Park District, and the private Obama Foundation.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States and pursuant to 28 U.S.C. § 1343 because it seeks to redress the deprivation under color of State law of constitutional rights.  The suit also seeks declaratory relief pursuant to 28 U.S.C. § 2201. The Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367.

26.     Venue is proper in this District because all of the parties reside in this District, and the facts giving rise to this action occurred in this District.

## ADDITIONAL FACTS

A.     The History and Unique Features of Jackson Park's Open Space.

27.     In 1869 the General Assembly passed "An Act to Provide for the Location and Maintenance of a Park for the Towns of South Chicago, Hyde Park and Lake" which was approved and in force February 24, 1869. (Private Laws, 1869, vol. 1, p. 358.) The statute provided that five persons, to be appointed by the Governor, be constituted a board of public park commissioners for the towns in question to be known as the "South Park Commissioners." The act authorized the commissioners to select certain lands which are specifically described by metes and bounds and provided in section 4 thereof that the lands "when acquired by said Commissioners, as provided by this act, shall be held, managed and controlled by them and their

9

successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever." Pursuant to the granted authority the commissioners proceeded to acquire, among other lands, the land which is now known as Jackson Park.

28.     The Illinois Legislature enacted the Park District Consolidation Act in the year 1934 which consolidated the-existing park districts, including the South Park District, into the Chicago Park District. The Park District Consolidation Act is now known as the Park District Act.

29.     As set forth above, the Illinois Legislature has dedicated Jackson Park for use as "a public park" to "be free to all persons forever."  The Park District therefore holds Jackson Park as a public park in trust for the uses and purposes of a park. Jackson Park is accordingly held in public trust for the benefit of the citizens of the City of Chicago and State of Illinois.

30.     Historic Jackson Park is one of the outstanding links in the City's inspired 26 mile long Chicago lakefront public park system, extending from the North side to the South side, that has served to bring distinction to the City and earn international acclaim for its enlightened dedicated preservation of limited and invaluable lake shore land as open, clear and free public park space.

31.     Jackson Park itself is notable for being the largest public park on the South side of Chicago, a facility which is heavily used and enjoyed by local residents and much needed in the notably park starved and densely populated neighborhoods of Southside Chicago when compared to the many lake shore park developments located on the North side. This North/South disparity in public park services had previously resulted in a federal court decree specifically requiring more equal Chicago Park System park investment in underprivileged and ignored sections of the South side public park system. A true and correct copy is attached hereto as Exhibit D.

32.     Chicago ranks 12th on a list of the most-densely populated cities in the country in terms of parkland per 1,000 residents. As a young community organizer, Mr. Obama, now former President, came to the parks' protection group Friends of the Parks and asked how "we"/ they might work together to increase park space in south side communities. When the Obama Foundation plan was still to establish an official Presidential Library, Friends of the Parks asked Mr. Obama to be culturally sensitive and proceed as presidential libraries in other cities have, and serve the deprived community by building the proposed Library on available underutilized private land, such as the existing identified vacant land across the street from Washington Park, without demanding dedicated public park land for his project. *See,* Exhibit "E".

33.     That Jackson Park exists and has survived and thrived to this day is a miracle story of the genius, dedication, and persistence of many public spirited people from Daniel Burnham, Frederick Law Olmstead, to Aaron Montgomery Ward and numbers of dedicated public servants who have had the wisdom to seize the opportunity to use the groundwork of the Columbian Exposition of 1893 to create and preserve the unique beauty of the Jackson Park that exists today. *See,* Exhibit F attached hereto.

34.     The Chicago Park District proudly displays on its website an historic newspaper article describing how "early leaders foresaw the importance of saving lakefront property as open space" and adopted the inscription "Public Ground - A Common to Remain Forever Open, Clear, and Free of any Building or Other Obstruction Whatever" that "established a legal precedent for lakefront protection." *See,* Exhibit G.

35.     One need only read the elegiac words of the Park District itself to confirm the Park Commissioners know their public mission and their sworn duty. The Chicago Park District brags on its website that:

> One of America's best kept secrets is Chicago's historic park system. Even Chicagoans who routinely enjoy its diverse open spaces-from the magnificent lakeshore parks to intimate neighborhood settings-may be surprised about their parkland legacy. We invite you to learn more about the history of Chicago parks, which are second to none in America and abroad. . .

*See,* Exhibit H, attached hereto.

36.     Among the many accolades given to Jackson Park is the one given at the annual meeting of the American Society of Landscape Architects at which Defendant Chicago Park District's own historian, Julia Sniderman Bachrack, now retired, appeared as a panel member:

> Jackson Park is a nationally significant landscape on the south side of Chicago, famed for its connections to Frederick Law Olmsted and Daniel Burnham, and as the site of the 1893 World's Columbian Exposition. This session will discuss techniques for preserving this valuable historic resource. Jackson Park is one of the most significant and complex historic landscapes in Chicago and the nation. Originally designed by Olmsted & Vaux in 1871, the site was redeveloped by Olmsted and Daniel H. Burnham, and the Wooded Island in the park is considered one of '150 great places in Illinois.'

*See,* Exhibit I, attached hereto.

37.     Jackson Park was listed on the National Register of Historic Places on December 15, 1972.

38.     The Commissioners of the Chicago Park District take a sworn oath of office to faithfully perform their public duty to protect and preserve the public parks that have been entrusted to them.

39.     On February 11, 2015, at the very moment when the Defendant Park District was voting to give away Jackson Park, the Army Corps of Engineers was already engaged in a $10 million rehabilitation and ecological restoration of Jackson Park that had been awarded by the Park District in 2014, and such was the concern of residents and historians alike that the project might violate the historic vision of Olmsted that private money in the area of $250,000 was used to hire

one of the country's premier Olmsted experts to work alongside the Army Corp of Engineers to insure that the historic integrity of Jackson Park was maintained down to the individual plants selected.

40.     The City has already spent millions on these areas which have promoted area wildlife such as Monarch butterflies, herons, and countless other species of migrating birds who use the area for rest and food as well as others who now call this area their permanent home, under protection of the rules and regulations adopted pursuant to the International Migratory Bird Treaty of March 2001.

41.     The Chicago Lakefront on the southwest shore of Lake Michigan plays a major role in providing habitat for millions of migratory birds. In the last century and a half, the conversion of much of the adjoining land to agriculture and urban uses has only increased the importance of the lakefront open space with its canopy of trees and shrubs. The City of Chicago recognized these facts with the signing of the "Urban Conservation Treaty for Migratory Birds" with the U.S. Fish and Wildlife Service ("USFWS") on March 25, 2000. *See* Exhibit J attached hereto. This treaty commits USFWS to a long-term partnership with the City of Chicago and its conservation partners, including the Chicago Park District and citizen conservation groups, for the benefit of migratory birds.

42.     The Chicago Park District worked with Friends of the Parks, other open space and conservation organizations and park advisory councils, to develop guidelines for the lakefront as a crucial stopover point for migratory birds, The Park District Board of Commissioners adopted "Lakefront Bird Habitat Guidelines." These guidelines are being used by the District, its contractors and subcontractors, to protect and promote bird habitat in Chicago's lakefront parks. Since 1973 regular Wooded Island Bird Tours have been conducted. Accessible minimally

disturbing nature paths were provided at the lagoons. Bob-o-Link Meadow and Woods, east of the East Lagoon and south of the Music Court Bridge are part of the Natural Areas of Jackson Park and declared a nature sanctuary. At the south end along the lagoon shore are cattails, as well as other wildlife friendly plants. As part of an international Sister City relationship with Osaka Japan, Osaka donated $200,000 for the Osaka Garden restoration/remake, and a new Japanese Torii Gate designed for the garden entrance.

43.     The specific location that was to become Jackson Park is described by the neighborhood organization Jackson Park Advisory Council as rising from the lake bottom, and many park commentators have observed "As with much of Chicago's shoreline, parts of Jackson Park were not even above Lake Michigan through much of the 19th Century." *See,* Exhibit K, attached hereto.

44.     With the 1893 Columbia Exposition when Frederick Law Olmsted/Calvert Vaux and Olmsted sons reshaped the park, Olmsted, selected to landscape, quickly determined that even after scraping and filling, most of the fair would be below lake level.  He brought in vast amounts of manure from the Stockyards and 200,000 cubic feet of dirt by railroad. Olmsted insured that the eastern part of the park near the lake was high enough to prevent flooding. These multiple layers made possible the later landscaping of the Jackson Park where land is mostly sand. Bringing in fill to contain the lake and straighten its edge was one of the few things Olmsted could do before work on the park was stalled after the 1871 Chicago Fire.

45.      Jackson Park is located along the shores of Lake Michigan, and on information and belief is on formerly submerged land.  The City of Chicago has enacted the Lake Michigan and Chicago Lakefront Ordinance, Section 16-4-030, which describes its purpose in subsection "e":

> To insure that the lakefront parks and the lake itself are devoted only to public purposes and to insure the integrity of and expand the quantity and quality of the lakefront parks.

46.     Section 16-4-130 of the Lakefront Ordinance further provides that "The Commissioner of planning and development may upon receipt of any proposal or application as hereinabove provided, conduct an investigation of the ecological and environmental impact of such proposal."

47.     On information and belief, no such oversight, investigation, or report of findings has taken place with respect to the Presidential Center.

48.     A separate federal review is taking place because of Jackson Park's status on the National Register of Historic Places, because the plan involves closing and expanding major streets. The National Environmental Policy Act and National Historic Preservation Act have separate review processes, but are both conducted by City officials in conjunction with federal agencies. A number of public agencies, including the Chicago Department of Transportation and the Park District, are required to evaluate the Presidential Center plan, then determine how it will impact residents and the best ways to construct the Presidential Center without disrupting the community. On information and belief this has not been done.

49.     On February 11, 2015, the Park District Board voted to approve the shell game transfer of public park land to the City to transfer to the Foundation. *See,* Exhibit L, attached hereto. A video of this action exists, as noted in the Exhibit.

      B.     The Foundation's Plans for the Jackson Park Site.

50.     The Jackson Park Site consists of approximately 19.3 acres, and is shown in the illustration below:



51.     The Foundation is reported to break ground on the project in 2018.

        C.     <u>Locating the Presidential Center on the Jackson Park Site, As Opposed to Other Non-Public Trust Property, Benefits the Foundation, Not the Public.</u>

52.     The construction of multiple obstructive and overwhelming buildings on the Jackson Park Site—unrelated to any trust purpose—would destroy the pristine open environment of the Jackson Park site.  Moreover, the City of Chicago will be saddled with the massive 235-foot structure for centuries.  This Jackson Park site will consequently open the door to progressively more intrusive destruction of the public park and destroy the ability of the citizens of Chicago and the State of Illinois to enjoy and benefit from the dedicated public park.

16

53.     The decision to erect the Presidential Center on public trust property is patently to serve the interests of the Foundation first and not the needs of the public, most obviously, as non-public park land is readily available for a Presidential Center.

54.     The Plaintiffs, and the People of the State of Illinois and the City of Chicago, will suffer irreparable injury if the Presidential Center is located at the Jackson Park site and the Plaintiffs have no adequate remedy at law to redress the consequences of Defendants' actions as alleged herein.

55.     As beneficiaries of a trust and taxpayers supporting the Park District, Plaintiffs have standing to enjoin a breach of trust before it occurs.

56.     Article VIII, Section 1(a) of the Illinois Constitution provides: "Public funds, property or credit shall be used only for public purposes." Article XI, Section 1 of the Illinois Constitution provides: "The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. Article XI, Section 2 of the Illinois Constitution also provides: "Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law."

57.     Article I, Section 12 of the Illinois Constitution provides: "Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly."

## COUNT I
## Violation of Due Process

58.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 to 57, as and for the allegations contained in paragraph 58, as if fully set forth herein.

59.     Several Illinois statutes govern the Park District.  Primarily, the Park District Act, 70 ILCS 1205/0.01 *et seq.*, details certain powers and duties of the Park District with respect to land use.

60.     The Park District Act does not authorize the Park District to sell park land that is held in public trust to a third party, and does not authorize the Park District to sell park land held in the public trust to the City of Chicago for transfer to a nongovernmental private entity, as the Park District Act does not authorize the Park District itself to transfer valuable public trust land for virtually no compensatory return.

61.     As purported legal authority for their acts, in the January 21, 2015 City Ordinance the Defendants have cited the following as purported legal authorities for their conduct: (1) Article Vll, Section 10 of the 1970 Constitution of the State of Illinois;  (2)  the Intergovernmental Cooperation Act, 5 ILCS 220/1 et seq., ; and (3) the Local Government Property Transfer Act. 50 ILCS 605/0.01 et seq.

62.      However, to read the actual statutes and parse the language is to immediately understand why legal misdirection has been employed to give the superficial appearance of legality to what the law itself clearly prohibits.

63.     The City and Park District cite Article VII, Section 10 (a) of the Illinois Constitution as legal authority. This Article provides that:

> Units of local government and school districts may contract or otherwise associate among themselves, with the State, with other states and their units of

18

local government and school districts, and with the United States to obtain or share services and to exercise, combine, or transfer any power or function, **in any manner not prohibited by law or by ordinance**.
(Emphasis added)

64.     But the next following Article VIII, Section 1 (a) expressly provides that: "**Public funds, property or credit shall be used only for public purposes**," and the Park District Code, 70-1205/10-7, limits the transfer of public park real estate. The actions taken by the Defendants are clearly "**prohibited by law**."

65.     The Intergovernmental Cooperation Act, which is also cited, provides:

(d) The term "restriction" shall mean any condition, limitation, qualification, reversion, possibility of reversion, covenant, agreement or restraint of whatever kind or nature, the effect of which is to restrict the use or ownership of real estate by a municipality as defined in (c) above." and Section 2(b) provides "If any such real estate shall be held by the transferor municipality subject to or limited by any restriction, and the transferee municipality shall desire the use, occupation or improvement thereof free from said restriction, the transferor municipality (or the transferee municipality, in the name of and for and on behalf of the transferor municipality .... shall have the "power to secure from its grantor, or grantors, their heirs, successors, assigns, or others, a release of any or all of such restrictions upon such terms as may be agreed upon between either of said municipalities and the person or persons entitled to the benefit of said restrictions. Upon the recording of any such release the transferor municipality shall then have the powers granted in paragraph (a) of this Section.

(Emphasis added)

Notably, unlike other statutes cited, this statute does not address "restrictions" that exist under co-equal law, and fails to set or detail the standards and limitations applicable to creation of "Special Districts" like the Park District and is unconstitutionally vague and incapable of reaching non-conflicting interpretations and conclusions with respect to the existing Park District restrictions. Any attempt to invoke this statute to the shell game being played without

19

recognizing and applying the statutory and equally authoritative prohibitions of the Park District Act and the other applicable laws would render it unconstitutional as applied.

66.     In the present case, Jackson Park was dedicated to the people of the State of Illinois "as a public park . . . free to all persons forever." The Presidential Center is not a public park. The Presidential Center's museum will require admission tickets, and its parking garage will require fees. The private Presidential Center will not at all times be free to all persons forever.

67.     Section 3 of the Intergovernmental Cooperation Act (5 ILCS 220/1), which the City cites, provides: "Any power or powers, privileges, functions, or authority exercised or which may be exercised by a public agency of this State may be exercised, combined, transferred, and enjoyed **jointly with any other public agency of this State** and jointly with any public agency of any other state or of the United States to the extent that laws of such other state or of the United States do not prohibit joint exercise or enjoyment and **except where specifically and expressly prohibited by law**."

68.     The issue with the Park District and the City's scheme with respect to the Presidential Center is that the City does not in any way propose to "exercise, combine, or enjoy jointly" the powers and duties of the Park District in preserving and protecting the open, clear and free public park use of Jackson Park. The issue is Defendants' defiance of the law and their prohibited act of taking dedicated public park land to serve the interests of a non-governmental private entity for a private use. Defendants Park District and City of Chicago make no serious pretense of acting under the authority of this Act. Their conduct is patently a violation of the clear intent and purpose of the Act and a denial of due process.

69.     The Local Government Property Transfer Act, 50 ILCS 605/0.01 *et seq.* ("Property Transfer Act"), which is presumably the key statute the City relies upon for obtaining title to the

Jackson Park site, allows municipalities, including park districts, to transfer land to other municipalities. The Property Transfer Act, however, does not allow the Park District to transfer the Jackson Park Site to the City in order to permit the City to transfer possession and use to a private non-governmental Foundation to construct, operate and control a constantly changing so called "Presidential Center."

70. Section 2 of this Property Transfer Act provides as follows:

> If the territory of any municipality shall be wholly within, coextensive with, or partly within and partly without the corporate limits of any other municipality, or if the municipality is a school district and the territory of the school district is adjacent to the boundaries of any other school district, and the first mentioned municipality (herein called "transferee municipality"), shall by ordinance declare that it is necessary or convenient for it to use, occupy or improve any real estate held by the last mentioned municipality (herein called the "transferor municipality") in the making of any public improvement or for any public purpose, the corporate authorities of the transferor municipality shall have the power to transfer all of the right, title and interest held by it immediately prior to such transfer, in and to such real estate, whether located within or without either or both of said municipalities, to the transferee municipality upon such terms as may be agreed upon by the corporate authorities of both municipalities, in the manner and upon the conditions following:

(Emphasis added).

71. Pursuant to Section 2 of the Property Transfer Act, if a transferee municipality, such as the City of Chicago, desires to obtain land from another "municipality," a park district, the City may obtain the property for "it [the City] to use, occupy or improve. . ."

72. Here, it is not the City "using, occupying or improving" the Jackson Park site. Control over the Jackson Park Site is being transferred to a nongovernmental private Foundation, and it is the Foundation alone that will "use, occupy and improve" the Jackson Park site for a privately determined purpose. Therefore, the Property Transfer Act does not allow the Park District to do what it is prohibited from doing by law by the charade of transferring the Jackson Park site to the City to perform the illegal act.

73.     The Park District is subject to another specific restriction on the use of the dedicated public park property at issue.

74.     Section 2(b) of the Property Transfer Act, 50 ILCS 605/2(b), provides:

> (b) If any such real estate shall be held by the transferor municipality subject to or limited by any restriction, and the transferee municipality shall desire the use, occupation or improvement thereof free from said restriction, the transferor municipality (or the transferee municipality, in the name of and for and on behalf of the transferor municipality, but without subjecting the transferor municipality to any expense without the consent of its corporate authorities), shall have the power to secure from its grantor, or grantors, their heirs, successors, assigns, or others, a release of any or all of such restrictions upon such terms as may be agreed upon between either of said municipalities and the person or persons entitled to the benefit of said restrictions. Upon the recording of any such release the transferor municipality shall then have the powers granted in paragraph (a) of this Section.

75.     Therefore, if a transferor park district desires to transfer property limited by a restriction to a transferee municipality, the park district may only do so with the agreement of both the transferee municipality and "the person or persons entitled to the benefit of said restrictions."

76.     The term "restriction" is defined in the Property Transfer Act as follows:

> The term "restriction" shall mean any condition, limitation, qualification, reversion, possibility of reversion, covenant, agreement or restraint of whatever kind or nature, the effect of which is to restrict the use or ownership of real estate by a municipality as defined in (c) above.

50 ILCS 605/1(d).

77.     In the present case, Jackson Park was dedicated to the people of the State of Illinois "as a public park . . . free to all persons forever."  The Presidential Center is not a public park. The buildings that comprise the Presidential Center will not, on information and belief, at all times is free to all persons forever.

78.     The beneficiaries of the restriction on the use of Jackson Park as "a public park . . . free to all persons forever" are the citizens of the State of Illinois.  The Park District has never obtained

the agreement from the citizens of the State of Illinois to allow the transfer of the Jackson Park site to the City of Chicago; and the unelected Commissioners of the Chicago Park District are bound by their oath of office to preserve and protect the public park lands entrusted to their care which they have sworn to do.

79. The Illinois Park District Aquarium and Museum Act, 70 ILCS 1290/0.01 et seq. ("Park District Museum Act"), which contains limited authorization for other uses of park district public land in general only does not authorize the Park District to transfer public trust land to the City of Chicago for the City to in turn transfer the property to a private entity on a long term ground lease.

80. The Museum Act does not release the existing statutory duty of the Park District or the restrictions placed on Jackson Park or the Jackson Park Site that the property be maintained "as a public park . . . free to all persons forever."

81. Further, the Park District Museum Act does not supersede the public trust doctrine's prior application to the Jackson Park site as alleged in this Complaint.

82. The Plaintiffs, as taxpayers of the State of Illinois and the City of Chicago, have a fractional beneficial interest in the Jackson Park site that the Park District holds in trust for them, so as to create a protectable property interest.

83. The Plaintiffs, accordingly, have standing and the right to enforce their beneficial interest in the property held in public trust, which will otherwise deprive or otherwise diminish the beneficial ownership interest of Plaintiffs and other citizens of the City and State in the property without the required protective procedure, and in violation of their rights in such property under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

84.     In the alternative, proceeding with the transfer of the public trust Jackson Park site will take, deprive or otherwise diminish the beneficial ownership interest of Plaintiffs and other citizens of the City and State in the property without the required protective procedure and in violation of their rights in such property under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

85.     The Defendants' actions constitute an unlawful taking of the Jackson Park site by the Defendants from the Plaintiffs and the people of the City of Chicago and the State of Illinois in violation of the Takings Clause of the Fifth Amendment as incorporated into the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

86.     Pursuant to 42 U.S.C. § 1983, Plaintiffs seek to bar the Park District and the City from approving the building of the Presidential Center and from conveying any interest in or control of the Jackson Park Site to the Foundation as set forth in the contemplated long term ground lease, as such actions violate the rights of Plaintiffs and other Illinois and City of Chicago citizens as holders of beneficial interests protected under the Due Process Clause of the Fourteenth Amendment.

WHEREFORE, Plaintiffs respectfully request that the Court:

      A.     Enjoin the conveyance by the Park District to the City of Chicago of the Jackson Park Site;

      B.     Enjoin the Park District and the City of Chicago from approving or allowing the construction of the Presidential Center on the Jackson Park Site, public trust lands;

      C.     Award Plaintiffs their reasonable attorney's fees and costs; and

      D.     Award any other just and equitable relief that the Court deems appropriate.

## COUNT II
### Breach of the Public Trust

87.     Plaintiffs reallege and repeat the allegations contained in paragraphs 1 to 86, as and for the allegations contained in paragraph 87, as if fully set forth herein.

88.     The Jackson Park Site is owned by the Park District for a public use, specifically an open space public park.

89.     Under the public trust doctrine, the Park District holds the Jackson Park Site in trust for the benefit of the residents of the City of Chicago and State of Illinois.

90.     The Park District and the City's actions and contemplated actions as alleged herein would cause the Jackson Park Site to be used for a purpose that is in conflict with its public use as an open space park "free to all persons forever."

91.     Further, the Park District and the City's actions and threatened actions of transferring the Jackson Park site from the Park District to the City, and the City then executing a long term ground lease for only nominal consideration, transfers the use and control of the Jackson Park Site to the Foundation, which is a private non-governmental entity.  The Foundation will have control over public land for not just decades but centuries to come.

92.     The action to transfer use and control of this unique and priceless lakefront Jackson Park public property site is an unconstitutional taking as there exists a significant amount of non-park, non-public trust land, on which to beneficially locate a private Presidential Center.

93.     Locating the Presidential Center on non-public, non-public park trust land would serve the identical foundation purposes and escape deliberately doing damage to historic Jackson Park.

94.     Defendants are in breach of their duty to hold the Jackson Park site in trust for the people of the City of Chicago and State of Illinois as the beneficial owners of such property.

95.     A transfer of public trust Jackson Park Site to the Foundation as set forth in the contemplated long term ground lease, violates the public interest needs and purposes for which Jackson Park Site is held in trust.

96.     Plaintiffs have standing as well to enforce the trust and prevent the dissipation and waste of trust assets or actions that impair the value of the trust property to them or interfere with their use and enjoyment of the trust property as property held in common on their behalf.

WHEREFORE, Plaintiffs respectfully request that the Court:

    A.    Enjoin the conveyance by Park District to the City of Chicago of the Jackson Park Site;

    B.    Enjoin the Park District and the City of Chicago from approving or allowing the construction of the Presidential Center on the Jackson Park Site, public trust lands;

    C.    Award Plaintiffs their reasonable attorney's fees and costs; and

    D.    Award any other just and equitable relief that the Court deems appropriate.

## COUNT III
### Ultra Vires Action

97.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 to 96, as and for the allegations contained in paragraph 97, as if fully set forth herein.

98.     The Park District's contemplated action of transferring the Jackson Park site to the City of Chicago for $1.00, so that the City will then enter into a long term lease with the Foundation has not been authorized by the State of Illinois. The Park District therefore lacks authority for the transaction.

99.     The Park District and the City's actions as alleged herein are *ultra vires* actions for which they have no authority.

WHEREFORE, Plaintiffs respectfully request that the Court:

A.   Declare that the purported conveyance of the Jackson Park Site to the City of Chicago invalid and without legal effect as an *ultra vires* act;

B.   Enjoin the long term ground lease from the City to the Foundation of any property rights or interest in or control of the Jackson Park Site;

C.   Enjoin the Defendants from approving or allowing the Foundation to construct a museum and other structures, including but not limited to a library, forum, athletic center, parking garage and other structures on the Jackson Park Site.

D.   Award Plaintiffs their reasonable attorney's fees and costs; and

E.   Award any other just and equitable relief that the Court deems appropriate.

## COUNT IV
### Declaratory Judgment As To Inapplicability of the Illinois Museum Act

100.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 to 99, as and for the allegations contained in paragraph 100, as if fully set forth herein.

101.   The 2016 Amendment to the Museum Act states on its face that it is not retroactive. The temporal reach of the 2016 Amendment states that the amendment is "declaratory of existing law," and therefore the substance of the 2016 Amendment cannot be made retroactive.

102.   However, the 2016 Amendment is not declaratory of existing law. Existing law at the time of the 2016 Amendment does not state allow aquariums and museums on formerly submerged lands, does not allow undefined "edifices" for "presidential libraries and centers" on park land, and does not allow the gifting of park land to private entities by allowing multiple 99 year leases of park land to a private entity – all of which were added in the 2016 Amendment to the Museum Act.

103.   On information and belief, the Defendants will contend that the Illinois Museum Act allows a private Presidential Center to be constructed on the Jackson Park Site. Therefore, an

27

actual and justiciable controversy exists between the Plaintiffs and the Defendants related to the applicability of the Museum Act to the Presidential Center.

WHEREFORE, Plaintiffs respectfully request that the Court:

A.  Decelerate the rights of the parties related to the application of the Illinois Museum Act;

B.  Decelerate the Illinois Museum Act does not authorize the Presidential Center in the Jackson Park site;

C.  Award Plaintiffs their reasonable attorney's fees and costs; and

D.  Award any other just and equitable relief that the Court deems appropriate.

## COUNT V
### Special Legislation

104.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 to 103, as and for the allegations contained in paragraph 104, as if fully set forth herein.

105.  The 2016 Amendment to the Museum Act provides, *inter alia*, that the corporate authorities of cities and park districts are authorized to erect and maintain:

> edifices to be used as aquariums or as museums of art, industry, science, or natural or other history, **including presidential libraries, centers, and museums, such aquariums and museums consisting of all facilities for their collections, exhibitions, programming, and associated initiatives**, or to permit the directors or trustees of any corporation or society organized for the construction or maintenance and operation of an aquarium or museum as hereinabove described to **erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate its aquarium or museum within any public park now** or hereafter under the control or supervision of any city or park district.
> . .
> (Emphasis added)

106.  The 2016 Amendment to the Illinois Museum Act expressly allowing a "presidential center" constitutes special legislation and is therefore unconstitutional.

28

107.     Article IV, Section 13 of the Illinois Constitution provides: "The General Assembly shall pass no special or local law when a general law is or can be made applicable." If in fact "the changes made to this Section are declaratory of existing law and shall not be construed as a new enactment" there was no need for amendment. The fact that Defendant City of Chicago saw the need to do so is a judicial admission that the 2016 Amendment is indeed special legislation.

108.     The 2016 Amendment to the Museum Act was specifically designed to benefit only one entity – the private Obama Foundation (repeating language that tracks the language of the pre-existing City Ordinance) and its plan to build what the Foundation originally called an official "Presidential Library" and which is now ambiguously described as a "Presidential Center."

109.     There can be little doubt that the Museum Act was specifically amended for the sole purpose to retroactively allow the Presidential Center on Park District property. In fact, the City of Chicago's legal department drafted the amendments to the Museum Act to specifically allow for the continually changing so-called "Presidential Center."

110.     City of Chicago's Corporation Counsel, Stephen Patton, submitted a Statement of Corporation Counsel Stephen R. Patton In Support of the Department of Law's Proposed 2016 Budget ("Statement") in support of the City of Chicago Law Departments proposed 2016 budget. That Statement is dated October 9, 2015, and a true and correct copy is attached hereto as Exhibit M.

111.     The Statement expressly provides that the City of Chicago's Department of Law drafted the 2016 Amendment to the Museum Act to allow the Presidential Center. The City of Chicago's Statement states, in relevant part, as follows:

        A. Helping to Secure the Barack Obama Presidential Center for Chicago

29

In December 2014, the Barack Obama Foundation announced that the University of Chicago's bid to host the Obama Presidential Center was in jeopardy because the University -- one of four finalists in the Foundation's competition to host the library -- did not own or control either of the sites it proposed in Washington and Jackson Parks. The Foundation subsequently made clear that in order for the University's bid to remain competitive, the City would need to develop a plan whereby it would acquire the sites in question and lease them to the Foundation. DOL attorneys worked over the Christmas and New Year holidays to research state law governing the use of park land and develop a plan and draft ordinances and an intergovernmental agreement whereby, if the University's bid were selected, the Chicago Park District would exercise its authority to transfer park land to the City, and the City in turn would exercise its authority to lease the land to the Foundation.

In January 2015, an ordinance was introduced authorizing the inter-governmental land transfer with the Chicago Park District, and that transfer was subsequently approved by the Chicago Plan Commission and the City Council after public hearings. Thereafter, DOL began negotiating the terms of a proposed ground lease and related transaction documents with the Obama Foundation to demonstrate the City's commitment to the project. Finally, last spring, to resolve any questions about the legality of using park land for the presidential center, DOL drafted legislation amending the State's Museum and Aquarium Act to expressly allow the long-term lease of park land for the center, which was subsequently signed into law in May.

112.    The 2016 Amendment to the Museum Act will benefit only the Foundation. Further, the legislation constitutes special legislation because it is arbitrary and uncertain in that it provides for the inclusion on park district land of any structure without particularity that any unvetted party could baldly contend is a "Presidential Center."

113.    The 2016 Amendment to the Illinois Museum Act is therefore unconstitutional as special legislation in violation of Article IV, Section 13 of the Illinois Constitution.

114.    On information and belief, the Defendants contend that the Illinois Museum Act allows the Presidential Center on the Jackson Park Site, and is not special legislation.  Therefore, an actual and justiciable controversy exists between the Plaintiffs and the Defendants related to the constitutionality of the 2016 Amendment to the Museum Act.

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare the rights of the parties related to the application of the Illinois Museum Act;

B.     Declare the 2016 Amendment to the Illinois Museum Act allowing undefined edifices constituting a presidential center is unconstitutional as special legislation;

C.     Award Plaintiffs their reasonable attorney's fees and costs; and

D.     Award any other just and equitable relief that the Court deems appropriate.

<u>COUNT VI</u>
**First Amendment Violation**

115.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 to 114, as and for the allegations contained in paragraph 115, as if fully set forth herein.

116.    The Ordinance and avowed purpose of the proposed Obama Foundation project is to create "an academic institute to enhance the <u>pursuit of the [former] President's initiatives</u> beyond 2017". (Emphasis added")

117.     Former President Obama has made it known that he intends to use his Center as a "bully pulpit" to continue his political activities by raising money for the Democrat Party, endorsing individual candidates for election, speaking out on controversial partisan political issues, and being outspoken in critiquing the actions of succeeding presidents and elected members of Congress with whom he disagrees.

118.    There is, of course, no objection to former president Obama exercising all his First Amendment Rights and using all the resources and facilities within his control. However, the Museum Act, which provides for a "Presidential Library" or "museum" with a collection of Mr. Obama's political mementos in Jackson Park, also provides for a new real estate tax to be

imposed upon all City property owners for the specific purpose of supporting that Library or Museum.

119.     Section 2 of the Museum Act states, in relevant part, that the Board of public park commissioners may:

> **levy annually a tax** not to exceed .03 per cent in park districts of less than 500,000 population **and in districts of over 500,000 population not to exceed .15 percent of the full, fair cash value**, as equalized or assessed by the Department of Revenue of taxable property embraced in said district, according to the valuation of the same as made for the purpose of State and county taxation by the general assessment last preceding the time when such tax hereby authorized shall be levied: **Such tax to be for the purpose of establishing, acquiring, completing, erecting, enlarging, ornamenting, building, rebuilding, rehabilitating, improving, operating, maintaining and caring for such aquarium and museum or museums and the buildings and grounds thereof; and the proceeds of such additional tax shall be kept as a separate fund. Said tax shall be in addition to all other taxes which such board of park commissioners is now or hereafter may be authorized to levy on the aggregate valuation of all taxable property within the park district**. Said tax shall be levied and collected in like manner as the general taxes for such parks **and shall not be included within any limitation of rate for general park purposes** as now or hereafter provided by law **but shall be excluded there from and be in addition thereto and in excess thereof**.

> (Emphasis added)

120.     On information and belief, the Obama Foundation will not pay real estate taxes. The effect of this special Obama Center tax on the public is therefore to make individuals who politically disagree with Mr. Obama on his political, environmental, or educational initiatives be nevertheless involuntarily compelled to contribute money to enable him to successfully pursue all his personal political and other initiatives and objectives. This is a denial of citizens own First Amendment rights of speech and assembly, and an unconstitutional exercise of governmental power.

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Enjoin the conveyance by Park District to the City of Chicago of the Jackson Park Site;

B.    Enjoin the Park District and the City of Chicago from approving or allowing the construction of the Presidential Center on the Jackson Park Site, public trust lands;

C.    Award Plaintiffs their reasonable attorney's fees and costs; and

D.    Award any other just and equitable relief that the Court deems appropriate.

Respectfully submitted,

/s/ Mark D. Roth
    Mark D. Roth

Roth Fioretti, LLC
Mark Roth
Robert Fioretti
Kenneth Hurst
311 S. Wacker Drive
Suite 2470
Chicago, IL 60606
Phone: (312) 922-6262
Fax: (312) 922-7747
Email: mark@rothfioretti.com
rwfchicago@yahoo.com
Ken@rothfioretti.com