## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

| | | |
|---|---|---|
| Protect Our Parks, Inc.; Charlotte Adelman; | ) | |
| Maria Valencia and Jeremiah Jurevis; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No.  18 CV 03424 |
| v. | ) | |
| | ) | |
| Chicago Park District and City of Chicago, | ) | Judge John Robert Blakey |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' <u>COMPLAINT</u>

Defendant City of Chicago (the "City"), by its attorney, Edward N. Siskel, Corporation Counsel of the City of Chicago, and Defendant Chicago Park District ("Park District"), by and through its attorneys, Burke, Warren, MacKay & Serritella, P.C., hereby submit their Answer and Affirmative Defenses to the Complaint filed by Plaintiffs Protect Our Parks, Inc., Charlotte Adelman, Maria Valencia, and Jeremiah Jurevis.  Defendants reserve all of their rights under the Federal Rules of Civil Procedure and the rules and orders of the Northern District of Illinois regarding their ability to oppose the Complaint, including by seeking dismissal or judgment in their favor, and to object to or seek deferral of the commencement of discovery or other pretrial practice:

## <u>INTRODUCTION</u>

1.     This is an action to enjoin a contrived collaboration involving the City of Chicago and the Chicago Park District, in which the Park District deceptively transfers unique historic Jackson Park public park land to the City of Chicago for the token payment of $1.00.  The sole purpose of the transfer is so that the City may then re-convey the land to a private entity, the Obama Foundation (the "Foundation"), a not for profit Washington DC corporation, for the Foundation's to be independently determined use.  The attempted "sale" of this much used,

enjoyed, and locally needed open, clear and free recreational public park land is in violation of the relevant controlling statutes; and upon objective examination is openly exposed to be, by design, a conscious scheme to negate these existing protective laws.

**ANSWER:** Defendants admit that, pursuant to ordinances enacted by or pending with the Chicago City Council, and approval issued by the Park District Board of Commissioners, the Park District intends to transfer land in Jackson Park to the City, and that the City is in the process of approving the construction and operation of the Obama Presidential Center ("OPC") on the transferred land by The Barack Obama Foundation ("Foundation"), a District of Columbia not-for-profit corporation. Defendants also admit that this lawsuit seeks to enjoin those activities.

Defendants deny the remaining allegations of paragraph 1. In particular, Defendants deny that the OPC will violate state law or is inconsistent with the proposed site's current status as public parkland, or that Defendants have engaged in a scheme to evade or negate state law. To the contrary, the OPC is expressly authorized by state law: The Park District Aquarium and Museum Act, 70 ILCS 1290/0.01 et seq. ("Museum Act") authorizes Defendants to enter into agreements with private entities, such as the Foundation, to build and operate museums, including presidential centers, on public parkland. Further, the Museum Act expressly affirms that presidential centers, along with the other museums authorized by the statute, "serve valuable public purposes, including, but not limited to, furthering human knowledge and understanding, educating and inspiring the public, and expanding recreational and cultural resources and opportunities." 70 ILCS 1290/1. The OPC would be the twelfth museum to be located in a public park within the City limits. The eleven other museums that operate on parkland in the City – Adler Planetarium, Field Museum, John G. Shedd Aquarium (in Burnham Park); Art Institute of Chicago (in Grant Park); National Museum of Mexican Art (in Harrison Park);

2

Institute of Puerto Rican Arts and Culture (in Humboldt Park); Museum of Science and Industry

(in Jackson Park); Museum of Contemporary Art (in Lake Shore Park); Peggy Notebaert Nature

Museum, Chicago History Museum (in Lincoln Park); and DuSable Museum of African

American History (in Washington Park) – are a testament to the long-standing state and local

policy recognizing that museums are valid uses of public parkland and provide myriad benefits

to the public.

Defendants further deny that the proposed site in Jackson Park will be subject to the

Foundation's "independently determined use." Rather, the Foundation's use of the proposed site

would be governed by, and subject to, the terms of City ordinances, including an ordinance

introduced to the City Council on September 20, 2018, approved in an amended form by the City

Council Committee on Housing and Real Estate on October 11, 2018, and scheduled for a vote

by the full City Council on October 31, 2018. That ordinance would, among other things,

authorize the City to acquire from the Park District the Jackson Park land currently contemplated

as the site of the OPC. It would also authorize the City to enter into a Use Agreement with the

Foundation governing the Foundation's operation of the OPC on that site. A true and correct

copy of that ordinance (the "Pending Ordinance"), which contains the terms of the proposed Use

Agreement, is attached hereto as Exhibit 1. The proposed Use Agreement is attached as Exhibit

D to the Pending Ordinance and is expressly referenced in that ordinance. See Exhibit 1 hereto,

at 11 (§ 5).

2.     The original purported purpose of the City and Park District's transfer of public
Jackson Park land to a private Foundation was widely proclaimed by the City and Park District
to be to enable construction of an official federal Presidential Library, pursuant to The
Presidential Libraries Act of 1955, as amended in 1986 (44 U.S.C. § 2112) and the Presidential
Records Act of 1978. These Acts establish that the Presidential records that document the
constitutional, statutory, and ceremonial duties of the President are the property of the United

States Government, and that after a President leaves office, the Archivist of the United States assumes custody of the records. The Acts permit duly established private presidential libraries to serve as the repository for presidential records under National Archives and Records Administration ("NARA") supervision.

**ANSWER:** Defendants admit that the initial conception of the OPC included, among other uses, an archival library containing presidential records and artifacts that would be under the custody and management of NARA. Defendants deny that the display of official presidential records and access to those records will not continue to be a purpose of the OPC. Rather, the OPC will, under the custody and management of NARA, display presidential artifacts as museum exhibits and will provide access to digitized copies of archived presidential records. The OPC will therefore continue to have a relationship with NARA. Defendants deny that the construction of an "official federal Presidential Library" was the sole "original purported purpose" of the Park District's anticipated transfer of land in Jackson Park to the City, and Defendants further deny that they "widely proclaimed" that the anticipated transfer of land would be made solely for that purpose. Plaintiffs' descriptions of the Presidential Libraries Act of 1955 and the Presidential Records Act of 1978 constitute legal conclusions that do not require an answer. To the extent that an answer is required, Defendants deny Plaintiffs' characterizations to the extent that they are contrary to the laws. Defendants deny the remaining allegations of paragraph 2.

3. The private Foundation contended that the public purpose of the Obama Presidential Library would be to provide all former President Obama's administration's presidential documents, records and artifacts conveniently available locally for close public examination. The Foundation also proposed that the former President's records would be available to facilitate professional research, analysis and study by historians, academics, and investigative journalists. The City of Chicago accordingly passed an Ordinance reciting these exact reasons for approving the construction of a desired national "Presidential Library" on what was known to all to be irreplaceable lake front public park land. A true and correct copy of the Ordinance is attached as Exhibit A. Further, the City of Chicago announced plans to enter into a

long term ground lease for the Jackson Park site with this nongovernmental entity, for a term of 99 years with the right to indefinitely renew the lease.

**ANSWER:**  Defendants deny that the sole public purpose of the OPC was to make presidential documents, records, and artifacts available for public examination or research, analysis, and study.  Defendants further deny that the 2015 City ordinance ("2015 Ordinance") referenced in paragraph 3 and attached as Exhibit A to the Complaint, recited this as the sole public purpose of the OPC.  The 2015 Ordinance also stated other purposes of the OPC, which included a museum recounting the history of the Obama presidency.  Further, Defendants deny that the 2015 Ordinance stated that "all" of President Obama's presidential documents would be housed at the OPC.  Rather, it stated that presidential records "will be available for review and analysis" at the OPC.  Compl., Ex. A thereto, at ordinance, p. 1.

Defendants deny that the 2015 Ordinance is controlling as to the purposes of the OPC.  Rather, that ordinance authorized the City to acquire from the Park District the land that was, at that time, contemplated as the site of the OPC.  Since then, the location of the proposed site has changed (it has shifted to the north and to the east), and a new City ordinance – the Pending Ordinance – would authorize acquisition of the new site.  See Exhibit 1 hereto, at 3-4, 11(§ 4).  Further, while the 2015 Ordinance stated that it was anticipated that the City and the Foundation would enter into a long-term ground lease governing operation of the OPC at the proposed site, the 2015 Ordinance did not authorize such a lease or the construction of the OPC; the ordinance's authorization was limited to authorizing the acquisition of the prior OPC site from the Park District.  It will be the Pending Ordinance that authorizes the Foundation to build the OPC, and, under that ordinance, the City would enter into a Use Agreement, rather than a ground lease, governing the Foundation's use of the Jackson Park site for the OPC.

Defendants further deny that the proposed site of the OPC was known to all to be "irreplaceable lake front public park land." It is incorrect to call the proposed OPC site "lakefront parkland," as it is on the western edge of Jackson Park adjacent to Stony Island Avenue and is separated from the lakefront by multiple features. Moving eastward from the site toward the lake, there is Cornell Drive (running north-south), then the lagoons and Wooded Island of Jackson Park, then Jackson Park's golf driving range and other grounds; then Lake Shore Drive (running north-south), then a pedestrian and bike path (running north-south) and then, finally, the lakefront. Further, Cornell Drive effectively isolates the proposed site from the rest of Jackson Park. That will be cured by the plans for the OPC, which call for Cornell Drive to be vacated and converted into parkland, which will allow the proposed site to be integrated with the Jackson Park lands and lagoons to the east and will enhance Jackson Park as a whole. Moreover, the proposed site has already been subject to development, since it currently houses a Park District track and field facility. Defendants lack knowledge or information sufficient to form a belief as to the truth of the specific statements Plaintiffs are referring to when they allege that the Foundation made certain contentions and proposals, and that the City announced plans to enter into a long term ground lease for the Jackson Park site for a term of 99 years with the right to indefinitely renew the lease, as Plaintiffs do not identify the statements to which they refer. Defendants deny the remaining allegations of paragraph 3.

4.      In August 2016, the City and the Park District publically announced that the Obama Presidential Library, promised to include all of the former President's official records, would be built in Jackson Park. Then, in May 2017, after the Defendants' public announcement that a true "Presidential Library" would be built, the Obamas did an about face on their commitment to a Presidential Library. Former President Barack Obama and his wife publicly announced there had been a total change in the proposed "Presidential Library's" intended purpose and use. The Obamas announced that, instead, the Foundation had decided to forego and relinquish all custody and control of the former president's records to NARA, and

abandoned all plans for building a "Presidential Library." Rather, there would NOT be a government managed NARA Presidential Library facility, and it would NOT be a local repository for the official presidential records of the former president's administration being made available for public examination, research and study. The new, renamed "Presidential Center" would instead be privately owned, managed and operated in ways that the private Foundation itself would decide.

**ANSWER:** Defendants admit that the City and Park District announced in August 2016 that the OPC would be built in Jackson Park. Defendants also admit that in May 2017 President Obama and Mrs. Obama publicly presented new plans for the OPC, which, among other features, included allowing the public to digitally access the President's records in lieu of an on-site and limited-access physical archive of records managed by NARA.

Defendants state that, as currently conceived, the OPC will yield numerous benefits to the public, the City, and the Park District. The OPC will be a campus consisting of open greenspace; a Museum Building approximately 235 feet tall; a Forum Building; a Library Building; a Program, Athletic, and Activity Center; an underground parking garage; a Plaza; and other features.

These features will be consistent with the public purposes recognized and endorsed in the Museum Act and acknowledged by Chicago's long history of enhancing public parkland with museums. The Museum Building will be used principally as a museum featuring artifacts from President Obama's presidency and will tell the story of the first African-American president of the United States and First Lady, their historical connection to Chicago, and the individuals, communities, and social currents that shaped their journey, both locally and nationally, and both historically and in the 21st century. See Exhibit 1 hereto, at 5. The Forum Building will house collaboration and creative spaces, including an auditorium, meeting rooms, recording and broadcasting studios, and a winter garden and restaurant. See id. at 6. The Library Building will

include a branch of the Chicago Public Library housing a multimedia collection and spaces for reading and study. See id. at 5. It will also house a President's Reading Room, where visitors may experience exhibits relating to the importance of literacy, education, and community service, as well as a selection of books and other materials that have been significant to President Obama. See id. at 5-6. The Program, Athletic, and Activity Center will host large-scale indoor programs and be used for formal or informal recreation activities. See id. at 6.

Further, pursuant to the contemplated Use Agreement, the open green and recreational spaces of the OPC campus (defined in the Use Agreement as the "Presidential Center Green Space," "Green Space," and "Plaza") will generally be open to the public during regular Chicago Park District hours, like the rest of Jackson Park. See Exhibit 1 hereto, Ex. D thereto, § 6.2. In addition, the Foundation must operate the Presidential Center in accord with the Museum Act's free admission requirements, which require free admission to all Illinois residents for a period equivalent to 52 days, at least 6 of which must be in June through August, each year, and free admission to Illinois school children at all times when accompanied by a teacher. See id. § 6.1; 70 ILCS 1290/1.

Defendants admit that the OPC will not physically house the complete archive of President Obama's Presidential Records, and that those records will be primarily maintained in an off-site facility. But Defendants deny that the OPC will have no relationship with NARA. Rather, artifacts and records subject to NARA's management and control will be displayed in the OPC's Museum Building. The OPC will also provide access to digitized copies of archived presidential records in coordination with NARA. The OPC will therefore continue to have a relationship with NARA. Defendants further state that the physical space housing the NARA archive of Obama Administration Presidential Records would not have been generally accessible

8

by the public, and that, since that archive will no longer be part of the OPC campus, more space will be available for use by the general public for recreation, educational programming, and cultural enrichment.

Defendants deny that the OPC will be privately owned. Rather, under the terms of the Pending Ordinance and the Use Agreement that would be authorized by that ordinance, the City will retain ownership of the OPC site, and upon completion of the buildings comprising the OPC (which the Foundation will construct at its sole expense), the Foundation will transfer ownership of those buildings and other site improvements to the City at no charge. See Exhibit 1 hereto, Ex. D thereto (Use Agreement), §§ 2.1, 4.4.

Defendants also deny that the OPC will be managed and operated in ways that the Foundation will decide. Rather, the management and operation of the OPC would be governed by, and subject to, the proposed Pending Ordinance and the Use Agreement authorized by that ordinance.

Defendants lack knowledge or information sufficient to form a belief as to the truth of the particular statements by President Obama and Mrs. Obama to which Plaintiffs refer in paragraph 4, because the particular statements are not identified. Defendants deny the remaining allegations in paragraph 4.

5. Among the critical reactions to this institutional bait and switch is an article that appeared in American Thinker which put it succinctly as: "The so-called 'Obama Presidential Center' in Chicago is not a presidential library, and it is not part of the National Archives. It will contain no collections of presidential papers and therefore will have little if any value to historians and scholars of his presidency. It is a private building, financed by private donations. Its function appears to be serving as a monument to the man himself [to replace] a treasured legacy of the Chicago World's Fair that defines the surrounding neighborhoods."

**ANSWER:** Defendants admit that the language quoted in paragraph 5 appeared in a post on the weblog *American Thinker*, though Defendants deny that Plaintiffs' emendation to the final quoted sentence accurately reflects the text of the post. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation that the cited article was "among the critical reactions" to the OPC. Defendants deny the remaining allegations in paragraph 5.

6.     The controlling law relating to transfer of valuable public park property to a nongovernment private entity, and the statute most immediately applicable to this attempted "gifting" of dedicated Jackson Park public parkland to a nongovernmental private entity, is the Park District Code, 70 ILCS 1205/10-7 (which, notably, Defendants have never publicly acknowledged in any public discussion or formally addressed in any way to comply). It specifically provides, in relevant part:

> Any park district owning or holding any real estate is authorized to convey
> such property to a nongovernmental entity in exchange for other real property
> of substantially equal or greater value as determined by 2 appraisals of the
> property and of substantially the same or greater suitability for park purposes
> without additional cost to such district.

In all their proceedings, Defendants have simply held this Park District Code provision secret, as if it did not exist, and have consciously failed and refused to enforce or comply with its requirements, in direct violation of the express mandates and due process required under the Park District Code, the U. S. Constitution and the Illinois Constitution, a duty that the Defendants and their Officers have sworn to protect.

**ANSWER:** Paragraph 6 asserts legal conclusions regarding Section 10-7 of the Park District Code that do not require an answer. To the extent that an answer is required, Defendants deny that the Park District is transferring land to a non-governmental entity. Rather, the Park District would transfer the Jackson Park site to the City, which would then retain ownership of the site. Defendants further deny that the cited section of the Park District Code applies here. Rather, the Park District Code expressly states that it does not alter the powers of the Chicago Park District.

10

See 70 ILCS 1205/1-2(d) ("Nothing set forth herein shall be construed to disturb, alter, amend, limit, or broaden the powers of the Chicago Park District or any other park district heretofore formed under special charter."). Defendants deny the remaining allegations in paragraph 6, including the allegation that Defendants have held the Park District Code "secret," as the Code is a publicly-available law. Defendants also deny that they have consciously failed and refused to enforce or comply with its requirements, since the Code's requirements do not apply here.

7.     The City and the Park District clearly realize and fully understand that this established law precludes the Park District from arbitrarily transferring possession, use and control of this dedicated "open, clear and free" public parkland in Jackson Park to a private nongovernmental private entity's self-determined use. Defendants have chosen to deal with it in a classic Chicago political way, known as a short con shell game, a corrupt scheme to deceive and seemingly legitimize an illegal land grab, one that will endure for centuries to come, regardless of future changing public park needs and increasingly consequential environmental conditions. Furthermore, as the scheme has been designed, it is the public taxpayers of the already overtaxed and budget deficit saddled State of Illinois and City of Chicago who will be required to now pay, together with all the resulting and escalating high costs for changes in street and public utility infrastructure demanded by the Foundation, an egregious new special add-on Park District real estate tax to pay for the Presidential Center's upkeep, and to further accommodate and enable this private nongovernmental entity to exist in the public Jackson Park. Notably, by law, the "charitable" Foundation itself is not subject to real estate taxes payable to the Park District and will apparently, at most, pay only token rental for its acquired control of this priceless lakefront public park land.

**ANSWER:**  Defendants deny that a dedication applies to the proposed OPC site requiring the land to be kept "open, clear and free." Rather, the operative dedication language, which originates in an 1869 statute ("1869 Statute") that Plaintiffs themselves cite in Paragraph 27 of the Complaint, provides that the land is to be used "as a public park, for the recreation, health, and benefit of the public, and free to all persons forever, subject to such necessary rules and regulations as shall from time to time be adopted by [the controlling park commissioners] and their successors, for the well ordering and government of the same."

11

Defendants further deny that the Park District is transferring land in Jackson Park to the City, rather than to the Foundation directly, as part of a scheme to evade limitations placed on the Park District by the Park District Code. There are no such limitations, because the Park District Code does not restrict the Chicago Park District's powers. See Answer to Paragraph 6, supra. Further, the Illinois Constitution and state statutes authorize the transfer of land from the Park District to the City, and the Museum Act expressly authorizes the City to enter into an agreement with an entity like the Foundation for the purpose of establishing a presidential center on public parkland. See Answer to Paragraph 1, supra.

Moreover, a transfer of the site from the Park District to the City furthered selection of Jackson Park as the site for the OPC. As recounted in the 2015 Ordinance, during the selection process for choosing the site of the OPC, the Foundation expressed concern about the City's lack of control over the Jackson Park site, and indicated that consolidating ownership of the site and local decision-making authority in the City was a prerequisite to a successful bid. See Compl., Ex. A thereto, at ordinance, p. 2. Moreover, the City's ownership of the site will facilitate the construction and operation of the OPC going forward. The City's home rule power under the Illinois Constitution (a power that the Park District does not have), along with its large planning, transportation, and other infrastructure departments, situate the City to facilitate the various large-scale infrastructure and investment initiatives in and around the OPC, and to oversee the development and operation of the OPC in accordance with the agreements that would be authorized by the Pending Ordinance. See Exhibit 1 hereto, at 3.

Defendants deny that taxpayers will be required to pay an "add-on" Park District real estate tax to pay for the OPC's upkeep. Further, Defendants state that the Foundation will be required to maintain the OPC site and the OPC buildings in good condition and repair at the

Foundation's sole cost and expense.  See Exhibit 1 hereto, Ex. D thereto, § 7.1.  Moreover, the

Foundation will not receive tax revenues collected by the Park District under Section 2 of the

Museum Act, which authorizes the Park District to levy and collect a tax to fund the maintenance

of museums on parkland that the Park District controls, because the Park District will neither

own nor control the OPC site.  Defendants admit that the Foundation is a tax-exempt non-profit

organization that will not be subject to real estate taxes.  But nor will the Foundation own the

real estate comprising the OPC site.  Rather, that land will remain owned by the City.  See

Exhibit 1 hereto, at 11 (§§ 4 & 5); id. Ex. D thereto, § 2.1.

Defendants admit that, under the Use Agreement contemplated by the Pending

Ordinance, the Foundation will pay ten dollars to the City.  In addition to this payment, the

Foundation will provide substantial additional benefits to the City and its residents under the Use

Agreement, including building the OPC – a singular and world-class historical, cultural,

educational, and community resource – at the Foundation's sole expense.   The Foundation will

also transfer ownership of the OPC's buildings to the City at no cost to the City.  The Foundation

will then maintain the OPC at its sole expense for the life of the Use Agreement, which has a

term of 99 years.  The Foundation will also provide other enhancements to the OPC site which

will improve the public's access to Jackson Park and the lakefront more generally.  Defendants

deny the remaining allegations of paragraph 7.

8.       Plans for the Presidential Center also include, and require, the vacation of roads
for the Midway Pleasance southeast of Stony Island Avenue, and vacation of a portion of Cornell
Drive.  Further, it is believed that the City will be permanently closing Marquette Drive, and the
State of Illinois will be widening Lake Shore Drive from 57th Street to Hayes Drive in order to
accommodate the Presidential Center.

13

**ANSWER:** Defendants admit that plans for the OPC require the vacation of portions of Cornell Drive near the eastern edge of the OPC site and portions of South Midway Plaisance east of Stony Island Avenue. The City also intends to vacate portions of Marquette Drive between Stony Island Avenue and Richards Drive. See Exhibit 1 hereto, Ex. G thereto (depicting street closures). Defendants further admit that Lake Shore Drive will be widened from 57th Street to Hayes Drive, and that other improvements will be made to Lake Shore Drive, Hayes Drive, and Stony Island Avenue, associated with the OPC or the Park District's 2018 update to its South Lakefront Framework Plan. See id., Ex. H-1 thereto. Defendants state that the closure of roads in Jackson Park will yield various public benefits, including converting roadways to open parkland, improving bicycle and pedestrian access to Jackson Park's lagoons and the lakefront by eliminating roadways that separate the OPC site from greater Jackson Park, improving the OPC site's connectivity with the Museum of Science and Industry, and enhancing the outdoor spaces that currently exist on the OPC site by connecting those spaces to new parkland and walkways that will be created in place of the roadways. See id. at 3.

9. On information and belief, the Park District and the City of Chicago will not receive any direct compensation in cash or in kind, other than potentially very nominal consideration, in exchange for transferring their rights, including the right to control the Jackson Park site, to the Foundation. In addition, on information and belief, neither the Park District, the City, nor the State will receive compensation from the Foundation for the costly changes in infrastructure required for the Foundation to occupy the Jackson Park site and to operate the Presidential Center.

**ANSWER:** Defendants admit that they will not receive direct monetary compensation greater than ten dollars, paid to the City, in exchange for the Foundation's right to build and operate the OPC. Defendants deny that they will receive no other benefits; the additional benefits to Defendants and the public are legion, as already explained. See Answers to Paragraphs 3, 4, 7 &

14

8, supra.  Defendants further deny that the Foundation will receive an unfettered right to control

the OPC site.  Rather, the Foundation's use of the site would be governed by, and subject to, the

Pending Ordinance and the Use Agreement.  Defendants admit that they do not anticipate that

they, or the State, will receive compensation from the Foundation for certain infrastructure

changes required for construction and operation of the OPC.  Defendants deny the remaining

allegations of paragraph 9.

      10.    It is telling that, belatedly, the City of Chicago discovered a need to have the
Illinois legislature enact an amendment to the existing Illinois Aquarium and Museum Act,
which became effective on January 1, 2016 ("2016 Amendment").  A true and correct copy of
the 2016 Amendment is attached hereto as Exhibit B.  This Amendment to the Museum Act, for
the first time and only after the City had approved the Presidential Center, added new language,
*inter alia*, allowing edifices to be used as aquariums or as museums of art, industry, science, or
natural or other history, including a new category of presidential libraries, centers, and museums,
such aquariums and museums "consisting of all facilities for their collections, exhibitions,
programming and associated initiatives…"

**ANSWER:**  Defendants admit that Exhibit B to the Complaint accurately reflects the 2016

Amendment to the Museum Act ("2016 Amendment"), and that the amendment added the

quoted language to the Act.  Defendants deny Plaintiffs' characterization of the text of the

amendment to the extent that it conflicts with the actual text of the amendment.  Defendants deny

that the City believed that there was a "need" for an amendment to the Museum Act, and they

deny the remaining allegations of paragraph 10.

      11.    It is an admission of Defendants' *mens rea* that the 2016 Amendment to the
Museum Act has a brazen need to declare: "The changes made to this Section by this amendatory
Act of the 99th General Assembly are declaratory of existing law and shall not be construed as a
new enactment."  In other words, a self-conscious illegal *ex post facto* act.

**ANSWER:**  Paragraph 11 asserts legal conclusions that do not require an answer.  To the extent

that an answer is required, Defendants deny that a statute passed by the Illinois General

Assembly constitutes an admission of Defendants' state of mind.  Defendants further deny that

the 2016 Amendment, which states that the changes made by it to the Museum Act are

"declaratory of existing law," constitutes an illegal *ex post facto* enactment.  Defendants deny the

remaining allegations of paragraph 11.

12.     Any "Amendment" by its very existence, cannot be declaratory of prior existing
law.   Further a determination of whether an amendment to a statute is declarative of existing law
constitutionally exists solely within the jurisdiction of the Judicial branch of government.
Further, for this 2016 Amendment to be deliberately applied retroactively to legalize a prior
illegal land transfer would be an admitted unconstitutional and illegal *ex post facto* act.

**ANSWER:**  Paragraph 12 asserts legal conclusions that do not require an answer.  To the extent

that an answer is required, Defendants deny the allegations.  In particular, Defendants deny that

application of the Museum Act in this case would be a retroactive application, because the 2016

Amendment predates the transfer of land from the Park District to the City (which has not yet

occurred), as well as the municipal approvals from the City necessary for the City to acquire the

currently-contemplated site from the Park District, and for the Foundation to build and operate

the OPC on that site.  Those approvals either occurred in 2018 or are expected to occur later in

2018.

13.     The 2016 Amendment to the Museum Act, moreover, is not declaratory of
existing law, and was enacted after both the City of Chicago approved the Presidential Center
and after the Park District approved the transfer of the Jackson Park site to the Foundation.
Further, the 2016 Amendment cannot be applied retroactively to allow the Presidential Center at
the Jackson Park site.

**ANSWER:**  Defendants deny that the Park District has approved the transfer of land in Jackson

Park to the Foundation; rather, the Park District has approved the transfer of land to the City.

Defendants admit that the 2016 Amendment was enacted and became effective after the Park

District approved the transfer of land in Jackson Park to the City, but Defendants deny that the

2016 Amendment was enacted or became effective after that land was actually transferred to the

City, or after the City issued the necessary approvals for it to acquire the currently-contemplated site from the Park District, and for the Foundation to build and operate the OPC. See Answer to Paragraph 12, supra. The remainder of paragraph 13 asserts legal conclusions that do not require an answer. To the extent that an answer is required, Defendants deny the allegations.

14. Although that original stated purpose of an official Presidential Library no longer exists, Defendants continue to forge ahead to advance a totally different private nongovernmental project on public parkland. The existing design plans for this new Presidential Center call for defacing the public park by building a monumental 12 story 235-foot tall obelisk tower that the Foundation describes as a personal "Museum," together with a "forum building" for meetings, a now misnamed "library building", an "athletic center" building, a 450 car "parking garage" and other satellite physical structures, and an outdoor plaza to host food trucks in the historic formerly pristine park.

**ANSWER:** Defendants admit that the plans for the OPC presented to the City in 2018 contemplate that the OPC will be a campus consisting of open greenspace; a Museum Building approximately 235 feet tall; a Forum Building; a Library Building; a Program, Athletic, and Activity Center; an underground parking garage; a Plaza; and other features. Defendants deny that these features will amount to an improper private project on public land. Among other reasons, the OPC will yield numerous benefits to the public, the City, and the Park District; the OPC will be consistent with the public purposes recognized and endorsed in the Museum Act and acknowledged by Chicago's long history of enhancing public parkland with museums; the City will own the land and buildings comprising the OPC; the Foundation's use of the site for the OPC will be governed by the terms of the Use Agreement; and the Foundation will construct and operate the OPC at its sole expense. See Answer to Paragraph 4, supra. Further, Defendants deny that the contemplated site for the OPC is currently pristine parkland and that the OPC's buildings will deface the site. Rather, the land currently contains, among other things, an athletic track and field. Further, aside from the Museum Building, the other component buildings of the

OPC will be low-lying or partially integrated into the surrounding landscape through green roofs

or other landscaping features. See Exhibit 2 hereto (May 23, 2018 City Council ordinance

approving an Institutional Planned Development zoning designation for the OPC site).

Defendants deny the remaining allegations in paragraph 14.

15.    For undisclosed reasons, the existing and readily available choice lake shore

location of the South Shore Cultural Center, which is already providing essentially all the same

social service programs being proposed for the Obama Center, was mysteriously and summarily

excluded in the Ordinance passed by the City on January 21, 2015, as a demonstration of the

City's "robust commitment to bringing the Presidential Center to Chicago." As stated in the

Ordinance: "The City and the Park District have eliminated the South Shore Cultural Center

from consideration as a potential location for the Presidential Center, but strongly support the

location of the Presidential Center in either of the other two proposed [public park] locations in

UChicago's proposal". See, Exhibit A at ¶ 13. Although UChicago itself already owns private

land in Woodlawn and Hyde Park being used and available for a development of a presidential

center, it instead volunteered confiscation of land which it doesn't own, and which will now

require a significant zoning change to permit private construction on recreational public park

land. On January 10, 2018 the Foundation filed an application to rezone the Jackson Park site

from its current zoning of "POS-1," Regional or Community Park, to "IPD," Institutional

Planned Development. A true and correct copy of the request for zoning change is attached

hereto as Group Exhibit C.

**ANSWER:** Defendants admit that the South Shore Cultural Center was not included as a

location for the OPC in the City Ordinance enacted in January 2015. Defendants admit that that

ordinance contains the language quoted in paragraph 15. Defendants deny that the South Shore

Cultural Center is providing the same services and benefits that will be provided by the OPC.

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegation that the University of Chicago owns private land in Woodlawn and Hyde Park that is

available for a development of a presidential center. The allegation that the University of

Chicago "volunteered confiscation" of land is vague and constitutes a legal conclusion that does

not require an answer. To the extent that an answer is required, Defendants lack knowledge or

information sufficient to form a belief as to the truth of the allegation, because Plaintiffs do not

identify the statement to which they refer.  Further, Defendants deny that the Foundation's

proposed use of the OPC site constitutes a "confiscation" of parkland.  Defendants admit that

development of the OPC on the proposed site required a zoning change, and that the Foundation

filed an application for rezoning on January 10, 2018.  Defendants deny that Exhibit C to the

Complaint is an application for a zoning change filed by the Foundation.  Rather, Exhibit C is an

application for approval under the City's Lake Michigan and Chicago Lakefront Protection

Ordinance.  Defendants admit that on May 23, 2018, the City Council approved an Institutional

Planned Development zoning classification for the proposed OPC site, see Exhibit 2 hereto, and

that the underlying zoning classification for that property is POS-1, Regional or Community

Park.  Defendants deny the remaining allegations of paragraph 15.

16.     Illinois had deeded the Jackson Park site to the Park District with the express
restriction that the land "be held, managed and controlled by them and their park, for the
recreation, health and benefit of the public, and free to all." Construction of the various proposed
buildings in the park destroys the public park's recreational purpose of open space, "free to all
persons forever."  That deprives each citizen of their fractional interest in the public trust land,
although there is an abundance of readily available neighborhood locations that are non-public
park, privately owned, in prime locations, but currently depressed, ignored, and left impatiently
waiting for productive and much needed investment and development.

**ANSWER:**  Defendants deny that the State deeded the Jackson Park site to the Park District or

its predecessor, the South Park Commissioners, but admit that the 1869 Statute authorized the

South Park Commissioners to acquire certain specified lands, including those currently

comprising Jackson Park.  Defendants deny that Plaintiffs accurately quote the statute.  Rather,

the statute states, in part, that the specified lands, upon their acquisition by the South Park

Commissioners, "shall be held, managed and controlled by them and their successors as a public

park, for the recreation, health and benefit of the public, and free to all persons forever . . . ."

Defendants deny that this statutory dedication renders the OPC unlawful, just as it is not unlawful to have other museums in Chicago's public parks, including Jackson Park, operated by private entities. Among other reasons, the Museum Act authorizes Defendants to enter into agreements with private entities, such as the Foundation, to build and operate museums, including presidential centers, on public parkland. See Answer to Paragraph 1, supra.

Further, whether a public trust applies to the proposed OPC site is a legal conclusion to which no answer is required. To the extent that an answer is required, Defendants state as follows: To the extent that Plaintiffs allege that the site is subject to a public trust that applies to lands previously submerged under Lake Michigan, Defendants deny that the site was previously submerged or that such a public trust applies. If, on the other hand, Plaintiffs allege that it is the language of the 1869 Statute that creates a public trust, Defendants admit that allegation to the extent that Illinois law recognizes such language as creating a kind of public trust, and Defendants further admit that the site was acquired by the Park District's predecessor pursuant to the terms of that statute. Moreover, even if a public trust applies to the OPC site (whether though the 1869 Statute or because the site was previously submerged), the OPC would be consistent with that trust, because, among other reasons, the people's elected representatives in the Illinois General Assembly, through the Museum Act, have expressly authorized presidential centers on public parkland, including land that was previously submerged, and because the operation of presidential centers and similar institutions on such land serves important and valuable public purposes. Defendants deny the remaining allegations of paragraph 16.

17.    This lawsuit seeks, among other remedies, to permanently enjoin the Park District from "selling" the Jackson Park site to the City of Chicago and the City then transferring control over this public park land to the Foundation, and the Foundation being given authority to erect its private Presidential Center on what is nationally recognized as invaluable, critically needed historic and dedicated public parkland.

**ANSWER:** Defendants admit that Plaintiffs seek to enjoin the transfer of the OPC site from the Park District to the City, and the City's authorization to the Foundation to build and operate the OPC on that site. Defendants deny the remaining allegations in paragraph 17.

## PARTIES

18. Protect Our Parks, Inc. ("Protect Our Parks") is a nonprofit park advocacy organization, dedicated to preserving, protecting, and improving Chicago's parks and forest preserves for all citizens.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18.

19. Protect Our Parks is an Illinois not for profit corporation. Protect Our Parks' principal place of business is located in Chicago, Illinois.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19.

20. Charlotte Adelman is a resident of the Village of Wilmette, State of Illinois.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20.

21. Maria Valencia is a resident of the City of Chicago, State of Illinois.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21.

22. Jeremiah Jurevis is a resident of the City of Chicago, State of Illinois. Protect Our Parks, Charlotte Adelman, Maria Valencia and Jeremiah Jurevis are collectively referred to as the "Plaintiffs."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the first sentence of paragraph 22. Defendants admit that the listed parties purport to be the plaintiffs in this action.

23. The Chicago Park District ("Park District") is a body politic and a corporate entity established by State law pursuant to what is now known as the Chicago Park District Act, 70 ILCS 1505/3 ("Park District Act").

**ANSWER:** Defendants admit the allegations in paragraph 23.

24. The City of Chicago ("City of Chicago" or "City") is a body politic and a municipal corporation. Chicago Mayor Rahm Emanuel, who had served as former President Obama's personal Chief of Staff in his time in office, in his present position as Mayor of Chicago has acted as the Chief Executive moving party and intermediary negotiating with the Foundation and arranging the details of the proposed public park land transfer arrangements taking place between the City, the Park District, and the private Obama Foundation.

**ANSWER:** Defendants admit that the City is a body politic and a municipal corporation and that its mayor, Rahm Emanuel, served as President Obama's White House Chief of Staff from 2009 to 2010 and currently acts as Chief Executive of the City. Defendants deny the remaining allegations of paragraph 24.

## JURISDICTION AND VENUE

25. This Court has jurisdiction over this matter pursuant to 28 U. S. C. § 1331 because it arises under the Constitution and laws of the United States and pursuant to 28 U. S. C. § 1343 because it seeks to redress the deprivation under color of State law of constitutional rights. The suit also seeks declaratory relief pursuant to 28 U. S. C. § 2201. The Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U. S. C. § 1367.

**ANSWER:** The allegations in paragraph 25 constitute legal conclusions that do not require an answer. Defendants nonetheless admit that this lawsuit seeks declaratory relief and seeks redress for the alleged violation of Plaintiffs' constitutional rights. Defendants deny that Plaintiffs have

suffered any violation of their rights or that Defendants are liable for any such violation.

Defendants further deny that the Court has jurisdiction over Plaintiffs' claims under Article III.

26.     Venue is proper in this District because all of the parties reside in this District, and the facts giving rise to this action occurred in this District.

**ANSWER:**  The allegation in paragraph 26 constitutes a legal conclusion that does not require

an answer.  Defendants nonetheless admit that venue is proper.

## ADDITIONAL FACTS

### A.     The History and Unique Features of Jackson Park's Open Space.

27.     In 1869 the General Assembly passed "An Act to Provide for the Location and Maintenance of a Park for the Towns of South Chicago, Hyde Park and Lake" which was approved and in force February 24, 1869.  (Private Laws, 1869, vol. 1, p. 358.)  The statute provided that five persons, to be appointed by the Governor, be constituted a board of public park commissioners for the towns in question to be known as the "South Park Commissioners." The act authorized the commissioners to select certain lands which are specifically described by metes and bounds and provided in section 4 thereof that the lands "when acquired by said Commissioners, as provided by this act, shall be held, managed and controlled by them and their successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever."   Pursuant to the granted authority the commissioners proceeded to acquire, among other lands, the land which is now known as Jackson Park.

**ANSWER:** Defendants admit the allegations in paragraph 27, except that Defendants deny that

Plaintiffs quote the entirety of the 1869 Statute.

28.     The Illinois Legislature enacted the Park District Consolidation Act in the year 1934 which consolidated the-existing park districts, including the South Park District, into the Chicago Park District.   The Park District Consolidation Act is now known as the Park District Act.

**ANSWER:**  Defendants admit that a 1934 statute, known as the Park Consolidation Act (and

now known as the Chicago Park District Act) created the Chicago Park District and consolidated

under its jurisdiction certain disparate park districts. Defendants deny the remaining allegations of paragraph 28.

29.     As set forth above, the Illinois Legislature has dedicated Jackson Park for use as "a public park" to "be free to all persons forever." The Park District therefore holds Jackson Park as a public park in trust for the uses and purposes of a park. Jackson Park is accordingly held in public trust for the benefit of the citizens of the City of Chicago and State of Illinois.

**ANSWER:** Defendants admit that the 1869 Statute authorized the South Park Commissioners, a predecessor of the Park District, to acquire certain specified lands, including those currently comprising Jackson Park. Defendants deny that Plaintiffs accurately quote the statute. Rather, the statute states, in part, that the specified lands, upon their acquisition by the South Park Commissioners, "shall be held, managed and controlled by them and their successors as a public park, for the recreation, health and benefit of the public, and free to all persons forever . . . ." The remaining allegations of paragraph 29 constitute legal conclusions that do not require an answer. To the extent that an answer is required, Defendants deny the allegations. In particular, to the extent that Plaintiffs allege that the proposed OPC site is subject to a public trust that applies to lands previously submerged under Lake Michigan, Defendants deny that the site was previously submerged or that such a public trust applies.

30.     Historic Jackson Park is one of the outstanding links in the City's inspired 26 mile long Chicago lakefront public park system, extending from the North side to the South side, that has served to bring distinction to the City and earn international acclaim for its enlightened dedicated preservation of limited and invaluable lake shore land as open, clear and free public park space.

**ANSWER:** Defendants admit that Chicago's lakefront public park system encompasses parks on the North and South sides of the City, and that these parks have brought the City and the Park District distinction and international acclaim, in no small part because these parks contain many world-class museums. See Answer to Paragraph 1, supra. Defendants further admit that Jackson

24

Park is a historic park and part of the chain of lakefront parks containing museums. Defendants

deny that the OPC site is located near the lakefront, as the site is on the westernmost side of

Jackson Park away from the lakefront. Defendants deny that Jackson Park is required to be kept

as "open, clear and free" public park space.

31.     Jackson Park itself is notable for being the largest public park on the South side of
Chicago, a facility which is heavily used and enjoyed by local residents and much needed in the
notably park starved and densely populated neighborhoods of Southside Chicago when
compared to the many lake shore park developments located on the North side. This
North/South disparity in public park services had previously resulted in a federal court decree
specifically requiring more equal Chicago Park System park investment in underprivileged and
ignored sections of the South side public park system. A true and correct copy is attached hereto
as Exhibit D.

**ANSWER:** Defendants admit that Jackson Park is one of the largest public parks on the South

Side of Chicago, but note that Burnham Park is larger. Defendants admit that Jackson Park is

generally used and enjoyed by local and regional residents, but deny that the intended site of the

OPC, which is currently separated from the remainder Jackson Park by six-lane Cornell Drive

and other streets, is "heavily used" by local residents. Defendants deny that Southside

neighborhoods are park-starved compared to Northside neighborhoods. There are approximately

1689 acres of lakefront parkland on the Southside, which is 121 more acres than the

approximately 1568 acres on the Northside. Defendants admit that a 1982 lawsuit against the

Park District alleging discrimination in the supply, distribution, and maintenance of services,

programs, and facilities resulted in a 1983 consent decree. Defendants answer further that that

consent decree was vacated and the case dismissed in 1989 because, among other things, the

objectives of the decree had been achieved. See Ex. D. to Compl. at 3. Defendants deny the

remaining allegations of paragraph 31.

32.     Chicago ranks 12th on a list of the most-densely populated cities in the country in terms of parkland per 1,000 residents.  As a young community organizer,  Mr. Obama, now former President, came to the parks' protection group Friends of the Parks and asked how "we"/ they might work together to increase park space in south side communities.  When the Obama Foundation plan was still to establish an official Presidential Library, Friends of the Parks asked Mr. Obama to be culturally sensitive and proceed as presidential libraries in other cities have, and serve the deprived community by building the proposed Library on available underutilized private land, such as the existing identified vacant land across the street from Washington Park, without demanding dedicated public park land for his project.  *See*, Exhibit "E".

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32.

33.     That Jackson Park exists and has survived and thrived to this day is a miracle story of the genius, dedication, and persistence of many public spirited people from Daniel Burnham, Frederick Law Olmstead, to Aaron Montgomery Ward and numbers of dedicated public servants who have had the wisdom to seize the opportunity to use the groundwork of the Columbian Exposition of 1893 to create and preserve the unique beauty of the Jackson Park that exists today.  *See*, Exhibit F attached hereto.

**ANSWER:**  The allegations in paragraph 33 contain opinion and characterization of fact that do not require an answer.  To the extent that an answer is required, Defendants admit that a number of dedicated public servants have contributed to the beauty and success of Jackson Park over the years – including those who designed the 1893 Columbian Exposition fairgrounds, which are known as the "White City" because their design entailed the construction of numerous buildings in Jackson Park that were devoted to educating and inspiring the public, and providing cultural and recreational opportunities.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 33.

34.     The Chicago Park District proudly displays on its website an historic newspaper article describing how "early leaders foresaw the importance of saving lakefront property as open space" and adopted the inscription "Public Ground - A Common to Remain Forever Open, Clear, and Free of any Building or Other Obstruction Whatever" that "established a legal precedent for lakefront protection. " *See*, Exhibit G.

**ANSWER:** Defendants admit that the Park District's website contains the language quoted in paragraph 34, although that language is contained in Exhibit H, rather than Exhibit G, to the Complaint. Defendants deny that the quoted language accurately describes the legal status of Jackson Park in general, or of the proposed OPC site in particular. Defendants note that the full text of Exhibit H to the Complaint expressly states that the "legal precedent" described in that exhibit "marked the beginnings of what later became known as Grant Park," not Jackson Park. The remaining allegations of paragraph 34 constitute opinion and characterization of fact that do not require an answer.

35. One need only read the elegiac words of the Park District itself to confirm the Park Commissioners know their public mission and their sworn duty. The Chicago Park District brags on its website that:

> One of America's best kept secrets is Chicago's historic park system. Even Chicagoans who routinely enjoy its diverse open spaces-from the magnificent lakeshore parks to intimate neighborhood settings-may be surprised about their parkland legacy. We invite you to learn more about the history of Chicago parks, which are second to none in America and abroad. . .

*See*, <u>Exhibit H</u>, attached hereto.

**ANSWER:** Defendants admit that the Park District's website contains the language quoted in paragraph 35, as shown in Exhibit H to the Complaint. The remaining allegations of paragraph 35 constitute opinion and characterization of fact that do not require an answer.

36. Among the many accolades given to Jackson Park is the one given at the annual meeting of the American Society of Landscape Architects at which Defendant Chicago Park District's own historian, Julia Sniderman Bachrack, now retired, appeared as a panel member:

> Jackson Park is a nationally significant landscape on the south side of Chicago, famed for its connections to Frederick Law Olmsted and Daniel Burnham, and as the site of the 1893 World's Columbian Exposition. This session will discuss techniques for preserving

27

> this valuable historic resource.  Jackson Park is one of the most significant and complex
> historic landscapes in Chicago and the nation.  Originally designed by Olmsted & Vaux
> in 1871, the site was redeveloped by Olmsted and Daniel H.  Burnham, and the Wooded
> Island in the park is considered one of '150 great places in Illinois. '

*See*, Exhibit I, attached hereto.

**ANSWER:**  Defendants admit that the language quoted in paragraph 36 is contained in Exhibit I

to the Complaint, which appears to be the description of a panel discussion to be held at the 2009

annual meeting of the American Society of Landscape Architects.  Defendants lack knowledge

or information sufficient to form a belief as to the truth of the remaining allegations in paragraph

36.

37.     Jackson Park was listed on the National Register of Historic Places on December
15, 1972.

**ANSWER:**  Defendants admit the allegations in paragraph 37.

38.     The Commissioners of the Chicago Park District take a sworn oath of office to
faithfully perform their public duty to protect and preserve the public parks that have been
entrusted to them.

**ANSWER:**  Paragraph 38 asserts a legal conclusion that does not require an answer.  To the

extent that an answer is required, the City lacks knowledge or information sufficient to form a

belief about the truth of the allegations. The Park District admits that the Park District

Commissioners take an oath, but denies that the content of the oath is as alleged in Paragraph 38.

39.     On February 11, 2015, at the very moment when the Defendant Park District was
voting to give away Jackson Park, the Army Corps of Engineers was already engaged in a $10
million rehabilitation and ecological restoration of Jackson Park that had been awarded by the
Park District in 2014, and such was the concern of residents and historians alike that the project
might violate the historic vision of Olmsted that private money in the area of $250,000 was used
to hire one of the country's premier Olmsted experts to work alongside the Army Corp of
Engineers to insure that the historic integrity of Jackson Park was maintained down to the
individual plants selected.

**ANSWER:** Defendants admit that the United States Army Corps of Engineers awarded a contract in 2014, and provided funding, for the ecological restoration of Jackson Park, and that the restoration project was underway in February 2015. Defendants lack knowledge or information sufficient to form a belief as to the truth of allegations regarding the total cost of the restoration project or the alleged concerns of residents and historians, since the particular statements expressing such alleged concerns are not identified. Defendants admit that the private contractor conducting the restoration project hired a landscape architecture firm with expertise regarding Frederick Law Olmsted and experience working on landscapes initially designed by Olmsted, for the purposes of historic preservation and ecological restoration. Defendants lack knowledge or information sufficient to form a belief as to the truth of allegations concerning the amount paid to the landscape architects and the source of any payments made. Defendants deny that the restoration project involved any portion of Jackson Park intended for use as the site of the OPC. Defendants deny the remaining allegations of paragraph 39.

40. The City has already spent millions on these areas which have promoted area wildlife such as Monarch butterflies, herons, and countless other species of migrating birds who use the area for rest and food as well as others who now call this area their permanent home, under protection of the rules and regulations adopted pursuant to the International Migratory Bird Treaty of March 2001.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40 because the phrase "these areas" is too vague to allow Defendants to frame a response. Defendants admit that the City has spent funds to promote wildlife within the City's natural spaces and that those spaces – including the Paul H. Douglas Nature Sanctuary on Jackson Park's Wooded Island – serve as home to numerous species of wildlife. Defendants deny, however, that construction and operation of the OPC on the proposed

29

site, which is on the western edge of Jackson Park, is currently separated from the remainder of

Jackson Park to the east by the six-lane Cornell Drive, and is not adjacent to the Wooded Island,

will have any detrimental effect on wildlife. The allegations concerning the protections afforded

by the rules and regulations adopted pursuant to the International Migratory Bird Treaty of

March 2001 constitute legal conclusions that do not require an answer. To the extent that an

answer is required, Defendants deny the allegations to the extent that they are inconsistent with

the treaty. Defendants deny the remaining allegations in paragraph 40.

41.    The Chicago Lakefront on the southwest shore of Lake Michigan plays a major role in providing habitat for millions of migratory birds. In the last century and a half, the conversion of much of the adjoining land to agriculture and urban uses has only increased the importance of the lakefront open space with its canopy of trees and shrubs. The City of Chicago recognized these facts with the signing of the "Urban Conservation Treaty for Migratory Birds" with the U. S. Fish and Wildlife Service ("USFWS") on March 25, 2000. *See* Exhibit J attached hereto. This treaty commits USFWS to a long-term partnership with the City of Chicago and its conservation partners, including the Chicago Park District and citizen conservation groups, for the benefit of migratory birds.

**ANSWER:** Defendants admit that the City and the United States Fish and Wildlife Service

signed the Urban Conservation Treaty for Migratory Birds, in March 2000. The assertions in

paragraph 41 concerning the "major role" of the Chicago lakefront and "increased importance"

of lakefront open space in providing habitat for migratory birds constitute opinion and

characterization of fact that do not require an answer. To the extent those assertions contain

allegations of fact requiring an answer, Defendants admit that the City's lakefront serves as a

habitat for migratory birds. The allegations in paragraph 41 concerning USFWS's commitments

under the Urban Conservation Treaty constitute legal conclusions that do not require an answer.

To the extent that an answer is required, Defendants admit that Exhibit J to the Complaint, which

purports to be statements of the United States Fish and Wildlife Service from that agency's

website, states that the treaty "commits the Service to a long-term partnership with the City of

Chicago aimed at creating and enhancing urban natural areas, including bird-friendly

landscaping and habitat living for migratory birds." Defendants deny Plaintiffs'

characterizations of USFWS's obligations under the treaty to the extent that they conflict with

the treaty. Defendants lack knowledge or information sufficient to form a belief as to the truth of

the remaining allegations of paragraph 41.

42.     The Chicago Park District worked with Friends of the Parks, other open space and
conservation organizations and park advisory councils, to develop guidelines for the lakefront as
a crucial stopover point for migratory birds, The Park District Board of Commissioners adopted
"Lakefront Bird Habitat Guidelines." These guidelines are being used by the District, its
contractors and subcontractors, to protect and promote bird habitat in Chicago's lakefront parks.
Since 1973 regular Wooded Island Bird Tours have been conducted. Accessible minimally
disturbing nature paths were provided at the lagoons. BoboLink Meadow and Woods, east of
the East Lagoon and south of the Music Court Bridge are part of the Natural Areas of Jackson
Park and declared a nature sanctuary. At the south end along the lagoon shore are cattails, as
well as other wildlife friendly plants. As part of an international Sister City relationship with
Osaka Japan, Osaka donated $200,000 for the Osaka Garden restoration/remake, and a new
Japanese Torii Gate designed for the garden entrance.

**ANSWER:**     Defendants admit that the Park District worked with a number of organizations to

develop the Lakefront Bird Habitat Guidelines, that the Park District Board of Commissioners

adopted those guidelines, and that the guidelines are still in effect today. Defendants further

admit that bird watchers regularly tour the Wooded Island, that there are accessible nature paths

near the lagoons in Jackson Park, and that Bobolink Meadow and Woods are designated as

Nature Areas of Jackson Park and are considered nature sanctuaries. Defendants also admit that

the City of Osaka, Japan donated funds for the Osaka Garden restoration, and that a Japanese

Torii gate was designed for the garden entrance. Plaintiffs' assertions that the lakefront is a

"crucial stopover point for migratory birds" and that the lagoon's nature paths are "minimally

disturbing" constitute opinion and characterizations of fact that do not require an answer. Defendants deny that cattails, which are considered to be an invasive species, populate the south end of the lagoon shore. Defendants deny the remaining allegations in paragraph 42 and deny that the OPC will have any detrimental effect on any of the features of Jackson Park referenced in paragraph 42.

43.     The specific location that was to become Jackson Park is described by the neighborhood organization Jackson Park Advisory Council as rising from the lake bottom, and many park commentators have observed "As with much of Chicago's shoreline, parts of Jackson Park were not even above Lake Michigan through much of the 19th Century." *See*, Exhibit K, attached hereto.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation that the Jackson Park Advisory Council has described the location that was to become Jackson Park as "rising from the lake bottom." Defendants deny that the proposed site of the OPC was below Lake Michigan during the 19th century. Defendants admit that the timeline attached as Exhibit K to the Complaint states that parts of Jackson Park were not above Lake Michigan through much of the 19th Century, but Defendants lack knowledge or information sufficient to form a belief as to the truth of that vague assertion.

44.     With the 1893 Columbia Exposition when Frederick Law Olmsted/Calvert Vaux and Olmsted sons reshaped the park, Olmsted, selected to landscape, quickly determined that even after scraping and filling, most of the fair would be below lake level. He brought in vast amounts of manure from the Stockyards and 200,000 cubic feet of dirt by railroad. Olmsted insured that the eastern part of the park near the lake was high enough to prevent flooding. These multiple layers made possible the later landscaping of the Jackson Park where land is mostly sand. Bringing in fill to contain the lake and straighten its edge was one of the few things Olmsted could do before work on the park was stalled after the 1871 Chicago Fire.

**ANSWER:** Defendants admit that Frederick Law Olmsted and Calvert Vaux were selected to design the landscaping for parkland in Jackson Park. Defendants further admit that the 1871

32

Chicago Fire resulted in the suspension of landscaping work for a period of time, and that

Olmsted was later selected to design parkland used as the site of the World's Columbian

Exposition of 1893. Defendants lack knowledge or information sufficient to form a belief as to

the truth of the remaining allegations in paragraph 44.

45. Jackson Park is located along the shores of Lake Michigan, and on information and belief is on formerly submerged land. The City of Chicago has enacted the Lake Michigan and Chicago Lakefront Ordinance, Section 16-4-030, which describes its purpose in subsection "e":

> To insure that the lakefront parks and the lake itself are devoted only to public purposes and to insure the integrity of and expand the quantity and quality of the lakefront parks.

**ANSWER:** Defendants admit that Jackson Park is located along the shore of Lake Michigan,

but deny that the proposed site of the OPC, which is on the western edge of Jackson Park, is

located along the shore of Lake Michigan. Defendants lack knowledge or information sufficient

to form a belief as to what portions of Jackson Park were formerly submerged, and at what

periods. However, Defendants deny that the proposed site of the OPC was below Lake Michigan

during the 19th century. Defendants deny that Section 16-4-030 of the Chicago Municipal Code

is part of the Lake Michigan and Chicago Lakefront Ordinance. Rather, that ordinance is called

the Lake Michigan and Chicago Lakefront Protection Ordinance ("Lakefront Protection

Ordinance"). Defendants admit that subsection 030(e) of that ordinance contains the language

cited in paragraph 45, but Defendants deny that subsection 030(e) states the sole purpose of the

ordinance. Rather, Section 030 of the ordinance recites 12 purposes of the ordinance.

46. Section 16-4-130 of the Lakefront Ordinance further provides that "The Commissioner of planning and development may upon receipt of any proposal or application as hereinabove provided, conduct an investigation of the ecological and environmental impact of such proposal."

33

**ANSWER:** Defendants admit that Section 130 of the Lakefront Protection Ordinance contains the language quoted in paragraph 46, although the paragraph omits a comma, and the quoted portion contains the word "said" instead of "such."

47. On information and belief, no such oversight, investigation, or report of findings has taken place with respect to the Presidential Center.

**ANSWER:** Defendants deny the allegations in paragraph 47. Defendants state that on May 17, 2018, the Chicago Plan Commission held a public hearing that addressed, among other proposals concerning the OPC, the Foundation's application for approval of the OPC under the Lakefront Protection Ordinance, and that the Plan Commission approved the application after finding that the proposal complied with the applicable policies of the 1972 Lakefront Plan of Chicago and the purposes of the Lakefront Protection Ordinance. Defendants further state that, at that hearing, the Plan Commission received public comment from over 75 members of the public about the proposals, including representatives of groups such as the National Audubon Society, Friends of the Parks, Save the Midway, and Preservation Chicago, who addressed the OPC's alleged ecological and environmental impact. A true and correct copy of the transcript of proceedings from the May 17 hearing is attached hereto as Exhibit 3.

48. A separate federal review is taking place because of Jackson Park's status on the National Register of Historic Places, because the plan involves closing and expanding major streets. The National Environmental Policy Act and National Historic Preservation Act have separate review processes, but are both conducted by City officials in conjunction with federal agencies. A number of public agencies, including the Chicago Department of Transportation and the Park District, are required to evaluate the Presidential Center plan, then determine how it will impact residents and the best ways to construct the Presidential Center without disrupting the community. On information and belief this has not been done.

**ANSWER:** Defendants deny that federal reviews pursuant to the National Environmental Policy Act and the National Historic Preservation Act are taking place because Jackson Park is on the National Register of Historic Places. The National Park Service ("NPS") is reviewing the City's request to amend two previously-executed grant agreements under which funds were received for Jackson Park pursuant to the Urban Park and Recreation Recovery ("UPARR") program. The City's requested amendment would allow the partial conversion of UPARR-assisted parkland to a non-recreational use. The Federal Highway Administration ("FHWA") is reviewing the City's request for approval under the Federal Aid Highway Program for funding for certain transportation improvements associated with Jackson Park or the Park District's 2018 update to its South Lakefront Framework Plan. As part of these reviews, NPS and FHWA will conduct reviews under the National Environmental Policy Act and the National Historic Preservation Act. A number of public agencies, including the City and the Park District are participating in the federal review process. Defendants deny that the City and Park District, as local governmental entities, are ultimately responsible for these federal reviews. Defendants deny that paragraph 48 accurately states the purpose or procedure of the federal review process, and further deny that the review process is not underway. Defendants deny the remaining allegations of paragraph 48.

49. On February 11, 2015, the Park District Board voted to approve the shell game transfer of public park land to the City to transfer to the Foundation. *See*, Exhibit L, attached hereto. A video of this action exists, as noted in the Exhibit.

**ANSWER:** Defendants admit that on February 11, 2015, the Park District Board voted to approve the transfer of public parkland to the City for use by the Foundation to erect and operate the OPC, and that a video of the meeting exists. The characterization of the transfer as a "shell game" is an opinion or characterization of fact that does not require an answer. To the extent

Plaintiffs' assertion requires an answer, Defendants deny it. In particular, Defendants deny that the approval of a transfer of land by a duly-constituted public body at a meeting open to the public constitutes any type of game or scheme to evade the law.

### B. The Foundation's Plans for the Jackson Park Site.

50. The Jackson Park Site consists of approximately 19.3 acres, and is shown in the illustration below: [picture insert]

**ANSWER:** Defendants admit that the proposed site of the OPC consists of approximately 19.3 acres and that the illustration inserted in paragraph 50 depicts a preliminary illustration of the OPC site. Defendants state that further illustrations of the OPC site are contained in a presentation by the City's Department of Planning and Development to the Chicago Plan Commission during its May 17, 2018 hearing regarding the OPC. That presentation is available on the City's website at:

https://www.cityofchicago.org/content/dam/city/depts/dcd/supp_info/jackson/opc-presentation.pdf. A copy of the presentation is attached hereto as Exhibit 4.

51. The Foundation is reported to break ground on the project in 2018.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 51, as Plaintiffs do not identify the report(s) to which they refer. Further answering, Defendants state that the Foundation anticipates breaking ground in 2019.

### C. Locating the Presidential Center on the Jackson Park Site, As Opposed to Other Non-Public Trust Property, Benefits the Foundation, Not the Public.

52. The construction of multiple obstructive and overwhelming buildings on the Jackson Park Site—unrelated to any trust purpose—would destroy the pristine open environment of the Jackson Park site. Moreover, the City of Chicago will be saddled with the massive 235-foot structure for centuries. This Jackson Park site will consequently open the door to

progressively more intrusive destruction of the public park and destroy the ability of the citizens of Chicago and the State of Illinois to enjoy and benefit from the dedicated public park.

**ANSWER:** Paragraph 52 asserts opinion and characterizations of fact that do not require an answer. To the extent that the paragraph is deemed to contain allegations of fact that require an answer, Defendants deny them. In particular, Defendants deny that the OPC site is currently a pristine open environment. Rather, the site currently houses a Park District track and field facility. Defendants further deny that construction of the OPC would destroy or detract from the site's current environment or from the environment of Jackson Park. On the contrary, the OPC will enhance the parkland environment of the site, and Jackson Park as a whole, by adding features such as a sloped lawn for picnicking and recreation, a nature walk along the lagoon, other walking paths, a sledding hill, play areas for children, and natural contemplative spaces. See Exhibit 1 hereto, at 6. In addition, the OPC site will include new natural park space on the land that is currently the six-lane Cornell Drive. This will enhance the parkland environment of the site itself, and also remove the wide road that separates the site from the rest of Jackson Park to the east, thus connecting the site to Jackson Park's lagoons, the lakefront, and the Museum of Science and Industry. See Answer to Paragraph 9, supra. Defendants also deny that the buildings will be obstructive or overwhelming. The Forum and Library Buildings will be integrated into the landscape by being placed partially below-grade, and by using green roofs or other landscaping features, and the parking garage will be underground. The OPC will also provide myriad other public benefits and is consistent with the Chicago tradition of locating world-class museums within public parks. See Answers to Paragraphs 1, 3, 4, 7 & 14, supra. Defendants further deny that the OPC will "open the door to progressively more intrusive destruction of the public park" because the OPC is being built under the authority conferred by

37

the Museum Act, which is not a free-wheeling authorization of development in parkland, but rather permits only those museums and aquariums described in the statute.

53. The decision to erect the Presidential Center on public trust property is patently to serve the interests of the Foundation first and not the needs of the public, most obviously, as nonpublic park land is readily available for a Presidential Center.

**ANSWER:** Paragraph 53 contains opinion and characterizations of fact that do not require an answer. To the extent that the paragraph is deemed to contain allegations of fact that require an answer, Defendants deny them. In particular, Defendants deny that the OPC is primarily intended to serve private interests. Contrary to Plaintiffs' allegations, the construction and operation of the OPC on the Jackson Park site would be highly beneficial to the public in numerous ways, including because it will enhance the benefit to the public of that particular part of Jackson Park, as well as the public's enjoyment of Jackson Park as a whole. See Answers to Paragraphs 1, 3, 4, 7, 9, 14 & 52, supra. And the location of the OPC within Jackson Park is consistent with Chicago's other museums in parks. Defendants deny that locating a museum operated by the Foundation, a 501(c)(3) not-for-profit entity, on public parkland rather than nonpublic land that might conceivably be available equates to serving that entity's interests rather than the public's interests; that proposition would lead to the erroneous conclusion that the current museums in Chicago on public parkland do not serve public interests simply because they are operated by not-for-profit entities and could conceivably be located elsewhere. Further, to the extent that Plaintiffs allege that the proposed OPC site is subject to a public trust that applies to lands previously submerged under Lake Michigan, Defendants deny that the site was previously submerged or that such a public trust applies.

54. The Plaintiffs, and the People of the State of Illinois and the City of Chicago, will suffer irreparable injury if the Presidential Center is located at the Jackson Park site and the

Plaintiffs have no adequate remedy at law to redress the consequences of Defendants' actions as alleged herein.

**ANSWER:** Paragraph 54 asserts legal conclusions that do not require an answer. To the extent that an answer is required, Defendants deny the allegations.

55. As beneficiaries of a trust and taxpayers supporting the Park District, Plaintiffs have standing to enjoin a breach of trust before it occurs.

**ANSWER:** Paragraph 55 contains legal conclusions that do not require an answer. To the extent that an answer is required, Defendants deny the allegations.

56. Article VIII, Section 1(a) of the Illinois Constitution provides: "Public funds, property or credit shall be used only for public purposes." Article XI, Section 1 of the Illinois Constitution provides: "The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. Article XI, Section 2 of the Illinois Constitution also provides: "Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law."

**ANSWER:** Defendants admit that paragraph 56 contains accurate quotations from Article VIII, Section 1(a); Article XI, Section 1; and Article XI, Section 2, respectively, of the Illinois Constitution.

57. Article I, Section 12 of the Illinois Constitution provides: "Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly."

**ANSWER:** Defendants admit that paragraph 57 contains an accurate quotation from Article I, Section 12 of the Illinois Constitution.

## COUNT I

### Violation of Due Process

58.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 to 57, as and for the allegations contained in paragraph 58, as if fully set forth herein.

**ANSWER:** Paragraph 58 repeats the allegations contained in paragraphs 1 to 57 and does not require an answer.  To the extent that an answer is required, Defendants incorporate their answers to paragraphs 1 to 57.

59.     Several Illinois statutes govern the Park District.  Primarily, the Park District Act, 70 ILCS 1205/0.01 *et seq.*, details certain powers and duties of the Park District with respect to land use.

**ANSWER:** Paragraph 59 asserts legal conclusions that do not require an answer.  To the extent that an answer is required, Defendants deny that the Park District Code restricts the powers of the Park District, including the Park District's power to transfer land to the City.  <u>See</u> Answer to Paragraph 6, <u>supra</u>.

60.     The Park District Act does not authorize the Park District to sell park land that is held in public trust to a third party, and does not authorize the Park District to sell park land held in the public trust to the City of Chicago for transfer to a nongovernmental private entity, as the Park District Act does not authorize the Park District itself to transfer valuable public trust land for virtually no compensatory return.

**ANSWER:** Paragraph 60 asserts legal conclusions that do not require an answer.  To the extent that an answer is required, Defendants deny that the Park District Code restricts the powers of the Park District, including the Park District's power to transfer land to the City.  <u>See</u> Answer to Paragraph 6, <u>supra</u>.  Further, to the extent that Plaintiffs allege that the proposed OPC site is subject to a public trust that applies to lands previously submerged under Lake Michigan, Defendants deny that the site was previously submerged or that such a public trust applies.

40

61.     As purported legal authority for their acts, in the January 21, 2015 City Ordinance the Defendants have cited the following as purported legal authorities for their conduct: (1) Article VII, Section 10 of the 1970 Constitution of the State of Illinois; (2) the Intergovernmental Cooperation Act, 5 ILCS 220/1 et seq.; and (3) the Local Government Property Transfer Act. 50 ILCS 605/0.01 et seq.

**ANSWER:** Defendants admit that the 2015 Ordinance cites the authorities listed in paragraph

61 as authorizing intergovernmental cooperation, contracting, and/or land transfers between

municipal entities.

62.     However, to read the actual statutes and parse the language is to immediately understand why legal misdirection has been employed to give the superficial appearance of legality to what the law itself clearly prohibits.

**ANSWER:** Paragraph 62 asserts legal conclusions that do not require an answer.  To the extent

that an answer is required, Defendants deny the allegations.  In particular, Defendants deny that

the overt citation of constitutional and statutory provisions that authorize the transfer of land

from Park District to the City is an attempt at "legal misdirection."

63.     The City and Park District cite Article VII, Section 10 (a) of the Illinois Constitution as legal authority.  This Article provides that:

> Units of local government and school districts may contract or otherwise
> associate among themselves, with the State, with other states and their units of
> local government and school districts, and with the United States to obtain or
> share services and to exercise, combine, or transfer any power or function, **in
> any manner not prohibited by law or by ordinance**.
> (Emphasis added)

**ANSWER:** Paragraph 63 asserts legal conclusions that do not require an answer.  To the extent

that an answer is required, Defendants admit that the 2015 Ordinance cites Article VII, Section

10 of the Illinois Constitution as authorizing state and local governing bodies to cooperate in the

performance of their responsibilities by contracts and other associations.  Defendants further

admit that Article VII, Section 10(a) of the Illinois Constitution contains the language quoted in paragraph 63 (without the emphasis added by Plaintiffs).

64.     But the next following Article VIII, Section 1 (a) expressly provides that: **"Public funds, property or credit shall be used only for public purposes,"** and the Park District Code, 70-1205/10-7, limits the transfer of public park real estate.  The actions taken by the Defendants are clearly **"prohibited by law."**

**ANSWER:**  Defendants admit that Article VIII, Section 1(a) of the Illinois Constitution contains the language quoted in paragraph 64 (without the emphasis added by Plaintiffs).  The remaining statements in the paragraph are legal conclusions that do not require an answer.  To the extent that an answer is required, Defendants deny the allegations.  In particular, Defendants deny that the Park District Code restricts the powers of the Park District, including the Park District's power to transfer land to the City.  See Answer to Paragraph 6, supra.  Defendants further deny that their actions are otherwise prohibited by law.  On the contrary, Defendants' actions are authorized by the Illinois Constitution and state statutes.

65.     The Intergovernmental Cooperation Act, which is also cited, provides:

> (d) The term "restriction" shall mean any condition, limitation, qualification, reversion, possibility of reversion, covenant, agreement or restraint of whatever kind or nature, the effect of which is to restrict the use or ownership of real estate by a municipality as defined in (c) above." and Section 2(b) provides "If any such real estate shall be held by the transferor municipality subject to or limited by any restriction, and the transferee municipality shall desire the use, occupation or improvement thereof free from said restriction, the transferor municipality (or the transferee municipality, in the name of and for and on behalf of the transferor municipality . . . .  shall have the "power to secure from its grantor, or grantors, their heirs, successors, assigns, or others, a release of any or all of such restrictions upon such terms as may be agreed upon between either of said municipalities and the person or persons entitled to the benefit of said restrictions. Upon the recording of any such release the transferor municipality shall then have the powers granted in paragraph (a) of this Section.

(Emphasis added)

Notably, unlike other statutes cited, this statute does not address "restrictions" that exist under co-equal law, and fails to set or detail the standards and limitations applicable to creation of "Special Districts" like the Park District and is unconstitutionally vague and incapable of reaching non-conflicting interpretations and conclusions with respect to the existing Park District restrictions. Any attempt to invoke this statute to the shell game being played without recognizing and applying the statutory and equally authoritative prohibitions of the Park District Act and the other applicable laws would render it unconstitutional as applied.

**ANSWER:** Defendants deny that the quoted language is from the Intergovernmental

Cooperation Act; rather, the quoted language is from the Local Government Property Transfer

Act (without the emphasis added by Plaintiffs). See 50 ILCS 605/1(d). The remaining

statements in paragraph 65 are legal conclusions that do not require an answer. To the extent

that an answer is required, Defendants deny the allegations.

66. In the present case, Jackson Park was dedicated to the people of the State of Illinois "as a public park . . . free to all persons forever." The Presidential Center is not a public park. The Presidential Center's museum will require admission tickets, and its parking garage will require fees. The private Presidential Center will not at all times be free to all persons forever.

**ANSWER:** Defendants admit that the 1869 Statute authorized certain specified lands, including

those currently comprising Jackson Park, to be acquired by the South Park Commissioners, a

predecessor of the Park District. Defendants further admit that the 1869 Statute states, in part,

that the specified lands, upon their acquisition by the South Park Commissioners, "shall be held,

managed and controlled by them and their successors as a public park, for the recreation, health

and benefit of the public, and free to all persons forever," subject to additional terms in the

statute. Defendants deny that this statutory dedication renders the OPC unlawful. Defendants

lack knowledge or information sufficient to form a belief as to the truth of the allegation that

"The Presidential Center is not a public park" because the assertion is vague; in addition, the

assertion constitutes a legal conclusion that does not require an answer.  To the extent that an answer is required, Defendants deny that the OPC is inconsistent with or detracts from the proposed site's current status as public parkland.  Rather, among other reasons, the Museum Act expressly authorizes museums, including presidential centers, to be built and operated on parkland, and the operation of presidential centers and similar institutions on such land serves important and valuable public purposes.

The assertion that the OPC will not at all times be "free to all persons forever" is a legal conclusion that does not require an answer, and to the extent that an answer is required, Defendants deny it.  Defendants admit that the OPC is expected to charge fees for admission to the museum in the Museum Building, and for parking in the garage.  But Defendants deny that this renders the OPC an improper use of parkland.  The Museum Act expressly authorizes museums on parkland to charge an admission fee.  See 70 ILCS 1290/1.  And other museums on Chicago parkland – including the Field Museum, Museum of Science and Industry, and Shedd Aquarium – charge such fees.  Further, Defendants state that, under the Pending Ordinance and the Use Agreement, the Foundation's general admission fee policies for admission to the museum (exclusive of special exhibitions or special events for which there may be a supplemental charge) for members of the public who are (a) City residents, or (b) low-income individuals and their families participating in the Supplemental Nutrition Assistance Program (or such equivalent program as may be implemented), must be substantially consistent with comparable general admission fee policies for such categories of patrons maintained from time to time by other museums in Chicago parks.  See Exhibit 1 hereto, Ex. D thereto, § 6.10. Moreover, the fees for visitor use of the underground parking garage must be substantially consistent with the parking rates charged from time to time to the general public in the parking

44

garage of the Museum of Science and Industry or in the North Garage adjacent to the Field

Museum and John G. Shedd Aquarium.  See id.  Further, the monies collected by the Foundation

from admission and parking fees must be used to pay for the use, maintenance, and management

of the OPC's buildings and site, or deposited into an endowment used to pay the costs of

operating, enhancing, and maintaining the OPC.  See id. § 6.9.

In addition, the Foundation must operate the Presidential Center in accord with the

Museum Act's free admission requirements, which require free admission to all Illinois residents

for a period equivalent to 52 days, at least 6 of which must be during the period from June

through August, each year, and free admission to Illinois school children at all times when

accompanied by a teacher.  See Exhibit 1 hereto, Ex. D thereto, § 6.1; 70 ILCS 1290/1.

67.     Section 3 of the Intergovernmental Cooperation Act (5 ILCS 220/1), which the
City cites, provides: "Any power or powers, privileges, functions, or authority exercised or
which may be exercised by a public agency of this State may be exercised, combined,
transferred, and enjoyed jointly with any other public agency of this State and **jointly with any
public agency of any other state** or of the United States to the extent that laws of such other
state or of the United States do not prohibit joint exercise or enjoyment and **except where
specifically and expressly prohibited by law.**"

**ANSWER:**  Defendants admit that the language quoted in paragraph 67 (without the emphasis

added by Plaintiffs) is contained in section 3 of the Intergovernmental Cooperation Act, 5 ILCS

220/3.

68.     The issue with the Park District and the City's scheme with respect to the
Presidential Center is that the City does not in any way propose to "exercise, combine, or enjoy
jointly" the powers and duties of the Park District in preserving and protecting the open, clear
and free public park use of Jackson Park.  The issue is Defendants' defiance of the law and their
prohibited act of taking dedicated public park land to serve the interests of a non-governmental
private entity for a private use.  Defendants Park District and City of Chicago make no serious
pretense of acting under the authority of this Act.  Their conduct is patently a violation of the
clear intent and purpose of the Act and a denial of due process.

**ANSWER:** Paragraph 68 asserts legal conclusions that do not require an answer. To the extent that an answer is required, Defendants deny the allegations. In particular, Defendants deny that the Intergovernmental Cooperation Act requires Defendants to combine or exercise jointly particular powers of the Park District, that there is a requirement that the proposed OPC site be kept "open, clear and free," or that the City's proposed use of the OPC site is prohibited or otherwise in defiance of the law. Rather, presidential centers on public parkland are expressly authorized by the Museum Act. Defendants further deny that the City's purpose for authorizing the OPC is to serve the interests of a private entity or to promote a private use of the site. Rather, it is to provide numerous public benefits to the public, the City, and the Park District. See Answers to Paragraphs 1, 3, 4, 7, 9, 14 & 52, supra.

69. The Local Government Property Transfer Act, 50 ILCS 605/0.01 et seq. ("Property Transfer Act"), which is presumably the key statute the City relies upon for obtaining title to the Jackson Park site, allows municipalities, including park districts, to transfer land to other municipalities. The Property Transfer Act, however, does not allow the Park District to transfer the Jackson Park Site to the City in order to permit the City to transfer possession and use to a private non-governmental Foundation to construct, operate and control a constantly changing so called "Presidential Center."

**ANSWER:** Paragraph 69 asserts legal conclusions that do not require an answer. To the extent that an answer is required, Defendants admit that the Local Government Property Transfer Act ("Property Transfer Act") allows municipalities, including park districts, to transfer land to other municipalities, and that it states that the receiving municipality may "use, occupy or improve the real estate so transferred for any municipal or public purpose and shall hold said real estate by the same right, title and interest by which the transferor municipality held said real estate immediately prior to said transfer." 50 ILCS 605/2(a) (emphasis added). Defendants deny the remaining allegations in paragraph 69.

70.     Section 2 of this Property Transfer Act provides as follows:

> If the territory of any municipality shall be wholly within, coextensive with, or partly within and partly without the corporate limits of any other municipality, or if the municipality is a school district and the territory of the school district is adjacent to the boundaries of any other school district, and <u>the first mentioned municipality (herein called "transferee municipality"), shall by ordinance declare that it is necessary or convenient for it to use, occupy or improve any real estate held by the last mentioned municipality (herein called the "transferor municipality") in the making of any public improvement or for any public purpose, the corporate authorities of the transferor municipality shall have the power to transfer</u> all of the right, title and interest held by it immediately prior to such transfer, in and to such real estate, whether located within or without either or both of said municipalities, to the transferee municipality upon such terms as may be agreed upon by the corporate authorities of both municipalities, in the manner and upon the conditions following:

(Emphasis added).

**ANSWER:**  Defendants admit that the language quoted in paragraph 70 (without the emphasis added by Plaintiffs) is contained in 50 ILCS 605/2.

71.     Pursuant to Section 2 of the Property Transfer Act, if a transferee municipality, such as the City of Chicago, desires to obtain land from another "municipality," a park district, the City may obtain the property for "<u>it</u> [the City] to use, occupy or improve. . . "

**ANSWER:**  Paragraph 71 asserts legal conclusions that do not require an answer.  To the extent that an answer is required, Defendants admit that the Property Transfer Act contains (without the emphasis added by Plaintiffs) the language quoted, but Defendants deny that Plaintiffs' quotation is complete.  <u>See</u> Answer to Paragraph 69, <u>supra</u>.

72.     Here, it is not the City "using, occupying or improving" the Jackson Park site. Control over the Jackson Park Site is being transferred to a nongovernmental private Foundation, and it is the Foundation alone that will "use, occupy and improve" the Jackson Park site for a privately determined purpose.  Therefore, the Property Transfer Act does not allow the Park District to do what it is prohibited from doing by law by the charade of transferring the Jackson Park site to the City to perform the illegal act.

47

**ANSWER:** Paragraph 72 asserts legal conclusions that do not require an answer. To the extent that an answer is required, Defendants deny the allegations. In particular, Defendants deny that control over the Jackson Park site will be transferred to the Foundation, or that the Foundation alone will use, occupy and improve the OPC site for a privately-determined purpose. On the contrary, the City will maintain ownership of the site and will obtain ownership of the OPC buildings upon their completion, as well as exercise control over the use of the site through, among other laws and legal documents, the Pending Ordinance and the Use Agreement. See Answer to Paragraph 4, supra. Defendants further deny that the Park District would have been prohibited from entering into an agreement with the Foundation allowing the Foundation to use the site for the OPC.

73.     The Park District is subject to another specific restriction on the use of the dedicated public park property at issue.

**ANSWER:** Paragraph 73 asserts a legal conclusion that does not require an answer. To the extent that an answer is required, Defendants deny the allegations.

74.     Section 2(b) of the Property Transfer Act, 50 ILCS 605/2(b), provides:

> (b) If any such real estate shall be held by the transferor municipality subject to or limited by any restriction, and the transferee municipality shall desire the use, occupation or improvement thereof free from said restriction, the transferor municipality (or the transferee municipality, in the name of and for and on behalf of the transferor municipality, but without subjecting the transferor municipality to any expense without the consent of its corporate authorities), shall have the power to secure from its grantor, or grantors, their heirs, successors, assigns, or others, a release of any or all of such restrictions upon such terms as may be agreed upon between either of said municipalities and the person or persons entitled to the benefit of said restrictions. Upon the recording of any such release the transferor municipality shall then have the powers granted in paragraph (a) of this Section.

**ANSWER:** Defendants admit that the language quoted in paragraph 74 is contained in section 2(b) of the Property Transfer Act, 50 ILCS 605/2(b).

75.     Therefore, if a transferor park district desires to transfer property limited by a restriction to a transferee municipality, the park district may only do so with the agreement of both the transferee municipality <u>and</u> "the person or persons entitled to the benefit of said restrictions."

**ANSWER:** Paragraph 75 asserts legal conclusions that do not require an answer. To the extent that an answer is required, Defendants deny the allegations. In particular, Defendants deny that Section 2(b) of the Property Transfer Act limits the Park District's power to transfer the proposed OPC site to the City. Rather, the section provides a method for the receiving municipality to seek to free the property from restrictions that apply to the property prior to the transfer.

76.     The term "restriction" is defined in the Property Transfer Act as follows:

> The term "restriction" shall mean any condition, limitation, qualification, reversion, possibility of reversion, covenant, agreement or restraint of whatever kind or nature, the effect of which is to restrict the use or ownership of real estate by a municipality as defined in (c) above.

50 ILCS 605/1(d).

**ANSWER:** Defendants admit that the definition of "restriction" quoted in paragraph 76 is the definition contained in 50 ILCS 605/1(d).

77.     In the present case, Jackson Park was dedicated to the people of the State of Illinois "as a public park . . . free to all persons forever." The Presidential Center is not a public park. The buildings that comprise the Presidential Center will not, on information and belief, at all times is free to all persons forever.

**ANSWER:** Defendants deny the allegations of paragraph 77. <u>See</u> Answer to Paragraph 66, <u>supra</u>.

78.     The beneficiaries of the restriction on the use of Jackson Park as "a public park . . . free to all persons forever" are the citizens of the State of Illinois.  The Park District has never obtained the agreement from the citizens of the State of Illinois to allow the transfer of the Jackson Park site to the City of Chicago; and the unelected Commissioners of the Chicago Park District are bound by their oath of office to preserve and protect the public park lands entrusted to their care which they have sworn to do.

**ANSWER:**  The assertion in paragraph 78 concerning the alleged beneficiaries of the statutory dedication of Jackson Park constitutes a legal conclusion that does not require an answer.  To the extent that an answer is required, Defendants deny the allegation.  Defendants admit that the Park District has not obtained a contractual agreement from the citizens of the State of Illinois to allow the transfer of the OPC site to the City, but Defendants deny that any such agreement is required under the law prior to the Park District's transferring the proposed OPC site to the City. The assertion in paragraph 78 concerning the obligations of the Commissioners of the Park District contains legal conclusions that do not require an answer.  To the extent that an answer is required, the City lacks knowledge or information sufficient to form a belief about the truth of the allegations. The Park District admits that the Park District Commissioners take an oath, but denies that the content of the oath is as alleged in Paragraph 78.

79.     The Illinois Park District Aquarium and Museum Act, 70 ILCS 1290/0.01 et seq. ("Park District Museum Act"), which contains limited authorization for other uses of park district public land in general only does not authorize the Park District to transfer public trust land to the City of Chicago for the City to in turn transfer the property to a private entity on a long term ground lease.

**ANSWER:**  Paragraph 79 asserts legal conclusions that do not require an answer.  To the extent that an answer is required, Defendants deny the allegations.  In particular, Defendants deny that the Museum Act pertains only to "park district public land in general only."  Rather, the Act authorizes park districts *and* cities to enter into long-term agreements, including but not limited

to ground leases, with private entities for the construction, maintenance, and operation of museums – including presidential centers – on public parkland. See 70 ILCS 1290/1. Further, to the extent that Plaintiffs allege that the proposed OPC site is subject to a public trust that applies to lands previously submerged under Lake Michigan, Defendants deny that the site was previously submerged and that such a public trust applies.

80. The Museum Act does not release the existing statutory duty of the Park District or the restrictions placed on Jackson Park or the Jackson Park Site that the property be maintained "as a public park . . . free to all persons forever. "

**ANSWER:** Paragraph 80 asserts legal conclusions that do not require an answer. To the extent that an answer is required, Defendants deny the allegations. Defendants further state that the Museum Act, which expressly permits presidential centers to be built on public parkland, does not conflict with the 1869 Statute. Moreover, even if the two did conflict, the Museum Act would control, as it was enacted after the 1869 Statute.

81. Further, the Park District Museum Act does not supersede the public trust doctrine's prior application to the Jackson Park site as alleged in this Complaint.

**ANSWER:** Paragraph 81 asserts a legal conclusion that does not require an answer. To the extent that an answer is required, Defendants deny the allegations. In particular, to the extent that Plaintiffs allege that the proposed OPC site is subject to a public trust that applies to lands previously submerged under Lake Michigan, Defendants deny that the site was previously submerged or that such a public trust applies. Moreover, even if such a public trust does apply to the OPC site, the OPC would be consistent with that trust, because the people's elected representatives in the Illinois General Assembly, through the Museum Act, have expressly authorized presidential centers on public parkland, including land that was previously

submerged, and because the operation of presidential centers and similar institutions on such land serves important and valuable public purposes.

82. The Plaintiffs, as taxpayers of the State of Illinois and the City of Chicago, have a fractional beneficial interest in the Jackson Park site that the Park District holds in trust for them, so as to create a protectable property interest.

**ANSWER:** Paragraph 82 asserts legal conclusions that do not require an answer. To the extent that an answer is required, Defendants deny the allegations. In particular, Defendants deny that Plaintiffs' alleged fractional beneficial interest in the OPC site constitutes a protectable property interest in that land. Further, to the extent that Plaintiffs allege that the proposed OPC site is subject to a public trust that applies to lands previously submerged under Lake Michigan, Defendants deny that the site was previously submerged or that such a public trust applies.

83. The Plaintiffs, accordingly, have standing and the right to enforce their beneficial interest in the property held in public trust, which will otherwise deprive or otherwise diminish the beneficial ownership interest of Plaintiffs and other citizens of the City and State in the property without the required protective procedure, and in violation of their rights in such property under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

**ANSWER:** Paragraph 83 contains legal conclusions that do not require an answer. To the extent that an answer is required, Defendants deny the allegations.

84. In the alternative, proceeding with the transfer of the public trust Jackson Park site will take, deprive or otherwise diminish the beneficial ownership interest of Plaintiffs and other citizens of the City and State in the property without the required protective procedure and in violation of their rights in such property under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

**ANSWER:** Paragraph 84 contains legal conclusions that do not require an answer. To the extent that an answer is required, Defendants deny the allegations.

85.     The Defendants' actions constitute an unlawful taking of the Jackson Park site by the Defendants from the Plaintiffs and the people of the City of Chicago and the State of Illinois in violation of the Takings Clause of the Fifth Amendment as incorporated into the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

**ANSWER:** Paragraph 85 contains legal conclusions that do not require an answer.  To the extent that an answer is required, Defendants deny the allegations.

86.     Pursuant to 42 U.S.C. § 1983, Plaintiffs seek to bar the Park District and the City from approving the building of the Presidential Center and from conveying any interest in or control of the Jackson Park Site to the Foundation as set forth in the contemplated long term ground lease, as such actions violate the rights of Plaintiffs and other Illinois and City of Chicago citizens as holders of beneficial interests protected under the Due Process Clause of the Fourteenth Amendment.

**ANSWER:** Defendants admit that Plaintiffs seek the relief sought in paragraph 86, but Defendants deny that Plaintiffs are entitled to that, or any, relief.  The remaining statements in paragraph 86 constitute legal conclusions that do not require an answer.  To the extent that an answer is required, Defendants deny the allegations.

**WHEREFORE**, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiffs on Count I and grant Defendants such further relief as the Court deems just and appropriate.

## COUNT II

### Breach of the Public Trust

87.     Plaintiffs reallege and repeat the allegations contained in paragraphs 1 to 86, as and for the allegations contained in paragraph 87, as if fully set forth herein.

**ANSWER:** Paragraph 87 repeats the allegations contained in paragraphs 1 to 86 and does not require an answer.  To the extent an answer is required, Defendants incorporate their answers to paragraphs 1 to 86.

88.     The Jackson Park Site is owned by the Park District for a public use, specifically an open space public park.

**ANSWER:** Defendants admit that the proposed site of the OPC is presently owned by the Park District and is within Jackson Park, which is a public park. Defendants deny the remaining allegations of paragraph 88. In particular, Defendants deny that Jackson Park is designated as an "open space public park" or that its use is limited to open space.

89.     Under the public trust doctrine, the Park District holds the Jackson Park Site in trust for the benefit of the residents of the City of Chicago and State of Illinois.

**ANSWER:** Paragraph 89 contains a legal conclusion that does not require an answer. To the extent that an answer is required, Defendants deny that the proposed OPC site is subject to a public trust that applies to lands previously submerged under Lake Michigan, as Defendants deny that the site was previously submerged.

90.     The Park District and the City's actions and contemplated actions as alleged herein would cause the Jackson Park Site to be used for a purpose that is in conflict with its public use as an open space park "free to all persons forever."

**ANSWER:** Paragraph 90 asserts a legal conclusion that does not require an answer. To the extent that an answer is required, Defendants deny the allegations. In particular, Defendants deny that there is any legal requirement that the OPC site be used as an "open space park" and further deny that Plaintiffs cite the full text of the dedication in the 1869 Statute. Defendants further deny that there is any conflict between the operation of the OPC at the proposed site and the 1869 Statute. On the contrary, the location of the OPC within Jackson Park – for the uses authorized by the Use Agreement and the Pending Ordinance – is consistent with the 1869 dedication and the tradition of locating museums within Chicago's parks (including Jackson Park), and is authorized by the plain text of the Museum Act.

91.     Further, the Park District and the City's actions and threatened actions of transferring the Jackson Park site from the Park District to the City, and the City then executing a long term ground lease for only nominal consideration, transfers the use and control of the Jackson Park Site to the Foundation, which is a private non-governmental entity.  The Foundation will have control over public land for not just decades but centuries to come.

**ANSWER:** Paragraph 91 contains legal conclusions that do not require an answer.  To the extent that an answer is required, Defendants deny that the City intends to execute a long-term ground lease with the Foundation; rather, the Pending Ordinance would authorize the City to enter into the Use Agreement.  See Answer to Paragraph 3, supra.  Defendants also deny that the City will receive only nominal consideration in exchange for entering into the Use Agreement or that control of the site will be transferred to the Foundation.  On the contrary, the City will maintain ownership of the site and will receive title to the OPC's buildings upon completion of their construction at the Foundation's sole expense, and the operation of the OPC, which will be governed by the Use Agreement, will provide numerous benefits to the City and to the public at large.  See Answers to Paragraphs 1, 3, 4, 7, 9, 14 & 52, supra.

92.     The action to transfer use and control of this unique and priceless lakefront Jackson Park public property site is an unconstitutional taking as there exists a significant amount of non-park,  non-public trust land, on which to beneficially locate a private Presidential Center.

**ANSWER:** Paragraph 92 asserts a legal conclusion that does not require an answer.  To the extent that an answer is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations that there exists a "significant amount of non-park, non-public trust land" where a presidential center might be "beneficially located," as the allegations are vague and conclusory. Defendants deny the remaining allegations in paragraph 92.

93.     Locating the Presidential Center on non-public, non-public park trust land would serve the identical foundation purposes and escape deliberately doing damage to historic Jackson Park.

**ANSWER:** Defendants deny the allegations of paragraph 93.  In particular, Defendants deny that locating the OPC at another site would identically serve the City's, the Park District's, or the Foundation's purposes.  The proposed site possesses unique attributes that make it the ideal location for the OPC.  The site is located in a community with strong historical ties to President Obama and Mrs. Obama.  Further, locating the OPC at the proposed site will not only enhance the site's utility as a recreational and cultural resource for the community and the public, but will also improve the public's access to, and engagement with, the rest of Jackson Park and the lakefront.  See Answers to Paragraphs 1, 3, 4, 7, 9, 14 & 52, supra.  Defendants also deny that the City is "deliberately doing damage to historic Jackson Park."  On the contrary, the integration of a world-class presidential center within the park honors the historic legacy of Jackson Park and enhances the recreational and cultural opportunities for Jackson Park visitors and members of the surrounding community.  In addition, the OPC site currently sits on the western edge of Jackson Park, where it is separated from the remainder of Jackson Park to the east by a six-lane road (Cornell Drive).  Improving that site by, among other things, connecting it with the remainder of Jackson Park to the east by replacing that road with new natural parkland will enhance Jackson Park, not damage it.

94.     Defendants are in breach of their duty to hold the Jackson Park site in trust for the people of the City of Chicago and State of Illinois as the beneficial owners of such property.

**ANSWER:** Paragraph 94 asserts legal conclusions that do not require an answer.  To the extent that an answer is required, Defendants deny the allegations.  In particular, Defendants deny that

the proposed OPC site is subject to a public trust that applies to lands previously submerged under Lake Michigan, as Defendants deny that the site was previously submerged.

95.     A transfer of public trust Jackson Park Site to the Foundation as set forth in the contemplated long term ground lease, violates the public interest needs and purposes for which Jackson Park Site is held in trust.

**ANSWER:** Paragraph 95 asserts legal conclusions that do not require an answer.  To the extent that an answer is required, Defendants deny the allegations.  In particular, Defendants deny that the proposed site will be transferred to the Foundation at all, much less via a long-term ground lease.  Rather, the City would continue to own the land, and its use by the Foundation would be governed by, and subject to, the Pending Ordinance and the Use Agreement.  Defendants further deny that allowing the Foundation to use the proposed site under the terms of the anticipated Use Agreement would violate any legal requirements applying to the proposed site.  Further, to the extent that Plaintiffs allege that the proposed OPC site is subject to a public trust that applies to lands previously submerged under Lake Michigan, Defendants deny that the site was previously submerged or that such a public trust applies.

96.     Plaintiffs have standing as well to enforce the trust and prevent the dissipation and waste of trust assets or actions that impair the value of the trust property to them or interfere with their use and enjoyment of the trust property as property held in common on their behalf.

**ANSWER:** Paragraph 96 asserts legal conclusions that do not require an answer.  To the extent that an answer is required, Defendants deny the allegations.

**WHEREFORE**, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiffs on Count II and grant Defendants such further relief as the Court deems just and appropriate.

## COUNT III

### Ultra Vires Action

97.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 to 96, as and for the allegations contained in paragraph 97, as if fully set forth herein.

**ANSWER:**  Paragraph 97 repeats the allegations contained in paragraphs 1 to 96 and does not require an answer.  To the extent that an answer is required, Defendants incorporate their answers to paragraphs 1 to 96.

98.     The Park District's contemplated action of transferring the Jackson Park site to the City of Chicago for $1.00, so that the City will then enter into a long term lease with the Foundation has not been authorized by the State of Illinois.  The Park District therefore lacks authority for the transaction.

**ANSWER:**  Paragraph 98 asserts legal conclusions that do not require an answer.  To the extent that an answer is required, Defendants admit that the Park District contemplates transferring the land for the proposed site of the OPC to the City for one dollar so that the Foundation may use the land to construct and operate the OPC.  Defendants deny that the City intends to enter into a long term lease with the Foundation; rather, under the Pending Ordinance, the City would enter into the Use Agreement with the Foundation.  Defendants also deny that the Park District lacks authority under the Illinois Constitution or state statutes to transfer land to the City so that the City may enter into a use agreement with the Foundation governing the construction and operation of the OPC.  On the contrary, the Museum Act expressly authorizes the City to enter into an agreement with an entity like the Foundation for the purpose of locating a presidential center within a public park, and state law authorizes the transfer of land from the Park District to the City to advance such a public purpose.

99.     The Park District and the City's actions as alleged herein are ultra vires actions for which they have no authority.

**ANSWER:** Paragraph 99 asserts legal conclusions that do not require an answer. To the extent that an answer is required, Defendants deny the allegations.

**WHEREFORE**, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiffs on Count III and grant Defendants such further relief as the Court deems just and appropriate.

## COUNT IV

### Declaratory Judgment As To Inapplicability of the Illinois Museum Act

100.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 to 99, as and for the allegations contained in paragraph 100, as if fully set forth herein.

**ANSWER:** Paragraph 100 repeats the allegations contained in paragraphs 1 to 99 and does not require an answer. To the extent that an answer is required, Defendants incorporate their answers to paragraphs 1 to 99.

101.     The 2016 Amendment to the Museum Act states on its face that it is not retroactive. The temporal reach of the 2016 Amendment states that the amendment is "declaratory of existing law," and therefore the substance of the 2016 Amendment cannot be made retroactive.

**ANSWER:** Defendants deny that the 2016 Amendment states on its face that it is not retroactive, or that the changes made to the Museum Act by the amendment cannot be made retroactive. Rather, the 2016 Amendment states that the changes "are declaratory of existing law and shall not be construed as a new enactment." The assertion that the 2016 Amendment cannot be made retroactive is a legal conclusion to which no answer is required. To the extent that an answer is required, Defendants deny the allegation.

102.    However, the 2016 Amendment is not declaratory of existing law.  Existing law at the time of the 2016 Amendment does not state allow aquariums and museums on formerly submerged lands, does not allow undefined "edifices" for "presidential libraries and centers" on park land, and does not allow the gifting of park land to private entities by allowing multiple 99 year leases of park land to a private entity – all of which were added in the 2016 Amendment to the Museum Act.

**ANSWER:**  Paragraph 102 asserts legal conclusions that do not require an answer.  To the extent that an answer is required, Defendants admit that the 2016 Amendment added certain language to the Museum Act, but Defendants deny that the 2016 Amendment was not declaratory of existing law.  Defendants deny the remaining allegations of paragraph 102.

103.    On information and belief, the Defendants will contend that the Illinois Museum Act allows a private Presidential Center to be constructed on the Jackson Park Site.  Therefore, an actual and justiciable controversy exists between the Plaintiffs and the Defendants related to the applicability of the Museum Act to the Presidential Center.

**ANSWER:**  Defendants admit that they contend that the Museum Act allows a presidential center operated by a private foundation to be constructed in Jackson Park on the proposed OPC site.  The assertion that a justiciable controversy exists is a legal conclusion that does not require an answer.  To the extent that an answer is required, Defendants deny the allegation.

**WHEREFORE**, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiffs on Count IV and grant Defendants such further relief as the Court deems just and appropriate.

## COUNT V

### Special Legislation

104.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 to 103, as and for the allegations contained in paragraph 104, as if fully set forth herein.

60

**ANSWER:** Paragraph 104 repeats the allegations contained in paragraphs 1 to 103 and does not require an answer. To the extent that an answer is required, Defendants incorporate their answers to paragraphs 1 to 103.

105. The 2016 Amendment to the Museum Act provides, *inter alia*, that the corporate authorities of cities and park districts are authorized to erect and maintain:

> edifices to be used as aquariums or as museums of art, industry, science, or natural or other history, **including presidential libraries, centers, and museums, such aquariums and museums consisting of all facilities for their collections, exhibitions, programming, and associated initiatives**, or to permit the directors or trustees of any corporation or society organized for the construction or maintenance and operation of an aquarium or museum as hereinabove described to **erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate its aquarium or museum within any public park now** or hereafter under the control or supervision of any city or park district…

(Emphasis added)

**ANSWER:** Defendants admit that the 2016 Amendment authorizes the corporate authorities of cities and park districts to erect and maintain – or to permit the directors or trustees of a corporation to erect and maintain – museums, including presidential centers, on parkland. Defendants further admit that the 2016 Amendment contains the language quoted in paragraph 105 (without the emphasis added by Plaintiffs).

106. The 2016 Amendment to the Illinois Museum Act expressly allowing a "presidential center" constitutes special legislation and is therefore unconstitutional.

**ANSWER:** Paragraph 106 asserts a legal conclusion that does not require an answer. To the extent that an answer is required, Defendants deny the allegations. In particular, Defendants deny that the 2016 Amendment – which does not confer a benefit on any person or class of

persons that is denied to those similarly situated, and which is otherwise rationally related to a

legitimate governmental interest – constitutes special legislation or is otherwise unconstitutional.

107.    Article IV, Section 13 of the Illinois Constitution provides: "The General
Assembly shall pass no special or local law when a general law is or can be made applicable."
If in fact "the changes made to this Section are declaratory of existing law and shall not be
construed as a new enactment" there was no need for amendment.  The fact that Defendant City
of Chicago saw the need to do so is a judicial admission that the 2016 Amendment is indeed
special legislation.

**ANSWER:**  Defendants admit that Article IV, Section 13 of the Illinois Constitution contains

the language quoted in the first sentence of paragraph 107.  Defendants deny the remaining

allegations of paragraph 107.  The allegations that there "was no need for [an] amendment" that

was declaratory of existing law, and that the City's alleged belief about the necessity of the 2016

Amendment constitutes a "judicial admission" that the Amendment is special legislation, are

legal conclusions that do not require an answer.   To the extent that an answer is required,

Defendants deny the allegations.  In particular, Defendants deny that the City viewed the 2016

Amendment as necessary, that the City has ever admitted that the 2016 Amendment is special

legislation, or that the 2016 Amendment constitutes special legislation.

108.    The 2016 Amendment to the Museum Act was specifically designed to benefit
only one entity – the private Obama Foundation (repeating language that tracks the language of
the preexisting City Ordinance) and its plan to build what the Foundation originally called an
official "Presidential Library" and which is now ambiguously described as a "Presidential
Center."

**ANSWER:**  Defendants deny that the 2016 Amendment was specifically designed to benefit

only one entity or that use of the term "presidential center" demonstrates an intent to benefit only

one entity, as the text of the amendment refers to presidential centers generally and would apply

to any future plans to locate a presidential center within public parks in Illinois.  Further, far

from being terminology that is ambiguous or unique to the OPC, "presidential center" is a term commonly used for modern presidential museum complexes that include not only museums, but also other facilities dedicated to social or community engagement.  For instance, the official website of the George W. Bush Presidential Center states that "The Bush Center is home to the George W. Bush Presidential Library and Museum, which is operated by the National Archives and Records Administration, and the George W. Bush Institute, the nonpartisan, public policy arm of the Bush Center.  The Bush Center is located on the campus of SMU in Dallas, Texas, and also includes a 15-acre park, a full-service restaurant, Café 43, and a museum store." Exhibit 5 hereto (https://www.bushcenter.org/about-the-center/index.html).  The website further states that "[t]he Bush Institute is an action-oriented, nonpartisan policy organization that develops leaders, advances policy, and takes action to solve today's most pressing challenges. Our work is inspired by the principles that guide President and Mrs. Bush in public life."  Id. Similarly, the official website of the Clinton Presidential Center states that "[t]he William J. Clinton Presidential Center is the home of the Little Rock offices of the Clinton Foundation; the Clinton Presidential Library and Museum; the Clinton School of Public Service, the first institution in the nation to offer a Master of Public Service (MPS) degree; and is a managing partner of the Presidential Leadership Scholars program, a national bipartisan executive-style leadership development initiative.  Additionally, the Clinton Center is a world-class educational and cultural venue offering a variety of educational programs, special events, exhibitions, and lectures, presenting a unique perspective of the work – past, present, and future – of the 42nd President of the United States, William Jefferson Clinton."  Exhibit 6 hereto (https://www.clintonfoundation.org/clinton-presidential-center/visit/visiting-center).

109.    There can be little doubt that the Museum Act was specifically amended for the sole purpose to retroactively allow the Presidential Center on Park District property.  In fact, the City of Chicago's legal department drafted the amendments to the Museum Act to specifically allow for the continually changing so-called "Presidential Center."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation concerning the Illinois General Assembly's purpose in enacting amendments to a statute.  Defendants deny that the text of the 2016 Amendment indicates that the General Assembly acted with any singular purpose in enacting the 2016 Amendment, other than to clarify that the changes made by the amendment were declaratory of existing law.  The City admits that its Law Department submitted draft legislation amending the Museum Act to the General Assembly to resolve any questions about the legality of using parkland for a presidential center.

110.    City of Chicago's Corporation Counsel, Stephen Patton, submitted a Statement of Corporation Counsel Stephen R.  Patton In Support of the Department of Law's Proposed 2016 Budget ("Statement") in support of the City of Chicago Law Departments proposed 2016 budget. That Statement is dated October 9, 2015, and a true and correct copy is attached hereto as Exhibit M.

**ANSWER:** Defendants admit the allegations in paragraph 110.

111.    The Statement expressly provides that the City of Chicago's Department of Law drafted the 2016 Amendment to the Museum Act to allow the Presidential Center.  The City of Chicago's Statement states, in relevant part, as follows:

**A.    Helping to Secure the Barack Obama Presidential Center for Chicago**

In December 2014, the Barack Obama Foundation announced that the University of Chicago's bid to host the Obama Presidential Center was in jeopardy because the University -- one of four finalists in the Foundation's competition to host the library -- did not own or control either of the sites it proposed in Washington and Jackson Parks.  The Foundation subsequently made clear that in order for the University's bid to remain competitive, the City would need to develop a plan whereby it would acquire the sites in question and lease them to the Foundation. DOL attorneys worked over the Christmas and New Year holidays to research state law governing the use of park land and develop a plan and draft ordinances

64

and an intergovernmental agreement whereby, if the University's bid were selected, the Chicago Park District would exercise its authority to transfer park land to the City, and the City in turn would exercise its authority to lease the land to the Foundation.

In January 2015, an ordinance was introduced authorizing the inter-governmental land transfer with the Chicago Park District, and that transfer was subsequently approved by the Chicago Plan Commission and the City Council after public hearings. Thereafter, DOL began negotiating the terms of a proposed ground lease and related transaction documents with the Obama Foundation to demonstrate the City's commitment to the project. Finally, last spring, to resolve any questions about the legality of using park land for the presidential center, DOL drafted legislation amending the State's Museum and Aquarium Act to expressly allow the long-term lease of park land for the center, which was subsequently signed into law in May.

**ANSWER:** Defendants admit that paragraph 111 quotes the text of the Law Department statement described in Paragraph 110. Defendants deny that the statement expressly states that the Law Department drafted the language ultimately adopted by the General Assembly when enacting the 2016 Amendment.

112. The 2016 Amendment to the Museum Act will benefit only the Foundation. Further, the legislation constitutes special legislation because it is arbitrary and uncertain in that it provides for the inclusion on park district land of any structure without particularity that any unvetted party could baldly contend is a "Presidential Center."

**ANSWER:** Defendants deny that the 2016 Amendment will benefit only the Foundation, as it applies to presidential centers generally, and it will benefit the public, the City, and the Park District by allowing a world-class museum to join the eleven other museums in Chicago parks. The assertion that the 2016 Amendment constitutes special legislation because of the vagueness of the term "Presidential Center" is a legal conclusion that does not require an answer. To the extent that an answer is required, Defendants deny the allegation.

113. The 2016 Amendment to the Illinois Museum Act is therefore unconstitutional as special legislation in violation of Article IV, Section 13 of the Illinois Constitution.

**ANSWER:** Paragraph 113 asserts a legal conclusion that does not require an answer. To the extent that an answer is required, Defendants deny the allegations.

114. On information and belief, the Defendants contend that the Illinois Museum Act allows the Presidential Center on the Jackson Park Site, and is not special legislation. Therefore, an actual and justiciable controversy exists between the Plaintiffs and the Defendants related to the constitutionality of the 2016 Amendment to the Museum Act.

**ANSWER:** Defendants admit that they contend that the Museum Act authorizes the construction and operation of the OPC on the proposed site in Jackson Park and that the 2016 Amendment is not special legislation. The assertion that an actual and justiciable controversy exists concerning the constitutionality of the 2016 Amendment is a legal conclusion that does not require an answer. To the extent that an answer is required, Defendants deny the allegation.

**WHEREFORE**, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiffs on Count V and grant Defendants such further relief as the Court deems just and appropriate.

## <u>COUNT VI</u>

### First Amendment Violation

115. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 to 114, as and for the allegations contained in paragraph 115, as if fully set forth herein.

**ANSWER:** Paragraph 115 repeats the allegations contained in paragraph 1 to 114 and does not require an answer. To the extent that an answer is required, Defendants incorporate their answers to paragraphs 1 to 114.

66

116.    The Ordinance and avowed purpose of the proposed Obama Foundation project is to create "an academic institute to enhance the <u>pursuit of the [former] President's initiatives beyond 2017</u>".  (Emphasis added")

**ANSWER:**  Defendants admit that the 2015 Ordinance contains the language quoted in paragraph 116 (without the emphasis added by Plaintiffs), and that it stated that one of the purposes of the OPC is to create an academic institute to enhance the pursuit of President Obama's post-presidential initiatives.  Defendants deny that this is the sole purpose of the OPC. Defendants deny the remaining allegations of paragraph 116.

117.    Former President Obama has made it known that he intends to use his Center as a "bully pulpit" to continue his political activities by raising money for the Democrat Party, endorsing individual candidates for election, speaking out on controversial partisan political issues, and being outspoken in critiquing the actions of succeeding presidents and elected members of Congress with whom he disagrees.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations that President Obama has made certain statements described in paragraph 117, but Defendants deny that the OPC will be used for partisan political activities, because such activities will be prohibited by the Use Agreement and the Foundation's 501(c)(3) status.  In particular, Section 6.3(d) of the Use Agreement states that "[t]he Foundation shall not use or allow the Subject Property to be used for political fundraisers or use or occupy, or authorize the use or occupancy of, the Subject Property or Project Improvements, in whole or in part, in a manner that would be inconsistent with the Foundation's status as a tax exempt entity under Section 501(c)(3) of the Internal Revenue Code."  Exhibit 1 hereto, Ex. D thereto, § 6.3(d). Further, the Pending Ordinance states that "the Use Agreement permits the Foundation to use the OPC Site for a Presidential Center consistent with purposes accorded to and limitations imposed by the Foundation's status as a non-profit, non-partisan entity exempt from federal income tax

under Section 501(c)(3) of the Internal Revenue Service Code, and for no other purpose."

Exhibit 1 hereto, at 8.

118.    There is, of course, no objection to former president Obama exercising all his First Amendment Rights and using all the resources and facilities within his control. However, the Museum Act, which provides for a "Presidential Library" or "museum" with a collection of Mr. Obama's political mementos in Jackson Park, also provides for a new real estate tax to be imposed upon all City property owners for the specific purpose of supporting that Library or Museum.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of Plaintiffs' lack of objection as stated in the first sentence of paragraph 118. Defendants admit that Section 2 of the Museum Act allows the Park District to levy a real estate tax for the purpose of "establishing, acquiring, completing, erecting, enlarging, ornamenting, building, rebuilding, rehabilitating, improving, operating, maintaining and caring for such aquarium and museum or museums and the buildings and grounds thereof," to the extent that the Park District controls the land on which the museum is located. Defendants deny that Section 2 permits the City to levy such a tax, and Defendants further deny that the Park District plans to levy a tax pursuant to Section 2 of the Museum Act for the benefit of the Foundation or the OPC, as the Park District will not own or control the land used as the site of the OPC. Defendants deny the remaining allegations of paragraph 118.

119.    Section 2 of the Museum Act states, in relevant part, that the Board of public park commissioners may:

> **levy annually a tax** not to exceed .03 per cent in park districts of less than 500,000 population **and in districts of over 500,000 population not to exceed .15 percent of the full, fair cash value**, as equalized or assessed by the Department of Revenue of taxable property embraced in said district, according to the valuation of the same as made for the purpose of State and county taxation by the general assessment last preceding the time when such tax hereby authorized shall be levied: **Such tax to be for the purpose of establishing, acquiring,**

68

**completing, erecting, enlarging, ornamenting, building, rebuilding, rehabilitating, improving, operating, maintaining and caring for such aquarium and museum or museums and the buildings and grounds thereof; and the proceeds of such additional tax shall be kept as a separate fund. Said tax shall be in addition to all other taxes which such board of park commissioners is now or hereafter may be authorized to levy on the aggregate valuation of all taxable property within the park district**. Said tax shall be levied and collected in like manner as the general taxes for such parks **and shall not be included within any limitation of rate for general park purposes** as now or hereafter provided by law **but shall be excluded there from and be in addition thereto and in excess thereof**.

(Emphasis added)

**ANSWER:** Defendants admit that the language quoted in paragraph 119 is contained in section

2 of the Museum Act, 70 ILCS 1290/2 (without the emphasis added by Plaintiffs).

120. On information and belief, the Obama Foundation will not pay real estate taxes. The effect of this special Obama Center tax on the public is therefore to make individuals who politically disagree with Mr. Obama on his political, environmental, or educational initiatives be nevertheless involuntarily compelled to contribute money to enable him to successfully pursue all his personal political and other initiatives and objectives. This is a denial of citizens own First Amendment rights of speech and assembly, and an unconstitutional exercise of governmental power.

**ANSWER:** Defendants admit that, as a tax-exempt nonprofit organization, the Foundation will

not pay real estate taxes. Defendants deny that there will be any "special Obama Center tax on

the public," and Defendants further deny that individuals who politically disagree with President

Obama will be compelled to contribute money to support his personal political initiatives. See

Answer to Paragraphs 117-118, supra. The assertion that citizens' First Amendment rights will

be violated is a legal conclusion that does not require an answer. To the extent that an answer is

required, Defendants deny the allegations.

69

**WHEREFORE**, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiffs on Count VI and grant Defendants such further relief as the Court deems just and appropriate.

## DEFENDANTS' AFFIRMATIVE DEFENSES

### First Affirmative Defense – Lack of Subject-Matter Jurisdiction (Lack of Standing)

1.      For a federal court to have subject matter jurisdiction over a case, Article III of the Constitution requires that the plaintiff have standing.  To have standing, the plaintiff must show that he has suffered a concrete and particularized injury that affects him in a personal and individual way.  A mere generalized grievance is not enough, no matter how sincere.

2.       Plaintiffs claim that they have standing because they are "beneficiaries of a trust and taxpayers supporting the Park District."  Compl. ¶ 55.  The trust they allege is a "public trust" requiring Jackson Park to be used as a park.  They claim that building the OPC on this land will injure their beneficial interests in the trust because it will "deprive[] each citizen of their fractional interest in the public trust land."  Id. ¶ 16.  And the tax they allege is a Park District tax that will be used to pay for the "upkeep" of the OPC.  Id. ¶ 7.

3.      These allegations do not support standing.  By Plaintiffs' own admission, their interest as alleged trust beneficiaries is an interest that belongs to "each citizen."  That is, Plaintiffs' interest is no different from that of the other 12 million residents of Illinois.  Thus what Plaintiffs assert is a generalized grievance, not a concrete injury particular to them.   And even if Illinois law recognizes Plaintiffs' standing to sue in this instance, standing under state law does not suffice to confer Article III standing.  Article III's limits on the subject-matter

jurisdiction of federal courts are independent of state standing doctrines. States cannot alter federal constitutional limitations on the jurisdiction of federal courts.

4.      Plaintiffs' alleged status as "taxpayers supporting the Park District" is also insufficient to confer Article III standing. Plaintiffs' taxpayer status, like their status as alleged trust beneficiaries, is nothing more than a generalized grievance; they do not point to a concrete and particularized injury stemming from their tax payments. Indeed, Plaintiffs do not identify any expenditure of Park District tax revenue that will be used for the OPC. A plaintiff's status as a municipal taxpayer is irrelevant for standing purposes if no tax money is spent on the allegedly unlawful activity. Plaintiffs do allege that a "special add-on Park District real estate tax [will be used] to pay for the Presidential Center's upkeep." Compl. ¶ 7; see also id. ¶¶ 119–20. But Plaintiffs are wrong. Under the proposed Use Agreement, the Foundation will be required to maintain the OPC site and the OPC buildings in good condition and repair at the Foundation's sole cost and expense. See Exhibit 1 hereto, Ex. D thereto, § 7.1. And tax revenues collected by the Park District under section 2 of the Museum Act will not be used for the OPC, as the Park District will not own or control the land used for the OPC.

6.      Plaintiffs' First Amendment claim suffers from additional standing problems. Plaintiffs claim that their First Amendment rights will be violated because tax revenue will be used to fund partisan political speech at the OPC. See Compl. ¶¶ 117, 120. Plaintiffs fail to show how they have been concretely harmed in a particularized way by expressive activity taking place at the OPC. Nor could they. The OPC does not yet exist, and it will be years before the OPC opens. And when it does, the Pending Ordinance and the proposed Use Agreement would prohibit the Foundation from using the OPC to host political fundraisers, or to use, or allow others to use, the OPC in ways inconsistent with the Foundation's status as a tax exempt

entity under Section 501(c)(3) of the Internal Revenue Code.  Thus the OPC will be prohibited from engaging in the activities that Plaintiffs fear.  For these additional reasons, Plaintiffs lack standing to bring their First Amendment claim.

**Second Affirmative Defense – Lack of Subject-Matter Jurisdiction (Lack of Ripeness)**

1.     Defendants incorporate Paragraphs 1-6 of their First Affirmative Defense as if set forth fully herein.

2.     Plaintiffs' First Amendment claim is based on two assumptions about the future: (1) the OPC will be used as a forum for partisan political activities that will (2) be funded by proceeds from a special tax.

3.     A claim that rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all, is not ripe for adjudication.  That is the case here.  Indeed, as explained above, the speech activities and the taxpayer funding of those activities that Plaintiffs fear are not merely uncertain, they are highly unlikely.  Any adjudication of how the OPC might be used in the future would constitute an impermissible advisory opinion based on a highly unlikely chain of contingencies, a chain that would, to boot, require the Court to assume that the Foundation would violate the governing legal documents.  The Court therefore lacks subject-matter jurisdiction over the claim.

Date:   October 22, 2018                    Respectfully submitted,

                                            EDWARD N. SISKEL,
                                            Corporation Counsel for the City of Chicago

                                            By:     /s/ Andrew Worseck

John Hendricks
Deputy Corporation Counsel
Andrew W. Worseck
Chief Assistant Corporation Counsel
Justin Tresnowski
Assistant Corporation Counsel
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-6975 / 4-7129 / 4-4216
Attorneys for Defendant City of Chicago


BURKE, WARREN, MACKAY & SERRITELLA,
P.C.
Counsel for the Chicago Park District

By:     /s/ Joseph P. Roddy

Richard W. Burke
Joseph P. Roddy
Elizabeth Meyer Pall
Susan M. Horner
Burke, Warren, MacKay & Serritella, P.C.
330 North Wabash Avenue, Suite 2100
Chicago, Illinois 60611
(312) 840-7000
Attorneys for Defendant Chicago Park District

## **CERTIFICATE OF SERVICE**

I, Andrew Worseck, an attorney, hereby certify that on this, the 22nd day of October, 2018, I caused copies of **Defendants' Answer and Affirmative Defenses to Plaintiffs' Complaint** to be served by electronic case filing (ECF) on Plaintiffs Protect Our Parks, Inc., Charlotte Adelman, Maria Valencia, and Jeremiah Jurevis via their counsel who have appeared in this action.

/s/ Andrew Worseck