**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

Protect Our Parks, Inc.; Charlotte Adelman; )
Maria Valencia and Jeremiah Jurevis; )
                                       )
                   Plaintiffs, )
                                        )     No.  18 CV 03424
                   v. )
                                         )
Chicago Park District and City of Chicago, )     Judge John Robert Blakey
                                         )
                   Defendants. )

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION
<u>AND, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS</u>**

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 4

A.  The OPC Site ........................................................................................ 4

B.  The Municipal Approval Process.......................................................... 5

C.  The Use Agreement .............................................................................. 6

D.  The OPC's Features ............................................................................. 7

E.  Construction, Ownership, and Use of the OPC .................................... 9

F.  The City Council's Findings .............................................................. 10

ARGUMENT .................................................................................................... 12

I.  The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims. ........................... 14

II.  The Federal Claims Fail..................................................................... 16

    A.  Plaintiffs Have No Due Process Claim. ..................................... 16

    B.  Plaintiffs Have No First Amendment Claim............................... 19

III.  The OPC Does Not Violate The State Public Trust Doctrine........................................ 21

    A.  The Museum Act disposes of Plaintiffs' public trust claim................................. 22

    B.  The OPC is not barred by the public trust doctrine as it has been applied to formerly-submerged lands. ...................................... 26

        1.  The OPC will provide valuable public benefits. ................................. 28

        2.  A public entity – the City – will own the OPC site and buildings and retain control over the site through the Use Agreement. .................. 30

        3.  The Foundation will reap no private benefits separate from supporting the OPC itself, and in any event these advantages are trivial compared to the public benefits..................................... 32

IV.  State Law Authorizes The Transfer Of Park District Land To The City........................ 33

V.  The 2016 Amendment To The Museum Act Applies In This Case. .............................. 35

VI.  The 2016 Amendment Is Not Unconstitutional Special Legislation. .............................. 36

CONCLUSION................................................................................................. 38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Archie v. City of Racine,
    847 F.2d 1211 (7th Cir. 1988) ...............................................................17

People ex. rel. Attorney Gen. v. Kirk,
    162 Ill. 138 (1896) ............................................................................26

Bd. of Regents of State Coll. v. Roth,
    408 U.S. 564 (1972)..........................................................................18

Bd. of Regents of Univ. of Wis. Sys. v. Southworth,
    529 U.S. 217 (2000)..........................................................................21

Big Sky Excavating, Inc. v. Ill. Bell Tel. Co.,
    217 Ill. 2d 221 (2005) .......................................................................36

People ex rel. Bransom v. Walsh,
    96 Ill. 232 (1880) ............................................................................24

Clement v. O'Malley,
    95 Ill. App. 3d 824 (1st Dist. 1981) ..............................................22, 25

Cole v. Milwaukee Area Tech. Coll. Dist.,
    634 F.3d 901 (7th Cir. 2011) ............................................................18

Coniston Corp. v. Vill. of Hoffman Estates,
    844 F.2d 461 (7th Cir. 1988) ............................................................17

Crusius v. Ill. Gaming Bd.,
    216 Ill. 2d 315 (2005) .......................................................................37

Elementary Sch. Dist. 159 v. Schiller,
    221 Ill. 2d 130 (2006) ..................................................................36, 37

First Mortg. Co. v. Dina,
    2017 IL App (2d) 170043 ..................................................................36

Freedom From Religion Found., Inc. v. Zielke,
    845 F.2d 1463 (7th Cir. 1988) ..........................................................16

Friends of the Parks v. Chicago Park District,
    160 F. Supp. 3d 1060 (N.D. Ill. 2016) .....................................17, 30, 31

Friends of the Parks v. Chicago Park District,
    2015 WL 1188615 (N.D. Ill. Mar. 12, 2015)..........................................................15

Friends of the Parks v. Chicago Park District,
    No. 14-cv-9096 (N.D. Ill.) .................................................................................13

Friends of the Parks v. Chicago Park District,
    203 Ill. 2d 312 (2003) ................................................................................ passim

Furlong v. South Park Comm'rs,
    320 Ill. 507 (1926)...........................................................................3, 23, 24, 33

Hibbs v. Winn,
    542 U.S. 88 (2004).............................................................................................15

Hollingsworth v. Perry,
    570 U.S. 693 (2013).....................................................................................14, 15

Illinois Cent. R.R. v. Illinois,
    146 U.S. 387 (1892).........................................................................................26

Johanns v. Livestock Mktg. Ass'n,
    544 U.S. 550 (2005).........................................................................................21

Jones v. Griffith,
    870 F.2d 1363 (7th Cir. 1989) .........................................................................20

Kvapil v. Chippewa Cty.,
    752 F.3d 708 (7th Cir. 2014) ...........................................................................18

Lake Michigan Fed'n v. U.S. Army Corps of Engineers,
    742 F. Supp. 441 (N.D. Ill. 1990) ...................................................................15

People ex rel. Lumpkin v. Cassidy,
    184 Ill. 2d 117 (1998) ......................................................................................37

In re Marriage of Duggan,
    376 Ill. App. 3d 725 (2d Dist. 2007)................................................................36

Mid-American Waste Sys., Inc. v. City of Gary,
    49 F.3d 286 (7th Cir. 1995) .............................................................................17

N. Ill. Home Builders Ass'n, Inc. v. Cty. of Du Page,
    165 Ill. 2d 25 (1995) ........................................................................................37

Nguyen v. City of Cleveland,
    2016 WL 1031096 (N.D. Ohio Mar. 15, 2016) ...............................................15

Paepcke v. Public Bldg. Comm'n,
   46 Ill. 2d 330 (1970) ................................................................................ passim

Pennhurst State Sch. & Hosp. v. Halderman,
   465 U.S. 89 (1984) ........................................................................................17

People v. Ill. State Toll Highway Comm'n,
   3 Ill. 2d 218 (1954) ......................................................................................24

Petersen v. Chicago Plan Comm'n,
   302 Ill. App. 3d 461 (1st Dist. 1998) .........................................................18

Regan v. Taxation With Representation of Wash.,
   461 U.S. 540 (1983).................................................................................20, 21

Reichelderfer v. Quinn,
   287 U.S. 315 (1932).........................................................................18, 19, 24

Residences at Riverbend Condo. Assoc. v. City of Chicago,
   5 F. Supp. 3d 982 (N.D. Ill. 2013) ............................................................18

River Park, Inc. v. City of Highland Park,
   23 F.3d 164 (7th Cir. 1994) ........................................................................17

Rust v. Sullivan,
   500 U.S. 173 (1991).....................................................................................20

Illinois ex rel. Ryan v. Brown,
   227 F.3d 1042 (7th Cir. 2000) ....................................................................15

In re Samuels,
   126 Ill. 2d 509 (1989) .................................................................................36

Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,
   560 U.S. 702 (2010).....................................................................................19

Texas v. United States,
   523 U.S. 296 (1998).....................................................................................19

Tucker v. City of Chicago,
   903 F.3d 487 (7th Cir. 2018) ......................................................................17

**Statutes**

5 ILCS 220/3 ........................................................................................................34

50 ILCS 605/2 ......................................................................................................34

70 ILCS 1205/1-2(d) ...........................................................................................35

70 ILCS 1290/1 ....................................................................................................... passim

70 ILCS 1290/2 ...........................................................................................................16

I.R.C. § 501(c)(3) ........................................................................................................20

Municipal Code of Chicago, § 16-4-010 .....................................................................5

An Act to Provide for the Location and Maintenance of a Park for the Towns of
    South Chicago, Hyde Park and Lake, Private Laws, 1869, vol. 1, p. 358 et seq.........21, 22, 24

**Other Authorities**

Ill Const., art. IV, § 13 ..............................................................................................36

Ill. Const., art. VII, § 10 .......................................................................................34, 35

U.S. Const., amend. 5 .................................................................................................19

**INTRODUCTION**

The City of Chicago has the unique opportunity to bring a world-class historical, cultural, and recreational center, the Obama Presidential Center ("OPC"), to the City's South Side. The OPC will allow local and global visitors to experience the official artifacts and records telling the story of our Nation's first African-American President – a story framed by the Obama Administration's eight-year history, our country's broader social struggles and successes, and Chicago's own history, given President and Mrs. Obama's local roots. To further benefit the public, and consistent with its mission as a presidential center, the OPC will provide many new and enhanced educational and recreational amenities to the community. Its buildings and open spaces will provide countless opportunities for visitors to enjoy lectures, concerts, movies, athletic competitions, and other civic and cultural events.

As expressly authorized by state law, the City of Chicago, following extensive public debates and hearings, determined that a strip of parkland on the western edge of Jackson Park was a proper and fitting location for this unique and historic presidential center. The OPC project will upgrade and reinvigorate the underused open spaces currently on the site, adding new features like nature walks, a sledding hill, and landscaped contemplative spaces while preserving and improving access to the historical Women's Garden on the site. And it will restore the original, physical connection between the site – now an island surrounded by multiple lanes of traffic – and the rest of Jackson Park by transforming the adjacent streets into new parkland. This will enhance the public's access to the park's other historic attractions, including the Museum of Science and Industry, the Wooded Island and lagoons, and the lakefront.

The OPC will join a host of other privately-operated museums and cultural institutions that sit on Chicago parkland: the Adler Planetarium, Field Museum and John G. Shedd Aquarium in Burnham Park; the Art Institute of Chicago in Grant Park; the National Museum of

Mexican Art in Harrison Park; the Institute of Puerto Rican Arts and Culture in Humboldt Park; the Museum of Science and Industry in Jackson Park; the Museum of Contemporary Art in Lake Shore Park; the Peggy Notebaert Nature Museum and Chicago History Museum in Lincoln Park; and the DuSable Museum of African American History in Washington Park. Indeed, Chicago has spliced museums into public parkland for over a century, famously building an entire "White City" in Jackson Park itself in 1893 for the World's Columbian Exposition.

The Barack Obama Foundation ("Foundation"), a 501(c)(3), not-for-profit corporation, will pay to build and operate the OPC, yet both the OPC and the surrounding parkland within the OPC site will become and remain City – not Foundation – property. No tax money collected under the Illinois Park District Aquarium and Museum Act, 70 ILCS 1290 ("Museum Act"), will or can legally be used to build or sustain the OPC because the City, not the Park District, will control the site. And revenue from admission fees will be put back into the OPC, as required by law, to fund its maintenance and operation.

In short, the OPC will provide Chicago with a major and unique cultural and historical institution as well as a revitalized and better integrated park, all owned by the City. It is a singular opportunity for the South Side, Chicago as a whole, and Illinois. Unsurprisingly, the Illinois General Assembly explicitly recognizes as much. As the General Assembly declared in the Museum Act, museums – including presidential centers – "serve valuable public purposes, including, but not limited to, furthering human knowledge and understanding, educating and inspiring the public, and expanding recreational and cultural resources and opportunities," and therefore may be built on parkland. 70 ILCS 1290/1. The Museum Act thus echoes what the Illinois Supreme Court long ago explained: that "[p]ark purposes are not confined to a tract of land with trees, grass, and seats." Furlong v. South Park Comm'rs, 320 Ill. 507, 511 (1926).

This lawsuit seeks to block construction of the OPC on the theory that, notwithstanding the OPC's unquestionable benefits to the public, the state "public trust" doctrine *prohibits* buildings on the OPC site and *requires* the site to remain unimproved, open parkland.  In essence, Plaintiffs ask this Court to forbid municipal authorities from concluding that a City-owned center allowing the public to study the historic presidency of Chicago's first U.S. President and located in a neighborhood closely connected with him and his family is in the public interest, despite the General Assembly's express declaration that it is.  Plaintiffs' contention is squarely contradicted by the law, misunderstands the status of the OPC site at the time Jackson Park was created, and grossly distorts the public trust doctrine.  It is also contradicted by Chicago's long-established history of embracing museums in parks, and the underlying policy – endorsed by state law – that museums in these locations enhance civic life.

Plaintiffs' two federal claims are even further afield.  The first seeks to shoehorn every Illinois resident's "beneficial interest" in public parks into a protected "private property interest" under the federal Due Process Clause.  And the second tries to make a First Amendment case out of speculation that local tax money may be used to support the OPC in the future – even though the law prohibits it.  These claims are not only meritless, but Plaintiffs lack Article III standing to assert them (or any other claim) in this Court.

Plaintiffs' claims can and should be rejected now, without further proceedings or discovery.  As detailed here, documents incorporated in the Complaint or Answer or that can be judicially noticed provide all that is necessary to conclude that Plaintiffs' claims lack merit.  Defendants thus respectfully request that the Court dismiss this case for lack of jurisdiction or, in the alternative, enter judgment in Defendants' favor without delay.

# BACKGROUND

## A.     The OPC Site.

The Jackson Park site selected for the OPC is shown on an Existing Land Use Map

appended to City Ordinance SO2018-123. Ex. 1 (PD Ordinance) at 77196. The site lies on the

western edge of Jackson Park and includes existing parkland bounded by South Stony Island

Avenue on the west, North Midway Plaisance on the north, South Cornell Drive on the east, and

East Hayes Drive on the south. Id. When the state authorized the creation of Jackson Park in

1869, the OPC site was not submerged under Lake Michigan. See Defs.' Mot. to Dismiss for

Lack of Jurisdiction and for Judgment on Pleadings ¶ 7 (explaining how and why court may take

judicial notice of facts apparent from cited maps); Ex. 2-4 (historical maps of site location).

Several features currently separate the OPC site from the lake by approximately half a mile,

including six-lane Cornell Drive, the lagoons and Wooded Island of Jackson Park, Jackson

Park's golf driving range and other grounds, Lake Shore Drive, and a pedestrian and bike path.

Ex. 1 (PD Ordinance) at 77196.

In addition to the various structures that will be part of the OPC, the site will include new

parkland created by vacating portions of streets adjacent to existing parkland:  Cornell Drive

between North Midway Plaisance and East Hayes Drive, and South Midway Plaisance between

Stony Island Avenue and Cornell Drive.  Ex. 1 (PD Ordinance) at 77195, 77198; Ex. 5, Ex. G

thereto (Depiction of Road Closures).  As the City Council found, "construction of the OPC and

development of the OPC Site along with the roadway changes in and around Jackson Park will

result in a net gain of approximately three to four acres of new, added green space within

Jackson Park." Ex. 5 (Operating Ordinance) at 85884.  In total, the site will be 19.3 acres, or just

3.6% of the 542.89 acres comprising Jackson Park.  Ex. 1 (PD Ordinance) at 77186 ¶ 1;

https://www.chicagoparkdistrict.com/parks-facilities/jackson-park.

B.      **The Municipal Approval Process.**

Multiple public bodies reviewed and approved the OPC after extensive public meetings with opportunities for public comment.  In February 2015, the Park District's Board of Commissioners voted to approve the transfer of Jackson Park land to the City for use by the Foundation to build and operate the OPC.  Ex. 6 (Meeting Minutes).  Transfer of the site to the City would permit the City, with its capacity to undertake large-scale infrastructure and planning initiatives, to oversee the project.  The meeting was open, and members of the public spoke and submitted written comments.  Id.[1]

Next, because the site is in Jackson Park, the Chicago Plan Commission reviewed the project to ensure conformity with the thirteen purposes of the Lake Michigan and Chicago Lakefront Protection Ordinance, Municipal Code of Chicago, § 16-4-010, et seq.  Two of those purposes are (1) "to insure that the lakefront parks and the lake itself are devoted only to public purposes and to insure the integrity of and expand the quantity and quality of the lakefront parks," and (2) "to promote and provide for pedestrian access to the lake and lakefront parks from and through areas adjacent thereto at regular intervals of one-fourth mile and additional places wherever possible, and to protect and enhance visits at these locations and wherever else possible."  Id. § 16-4-030(e), (g).  The Plan Commission held a public hearing on May 17, 2018, where representatives of the City's Department of Planning and Development and the Foundation discussed the proposal, and more than 75 members of the public also commented.  Dkt. 38-4 (Ex. 3 to Answer).  The Plan Commission approved the proposal and adopted the

---

[1] A video of the meeting appears at: http://chicagoparkdistrict.granicus.com/MediaPlayer.php?view_id =2&clip_id=85.  Following that meeting, the boundaries of the site shifted to the north and east.  See Ex. 5, Ex. C thereto (Comparison of Original and Revised Sites).  The Board of Commissioners confirmed authority to transfer the reconfigured site in another public meeting in February 2018.  See http://chicagoparkdistrict.granicus.com/MediaPlayer.php?view_id=2&clip_id=212&meta_id=27291.

Department of Planning and Development's staff report as the Commission's findings of fact. Ex. 7 (LPO Resolution).

In addition, the City Council's Committee on Zoning, Landmarks and Building Standards held a public hearing on May 22, 2018 to address a zoning amendment – the Planned Development Ordinance – for the OPC site. The committee recommended that the full City Council approve the ordinance. Ex. 1 (PD Ordinance) at 77185. The City Council did so on May 23, 2018. Id. at 77185-86.

Finally, the City Council passed an "Operating Ordinance" allowing the City to accept title to the Jackson Park site from the Park District and to enter into agreements governing the Foundation's use of the site. After the Operating Ordinance was introduced to the Chicago City Council on September 20, 2018, the Council's Committee on Housing and Real Estate held a public hearing on October 11, 2018. Ex. 8 (Hearing Tr.). The Committee unanimously voted to recommend the ordinance's adoption, id. at 147-49, and the full City Council unanimously adopted the ordinance on October 31, 2018. Ex. 5 (Operating Ordinance).[2]

## C.    The Use Agreement.

One of the agreements authorized by the Operating Ordinance – the Use Agreement – sets the terms by which the Foundation may use the Jackson Park site for the OPC. Ex. 5 (Operating Ordinance), § 5; id., Exhibit D thereto (Use Agreement). Along with the PD Ordinance, which controls the size and layout of the buildings on the site, the Operating Ordinance and Use Agreement govern the OPC's nature and operations. For example, the

---

[2] That same day, the City Council enacted an ordinance authorizing the City to close South Midway Plaisance and a segment of Cornell Drive, as contemplated by the OPC project. See Journal of Proceedings of the City Council of Chicago, October 31, 2018, meeting, Vol. 1, at 85987 – 86004 (accessible at http://chicityclerk.s3.amazonaws.com/s3fs-public/document _uploads/journals-proceedings/2018/2018_10_31_VI.pdf).

Operating Ordinance and Use Agreement authorize the Foundation to use the site only to operate the OPC.  Ex. 5 (Operating Ordinance), §§ 4, 5; id., Ex. D thereto (Use Agreement), § 2.1.  Like agreements that apply to other museums within Chicago parks, these documents constitute an agreement to use the property (a use agreement), not a lease.  And neither the Operating Ordinance nor the Use Agreement allows the City to transfer ownership of the site to the Foundation.  Rather, after receiving title to the land from the Park District, the City will retain ownership of the OPC site.  If the Foundation fails to operate the OPC museum on the site in accord with the Use Agreement, the City may terminate the Use Agreement.  Ex. 5, Ex. D thereto (Use Agreement), § 16.2.

**D.    The OPC's Features.**

As specified in the governing City ordinances and the Use Agreement, the OPC will consist primarily of open green space, a Plaza, and four buildings.  Ex. 5 (Operating Ordinance) at 85880; id., Ex. D thereto (Use Agreement), § 2.1(b) (authorizing Foundation to build "Presidential Center Architectural Spaces"); Ex. 1 (PD Ordinance) at 77199.  It will also include an underground parking garage.  Id.

The principal building at the OPC will be the Museum Building; the City Council and the Foundation describe the operation of the Museum as the OPC's "central mission."  Ex. 5 (Operating Ordinance) at 85876; id., Ex. D thereto, Sub-Ex. C thereto (OPC mission statement). The Museum Building will feature artifacts and records from President Obama's presidency on loan from the National Archives and Records Administration ("NARA").  Ex. 5 (Operating Ordinance) at 85879-80; id., Ex. D thereto (Use Agreement), Recital J and § 6.3(e).  It will tell the stories of the first African-American President and First Lady of the United States, their connection to Chicago, and the individuals, communities, and social currents that shaped their local and national journey.  Ex. 5 (Operating Ordinance) at 85876, 85880.  As the Operating

Ordinance explains, the Foundation "is funding and collaborating with NARA" to digitize records from the Obama Administration, "which will give researchers, educators, students and any other interested persons the opportunity to study presidential history from any location around the world"; thus, "instead of dedicating space [in the OPC] to a physical archive that would have limited public access, the Foundation will use the remaining space in the OPC for cultural enrichment, public outreach, educational programs, a public library and community programs available to all." Id. at 85880.

In addition to the Museum Building, the OPC will contain a Forum Building; a Library Building; and a Program, Athletic, and Activity Center. Ex. 5 (Operating Ordinance) at 85880; id., Ex. D thereto (Use Agreement), Recital L. The Forum Building will contain collaboration and creative spaces, including an auditorium, meeting rooms, recording and broadcasting studios, and a winter garden and restaurant. Ex. 5 (Operating Ordinance) at 85881. The Library Building will include a branch of the Chicago Public Library housing a multimedia collection and spaces for reading and study. Id. It will also house a President's Reading Room, with exhibits relating to the importance of literacy, education, and community service, as well as a selection of books and other materials significant to President Obama. Id. The Program, Athletic, and Activity Center will host large-scale indoor programs and allow for formal and informal recreational activities. Id.

The OPC will include extensive open green and recreational spaces as well. These spaces – defined in the Use Agreement as the "Presidential Center Green Space," "Green Space," and "Plaza," and depicted on Exhibit D to the Use Agreement – will include features such as a sloped lawn for picnicking and recreation, a nature walk along the lagoons and other walking paths, a sledding hill, play areas for children, and natural contemplative spaces. See id. Like the

rest of Jackson Park, these areas will generally be open to the public during regular Chicago Park District hours. Id., Ex. D thereto (Use Agreement), § 6.2.[3] Moreover, the Foundation will preserve and enhance the existing Women's Garden and Lawn, keeping it open and available as green space, while making it more accessible for visitors to Jackson Park. Ex. 5 (Operating Ordinance) at 85881. And natural landscaping features will be used to integrate some of the buildings into the surrounding green space. Ex. 1 (PD Ordinance) at 77200-11.

**E. Construction, Ownership, and Use of the OPC.**

The Foundation will construct the OPC's buildings at its own expense and, upon completion, transfer ownership of the buildings and other site improvements to the City at no charge. Ex. 5, Ex. D thereto (Use Agreement), §§ 2.1, 4.4. The Foundation also will maintain the OPC site and buildings at its sole expense for the entire, 99-year life of the Use Agreement. Id. §§ 2.2, 7.1. The City is not obligated to enter into the Use Agreement until the Foundation establishes an endowment for the OPC and the site and confirms that it has funds or commitments sufficient to pay the projected construction costs. Ex. 5 (Operating Ordinance) at 85884; id., Ex. E thereto (Master Agreement), § 12.

The Foundation must operate the OPC in accord with the Museum Act's free admission requirements, including free admission to all Illinois residents at least 52 days out of the year and to all Illinois school children accompanied by a teacher. Ex. 5, Ex. D thereto (Use Agreement), § 6.1; 70 ILCS 1290/1. Further, the Foundation may not use the OPC for political fundraisers or

---

[3] As is common in construction projects of the OPC's size and scope, certain design details may be refined going forward. For example, the site plan may require modification to account for in-the-field conditions or safety requirements. Any such changes here will remain subject to the Use Agreement and authorizing ordinances. To the extent that a design change would be so material as to require a new and independent City approval, the Foundation will be required to seek and obtain it. Municipal Code of Chicago § 17-13-0611.

in any manner inconsistent with its status as an I.R.C. § 501(c)(3) "public charity." Ex. 5, Ex. D

thereto (Use Agreement), § 6.3(d); Ex. 9 (IRS Letter).

## F.    The City Council's Findings.

In the course of approving the OPC, the City Council concluded that transfer of the site

from the Park District to the City was necessary.  The Council recounted that, during the

selection process for a city and site to host the OPC, "the Foundation expressed concerns

regarding the City's lack of control" over the Jackson Park site (and a potential site in

Washington Park).  Compl., Ex. A at 2.  The Council also found that "the City, with its home

rule authority and large planning, transportation and other infrastructure departments, is well-

situated to facilitate the various large-scale infrastructure and investment initiatives in and

around the OPC and to oversee the development and operation of the OPC in accordance with

the agreements as described herein."  Ex. 5 (Operating Ordinance) at 85878.

The City Council determined that the OPC would benefit the City and the public in

numerous ways.  Most obviously, locating the OPC in Chicago would offer Chicago residents

the opportunity to experience a presidential museum "telling the story of our nation's first

African-American President and First Lady, their journey to the White House, [and] their

historical connection to Chicago."  Id. at 85876.  Additionally, work at the site would beautify

the grounds, and the Foundation would provide ongoing financial and operational support for

public historical, cultural, and recreational enrichment activities.  Id. at 85883.  The City would

receive title to all OPC buildings and improvements at no charge, while the Foundation would

operate, maintain, and insure such buildings and improvements for the term of the Use

Agreement.  Id.  The City Council further concluded that "locating the OPC in Jackson Park will

generate momentum for the development of a 'Museum Campus South,' one of the initiatives

identified in the Chicago Cultural Plan of 2012, which has the goal of connecting major

institutions on the South Side and creating new opportunities for collaboration and growth." Id. at 85878. Moreover, "construction of the OPC and development of the OPC Site will support local businesses and encourage additional investments in the area." Id. at 85882. The Council thus explained that "the Foundation's selection of Chicago for the OPC is a great honor and unparalleled opportunity for the State of Illinois, all of the City, and especially the South Side," and "the location of the OPC in Jackson Park will underscore the vital role the OPC plays in the public life of Chicago and will encourage greater use and enjoyment of the park and lakefront." Id. at 85885.

As to park and lakefront access in particular, the City Council observed that "in its current state, the OPC Site is isolated from the rest of Jackson Park and from the surrounding neighborhood by busy roadways, including six lanes of traffic on South Cornell Drive to the east, two lanes of traffic on South Stony Island Avenue to the west, two lanes of traffic on the westbound Midway Plaisance to the north, and two lanes of traffic on East Hayes Drive to the south." Id. at 85882. Accordingly, "residents and visitors using the OPC Site in its current state cannot access the contiguous parts of Jackson Park, such as the lagoons and the lakefront, without crossing six lanes of traffic at road-level on South Cornell Drive." Id. The City Council found that the OPC plans and related street improvements will "improve the connection of the OPC Site to the Museum of Science and Industry," id. at 85879, and "will enhance pedestrian access from the neighborhood to the OPC Site and from there to the lakefront, through the reconfiguration of roadways and the construction of additional pedestrian underpasses, signalized crossings and pedestrian refuge islands." Id. at 85882.

"[I]n sum," the Council concluded, "the OPC will feature a museum that memorializes and examines President Obama's historic presidency within the larger story of American history,

11

inspire visitors to engage actively in their own communities, showcase the South Side and Jackson Park to the nation and world, enhance the park's recreational value, attract cultural tourism to the South Side, create direct and indirect economic development benefits, strengthen Chicago's reputation as a global city, and enable the City to directly advance its previously adopted Cultural Plan." Id. at 85886.

## ARGUMENT

In this case, Plaintiffs claim that the plans for the OPC violate the public trust doctrine and related state doctrines as well as the Due Process Clause and First Amendment of the federal Constitution. These claims fail for multiple, independent reasons, each of which is apparent based on the existing record.

To begin, Plaintiffs cannot establish federal subject matter jurisdiction. All of Plaintiffs' claims rest on a generalized and inchoate grievance that is insufficient to confer standing under Article III, regardless of whether a state court would have jurisdiction to adjudicate the claim. Even if the Court did have jurisdiction, moreover, Plaintiffs' federal claims fail on the merits. Plaintiffs cannot transform their state law claims into a federal due process violation, and their purported First Amendment objections are speculative and contrary to binding precedent.

Plaintiffs' state law claims are equally meritless. The public trust doctrine does not bar the City from using this site for the OPC for two independent reasons. First, the version of the public trust doctrine that applies to lands previously submerged under Lake Michigan does not apply here because the OPC site was not submerged, as established by judicially noticeable documents described below. The site is part of a public park because in 1869, the General Assembly established parkland that includes Jackson Park on then-existing land. Because the General Assembly chose to create the parkland at issue here (the OPC site) from existing land, not land formerly submerged by Lake Michigan, the General Assembly has the power to decide

12

– as it has – that presidential centers and other museums are an appropriate use of that land. That determination by the General Assembly conclusively resolves the OPC's legality under Illinois law and establishes that the public trust doctrine does not bar the Defendants from establishing the OPC on this site.

Second, the conclusion is the same even if the submerged-land version of the public trust doctrine, as set out in cases relating to formerly-submerged lands, applies. Given the unique and quintessentially public benefits the OPC will provide and the public ownership and control the City will retain, that version of the public trust doctrine is satisfied too. Under the governing contract between the City and the Foundation – a Use Agreement for a fixed term of 99 years – the City will retain ownership of the land *and* gain ownership of the OPC's buildings after the Foundation builds them at its own expense. Further, the Use Agreement authorizes the Foundation to occupy and use the land and buildings only for the OPC, and not for other, unapproved purposes. The OPC is in these ways comparable to the several other museums that have long stood in Chicago parks – including the Museum of Science and Industry in Jackson Park – which are likewise privately operated pursuant to use agreements with the government owning the parkland.

For these reasons, and others discussed below, this case is readily distinguished from Friends of the Parks v. Chicago Park District, No. 14-cv-9096 (N.D. Ill.) ("Lucas"). Among other distinctions: (i) the museum in Lucas was sited on previously submerged land, a fact the court repeatedly emphasized in its opinions; (ii) the governing contract in Lucas was a 99-year ground lease with multiple options to renew, not a fixed-term use agreement as here; and (iii) the entity operating the museum in Lucas would retain ownership of the buildings rather than surrender them to a government body. Even if the analysis in Lucas were persuasive, therefore,

13

that case would not support Plaintiffs' claims here.

## I. The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims.

To have Article III standing, a plaintiff must show a "concrete and particularized injury" that affects him in a "personal and individual" way. Hollingsworth v. Perry, 570 U.S. 693, 704, 705 (2013). A mere "generalized grievance," "no matter how sincere," is not enough. Id. at 706. Nor does standing exist where "concerned bystanders" bring litigation "as a vehicle for the vindication of value interests." Id. at 707 (quotation marks omitted). These requirements protect the separation of powers by ensuring that courts "do not engage in policymaking properly left to elected representatives." Id. at 700.

Plaintiffs allege standing as purported "beneficiaries of a trust and taxpayers supporting the Park District." Compl. ¶ 55. Specifically, they contend that there is a "public trust" requiring Jackson Park to serve solely as open parkland, and that the OPC will injure their beneficial interests in this trust by "depriv[ing] each citizen of their fractional interest in public trust land." Compl. ¶ 16. They also allege that they will pay a Park District tax that will purportedly be used to fund "upkeep" of the OPC. Id. ¶ 7. Neither theory confers standing.

First, by their own admission, Plaintiffs' interest as alleged trust beneficiaries belongs to "each citizen," meaning the interest is common to *all* Illinois residents. But as a matter of law, a plaintiff "seeking relief that no more directly and tangibly benefits him than it does the public at large" lacks the required "personal stake" that Article III standing requires. Hollingsworth, 570 U.S. at 706; see also id. at 707 (plaintiffs were "deeply committed" to defending a law, but they lacked standing because their interest was no different from that "of every citizen of [the state]").

To be sure, *Illinois* law recognizes standing in *state* court to assert the violation of the state public trust doctrine (although without concluding that this equates to a private property

right).  See Paepcke v. Public Bldg. Comm'n, 46 Ill. 2d 330, 341 (1970).  But as the Supreme

Court has held, "standing in federal court is a question of federal law, not state law," and "the

fact that a State thinks a private party should have standing to seek relief for a generalized

grievance cannot override . . . settled [federal] law to the contrary."  Hollingsworth, 570 U.S. at

715; see also Illinois ex rel. Ryan v. Brown, 227 F.3d 1042, 1045 (7th Cir. 2000) ("The mere fact

that Illinois courts would recognize the plaintiff's standing to bring such an action . . . does not

mean that he has standing to bring a federal action arising from the same occurrence.").  Thus,

the fact that Illinois affords generalized, citizen standing to assert state-law public trust claims in

state court does not entitle Plaintiffs to maintain those claims in federal court.  See Nguyen v.

City of Cleveland, 2016 WL 1031096, at *8 (N.D. Ohio Mar. 15, 2016) (holding that public trust

doctrine "is a matter of state law" and therefore did not relieve plaintiff "of the burden of

demonstrating Article III standing"), aff'd sub nom. United States ex. rel Nguyen v. City of

Cleveland, 2017 WL 4677202 (6th Cir. Mar. 3, 2017).  As the Supreme Court has emphasized,

states cannot expand a federal court's "limited" role "simply by issuing to private parties who

otherwise lack standing a ticket to the federal courthouse."  Hollingsworth, 570 U.S. at 715.[4]

Plaintiffs do not have standing as Park District taxpayers either.  Their taxpayer theory

alleges a generalized grievance common to thousands, if not millions, of residents who pay the

---

[4] Defendants recognize that in Friends of the Parks v. Chicago Park District, 2015 WL 1188615,
at *3 (N.D. Ill. Mar. 12, 2015) ("Lucas I"), the district court concluded that Paepcke was
sufficient to create Article III standing, but that conclusion is incompatible with both
Hollingsworth and Brown (neither of which the district court discussed).  E.g., Hollingsworth,
570 U.S. at 714 (holding that petitioners lacked federal standing despite the California Supreme
Court's "eloquent[]" "reasons for deciding that state law authorized petitioners to defend
Proposition 8").  The Lucas I opinion also cited Lake Michigan Federation v. U.S. Army Corps
of Engineers, 742 F. Supp. 441 (N.D. Ill. 1990), which pre-dated Hollingsworth and Brown and
did not address standing in any event.  Cf. Hibbs v. Winn, 542 U.S. 88, 126-27 (2004) ("[T]his
Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it
was passed sub silentio.").

same tax. Were that not enough, Plaintiffs cannot allege that any Park District tax revenue will be spent on the OPC. "A plaintiff's status as a municipal taxpayer is irrelevant for standing purposes if no tax money is spent on the allegedly unconstitutional activity." Freedom From Religion Found., Inc. v. Zielke, 845 F.2d 1463, 1470 (7th Cir. 1988). Plaintiffs contend that a "special add-on Park District real estate tax [will be used] to pay for the Presidential Center's upkeep." Compl. ¶ 7; see also id. ¶¶ 119–20. But judicially noticeable material shows that this is false. The Use Agreement requires the Foundation to bear sole financial responsibility for the OPC's upkeep. See Ex. 5, Ex. D thereto (Use Agreement), § 7.1. Moreover, no tax levied under the Museum Act may be used to support the OPC, for such taxes are available only to fund museums on parkland that the Park District controls. See 70 ILCS 1290/2. Here, the Park District will not own or control the OPC site.

## II.     The Federal Claims Fail.

### A.     Plaintiffs Have No Due Process Claim.

In Count I, Plaintiffs allege that locating the OPC in Jackson Park violates their federal due process rights. They do not claim lack of notice or the opportunity to be heard at the public meetings approving the OPC. Nor could they – all of the Park District and City meetings were open to the public, and public comment was permitted. Rather, Plaintiffs' federal due process claim rests entirely on the substantive requirements of Illinois law. In particular, Plaintiffs contend that their due process rights were violated because the Park District's transfer of the Jackson Park site to the City and the City's entry into a contract with the Foundation to develop the OPC are purportedly unauthorized under the Illinois Constitution and state statutes. See Compl. ¶ 60 (Park District Code, 70 ILCS 1205/0.01 et seq.); ¶¶ 6, 63-64 (Article VII, section 10 of the Illinois Constitution ); ¶¶ 65-68 (Intergovernmental Cooperation Act, 5 ILCS 220/1 et seq.); ¶¶ 69-78 (Local Government Property Transfer Act, 50 ILCS 605/1 et seq.); ¶¶ 79-81

(Park District Aquarium and Museum Act).[5]

As explained below in Parts III–VI, the premise of Plaintiffs' due process claim is wrong: Defendants did not violate state law. But Plaintiffs' due process claim fails for an even more basic reason. It is well-established that "[a] violation of state law is not a denial of due process of law." Coniston Corp. v. Vill. of Hoffman Estates, 844 F.2d 461, 467 (7th Cir. 1988). As the Seventh Circuit has repeatedly held, "[f]ailure to implement state law violates that state law, not the Constitution." River Park, Inc. v. City of Highland Park, 23 F.3d 164, 166-67 (7th Cir. 1994). Thus, "the due process clause does not require, or even permit, federal courts to enforce the substantive promises in state laws and regulations." Mid-American Waste Sys., Inc. v. City of Gary, 49 F.3d 286, 290 (7th Cir. 1995). "Were the rule otherwise, federal courts would sit effectively as appellate tribunals over every state proceeding," Tucker v. City of Chicago, 903 F.3d 487, 495 (7th Cir. 2018), and "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." Archie v. City of Racine, 847 F.2d 1211, 1217 (7th Cir. 1988) (en banc) (quoting Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984)).[6] Thus, even if Plaintiffs could show that development of the OPC was somehow improper (and they cannot) that still would not establish any violation of the federal Due Process Clause.

---

[5]  In Paragraph 60, the Complaint wrongly calls the Park District Code the Park District "Act." Paragraph 65 also incorrectly attributes the quoted statutory language to the Intergovernmental Cooperation Act, whereas that language actually appears in sections 1(d) and 2(b) of the Local Government Property Transfer Act.

[6] Friends of the Parks v. Chicago Park District, 160 F. Supp. 3d 1060 (N.D. Ill. 2016) ("Lucas II"), is not to the contrary. Unlike Plaintiffs here, the plaintiffs in Lucas II alleged a due process violation based on the General Assembly's purportedly inadequate procedure for amending the Museum Act. Id. at 1064-65. Lucas II did not consider whether a mere violation of state law can form the basis of a federal due process claim. As cases like Tucker and River Park demonstrate, it cannot.

Plaintiffs' due process claim also fails for the separate and independent reason that they have no cognizable property interest in the OPC site protected by the Constitution, meaning there can be no due process violation as a matter of law. See Cole v. Milwaukee Area Tech. Coll. Dist., 634 F.3d 901, 904 (7th Cir. 2011). For a property interest to rise to the level of being constitutionally protected, it must be so "secure and durable" that Plaintiffs have a "legitimate claim of entitlement" to it. Kvapil v. Chippewa Cty., 752 F.3d 708, 713 (7th Cir. 2014). Plaintiffs' desire for, or unilateral expectation of, a benefit is not enough. See Bd. of Regents of State Coll. v. Roth, 408 U.S. 564, 577-78 (1972).

Plaintiffs contend that their protected property interest is the "fractional beneficial interest in the Jackson Park site" that all residents hold under the Illinois public trust doctrine. Compl. ¶ 82. But Illinois law – including a case rejecting a challenge to a museum building in Jackson Park – is clear that the "interest as citizens entitl[ing] [plaintiffs] to enjoy the park and to desire that it be preserved" and "remain untouched" does not rise to the level of a due process property interest. Petersen v. Chicago Plan Comm'n, 302 Ill. App. 3d 461, 467 (1st Dist. 1998) (plaintiffs challenging Museum of Science and Industry's expansion in Jackson Park lacked protected property interest); see also Residences at Riverbend Condo. Assoc. v. City of Chicago, 5 F. Supp. 3d 982, 987-88 (N.D. Ill. 2013) (relying on Petersen to hold that opponents of development project had no due process property right in how land would be used). Indeed, even residents owning property next to the parkland being developed have no private property right. See Paepcke, 46 Ill. 2d at 338 (property owners adjacent to parkland have no "private property right to continuation of the park use of which even the legislature cannot deprive them"); Reichelderfer v. Quinn, 287 U.S. 315, 318-19 (1932) (neighboring landowners had no private property interest in public park).

Finally, although Count I purports to raise a takings claim, see Compl., ¶ 85, such a claim fails under the plain language of the Takings Clause, which states: "nor shall *private* property be taken for public use, without just compensation." U.S. Const., Amdt. 5 (emphasis added). No taking occurs where, as here, the property at issue is public. See, e.g., Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot., 560 U.S. 702, 715 (2010) ("the Takings Clause bars the State from taking *private* property without paying for it") (emphasis added); Reichelderfer, 287 U.S. at 323 ("[p]roperty was not taken" when legislation authorized new development on public parkland).

### B. Plaintiffs Have No First Amendment Claim.

Plaintiffs claim in Count VI that their First Amendment rights will be violated based on their allegation that (i) the OPC will be used for partisan political activity and (ii) residents with contrary views will have to support that supposed political activity in the future because of a tax under the Museum Act. This claim fails for two independent reasons. First, the claim is not ripe, for both parts of Plaintiffs' allegation are not only speculative, but are contrary to what the law requires the Foundation to do. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (quotation marks omitted). Plaintiffs' argument ignores that, by law, no Museum Act tax revenue will go to the OPC in light of the City's ownership and control of the land. See Part I supra.

Moreover, it is sheer speculation that the OPC would be used as Plaintiffs allege, and the activity they hypothesize is explicitly barred by law. It will be years before the OPC opens its doors, and Section 6.3(d) of the Use Agreement provides that "[t]he Foundation shall not use or allow the Subject Property to be used for political fundraisers or use or occupy, or authorize the

use or occupancy of, the Subject Property or Project Improvements, in whole or in part, in a manner that would be inconsistent with the Foundation's status as a tax exempt entity under Section 501(c)(3) of the Internal Revenue Code." The Foundation's tax exempt status, in turn, means that it cannot "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3). In short, Plaintiffs ask the Court for an advisory opinion, based on a presumption that years from now the Foundation might violate the law and legal documents governing the site. See Jones v. Griffith, 870 F.2d 1363, 1366 (7th Cir. 1989) ("A dispute must have ripened into a legal case before a federal court can act; the case must not lie merely in the future.").

Second, Plaintiffs' First Amendment claim fails on the merits. Governments regularly fund private programs in which funding recipients express their ideas. Declaring such activities unconstitutional merely because the funding is derived from tax dollars would be an extraordinary step, "render[ing] numerous [g]overnment programs constitutionally suspect." Rust v. Sullivan, 500 U.S. 173, 194 (1991). And that is not the law. See id.; Regan v. Taxation With Representation of Wash., 461 U.S. 540, 548-49 (1983) (Congress may "enact a statute providing public money for an organization dedicated to combatting teenage alcohol abuse, and impose no condition against using funds obtained from Congress for lobbying," and governmental "selection of particular entities or persons for entitlement to this sort of largesse" is "obviously a matter of policy and discretion not open to judicial review").

To be sure, in certain limited contexts, the Supreme Court has held that members of a discrete and identifiable private organization – such as a labor union, trade association, or state bar association – who object to the organization's expressive activities may not be compelled to

subsidize them. But the Court has never held that this "compelled subsidy" doctrine limits the government's use of revenue derived from a generally-applicable tax. "Compelled support of government"– even "those programs of government one does not approve" – is "perfectly constitutional, as every taxpayer must attest." Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 559 (2005). Where the "provision of subsidies is not aimed at the suppression of dangerous ideas," the government has broad power to spend tax revenue to "encourage actions deemed to be in the public interest" – even if some may disagree. Regan, 461 U.S. at 550 (internal quotation marks omitted).[7]

## III. The OPC Does Not Violate The State Public Trust Doctrine.

Plaintiffs' claim in Count II – that a state-law public trust requires the Jackson Park site to remain open parkland – likewise fails as a matter of law. Plaintiffs contend that an 1869 Illinois law ("1869 Statute") creates a "public trust" on the site. See Compl. ¶¶ 27-29, 90 (discussing An Act to Provide for the Location and Maintenance of a Park for the Towns of South Chicago, Hyde Park and Lake, Private Laws, 1869, vol. 1, p. 358 et seq.). But the General Assembly made clear in the Museum Act that presidential centers *are* an authorized use of parkland. This statutory authorization alone disposes of Plaintiffs' claim.

Nor is there anything to Plaintiffs' theory that the public trust doctrine applies because

---

[7] Even if the compelled subsidy doctrine applied to the government's expenditure of general tax revenue, any connection between Plaintiffs' tax payments and purported partisan activity at the OPC would be far too attenuated to support relief. Plaintiffs' tax payment under the Museum Act would be a minuscule fraction of the revenue collected from Chicago taxpayers; only a portion of that payment would go to the OPC (since it would be divided between other museums); and an even smaller fraction would be attributable to expressive activities at the OPC (rather than to OPC maintenance and operation). This is a far cry from "the clear connection between fee payer and offensive speech" that has "loomed large" in the Supreme Court's "union and bar cases" and therefore does not implicate the First Amendment. Bd. of Regents of Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 240 (2000) (Souter, J., concurring).

the OPC site was once submerged under Lake Michigan. Judicially noticeable material definitively shows that the site was not previously submerged, and this version of the public trust doctrine – as set out in cases applying it to sites previously submerged under Lake Michigan – therefore does not apply. Even if it did, legislative findings, the OPC's undeniable public benefits, and the City's retained ownership and control of the site doom this alternative public trust theory.

### A.    The Museum Act disposes of Plaintiffs' public trust claim.

The 1869 Statute created the South Park Commissioners (a predecessor of the Chicago Park District) and directed them to acquire lands encompassing today's Jackson Park. See Compl. ¶ 27; 1869 Statute, §§ 1, 4. The law required the Commissioners and their successors to hold this land "as a public park, for the recreation, health and benefit of the public, and free to all persons forever, subject to such necessary rules and regulations as shall from time to time be adopted by said commissioners and their successors." 1869 Statute, § 4; see also Clement v. O'Malley, 95 Ill. App. 3d 824, 828 (1st Dist. 1981) (explaining that Jackson Park was created by, and is subject to, the 1869 Statute). Plaintiffs contend that the OPC will violate this statutory directive. But Plaintiffs ignore the later-enacted Museum Act, which expressly authorizes museums, including *presidential centers*, as an appropriate and beneficial use of public parkland.

Under Illinois law, the General Assembly may authorize development on parkland that it previously established on then-existing land by passing legislation containing a "sufficient manifestation of legislative intent to permit the diversion and reallocation contemplated" by a particular development plan. Paepcke, 46 Ill. 2d at 342. That test – set out in Paepcke, a case that involved the very statute creating Jackson Park (the 1869 Statute) – is easily met here.

First, the Museum Act permits construction of a presidential center on parkland. Its

opening sentence states that cities and park districts with control or supervision over public parks are "authorized to purchase, erect, and maintain within any such public park or parks edifices to be used as aquariums or as museums of art, industry, science, or natural or other history, *including presidential libraries, centers, and museums* . . . ." 70 ILCS 1290/1 (emphasis added).

Second, the statute expressly authorizes the City to contract with the Foundation to build and operate the OPC: Cities may "permit the directors or trustees of any corporation or society organized for the construction or maintenance and operation of an aquarium or museum as hereinabove described to erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate its aquarium or museum . . . and to contract with any such directors or trustees of any such aquarium or museum relative to the erection, enlargement, ornamentation, building, rebuilding, rehabilitation, improvement, maintenance, ownership, and operation of such aquarium or museum." Id.; see also Furlong, 320 Ill. at 511 (upholding South Park Commissioners' authorization of private corporation to renovate and operate museum building in Jackson Park).

Third, the Museum Act's authorization applies to Jackson Park. The statute states that it governs "any" public park controlled by a city or park district. Contrary to Plaintiffs' claim, see Compl. ¶ 79, the statute need not refer to Jackson Park by name. In Paepcke, the Illinois Supreme Court held that subsequent statutes authorized facility construction in Washington Park (which, like Jackson Park, became parkland under the 1869 Statute) even though those later laws did not specifically identify Washington Park or even acknowledge the 1869 Statute's dedication. See Paepcke, 46 Ill. 2d at 343. It was enough that the later statutes "evidenced an intention on the part of the General Assembly to . . . authoriz[e] the program of school and recreational facilities in parks" (id. at 342-43) – just as the Museum Act plainly "evidences an

23

intention" to authorize presidential centers and other museums in parks here.

Plaintiffs contend that the Museum Act "does not release" the 1869 statutory dedication, Comp. ¶ 80, but the Museum Act need not negate the 1869 Statute to have effect. Rather, the Act reflects the legislature's binding determination that presidential centers, like other museums, are *consistent with* a parcel's designation as parkland – i.e., that use of parkland for a presidential center or other museum is "for the recreation, health and benefit of the public." 1869 Statute, § 4.

In addition, it has long been established under Illinois law that "[p]ark purposes are not confined to a tract of land with trees, grass, and seats." Furlong, 320 Ill. at 511. Almost a century ago, the Illinois Supreme Court declared that "[t]he construction of and maintenance of a building for museums, art galleries, botanical and zoological gardens, and many other purposes, for the public benefit, are recognized as legitimate purposes." Id. Indeed, Plaintiffs' claim that museums authorized by the Act are incompatible with parkland would throw into doubt the eleven other museums in Chicago parks, including the Museum of Science and Industry and the DuSable Museum of African American History, which like the OPC are located in parkland created by the 1869 Statute.[8]

Nor is there anything to Plaintiffs' claim that, because the OPC will charge admission

---

[8] Of course, if there were a conflict between the Museum Act and the 1869 Statute, the Museum Act would control. It "would be contrary to well established precedent" to hold that the General Assembly could never "change or reallocate" the 1869 dedication. Paepcke, 46 Ill. 2d at 340. "[T]he legislature represents the public," and "[s]o far as concerns the public, it may authorize one use to-day and another and different use tomorrow." People ex rel. Bransom v. Walsh, 96 Ill. 232, 250 (1880); see also People v. Ill. State Toll Highway Comm'n, 3 Ill. 2d 218, 234 (1954) ("Property devoted to the public use may be taken by authority of the legislature for a different public use, even if the earlier enterprise is thereby wholly destroyed."); Reichelderfer, 287 U.S. at 318 ("By dedicating the lands thus acquired to a particular public use, Congress declared a public policy, but did not purport to deprive itself of the power to change that policy by devoting the lands to other uses. The dedication expressed no more than the will of a particular Congress which does not impose itself upon those to follow . . . .").

fees, it will violate the 1869 Statute's requirement that dedicated lands be "free to all persons forever." See Compl. ¶ 66. "The mere existence of admission charges to public facilities, such as the museums and attractions in Burnham Park, as well as the stadium and parking facilities, does not impair the right of citizens to enjoy the use of public property." Friends of the Parks v. Chicago Park District, 203 Ill. 2d 312, 324 (2003) ("FOP"); see also Clement, 95 Ill. App. 3d at 834 (upholding admission fee for Jackson Park driving range, despite 1869 Statute, because fee "does not as such render the facility closed to the public, provided such fees are reasonable for the general population of the community"). In any event, Section 1 of the Museum Act expressly authorizes admission fees, so long as the museum offers free admission to all Illinois residents 52 days a year and throughout the year to Illinois school children accompanied by a teacher. 70 ILCS 1290/1. Here, the Use Agreement requires the OPC to comply with these terms. See Ex. 5, Ex. D thereto (Use Agreement), § 6.1.

In sum, under Paepcke, the fact that the Museum Act authorizes presidential centers ends the inquiry. As the Illinois Supreme Court explained, there has long been disagreement between "those members of the public who would preserve our parks and open lands in their pristine purity and those charged with administrative responsibilities who, under the pressures of the changing needs of an increasingly complex society, find it necessary, in good faith and for the public good, to encroach to some extent upon lands heretofore considered inviolate to change." 46 Ill. 2d at 347. But "the resolution of this conflict in any given case is for the legislature and not the courts. The courts can serve only as an instrument of determining legislative intent as evidenced by existing legislation measured against constitutional limitations. In this process the courts must deal with legislation as enacted and not with speculative considerations of legislative wisdom." Id.

**B.      The OPC is not barred by the public trust doctrine as it has been applied to formerly-submerged lands.**

Plaintiffs allege that the public trust doctrine also bars the OPC from being created on the site because unspecified portions of Jackson Park were formerly submerged under Lake Michigan, and that the Museum Act therefore is insufficient to demonstrate that the OPC satisfies Illinois's public trust doctrine.  See Compl. ¶¶ 45, 81.  But this theory fails on multiple grounds.  First, the OPC site is not located on land that was submerged and later reclaimed by human activity.  The site is located entirely within the western halves of the southwest and northwest quarters of Section 13 of Township 38 North, Range 14 East. As judicially noticeable maps from federal surveys conducted in 1822 and 1834 demonstrate, this portion of Section 13 was not submerged under Lake Michigan. See Defs.' Mot. to Dismiss for Lack of Jurisdiction and for Judgment on Pleadings ¶ 7 (explaining basis for judicial notice); Ex. 2-4 (historical maps of site location).[9]

Second, even if the OPC site had been submerged, the Museum Act still would control, for its authorization to erect museums unambiguously extends to "parks located on formerly submerged land."  70 ILCS 1290/1; see also People ex. rel. Attorney Gen. v. Kirk, 162 Ill. 138, 148-52 (1896) (General Assembly may declare uses of once-submerged land).

And third, even if the Museum Act were not alone dispositive as to formerly-submerged

---

[9] In addition to not being submerged, the land comprising the site was held by the federal government and sold to private owners in the 1830s and 1840s, decades before it became parkland under the 1869 Statute.  Ex. 10 (1839 land patent reflecting sale of western half of southwestern quarter of Section 13); Ex. 11 (1844 land patent reflecting sale of all land in northwestern quarter of Section 13).  This is a separate reason why Plaintiffs' asserted public trust does not apply.  See Illinois Cent. R.R. v. Illinois, 146 U.S. 387, 452 (1892) (explaining that nature of title held by Illinois in waters under Lake Michigan is "different from the title which the United States hold in the public lands which are open to preemption and sale").

land, it still would carry great weight in the public trust analysis applicable to such land, as the Illinois Supreme Court's decision in <u>FOP</u> demonstrates. That case established that when the Illinois legislature has determined that a particular use of public parkland is appropriate and in the public interest, that determination along with the documents establishing the legally-binding parameters of how the particular use of the parkland can and cannot occur defines the proper scope of a court's inquiry into whether the public trust doctrine is met.

In <u>FOP</u>, the Court upheld renovations to Soldier Field (located in formerly-submerged Burnham Park) and the surrounding parkland, even though the renovations benefitted the Chicago Bears, a private, for-profit entity. Invoking its decision in <u>Paepcke</u> to uphold a development plan on public parkland where "adequate legislative authorization existed to support the proposed changes," the <u>FOP</u> Court emphasized that the General Assembly had authorized public financing for renovations to government-owned stadiums. 203 Ill. 2d. at 327-28. The Court also stressed that the renovation plan would provide substantial public benefits: "a fully renovated, multiuse stadium" available for "athletic, artistic, and cultural events," and parkland upgrades providing "better access to the stadium, the museums, and the lakefront generally." <u>Id.</u> at 328. The Court further noted that, as here, a governmental entity (in <u>FOP</u>, the Park District) would own the stadium and by contract retain control over its use by the Bears. <u>Id.</u> at 327.

Instructive for this case, the <u>FOP</u> Court limited its review to the handful of official documents governing the renovation: "the Act, the implementing agreements, [and] the project documents." <u>FOP</u>, 203 Ill. 2d at 327; <u>see also</u> <u>id.</u> at 315-19 (explaining that "[t]he terms and conditions of the project are set out principally in three separate documents"). Indeed, although the plaintiffs had introduced expert testimony supposedly rebutting the anticipated public

benefits from the renovation project, the trial judge held that this testimony was "irrelevant," for courts are not to "inquir[e] into the merits or accuracy of the legislative findings." Id. at 319-20.

As FOP shows, even if the OPC site had been formerly submerged under Lake Michigan (it was not) and even if the Museum Act were not alone dispositive (it is), the governing City ordinances and the Use Agreement make clear that the OPC satisfies the public trust analysis in FOP. That is so for several reasons.

### 1.     The OPC will provide valuable public benefits.

As we have already mentioned (see p.2 supra), eleven other museums currently exist on Chicago parkland. These museums illustrate the fact that state and local policymakers have long recognized that museums – including parkland museums – are an important public good. Most recently, the General Assembly codified this recognition in the Museum Act, which states that parkland aquariums, presidential centers, and museums "serve valuable public purposes, including, but not limited to, furthering human knowledge and understanding, educating and inspiring the public, and expanding recreational and cultural resources and opportunities." 70 ILCS 1290/1.

The OPC will provide all of this – and then some. As discussed above, the OPC's Museum Building and other structures will provide unparalleled historical and cultural experiences to the public. See pp. 7-9 supra. Development of the OPC in Jackson Park will allow neighborhood residents as well as the rest of the City and world to learn about our nation's first African-American President and First Lady, the major national and international events that marked his eight years in office, and the lasting legacy of his presidency.

Plaintiffs complain that the facility will "NOT be a local repository for the official presidential records" of the Obama Administration, Compl. ¶ 4, but this hardly undermines the

OPC's public interest. Plaintiffs ignore that the OPC will offer in-person visitors "interactive exhibits and displays of artifacts and records from the Obama presidency," as well as "cultural enrichment, public outreach, educational programs, a public library and community programs available to all," and take advantage of modern technology to offer a "new model of a presidential library in which the Foundation [will] digitize the paper records" to enhance worldwide access. Ex. 5 (Operating Ordinance) at 85879-80. As the Illinois Supreme Court has recognized, "[w]hat is a 'public purpose' is not a static concept, but is flexible and capable of expansion to meet the changing conditions of a complex society," and "[t]he consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classified as involving a public purpose." FOP, 203 Ill. 2d at 320-21 (citation omitted). What matters is that the OPC will provide an array of cultural, educational, artistic, and recreational opportunities for the public's use and enjoyment. See id. at 328.

Beyond the buildings, moreover, the OPC will enhance existing parkland spaces with added features including a sloped lawn for picnicking and recreation, a nature walk along the lagoons to the east, other walking paths, a sledding hill, play areas for children, and natural contemplative spaces. See Ex. 5 (Operating Ordinance) at 85881. The improved parkland will generally be open during regular Chicago Park District hours. See id., Exhibit D thereto (Use Agreement), § 6.2. Currently, the OPC site consists mainly of open green space, as well as a playground and a track and field facility nearing the end of its useful life. The OPC will thus renew the site, just as the plan in FOP did. See FOP, 203 Ill. 2d, at 328 ("The public [would] now enjoy a fully renovated, multiuse stadium, instead of a deteriorating 78-year-old facility."). Indeed, even the track and field facility will be renewed, as the Park District has undertaken to construct a new facility nearby. See Dkt. 28-1, Exs. C-D.

29

Finally, these changes will enhance Jackson Park as a whole. Much of the built space will be woven into the surrounding parkland with engineering techniques such as green roofs or below-ground placement. Ex. 1 (PD Ordinance) at 77200-11. And just as the Soldier Field renovations created "better [public] access to the stadium, the museums, and the lakefront generally" (FOP, 203 Ill. 2d at 328), converting portions of Cornell Drive and South Midway Plaisance to open parkland will connect the site to the Jackson Park grounds immediately to the east, improving bicycle and pedestrian access to Jackson Park's lagoons, the Museum of Science and Industry, and the lakefront for those coming from the west of Jackson Park, and enhancing the area's overall attractiveness. See Ex. 5 (Operating Ordinance) at 85882; Ex. 7 (LPO Resolution), DPD Staff Report at 5, 12, 17.

In short, the OPC will provide the full range of public benefits recognized by the Supreme Court in FOP and by the General Assembly in the Museum Act.

### 2. A public entity – the City – will own the OPC site and buildings and retain control over the site through the Use Agreement.

In addition to the undeniable benefits it offers to the public, the OPC satisfies the two remaining factors critical to the analysis in FOP. The OPC site will be owned by a public entity – the City. Nothing in the Operating Ordinance or Use Agreement authorizes the City to transfer ownership to the Foundation. After the Foundation completes construction of the OPC buildings and other site improvements – which it will do at its sole expense – it will transfer ownership of them to the City at no cost. See Ex. 5, Ex. D thereto (Use Agreement), § 4.4. The project will therefore *increase* public ownership of parkland resources.

Lucas II is not to the contrary. The agreement at issue there was a 99-year ground lease with options to renew, and it also granted ownership of the museum building and related improvements to the private museum corporation. See Lucas II, 160 F. Supp. 3d at 1067–68.

30

The court found a putative lack of control based on Illinois case law that, in its view, showed that long-term leaseholders may be "owners" in a "constitutional sense." 160 F. Supp. at 1068. Whatever the merits of that conclusion, the City will, in this case, own the OPC's buildings, and the agreement between the OPC and the City *is not a lease*. Rather, like other Chicago museums located in public parkland, the OPC is governed by a Use Agreement allowing the City to retain control of the OPC site and permitting a third party (here, the Foundation) to use the site only insofar as it complies with that agreement. See Ex. 5, Ex. D thereto (Use Agreement), § 2.1; id., Article VI. Among other terms, moreover, the Use Agreement makes clear that the Foundation may use the site only for the OPC and related events, see id. § 6.1; that the Foundation must allow public access to OPC buildings essentially to the same extent as all other Chicago parkland museums, see id. § 6.2(a)(i); and that the OPC's open spaces must generally remain open to the public during regular Chicago Park District hours, see id. § 6.2(a)(ii). The Foundation also must provide the City with an annual report on the OPC's operations and, in conjunction with the City, form an Advisory Operations Committee to address ongoing operational issues related to the OPC and to adjacent and nearby areas of Jackson Park. See id. §§ 17.3, 17.4.

These contractual ownership and control provisions allow the people's representatives in City government to ensure that the OPC provides the benefits promised by the Foundation. Indeed, under the Use Agreement, the City retains no less (and perhaps more) control over what the Foundation may do on the OPC site than the Park District retains under the use agreements governing many other Chicago parkland museums. For instance, the relevant provisions of the 1929 agreement establishing the Museum of Science and Industry in Jackson Park state that the land and building "may be forever used, managed, operated and controlled by the Museum Corporation for the objects and purposes of an Industrial Museum" and that the "Museum

Corporation shall have the sole management, charge, control and operation of the said building and premises . . . ."  Ex. 12 (MSI Agreement), 1929 Agmt., Art. I & VI.

Likewise, the 1925 use agreement respecting the Shedd Aquarium granted a private society the right to construct and "permanently" maintain and operate the Aquarium on lands that had "been reclaimed from the waters of Lake Michigan and form a part of Grant Park" and gave the private society "sole charge and control of the aquarium … and all other matters connected with the maintenance, management and operation of the aquarium properties."  Ex. 13 (Shedd Agreement), 1925 Agmt., Art. I & IV; see also id., 2001 Third Supp. Agmt., Art. I (reiterating that society will "permanently maintain and operate [the] aquarium and oceanarium, including the Expansion Facilities thereon").[10]

In light of this history and the degree of control maintained by the City in the Use Agreement, any claim that the City has transferred public control over the OPC site in ways inconsistent with the public trust is baseless.

> 3. **The Foundation will reap no private benefits separate from supporting the OPC itself, and in any event these advantages are trivial compared to the public benefits.**

A central theme of the Complaint is that the Foundation stands to benefit from the OPC. But that is true of every not-for-profit entity permitted to build and operate a facility that is central to its purpose.  See Ex. 5, Ex. D thereto, Sub-Ex. C thereto (explaining that OPC is a

---

[10] Similarly, the 1915 agreement authorizing the Field Museum permits the private museum corporation to build a museum for its permanent use, and grants ownership of the building to the corporation so long as it is used for a natural history museum.  Ex. 14 (Field Agreement), 1915 Agmt. at 3 ("The Commissioners agree to permit the Museum and the Trustees thereof to erect and maintain an edifice upon the proposed museum site . . . and to provide the said site for said Museum and devote the said site to the permanent use of said Museum without cost to it."); id. at 4 ("If at any time the Trustees of said Museum shall cease to use said building for a museum as contemplated by this contract, all rights of said Museum in the above described site and the building situated thereon shall at once cease and determine, and said building shall thereupon be and become the property of the Commissioners.").

"core project" of the Foundation). As the Supreme Court recognized in FOP, nearly any public project involving a private entity will help that entity in some way, but the public trust is satisfied so long as the public benefits too. See 203 Ill. 2d at 321. Thus, the Court upheld the Soldier Field renovations because of their public benefits, "even though the Bears [would] also benefit" by using the renovated stadium for their games and charging admission. Id. at 324-25, 328; see id. at 325 (financial benefits to Bears "do[] not diminish the fact that the renovated Soldier Field will be used and enjoyed by the public for a wide variety of public purposes"). Unlike the Bears in FOP, moreover, the Foundation will reap no private financial advantages, for the funds it collects in operating the OPC must go back into the OPC, further adding to the public's benefit. Under the Use Agreement, admission and parking fees must be used to pay for the OPC's operations and maintenance or deposited into an endowment for those purposes. See Ex. 5, Ex. D thereto (Use Agreement), § 6.9. On top of this, any benefit to the Foundation is offset by its agreement to pay all of the OPC's construction, maintenance, and operating costs, see id. §§ 4.1, 7.1, sparing the public those expenses even though the Supreme Court has approved use of tax revenue to fund museums in Chicago parks. See Furlong, 340 Ill. at 369. In short, even more clearly here than in FOP, no private benefit undermines the project's lawfulness under the public trust doctrine.

## IV.    State Law Authorizes The Transfer Of Park District Land To The City.

Count III alleges that the Park District's transfer of parkland to the City for use as the OPC is ultra vires under state law. But state law plainly authorizes these actions.

The Local Government Property Transfer Act ("Property Transfer Act"), 50 ILCS 605/.01, et seq., expressly permits property transfers like the one here. Under Section 2, one municipality seeking to acquire property from another, whose territory is within or coextensive with the former's borders, may "by ordinance declare that it is necessary or convenient for it to

use, occupy or improve any real estate held by [the transferring municipality] in the making of any public improvement or for any public purpose." 50 ILCS 605/2. Once the acquiring municipality so declares, "the corporate authorities of the [transferring] municipality shall have the power to transfer all of the right, title and interest held by it immediately prior to such transfer, in and to such real estate . . . upon such terms as may be agreed upon by the corporate authorities of both municipalities." Id. The Operating Ordinance contains the declaration required by the Property Transfer Act, see Ex. 5 (Operating Agreement) at 85886 (§ 2), and as discussed in Section III.B.1, supra, the OPC will be a public improvement that advances important public purposes.

Plaintiffs contend that the Property Transfer Act does not apply because the Foundation, not the City, will be "using, occupying, or improving" the site. Compl. ¶ 72. This is both factually and legally incorrect. Factually, under the Use Agreement the City retains control over the use, occupancy, and improvements of the land and will hold title to improvements on the property. See Ex. 5 (Operating Agreement), Ex. D thereto (Use Agreement), §§ 2.1, 4.4. Legally, the Property Transfer Act does not prohibit the acquiring municipality from contracting with a third party to assist in improving the transferred land. And the Museum Act expressly grants authority to enter into such a contract. See Section III.A supra.

Article VII, section 10(a) of the Illinois Constitution also authorizes the transfer. This section permits units of local government to "transfer any power or function, in any manner not prohibited by law or ordinance." Likewise, another statute – the Intergovernmental Cooperation Act – allows the "powers, privileges, functions, or authority exercised or which may be exercised by a public agency of [the State of Illinois]," including a municipality, to be "transferred . . . with any other public agency . . . except where . . . expressly prohibited by law." 5 ILCS 220/3. This

package of rights necessarily includes the power to use and control the land on the site.

Plaintiffs contend that neither of these provisions of law applies because they only allow transfers not prohibited by law.  Compl. ¶¶ 63, 67.  But the laws that Plaintiffs claim prohibit the Park District's transfer to the City – the Park District Code and Article VIII, Section 1(a) of the Constitution – do no such thing.  The Code places no restrictions on the Park District or its property.  See 70 ILCS 1205/1-2(d) ("Nothing set forth herein shall be construed to disturb, alter, amend, limit, or broaden the powers of the Chicago Park District or any other park district heretofore formed under special charter.").  And Article VIII, Section 1(a) merely requires public funds, property, or credit to be used for public purposes – a requirement the OPC easily satisfies. See Section III.B.1 supra.

## V.      The 2016 Amendment To The Museum Act Applies In This Case.

Count IV of the Complaint seeks a declaration that the 2016 Amendment to the Museum Act – which added language expressly identifying presidential centers as a type of museum authorized by the Museum Act, see Compl., Ex. B. – is inapplicable because its "substance . . . cannot be made retroactive."  Compl. ¶ 101.  There is no retroactivity issue here. The activities Plaintiffs challenge – the Park District's transfer of land to the City, and the City's authorization of the OPC on that land – all post-date the amendment.  It was not until 2018 (indeed, just last month, October) that the City enacted the ordinance (the Operating Ordinance) authorizing the City to accept the OPC site from the Park District and to enter into an agreement with the Foundation.  The 2016 Amendment to the Museum Act had no "retroactive" effect on any of these activities.

Regardless, even assuming that the 2016 Amendment applied "retroactively" in this case, such an application would be entirely lawful.  If the General Assembly expresses an intent to have a statute apply retroactively, then the statute has retroactive application unless retroactivity

35

poses a constitutional hurdle. See In re Marriage of Duggan, 376 Ill. App. 3d 725, 728 (2d Dist.

2007). Here, the General Assembly stated that the amendment was merely "declaratory of

existing law." Compl., Ex. B. This is a clear statement of "intent to give the amendment maximal

retroactive effect." First Mortg. Co. v. Dina, 2017 IL App (2d) 170043, ¶ 29; see also id. ¶ 31

("[T]he difference between a statement that an amendment is declarative of existing law and one

that it should have full retroactive scope is one of form only."). Moreover, applying the 2016

Amendment retroactively would be constitutional. While Plaintiffs contend that the amendment

is unconstitutional special legislation (Compl. ¶ 106), that claim is meritless, as shown below in

Part VI. Nor is the amendment an "illegal ex post facto act." Id. ¶ 11. "The Federal and Illinois

ex post facto clauses . . . apply only to retroactive measures which are either criminal or penal in

nature." In re Samuels, 126 Ill. 2d 509, 523–24 (1989). The 2016 Amendment to the Museum

Act does not penalize or criminalize anything.

## VI. The 2016 Amendment Is Not Unconstitutional Special Legislation.

Count V seeks to void the 2016 Amendment under the Illinois Constitution's Special

Legislation Clause, which prohibits a "special or local law when a general law is or can be made

applicable." Ill Const., art. IV, § 13. The clause guards against classifications that "confer[] a

special benefit or privilege upon one person or group and exclud[e] others that are similarly

situated." Big Sky Excavating, Inc. v. Illinois Bell Tel. Co., 217 Ill. 2d 221, 235 (2005). But

even a statute containing a classification that "discriminates in favor of a select group" will

survive challenge so long as the classification is not arbitrary. See Elementary Sch. Dist. 159 v.

Schiller, 221 Ill. 2d 130, 149 (2006).

The 2016 Amendment does not violate the Special Legislation Clause because it creates

no exclusionary classification. It merely enumerates some of the things – presidential libraries,

centers, and museums – that are "includ[ed]" within the preexisting classification (museums).

See Compl., Ex. B.  The amendment does not exclude any entity wishing to operate a museum in a public park, for the class of entities comprising museums is no smaller than it was before.  See Elementary Sch. Dist. 159, 221 Ill. 2d at 153.  Plaintiffs' special legislation challenge fails for this reason alone.[11]

In any event, in a special legislation challenge, a statute that does not affect a fundamental right or involve a suspect classification is subject only to rational basis review. Crusius v. Ill. Gaming Bd., 216 Ill. 2d 315, 325 (2005).  The 2016 Amendment easily satisfies that deferential standard.  See N. Ill. Home Builders Ass'n, Inc. v. Cty. of Du Page, 165 Ill. 2d 25, 40 (1995) (court "need only determine whether a rational basis exists for the legislative action, not the wisdom of the classification"); People ex rel. Lumpkin v. Cassidy, 184 Ill. 2d 117, 124 (1998) ("The judgments made by the legislature in crafting a statute are not subject to courtroom fact finding.").  In light of the myriad public benefits that presidential centers in public parks provide, see Section III.B.1 supra, it was certainly rational for the General Assembly to conclude that these centers "serve valuable public purposes, including, but not limited to, furthering human knowledge and understanding, educating and inspiring the public, and expanding recreational and cultural resources and opportunities."  70 ILCS 1290/1. Plaintiffs may disagree or believe that other (unidentified) enterprises should also be allowed in parks, but that is irrelevant.  Under the rational basis test, courts may not "second-guess the wisdom of a statute that is rationally related to a legitimate state interest."  Crusius, 216 Ill. 2d at 332.

---

[11] It therefore does not matter whether, as Plaintiffs contend, the amendment was enacted to benefit "only one entity" – the Foundation – by allowing the OPC to be in a public park.  Compl. ¶¶ 108-09; see Chicago Nat'l League Ball Club, Inc. v. Thompson, 108 Ill. 2d 357, 365–67 (1985) (declining to consider legislative motive behind amendment in special legislation analysis).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss this case for lack of jurisdiction or, in the alternative, enter judgment in Defendants' favor on all claims in the Complaint.

Date:     November 21, 2018

BURKE, WARREN, MACKAY &
SERRITELLA, P.C.
Counsel for the Chicago Park District

By:      /s/ Joseph P. Roddy

Richard W. Burke
Joseph P. Roddy
Elizabeth Meyer Pall
Susan M. Horner
Burke, Warren, MacKay & Serritella, P.C.
330 North Wabash Avenue, Suite 2100
Chicago, Illinois 60611
(312) 840-7000
Attorneys for Defendant Chicago Park District

Respectfully submitted

EDWARD N. SISKEL,
Corporation Counsel for the City of Chicago

By:      /s/ Andrew Worseck

John Hendricks
Deputy Corporation Counsel
Andrew W. Worseck
Chief Assistant Corporation Counsel
Justin Tresnowski
Assistant Corporation Counsel
City of Chicago, Department of Law
Constitutional and Commercial Litigation
Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-6975 / 4-7129 / 4-4216
Attorneys for Defendant City of Chicago

Michael A. Scodro
Britt M. Miller
Jed W. Glickstein
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600 (Telephone)
(312) 701-7711 (Facsimile)
Attorneys for Defendant City of Chicago