Exhibit 5

(Published by the Authority of the City Council of the City of Chicago)

COPY



# JOURNAL of the PROCEEDINGS
## of the
## CITY COUNCIL
### of the
## CITY of CHICAGO, ILLINOIS

Regular Meeting -- Wednesday, October 31, 2018

at 10:00 A.M.

(Council Chamber -- City Hall -- Chicago, Illinois)

**OFFICIAL RECORD.**

**VOLUME I**

**RAHM EMANUEL**
**Mayor**

**ANDREA M. VALENCIA**
**City Clerk**

10/31/2018 COMMUNICATIONS, ETC. 85875

At this point in the proceedings, Alderman Burke moved to *Suspend the Rules Temporarily* for the purpose of going out of the regular order of business to consider matters otherwise discussed in the Reports of Committees portion of the meeting. The motion *Prevailed*.

———————————

## COMMITTEE ON HOUSING AND REAL ESTATE.

————————

AMENDMENT OF INTERGOVERNMENTAL USE AGREEMENT WITH CHICAGO PARK DISTRICT FOR USE OF PROPERTY AS OBAMA PRESIDENTIAL CENTER.
[SO2018-7136]

The Committee on Housing and Real Estate submitted the following report:

CHICAGO, October 31, 2018.

*To the President and Members of the City Council:*

Your Committee on Housing and Real Estate, for which a meeting was held on October 11, 2018, having had under consideration the substitute ordinance introduced by Mayor Rahm Emanuel on October 11, 2018, this being the amendment of an intergovernmental use agreement with the Chicago Park District for property to be used as the Obama Presidential Center, begs leave to recommend that Your Honorable Body *Pass* said substitute ordinance transmitted herewith.

This recommendation was concurred in by a voice vote of all committee members present, with no dissenting votes.

Respectfully submitted,

(Signed)   JOSEPH A. MOORE,
*Chairman.*

On motion of Alderman J. Moore, the said proposed substitute ordinance transmitted with the foregoing committee report was *Passed* by yeas and nays as follows:

*Yeas* -- Aldermen Moreno, Hopkins, Dowell, King, Hairston, Sawyer, Mitchell, Harris, Beale, Sadlowski Garza, Thompson, Cárdenas, Quinn, Burke, Lopez, Foulkes, D. Moore, Curtis, O'Shea, Brookins, Muñoz, Tabares, Scott, Solis, Maldonado, Burnett, Ervin, Taliaferro, Reboyras, Santiago, Waguespack, Mell, Austin, Ramirez-Rosa, Villegas, Mitts, Sposato, Laurino, Napolitano, Reilly, Smith, Tunney, Arena, Cappleman, Pawar, Osterman, J. Moore, Silverstein -- 48.

*Nays* -- None.

Alderman Harris moved to reconsider the foregoing vote. The motion was lost.

At this point in the proceedings, the Honorable Rahm Emanuel, Mayor, rose and expressed his appreciation to the many individuals who helped to make the Obama Presidential Center a reality. Reflecting on the long process that led to this moment, Mayor Emanuel observed that President Barak Obama began his public service career as a community organizer on the city's South Side and that the journey will now come full circle with the completion of the Obama Presidential Center in the Jackson Park community. Reading a letter from President Obama who conveyed his appreciation to the Mayor and members of the City Council for their support and expressed his excitement for this unique resource and amenity for the City of Chicago, Mayor Emanuel noted that the Obama Presidential Center is the beginning of a new chapter in Chicago's history and a legacy to generations to come that will serve as a reminder to young visitors -- from around this city and the world -- that their potential is limitless.

The following is said ordinances as passed:

WHEREAS, The City of Chicago (the "City") is a municipal corporation and home rule unit of government under Article VII, Section 6(a) of the 1970 Constitution of the State of Illinois and, as such, may exercise any power and perform any function pertaining to its government and affairs; and

WHEREAS, The Chicago Park District (the "Park District") is a body politic and corporate created pursuant to the Chicago Park District Act, 70 ILCS 1505/0.01, et seq., and a unit of local government under Article VII, Section 1 of the 1970 Constitution of the State of Illinois, and as such, has the authority to exercise control over and supervise the operation of all parks within the corporate limits of the City; and

WHEREAS, The Barack Obama Foundation is a 501(c)(3) non-partisan, not-for-profit corporation organized under the laws of the District of Columbia (the "Foundation"); and

WHEREAS, A core project of the Foundation is to build the Obama Presidential Center (the "OPC") in Jackson Park on the South Side of Chicago; and

WHEREAS, The central mission of the OPC is to house and operate, among other facilities, a presidential museum telling the story of our nation's first African-American President and First Lady, their journey to the White House, their historical connection to Chicago, and the countless individuals, communities, and social currents that shaped their journey; and

WHEREAS, The museum will allow visitors to experience firsthand the historic Obama presidency and its successes and challenges; and

WHEREAS, The OPC will contain a variety of spaces designed to offer opportunities for visitors to participate in activities that connect them to the values and skills of civic engagement and community building that have inspired the Obamas' lives and careers; and

WHEREAS, Each modern President has spearheaded the development of a presidential museum and facilities for related non-partisan educational and programmatic activities; and

WHEREAS, The Foundation has selected Chicago, and Jackson Park in particular, as the location for the OPC over other available and feasible out-of-state locations; and

WHEREAS, The OPC will be the 14th presidential museum displaying presidential artifacts owned by the National Archives and Records Administration ("NARA"); and

WHEREAS, The Park District Aquarium and Museum Act, 70 ILCS 1290/0.01, et seq. (the "Museum Act"), allows cities to authorize private institutions to build and operate museums and aquariums in public parks; and

WHEREAS, The Museum Act specifies that a presidential center is an authorized public park use under the Museum Act; and

WHEREAS, In addition to express legislative authorization for privately-operated museums in public parks, the Illinois Supreme Court has recognized the propriety of operating a museum within a public park; and

WHEREAS, Chicago has a long history of establishing museums in its parks as evidenced by the eleven "Museums in the Park" currently operating in Burnham Park (Adler Planetarium, Field Museum, John G. Shedd Aquarium), Grant Park (Art Institute of Chicago), Harrison Park (National Museum of Mexican Art), Humboldt Park (Institute of Puerto Rican Arts and Culture), Jackson Park (Museum of Science and Industry), Lake Shore Park (Museum of Contemporary Art), Lincoln Park (Peggy Notebaert Nature Museum, Chicago History Museum), and Washington Park (DuSable Museum of African American History); and

WHEREAS, These eleven museums are joined by the Lincoln Park Zoo, whose 49 acres are operated by the Lincoln Park Zoological Society; and

WHEREAS, These institutions are all operated by private, not-for-profit organizations, and all depend on private donations and private management and curatorial expertise; and

WHEREAS, Each uses park land free of charge and each has along-term right to occupy its buildings rent-free, so long as the buildings are used for museum purposes in compliance with the Museum Act; and

WHEREAS, Chicago's history of building museums in parks is part of a larger national tradition of combining culture, education and recreation through the placement of museums and other major cultural institutions in parks, including, to give just a few examples: the Los Angeles County Museum of Art and Page Museum in Hancock Park; the California Science Center, the Natural History Museum, and the California African American Museum in Exposition Park in Los Angeles; the San Diego Natural History Museum and 26 other arts, cultural and science institutions in Balboa Park; the California Academy of Sciences and the de Young Museum in Golden Gate Park; the Philadelphia Museum of Art in Fairmount Park; the Asian Art Museum in Seattle's Volunteer Park; and the Saint Louis Art Museum, Missouri History Museum and Saint Louis Science Center in Forest Park; and

WHEREAS, The 1972 Lakefront Plan of Chicago adopted by the Chicago Plan Commission (the "Lakefront Plan"), whose policies continue to govern approval of applications under the Lake Michigan and Chicago Lakefront Protection Ordinance, Chapter 16-4 of the Chicago Municipal Code (the "LPO"), celebrates the history of museums in Chicago's parks, and endorses the placement of cultural facilities "within the lakeshore parks" and "other large park locations" in the City; and

WHEREAS, Before the Lakefront Plan, Daniel Burnham and Edward Bennett's 1909 Plan of Chicago advocated building great public institutions, such as the Field Museum, in parks along Chicago's lakefront; and

WHEREAS, Jackson Park, like Lincoln Park, is a regional park, and just as the Lincoln Park Zoo, the Chicago History Museum and the Notebaert Nature Museum have welcomed visitors from throughout Chicago and beyond, the OPC will be a local, national and even global destination; and

WHEREAS, The OPC is one of a number of major improvements considered in the Park District's 2017/2018 update to its 1999 South Lakefront Framework Plan; and

WHEREAS, Locating the OPC in Jackson Park will generate momentum for the development of a "Museum Campus South", one of the initiatives identified in the Chicago Cultural Plan of 2012, which has the goal of connecting major institutions on the South Side and creating new opportunities for collaboration and growth; and

WHEREAS, The OPC is consistent with the Museum Act, the Lakefront Plan, the Chicago Cultural Plan, and the South Lakefront Framework Plan update, and is a legally permissible use of park land; and

WHEREAS, The City, with its home rule authority and large planning, transportation and other infrastructure departments, is well-situated to facilitate the various large-scale infrastructure and investment initiatives in and around the OPC and to oversee the development and operation of the OPC in accordance with the agreements as described herein; and

WHEREAS, On March 18, 2015, the City Council adopted an ordinance (the "2015 Ordinance"), authorizing the City to acquire land in Jackson Park (the "Original Site") from the Park District that the City would subsequently authorize the Foundation to use for the construction, operation and maintenance of the OPC, in accordance with an Intergovernmental Agreement attached to the 2015 Ordinance (the "2015 IGA"); and

WHEREAS, The Original Site is generally bounded by South Stony Island Avenue on the west, South Cornell Drive on the east, the eastbound lanes of Midway Plaisance on the north, and East Hayes Drive on the south, as legally described in the 2015 Ordinance (the "Original Legal Description") and depicted in a survey attached to the 2015 Ordinance (the "Original Survey"); and

WHEREAS, After passage of the 2015 Ordinance and with the benefit of in-depth engagement with neighboring communities spanning over two years, the Foundation, the Chicago Department of Planning and Development ("DPD"), the Chicago Department of Transportation ("CDOT") and the Park District determined that the construction of the OPC presented a rare opportunity for the City, in coordination with other local, state and federal entities, to enhance the Foundation's investment in the park by improving the road and trail network, reconnecting fragmented park land, improving bicycle and pedestrian connectivity to the lagoons and lakefront, improving traffic safety, reducing vehicle conflict with visitors to the park and enhancing outdoor spaces that currently exist; and

WHEREAS, In order to help accomplish this vision, and to improve the connection of the OPC Site to the Museum of Science and Industry, the Foundation has proposed shifting the boundaries of the Original Site to the north and east to incorporate portions of the Midway Plaisance and Cornell Drive, and CDOT has proposed closing these and additional road segments within the park and making additional Transportation Improvements (as hereinafter defined); and

WHEREAS, The City Council has determined it advances the public interest to accept such proposals; and

WHEREAS, The revised OPC project site (the "OPC Site") consists of approximately 19.3 acres and is legally described on Exhibit A attached hereto (the "Revised Legal Description") and depicted on Exhibit B attached hereto (the "Revised Survey"); and

WHEREAS, The original and reconfigured sites are approximately the same size (20 acres and 19.3 acres, respectively), and are depicted side-by-side for comparison purposes on Exhibit C attached hereto; and

WHEREAS, The City and the Park District desire to amend the 2015 Ordinance and the 2015 IGA to replace the Original Legal Description with the Revised Legal Description and the Original Survey with the Revised Survey; and

WHEREAS, The 2015 Ordinance contemplated the construction of a traditional "Presidential Library" operated by NARA that would serve, in part, as a repository for artifacts, paper records and historical materials from the Obama administration; and

WHEREAS, After passage of the 2015 Ordinance, the Foundation began working cooperatively with NARA to establish a new model of a presidential library in which the Foundation would digitize the paper records so that NARA can operate a virtual Obama Presidential Library in a more cost-effective manner and the Foundation would establish and maintain a museum promoting understanding of the presidency and the American experience; and

WHEREAS, The Foundation is funding and collaborating with NARA to digitize all residential records created during the Obama administration, which will give researchers, educators, students and any other interested persons the opportunity to study presidential history from any location around the world; and

WHEREAS, Like a traditional NARA-operated facility, at the core of the OPC will be a museum with interactive exhibits and displays of artifacts and records from the Obama presidency, but instead of dedicating space to a physical archive that would have limited public access for NARA-overseen documents, the Foundation will use the remaining space in the OPC for cultural enrichment, public outreach, educational programs, a public library and community programs available to all (as further described herein, the "Revised Proposal"); and

WHEREAS, The OPC is designed as a campus consisting of four buildings and an underground parking facility, complemented by a plaza, play areas, pedestrian and bicycle pathways and other landscaped open space, as described and depicted in the Use Agreement (as hereinafter defined) and in Institutional Planned Development Number 1409 adopted by the City Council on May 23, 2018 and published in the *Journal of the Proceedings of the City Council of the City of Chicago* such date on pages 77185 through 77214 ("PD 1409"); and

WHEREAS, The four OPC buildings include the Museum Building, the Forum Building and the Library Building (which buildings will be connected below grade at the garden level and wrap around a plaza), and the Program, Athletic and Activity Center at the southern end of the site, as described in the Use Agreement and depicted in P.D. 1409; and

WHEREAS, The Museum Building is designed to establish the OPC as an important civic space in the City, and will house exhibits that tell the story of the people and events of the Obama administration within a broader historical context; and

WHEREAS, Drawing from the broader story of American history, the history of civil rights and the powerful place of Chicago in American history, the museum will frame President and Mrs. Obama's lives and careers, the 2008 and 2012 presidential elections, and the Obama presidency in the context of the movements and milestones that helped to shape the nation over time; and

WHEREAS, The museum will be a tribute to the American journey and celebrate the arc to the first African-American president of the United States; and

WHEREAS, The museum will feature presidential artifacts from President Obama's eight years in office that will be owned and loaned by NARA to the Foundation on a rotating basis, as well as artifacts from other sources and time periods that help tell the Obamas' story; and

WHEREAS, The Foundation will implement specific admission policies for the museum benefitting City residents and low-income individuals and families and will comply with all free admission requirements of the Museum Act; and

WHEREAS, The Library Building and Forum Building are low-lying, two-story buildings (with one level below-grade), which will include accessible, landscaped green roofs and be integrated into the surrounding landscape; and

WHEREAS, The Library Building will include a branch of the Chicago Public Library housing a multimedia collection and spaces for reading and study, as well as a dedicated children's area and a meeting space that will be available for public use; and

WHEREAS, The Library Building will also house a President's Reading Room which will serve as an extension of the museum experience, providing visitors to the Library Building with an accessible and inspiring setting for reading as well as for programs and small exhibits devoted to the importance of literacy, education and community service, and also featuring a special collection of books that have been significant to the President and manuscripts and other materials related to his life as a reader, writer, thinker and public servant; and

WHEREAS, The Forum Building will house collaboration and creative spaces, including an auditorium, multipurpose meeting rooms, recording and broadcast studios, a winter garden and a restaurant; and

WHEREAS, The Program, Athletic and Activity Center will be a multi-purpose facility hosting a variety of large-scale indoor programs including presentations, events, concerts and athletics, and will be used for formal and informal recreation activities; and

WHEREAS, The Museum Building, Forum Building, Library Building and Program, Athletic and Activity Center will be required to be open to the public in a manner substantially consistent with how other museums in the park are open to the public; and

WHEREAS, The Foundation intends to provide free public access to many interior spaces within the OPC, including: portions of the garden and plaza levels in the Museum Building; the top floor of the Museum Building, which will feature an observation and reflection space with views of Jackson Park, Lake Michigan and the surrounding city; the winter garden, restaurant and multi-purpose meeting rooms in the Forum Building; a new branch of the Chicago Public Library and the President's Reading Room in the Library Building; and

WHEREAS, The green space surrounding the OPC will include play areas for children; contemplative spaces for young and old; a sledding hill; a sloped lawn for picnicking, recreation and community and special events; additional walking paths surrounding the Women's Garden and Lawn; a nature walk along the lagoon; and new pathways; and

WHEREAS, The OPC will not only benefit Chicago residents and attract visitors from around the world, but will also enhance both accessibility and usability of Jackson Park; and

WHEREAS, In its current state, the OPC Site is isolated from the rest of Jackson Park and from the surrounding neighborhood by busy roadways, including six lanes of traffic on South Cornell Drive to the east, two lanes of traffic on South Stony Island Avenue to the west, two lanes of traffic on the westbound Midway Plaisance to the north, and two lanes of traffic on East Hayes Drive to the south; and

WHEREAS, Residents and visitors using the OPC Site in its current state cannot access the contiguous parts of Jackson Park, such as the lagoons and the lakefront, without crossing six lanes of traffic at road-level on South Cornell Drive; and

WHEREAS, In its current state, the OPC Site includes the historic Women's Garden and Lawn and the Women's Garden and Lawn is currently bounded on all sides by roadways; and

WHEREAS, The planned improvement of the OPC Site and associated Road Closures (as hereinafter defined) and Transportation Improvements (as hereinafter defined) will enhance pedestrian access from the neighborhood to the OPC Site and from there to the lakefront, through the reconfiguration of roadways and the construction of additional pedestrian underpasses, signalized crossings and pedestrian refuge islands; and

WHEREAS, The development will create off-street parking supply for the OPC without visual impact to the community through the construction of an underground parking garage to further enhance access to the OPC Site while maximizing available natural areas and parkland; and

WHEREAS, The Foundation's planned project will also enhance Jackson Park by improving public safety in and around the park, including by adding improved lighting and resurfaced pathways with clearer sightlines to create a safer means of traversing through Jackson Park; and

WHEREAS, The planned landscaping and development of the OPC Site will also increase the diversity of trees and plantings within Jackson Park and along South Stony Island Avenue; will improve ecological performance of planting at Jackson Park, including by using native plantings to promote and maintain wildlife habitats; and will introduce varied topography and increased biodiversity and hydrology features, including new storm water run-off management that will mitigate current storm water run-off issues from Jackson Park into the lagoon; and

WHEREAS, Construction of the OPC and development of the OPC Site will support local businesses and encourage additional investments in the area; and

WHEREAS, The Foundation will strive to award a minimum of 50 percent of subcontracts to diverse firms, far greater than the City's required minimum goal of 26 percent MBE and 6 percent WBE participation; and

WHEREAS, In light of the extensive benefits that the OPC will bring to Chicago residents, to the City and to the Park District, the City and the Park District desire to amend the 2015 Ordinance and the 2015 IGA to approve the Revised Proposal; and

WHEREAS, On May 17, 2018, the Chicago Plan Commission approved the construction of the OPC under the LPO, finding that the proposal complied with the applicable policies of the 1972 Lakefront Plan of Chicago and the purposes of the LPO; and

WHEREAS, At the same meeting on May 17, 2018, the Chicago Plan Commission recommended approval of P.D. 1409 for the OPC, and on May 23, 2018, as previously described, the City Council adopted an ordinance approving PD 1409; and

WHEREAS, The base zoning of P.D. 1409 is POS-1 (Parks and Open Space District, Regional or Community Park), which expressly allows "cultural exhibits and libraries" (including museums) as planned developments; and

WHEREAS, Pursuant to Section 17-6-0201 of the Municipal Code, the "POS" zoning district is "intended to preserve, protect and enhance lands set aside for public open space, public parks and public beaches" in order to provide "cultural and recreation opportunities", among other public benefits; and

WHEREAS, The City desires to enter into a use agreement with the Foundation for a term of 99 years in consideration of the Foundation's obligation to construct, operate and maintain the OPC, at its sole cost and expense, with title to the improvements constructed by the Foundation to be transferred to the City upon their completion, subject to and in accordance with the restrictions and provisions contained in a use agreement substantially in the form attached hereto as Exhibit D (the "Use Agreement"); and

WHEREAS, The Use Agreement permits the Foundation to use the OPC Site for a Presidential Center consistent with purposes accorded to and limitations imposed by the Foundation's status as a non-profit, non-partisan entity exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Service Code, and for no other purpose; and

WHEREAS, The City has the right to terminate the Use Agreement if the Foundation fails to use the OPC Site for its permitted Presidential Center uses, including if the Foundation ceases to operate a museum within the OPC Site; and

WHEREAS, During the term of the Use Agreement, the City will enjoy the benefits of the OPC Site in the form of the beautification of grounds, the Foundation's ongoing financial and operational support of public historical, cultural and recreational enrichment activities, and the City's receipt of title to all OPC buildings and improvements (in the manner set forth in the Use Agreement) without any payment to the Foundation and with the Foundation's agreement to operate, maintain and insure such buildings and improvements for the term of the Use Agreement; and

WHEREAS, In addition to the Use Agreement, the City and the Foundation intend to enter into a Master Agreement in substantially the form attached hereto as Exhibit E (the "Master Agreement") and an Environmental Remediation and Indemnity Agreement in substantially the form attached hereto as Exhibit F (the "Environmental Agreement"); and

WHEREAS, The Master Agreement establishes the conditions precedent to the execution of the Use Agreement, and sets forth the representations, warranties and covenants of both parties with respect to their authority to enter into the transaction and the condition of the OPC Site, among other matters; and

Case: 1:18-cv-03424 Document #: 49-6 Filed: 11/21/18 Page 12 of 114 PageID #:1259

WHEREAS, Pursuant to the Master Agreement, the City is not obligated to enter into the Use Agreement until the Foundation establishes an endowment for the OPC and the OPC Site, and has submitted to the City a certificate confirming that the Foundation has received funds and/or written gift pledge commitments equaling or exceeding the projected total construction costs of the OPC as described in the Master Agreement; and

WHEREAS, The Environmental Agreement obligates the Foundation to perform an environmental investigation of the OPC Site and remediate contamination exceeding residential remediation standards, if any; and

WHEREAS, The Environmental Agreement obligates the City to reimburse the Foundation for up to $75,000 in investigation costs plus any incremental costs of remediating the site (i.e., additional costs the Foundation would not otherwise incur to construct the OPC but for the pre-existing contamination and the required remediation work); and

WHEREAS, Two federal actions related to the OPC and the OPC Site have triggered review under the National Environmental Policy Act of 1969, 42 U.S.C. § 4331, et seq. ("NEPA") and Section 106 of the National Historic Preservation Act of 1966, 54 U.S.C. § 306108 ("Section 106"): first, the City's request for approval from the Federal Highway Administration ("FHWA") under the Federal Aid Highway Program of funding for the Transportation Improvements (as hereinafter defined); and second, the City's request for approval from the National Park Service ("NPS") to amend two grant agreements affecting Jackson Park funded under the Urban Park and Recreation Recovery ("UPARR") program (one from 1980 in the amount of $125,300, and the other from 1981 in the amount of $135,870) for the partial conversion of UPARR-assisted parkland to anon-recreational use; and

WHEREAS, With respect to the Federal-aid Highway funding, CDOT has proposed and the Park District's 2018 update to the South Lakefront Framework Plan envisions the closure of four road segments in Jackson Park, as depicted on Exhibit G attached hereto (the "Road Closures") and the construction of a variety of multi-modal transportation improvements to mitigate the impacts of the Road Closures, as well as improve traffic safety and multi-modal access to and through the park, as described on Exhibit H-1 attached hereto and depicted on Exhibit H-2 attached hereto (collectively, the "Transportation Improvements"); and

WHEREAS, On May 17, 2018, the Chicago Plan Commission approved the Road Closures and Transportation Improvements under the LPO; and

WHEREAS, Construction of the OPC and development of the OPC Site along with the roadway changes in and around Jackson Park will result in a net gain of approximately three to four acres of new, added green space within Jackson Park; and

WHEREAS, With respect to the UPARR grants, NPS has preliminarily indicated that the Program, Athletic and Activity Center and the green space surrounding the OPC Site will remain in recreational use, but that certain proposed uses of the Museum, Forum and Library Buildings (for example, proposed educational uses) constitute a partial conversion under UPARR; and

WHEREAS, The City has asked NPS to approve amendments to the UPARR grant agreements (the "UPARR Grant Agreement Amendments") to remove the grant conditions from the footprint of the Museum, Library and Forum Buildings, and to transfer those conditions to the eastern end of the Midway Plaisance, or other park property of reasonably equivalent location and recreational usefulness ("UPARR Replacement Land"); and

WHEREAS, The City and the Park District will seek community input in order to develop recreational programming for the UPARR Replacement Land; and

WHEREAS, The City is in the process of completing the NEPA and Section 106 reviews, and anticipates that it may be necessary to enter into binding commitments to resolve and/or mitigate adverse effects, if any, identified as part of these reviews, including, but not limited to, a Memorandum of Agreement under Section 106 (collectively, "Mitigation Agreements"); and

WHEREAS, The requirements and restrictions in the Museum Act, the LPO, PD 1409 and the Use Agreement preserve substantial control by the City over the OPC Site; and

WHEREAS, Article VII, Section 10 of the 1970 Constitution of the State of Illinois, authorizes state and local governing bodies to cooperate in the performance of their responsibilities by contracts and other agreements; and

WHEREAS, The Intergovernmental Cooperation Act, 5 ILLS 220/1, et seq., similarly authorizes public agencies, including units of local government and school districts, to contract with one another to perform any governmental service, activity or undertaking; and

WHEREAS, The Local Government Property Transfer Act, 50 ILCS 605/0.01, et seq., authorizes and provides for municipalities to convey, grant or transfer real estate held by the municipality to any other municipality upon the agreement of the corporate authorities governing the respective parties; and

WHEREAS, By Resolution Number 18-039-21 and Resolution Number 18-042-21, adopted on May 17, 2018, the Chicago Plan Commission found that the City's acquisition of the OPC Site from the Park District, and the subsequent long-term authorization to the Foundation for use of the OPC Site, were in conformance with the City's long-range planning objectives; and

WHEREAS, The Foundation's selection of Chicago for the OPC is a great honor and unparalleled opportunity for the State of Illinois, all of the City, and especially the South Side; and

WHEREAS, The location of the OPC in Jackson Park will underscore the vital role the OPC plays in the public life of Chicago and will encourage greater use and enjoyment of the park and lakefront; and

WHEREAS, The City recognizes the potential for demographic change and displacement arising from large-scale public and private investment in urban neighborhoods and is committed to closely monitoring property values and other indicators of neighborhood change and implementing measures to preserve economic diversity, home ownership and affordability for long-term residents in the communities surrounding the OPC; and

WHEREAS, In sum, the OPC will feature a museum that memorializes and examines President Obama's historic presidency within the larger story of American history, inspire visitors to engage actively in their own communities, showcase the South Side and Jackson Park to the nation and world, enhance the park's recreational value, attract cultural tourism to the South Side, create direct and indirect economic development benefits, strengthen Chicago's reputation as a global city, and enable the City to directly advance its previously adopted Cultural Plan; now, therefore,

*Be It Ordained by the City Council of the City of Chicago:*

SECTION 1. The foregoing recitals are hereby adopted as the findings of the City Council and are incorporated herein and made a part of this Ordinance.

SECTION 2. It is hereby determined and declared and found that it is useful, desirable, necessary and convenient that the City acquire the OPC Site from the Park District for the public purpose of facilitating the construction and operation of the OPC in Chicago.

SECTION 3. The 2015 Ordinance and the 2015 IGA are hereby amended to replace the Original Legal Description, Original Survey and Original Proposal with the Revised Legal Description, Revised Survey and Revised Proposal.

SECTION 4. The City's acquisition of the OPC Site from the Park District is hereby approved. The Department of Planning and Development (the "Department") is hereby authorized to accept on behalf of the City a deed of conveyance from the Park District for the OPC Site, which shall provide that the OPC Site will revert to the Park District if the land is not used for the OPC. The Commissioner of the Department (the "Commissioner") or a designee of the Commissioner (either, the "Authorized Officer"), is each hereby authorized, subject to the review and approval of the City's Corporation Counsel as to form and legality, to negotiate, execute and deliver a revised IGA between the City and the Park District (the "IGA"), and to execute such other documents and take such other actions as may be necessary or appropriate for the Department to accept title to the OPC Site on behalf of the City and to carry out and comply with the provisions of the IGA, with such changes, deletions, insertions, terms and provisions as the Authorized Officer deems appropriate.

SECTION 5. The City is hereby authorized to grant rights of use of the OPC Site, including any roads to be vacated within the OPC Site, to the Foundation in accordance with, subject to the terms of, and in consideration of the obligations of the Foundation in, the Use Agreement. The City is further authorized to accept ownership from the Foundation of the "Project Improvements" (as defined in the Use Agreement) once constructed by the Foundation within the OPC Site. The Authorized Officer is hereby authorized, subject to the review and approval of the Corporation Counsel as to form and legality, to negotiate, execute and deliver, on behalf of the City, the Use Agreement, and

to execute such other documents and take such other actions as may be necessary or appropriate for the City to carry out and comply with the provisions of the Use Agreement, with such changes, deletions, insertions, terms and provisions as the Authorized Officer deems appropriate.

SECTION 6. The Authorized Officer is hereby authorized, subject to the review and approval of the Corporation Counsel as to form and legality, to negotiate, execute and deliver, on behalf of the City, the Master Agreement, the Environmental Agreement, the UPARR Grant Agreement Amendments, and the Mitigation Agreements (collectively, the "Transaction Documents"), and to execute such other documents and take such other actions as may be necessary or appropriate for the City to carry out and comply with the provisions of the Transaction Documents, with such changes, deletions, insertions, terms and provisions as the Authorized Officer deems appropriate. With respect to the Environmental Agreement, the City shall appropriate amounts sufficient to pay the obligations of the City pursuant to the Environmental Agreement, and the City hereby covenants to take timely action as required by law to carry out the appropriation provisions of this sentence.

SECTION 7. If any provision of this ordinance shall be held to be invalid or unenforceable for any reason, the invalidity or unenforceability of such provision shall not affect any of the other provisions of this ordinance.

SECTION 8. All ordinances, resolutions, motions or orders in conflict with this ordinance are hereby repealed to the extent of such conflict.

SECTION 9. This ordinance shall take effect immediately upon its passage and approval.


[Exhibits "B" and "C" referred to in this ordinance printed
on pages 85889 and 85890 of this *Journal*.]


Exhibits "A", "D" and "E" referred to in this ordinance read as follows:


*Exhibit "A".*
(To Ordinance)

*Revised Legal Description.*

(Subject To Final Survey And Title Commitment)


Parcel 1:

That part of the northwest quarter and the fractional northeast quarter of Section 13, Township 38 North, Range 14 East of the Third Principal Meridian, lying west of

Lake Michigan, (except that portion lying west of the east line of South Shore Drive and north of the south line of 56th Street) and (except that part falling in South Stoney Island Avenue), and that part of the southwest quarter and the fractional southeast quarter of Section 13, Township 38 North, Range 14 East of the Third Principal Meridian, lying west of west line of Lake Michigan, (excepting that part falling in South Stoney Island Avenue), described as follows:

beginning at the intersection of the south line of East 60th Street Extended Easterly with a line 67.00 feet east of and parallel with the west line of Section 13, Township 38 North, Range 13 East of the Third Principal Meridian, being the east line of South Stony Island Avenue as opened and used; thence north 01 degree, 28 minutes, 30 seconds west along said parallel line 510.04 feet; thence north 42 degrees, 06 minutes, 05 seconds east 28.98 feet to a curve, being the southerly line of East Midway Plaisance Drive north as opened and used; thence northeasterly along the arc of said curve concave north, being said southerly line, having a radius of 476.54 feet, having a chord bearing north 61 degrees, 55 minutes, 33 seconds east for a distance of 375.10 feet; thence north 88 degrees, 43 minutes, 12 seconds east 66.79 feet to the east edge of the easterly public walk for South Cornell Drive, being the east line of said South Cornell Drive as opened and used; thence along said east edge of walk, being said east line, the following described nine (9) courses and distances: 1) southerly along the arc of a curve concave east, having a radius of 38.54 feet, having a chord bearing south 00 degrees, 21 minutes, 42 seconds west for a distance of 12.87 feet; 2) thence south 06 degrees, 51 minutes, 19 seconds east 163.49 feet; 3) thence southerly along the arc of a curve concave west, having a radius of 1,120.31 feet, having a chord bearing south 05 degrees, 04 minutes, 57 seconds east for a distance of 157.87 feet; 4) thence southerly along the arc of a curve concave west, having a radius of 3,760.39 feet, having a chord bearing south 03 degrees, 25 minutes, 41 seconds west for a distance of 315.35 feet; 5) thence southerly along the arc of a curve concave east, having a radius of 393.46 feet, having a chord bearing south 06 degrees, 53 minutes, 25 seconds east for a distance of 180.73 feet; 6) thence south 18 degrees, 29 minutes, 44 seconds east 67.10 feet; 7) thence southerly along the arc of a curve concave west, having a radius of 2,172.82 feet, having a chord bearing south 15 degrees, 02 minutes, 50 seconds east for a distance of 267.87 feet; 8) thence southerly along the arc of a curve concave west, having a radius of 1,681.10 feet, having a chord bearing south 07 degrees, 06 minutes, 32 seconds east for a distance of 316.89 feet; 9) thence south 02 degrees, 30 minutes, 19 seconds east 396.02 feet; thence south 88 degrees, 54 minutes, 14 seconds west 213.25 feet; thence north 01 degree, 28 minutes, 06 seconds west 86.69 feet; thence south 88 degrees, 54 minutes, 14 seconds west 70.75 feet; thence south 01 degree, 28 minutes, 06 seconds east 86.69 feet; thence south 88 degrees, 54 minutes, 14 seconds west 265.03 feet to aforesaid parallel line; thence north 01 degree, 28 minutes, 30 seconds west along said parallel line 1,162.61 feet to the point of beginning; said parcel of land herein described contains 19.30 acres, more or less, all in Cook County, Illinois.

Total Area: 840,848 square feet ±, or 19.30 acres ±

10/31/2018        COMMUNICATIONS, ETC.        85889

*Exhibit "B".*
(To Ordinance)

*Revised Survey.*



*Exhibit "C".*
(To Ordinance)

## COMPARISON OF ORIGINAL AND REVISED SITES

### PROPOSED 2015 SITE BOUNDARIES



### REVISED 2018 SITE BOUNDARIES



10/31/2018                    COMMUNICATIONS, ETC.                         85891

*Exhibit "D".*
(To Ordinance)

*Use Agreement With The Barack Obama Foundation.*

This **USE AGREEMENT** ("**Agreement**") is made as of _____, 20___ (the "**Commencement Date**"), by and between the **CITY OF CHICAGO**, an Illinois municipal corporation and home rule unit of government (the "**City**"), acting by and through its Department of Planning and Development, having its principal offices at City Hall, 121 North LaSalle Street, Chicago, Illinois 60602, and **THE BARACK OBAMA FOUNDATION**, a District of Columbia nonprofit corporation and tax exempt entity under Section 501(c)(3) of the Internal Revenue Code (the "**Foundation**"), having offices at 5235 South Harper Court, Suite 1100, Chicago, Illinois 60615.

## RECITALS

A.      The City is the owner of certain real property in Jackson Park, which consists of approximately 19.3 acres of land and is more particularly described on Exhibit A attached hereto and depicted on the map attached hereto as Exhibit B (the "**Subject Property**").

B.      Jackson Park contains a total of 548 acres, including the Subject Property.

C.      The City acquired the Subject Property from the Chicago Park District, a municipal corporation organized and existing pursuant to the laws of the State of Illinois, 70 ILCS 1505/1 *et seq.* (the "**Park District**"), in order to facilitate the development of the Presidential Center (as hereinafter defined).

D.      The Park District Aquarium and Museum Act, 70 ILCS 1290/0.01 *et seq.* (the "**Museum Act**"), allows cities to authorize private institutions to build and operate museums and aquariums in public parks.

E.      The Museum Act specifies that a presidential center is an authorized public park use under the Museum Act.

F.      A core project of the Foundation is to build the Presidential Center in Jackson Park.

G.      The central mission of the Presidential Center is to house and operate a presidential museum that will present President and Mrs. Obama's story within the broader story of American history, the history of civil rights, and the powerful place of Chicago in American history.

H.      The museum will frame President and Mrs. Obama's lives and careers, the 2008 and 2012 presidential elections, and the Obama Presidency in the context of the movements and milestones that helped to shape the Nation over time.

I.      The Presidential Center will contain a variety of spaces designed to offer opportunities for visitors to participate in activities that connect them to the values and skills of civic engagement and community building that have inspired the Obamas' lives and careers.

J.      The Presidential Center will be the 14th presidential museum displaying presidential artifacts owned by NARA (as defined herein).

K.    In connection with the development of the Presidential Center, the Foundation proposes to develop the Subject Property to include four buildings and an underground parking facility, complemented by a plaza, play areas, pedestrian and bicycle pathways and other landscaped open space, as described herein and in the PD (as hereinafter defined).

L.    The four Presidential Center buildings include the Museum Building, the Forum Building, the Library Building, and the Program, Athletic and Activity Center (each as hereinafter defined), as described in this Agreement and depicted in the PD.

M.    The green space surrounding the Presidential Center will include play areas for children, contemplative spaces for young and old, a sledding hill, a sloped lawn for picnicking, recreation and community and special events, walking paths, and a nature walk along the lagoon.

N.    The Presidential Center will not only benefit Chicago residents and attract visitors from around the world, but will also enhance both accessibility and usability of Jackson Park.

O.    The Presidential Center will showcase the South Side and Jackson Park to the nation and world, enhance the park's recreational value, attract cultural tourism to the South Side, create direct and indirect economic development benefits and strengthen Chicago's reputation as a global city.

P.    This Agreement is being entered into pursuant to the terms of that certain Master Agreement dated as of _____, 2018 between the City and Foundation (the "**Master Agreement**").

Q.    On _____, 2018, the City Council adopted an ordinance approving and authorizing the execution of this Agreement  (Journal of Proceedings, pp. _____-_____), the recitals of which describe a rationale for and benefits of this Agreement, the Master Agreement and certain other Subject Property Documents (as defined herein).

R.    On _____, 2018, the Board of Directors of the Foundation adopted a resolution approving and authorizing the execution of this Agreement.

**NOW, THEREFORE**, for and in consideration of the mutual covenants and agreements set forth herein, together with other good and valuable consideration, the receipt and sufficiency of which are hereby confirmed and acknowledged by each of the parties hereto, and each of the parties intending to be bound thereby, the City and the Foundation agree as follows:

## ARTICLE I
## DEFINITIONS

As used in this Agreement, or any Exhibits to this Agreement, except where a different definition is clearly and expressly given, the following words or phrases, capitalized as shown, shall have the following meanings:

"**Agreement**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Alterations**" means any alterations, modifications, changes, additions, improvements, demolition and/or removal of or to the Project Improvements or Subject Property made following completion of Construction of the Project Improvements.

"**Ancillary Uses**" has the meaning assigned to such term in <u>Section 6.1</u> of this Agreement.

"**Architect**" means the architect licensed in the State and engaged by the Foundation to design the Project Improvements or any portion thereof. As of the Commencement Date, the Architect for the Presidential Center Architectural Spaces is Tod Williams Billie Tsien Architects, which is working together with Interactive Design Architects.

"**Award**" means all compensation, damages or interest paid or awarded for a Taking whether pursuant to a judgment, an agreement or otherwise.

"**Bankruptcy Proceeding**" means any bankruptcy, composition, insolvency, reorganization, or similar proceeding, whether voluntary or involuntary, under Title 11, United States Code, or any other or successor federal or state bankruptcy, insolvency, reorganization, moratorium, or similar law for the relief of debtors, including any assignment for the benefit of creditors and any adversary proceeding, proceedings for the appointment of a receiver or trustee, or similar proceeding.

"**Business Days**" means all days other than (a) Saturdays, (b) Sundays, and (c) weekdays on which City offices are not open for business.

"**Casualty Restoration Escrow Agreement**" has the meaning assigned to such term in Section 13.1(c) of this Agreement.

"**City**" has the meaning assigned to such term in the introductory paragraph of this Agreement. Except where clearly and expressly provided otherwise in this Agreement, any action to be taken by the City may be taken for the City by the Commissioner.

"**City Parties**" has the meaning assigned to such term in <u>Section 19.1</u> of this Agreement.

"**Commencement Date**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Commissioner**" means the commissioner of the Department, or such successor position as the City Council of the City may designate. The defined term "Commissioner" shall also include any person designated by the Commissioner to act on behalf of the Commissioner.

"**Condemnation Restoration Escrow Agreement**" has the meaning assigned to such term in <u>Section 15.1(b)</u> of this Agreement.

"**Construction**" has the meaning assigned to such term in <u>Section 4.1</u> of this Agreement.

"**County**" means Cook County, Illinois.

"**Cornell MOT Plan**" has the meaning assigned to such term in Section 4.14(a) of this Agreement.

"**Cornell Parcel**" means that portion of the Cornell Segment that is within the boundaries of the Subject Property.

"**Cornell Segment**" means the public roadway known as Cornell Drive, and the attendant public right-of-way adjacent thereto, between 59th Street and Hayes Drive in Chicago, Illinois.

"**Department**" means the Department of Planning and Development of the City, as a party to this Agreement, and any successor department thereto, or any department that the City Council may from time to time designate to fulfill the responsibilities and exercise the rights of the City hereunder.

"**Demolish**" or "**Demolition**" means the demolition of the Project Improvements, the removal of all construction materials and debris, the excavation and removal of any foundations, the capping or removal of all utility lines the maintenance, repair and replacement of which are the responsibility of the Foundation, and the grading of the Subject Property to the then surrounding grade and restoration of the Subject Property as nearly as possible to its original parkland condition.

"**Endowment**" means an endowment established by the Foundation having as its sole purpose paying, as and when necessary, the costs to operate, enhance and maintain the Project Improvements (including the Presidential Center) during the Term.

"**Environmental Conditions**" has the meaning assigned to such term in Section 9.1(a) of this Agreement.

"**Environmental Remediation Agreement**" has the meaning assigned to such term in Section 9.1(b) of this Agreement.

"**Event of Default**" has the meaning assigned to such term in Section 16.1 of this Agreement.

"**Exhibit Installations**" means structures, fixtures and other improvements installed in the Presidential Center to display, or as part of, any exhibit or installation to be made available for viewing by the general public.

"**Excluded Items**" has the meaning assigned to such term in Section 4.4 of this Agreement.

"**Federal Governmental Determinations**" shall mean the (i) securing of final decision/approval documents under the National Environmental Policy Act ("**NEPA**") from the National Park Service for a conversion under the Urban Park and Recreation Recovery Act, (ii) securing of final decision/approval documents under NEPA from the Federal Highway Administration in anticipation of funding under the Federal-Aid Highway Act for roadway improvements in Jackson Park, and (iii) completion of a consultation process under Section 106

of the National Historic Preservation Act, including if necessary, entry by the City into a memorandum of agreement to address known adverse effects on historic properties.

"**Final Completion Date**" means the date upon which the last of the punch list items for any Project Improvements has been completed as determined by the Architect.

"**Force Majeure Event**" means an act of god, fire, earthquake, floods, explosion, adverse weather, war, terrorism, invasion, insurrection, riot, mob violence, sabotage, inability to procure or general shortage of labor, equipment, facilities, materials, supplies, products or services in the open market, failure of transportation, strikes, lockouts, action of labor unions, condemnation, requisition, change in Laws, decisions or orders of governmental or civil or military or naval authorities, failure by the party hereto that is not asserting the existence of a Force Majeure Event to timely perform any of its obligations under the Subject Property Documents or any other cause, whether similar or dissimilar to the foregoing, in each case beyond the control of the applicable party.

"**Forum Building**" means a building comprising a portion of the Presidential Center that will be used principally for programming and events, including the roof and exterior area immediately above such building.

"**Foundation**" has the meaning assigned to such term in the introductory paragraph of this Agreement, including the Foundation's successors and permitted assigns.

"**Foundation Parties**" has the meaning assigned to such term in Section 6.7(b) of this Agreement.

"**Governmental Approvals**" means all licenses, building permits and other permits and governmental approvals required for the Construction of the Project Improvements and the Foundation's intended use of the Subject Property.

"**Governmental Authority**" means the United States, the State, the County, the City, and any other governmental authority having jurisdiction on or over the Subject Property or the Project Improvements, and any agency, department, commission, board, bureau or instrumentality of any of them.

"**Governmental Function**" means any regulatory, legislative, permitting, enforcement (including police power), licensing or other functions which the City is authorized or required to perform in its capacity as a Governmental Authority in accordance with applicable Laws. The entering into this Agreement and the performance by the City of its obligations under this Agreement shall not be considered a "Governmental Function."

"**Great Lawn**" means a sloped area located on the Subject Property as depicted in Exhibit D (as such Exhibit may be modified with approval from the Department to reflect Part II approvals issued from time to time under the PD), which will be used as a gathering space in warm weather periods and as a sledding hill or for other cold weather outdoor activities during cold weather periods.

"**Green Space**" means all portions of the Subject Property excluding the Presidential Center.

"**Hazardous Materials**" has the meaning assigned to such term in Section 9.1(c) of this Agreement.

"**Impositions**" means all real property and personal property taxes (whether designated as *ad valorem* taxes or in some other manner and however calculated), if any, and other taxes, assessments (general and special), impositions and other governmental charges, general and special, ordinary and extraordinary, of any kind or nature, which are assessed against or otherwise attributable to real or personal property by any Governmental Authority.

"**Imposition Lien**" has the meaning assigned to such term in Section 10.1(a) of this Agreement.

"**Laws**" means all present and future laws (including, without limitation, laws relating to Hazardous Materials or environmental, health, safety, industrial hygiene, pollution, or related matters), ordinances, statutes, codes, requirements, orders, directions, rules and regulations of all federal, state, county and municipal governments and of all other Governmental Authorities having or claiming jurisdiction over the City, the Foundation, the Subject Property, the Project Improvements or any appurtenances thereto or any part thereof, and of all the respective departments, bureaus and officials of any such authorities, common law and strict liability provisions, and any judicial or administrative interpretations thereof, including any governmental, judicial or administrative judgments, orders or directives.

"**Liabilities**" has the meaning assigned to such term in Section 19.1 of this Agreement.

"**Library Building**" means a building comprising a portion of the Presidential Center that will be used principally for educational purposes and the support of the other Project Improvements, including the roof and exterior area immediately above such building.

"**Liens**" means consensual liens (such as deeds of trust and mortgage liens) and judgment liens. This term does not include Mechanic's Liens or Imposition Liens.

"**Master Agreement**" has the meaning assigned to such term in the Recitals.

"**Material Damage**" has the meaning assigned to such term in Section 14.2(c) of this Agreement.

"**Material Taking**" has the meaning assigned to such term in Section 15.1(c) of this Agreement.

"**Mechanic's Lien(s)**" has the meaning assigned to such term in Section 6.6(a) of this Agreement.

"**Midway MOT Plan**" has the meaning assigned to such term in Section 4.14(b) of this Agreement.

"**Mission**" means the mission of the Presidential Center, as described on Exhibit C attached hereto.

"**Museum Act**" has the meaning assigned to such term in the Recitals.

"**Museum Building**" means a building comprising a portion of the Presidential Center that will be used principally as a museum open to the public.

"**Museums in the Park**" means the museums located on the Park District's land that are supported by the Aquarium and Museum Operating Fund, which as of the date hereof consists of the following museums: the Adler Planetarium, the Art Institute of Chicago, the Chicago History Museum, the DuSable Museum of African American History, The Field Museum, the John G. Shedd Aquarium, the Museum of Contemporary Art, the Museum of Science and Industry, the National Museum of Mexican Art, the National Museum of Puerto Rican Arts & Culture, and The Peggy Notebaert Nature Museum.

"**NARA**" means the National Archives and Records Administration, an agency of the federal government.

"**North Midway Plaisance Segment**" has the meaning assigned to such term in Section 4.14(b) of this Agreement.

"**Outside Completion Date**" means the date that is the later to occur of (a) the fourth (4th) anniversary of the Commencement Date, and (b) the third (3rd) anniversary of the date on which the later of the Cornell Parcel and the South Midway Plaisance Segment is delivered to the Foundation in the condition required in the Subject Property Documents.

"**Park District**" has the meaning assigned to such term in the Recitals.

"**PD**" means Planned Development No. 1409, as amended from time to time during the Term.

"**Permit Plans**" means, for each phase of the Project Improvements, the construction plans and specifications prepared by the Architect, and submitted to the City as the basis for obtaining the general building permits for Construction of such phase of the Project Improvements.

"**Permitted Use**" has the meaning assigned to such term in Section 6.1 of this Agreement.

"**Plaza**" means the principal exterior plaza located on the Subject Property lying in front of the Museum Building, Forum Building and Library Building.

"**Presidential Center**" means the portion of the Subject Property depicted on Exhibit D (as such Exhibit may be modified with approval from the Department to reflect Part II approvals issued from time to time under the PD), which is comprised of the Presidential Center Green Space, the Presidential Center Architectural Spaces, and all other improvements and fixtures constructed, installed or located by the Foundation on such portion of the Subject Property in accordance with this Agreement.

"**Presidential Center Architectural Spaces**" means the Museum Building (including its exterior courtyards and eastern bustle), the Forum Building (and its roof area), the Library Building (and its roof area), the Program, Athletic and Activity Center, the Underground Parking Facility, the Plaza, and any other buildings constructed or installed on the portion of the Subject Property labeled "Presidential Center" depicted on Exhibit D (as such Exhibit may be modified with approval from the Department to reflect Part II approvals issued from time to time under the PD), and other facilities and improvements ancillary to any of the foregoing constructed, installed or located on the Subject Property by the Foundation, such as, for example, loading/receiving areas and service drives.

"**Presidential Center Green Space**" means all portions of the Presidential Center other than the Presidential Center Architectural Spaces.

"**Program, Athletic and Activity Center**" means a building comprising a portion of the Presidential Center that will be used principally for purposes of programming, presentations, events, athletics and recreation.

"**Project**" means the design, financing and Construction of the Project Improvements.

"**Project Improvements**" means, collectively, the Presidential Center Architectural Spaces and all other improvements constructed, installed or located on the Subject Property by the Foundation in accordance with the terms of this Agreement.

"**Record Drawings**" means final as-built drawings of the Project Improvements. Upon reasonable advance request, the Record Drawings shall be made available for review by the City and its representatives at the Subject Property, subject to the Foundation's reasonable security protocols.

"**Remediation**" has the meaning assigned to such term in Section 9.1(d) of this Agreement.

"**Rules**" has the meaning assigned to such term in Section 6.2(b) of this Agreement.

"**Soft Costs**" means all architectural, engineering, consulting and other non-construction costs with respect to the Construction of the Project Improvements.

"**South Midway Plaisance Segment**" has the meaning assigned to such term in Section 4.14(b) of this Agreement.

"**State**" means the State of Illinois.

"**Subject Property**" has the meaning assigned to such term in the Recitals.

"**Subject Property Documents**" means this Agreement, the Master Agreement, the Environmental Remediation Agreement, and any other agreement relating to the Subject Property executed by the City and the Foundation.

"**Taking**" means the taking of all or a portion of the Subject Property or the Project Improvements for any public or quasi-public use, by eminent domain proceedings, by a

Governmental Authority or by an action in the nature of eminent domain (whether permanent or temporary) or the sale or other transfer of all or a portion of the Subject Property or the Project Improvements in lieu thereof.

"**Term**" has the meaning assigned to such term in Section 2.2 of this Agreement.

"**Termination Exercise Notice**" has the meaning assigned to such term in Section 16.5(a) of this Agreement.

"**Third-Party Vendor(s)**" has the meaning assigned to such term in Section 12.2 of this Agreement.

"**Total Construction Costs**" means all costs and expenses incurred in the Construction of the Project Improvements, which shall not include (a) any costs or expenses for which the City is responsible, pursuant to the Subject Property Documents, (b) any Soft Costs, and (c) any Exhibit Installations.

"**Turnover Date**" has the meaning assigned to such term in Section 4.14(c) of this Agreement.

"**Underground Parking Facility**" means a below-surface parking garage located on the Subject Property.

## ARTICLE II
## GRANT AND TERM

**Section 2.1**    Grant.    Subject to the terms, provisions, covenants, agreements and conditions of this Agreement, the City hereby gives and grants to the Foundation for the Term the following rights with respect to the Subject Property:

(a)    the right to construct and install the Project Improvements (including the Presidential Center);

(b)    the right to occupy, use, maintain, operate and alter the Presidential Center Architectural Spaces; and

(c)    the right to use, maintain, operate and alter the Presidential Center Green Space and Green Space.

The Subject Property shall be made available by the City to the Foundation as of the Commencement Date, subject to Section 4.14.

**Section 2.2**    Term.    The term ("Term") of this Agreement shall commence on the Commencement Date and shall expire on the day immediately prior to the 99th annual anniversary of the Commencement Date, unless this Agreement is earlier terminated pursuant to the provisions of this Agreement, in which case the Term shall end on the date of such termination.

## ARTICLE III
## CONSIDERATION

The consideration for this Agreement is Ten and 00/100 Dollars ($10.00) payable by the Foundation on the Commencement Date, the receipt and sufficiency of which, when taken together with the construction, development, operation, maintenance and repair of the Presidential Center and the other Project Improvements by the Foundation, the vesting of ownership of the Project Improvements by the Foundation in the City (as contemplated herein), as well as the material covenants and agreements set forth herein to be performed and observed by the Foundation, are hereby acknowledged by the City.

## ARTICLE IV
## DESIGN/CONSTRUCTION OF AND TITLE TO IMPROVEMENTS

**Section 4.1**    Construction. The Foundation shall, at its sole cost and expense, design and construct the Project Improvements in conformance with this Agreement, the Master Agreement, the PD, all applicable Laws, sound building and engineering practices and substantially in conformity with the Permit Plans (the physical construction of the Project Improvements being referred to herein as the "**Construction**"). The Foundation shall be solely responsible for the design and Construction of the Project Improvements, including the selection, termination and replacement of all architects, contractors, engineers and consultants involved in such Construction, subject to the requirements set forth in Exhibit F, and for the safety and structural soundness of all Project Improvements. Subject to delays to the extent resulting from Force Majeure Events, the Foundation (a) shall commence Construction of the Project Improvements on the Subject Property no later than the first (1st) anniversary of the Commencement Date, and (b) shall complete Construction of the Project Improvements (other than non-material Project Improvements, and subject to normal and customary punch list and finish items), and open the Presidential Center to the public, no later than the Outside Completion Date; provided, however, the Commissioner of the Department may extend the construction commencement and completion dates by up to one (1) year each (or two (2) years in the aggregate) if the Foundation encounters unexpected delays or difficulties.

**Section 4.2**    Project Costs. The City shall not be liable or otherwise responsible in any manner (a) for any of the Total Construction Costs, any of the Soft Costs, or, except as required pursuant to the Subject Property Documents, for any other costs, expenses, obligations, taxes, fees, penalties, Governmental Approvals or liabilities arising out of the planning, design, construction, furnishing, or operation of the Project Improvements; or (b) for any costs arising out of the financing of the Total Construction Costs or Soft Costs (if and to the extent any such financing is permitted hereunder). The immediately preceding sentence, however, is not intended to and shall not relieve the City from its responsibilities (and liabilities attendant thereto) relating to the exercise of its ordinary police powers and paying for any costs incurred in connection therewith (to the extent ordinarily paid by the City), or from any of the City's obligations expressly provided in the Subject Property Documents.

**Section 4.3**    Indemnification by Architect and Contractor. The Foundation shall cause the Architect employed or engaged by the Foundation in connection with the Construction to indemnify the City against all claims and liabilities arising out of the negligent performance of

professional services by such Architect with respect to the design of the Project Improvements, and shall cause the general contractor employed or engaged by the Foundation in connection with the Construction to indemnify the City against all claims and liabilities arising out of the negligent performance of work by such general contractor with respect to the Construction of the Project Improvements, in each instance to the extent permitted by applicable Law. The Foundation also shall cause such Architect and the general contractor, as applicable, to obtain and keep in full force and effect appropriate insurance for the benefit of the City to insure the City against any and all commercially insurable claims and liabilities asserted by third parties arising out of the design and construction of the Project Improvements.

**Section 4.4**　　Title to Project Improvements.　　Except for exhibits and Foundation-installed art and sculptures on the Subject Property ("**Excluded Items**"), title to which shall remain vested in the Foundation unless conveyed to the City by separate instrument, any and all Project Improvements placed or constructed by the Foundation on the Subject Property shall, upon completion thereof, become the property of the City and shall remain the property of the City during the Term. The Foundation shall, reasonably promptly after the City's request therefor, execute, acknowledge and deliver such documents as may be necessary or convenient in the City's discretion for the purpose of further evidencing that title to the Project Improvements (other than the Excluded Items) is vested in the City. After the expiration of the Term or earlier termination of this Agreement, title to such Project Improvements shall remain vested in the City, subject to and as provided in Section 18.1 of this Agreement.

**Section 4.5**　　Easements, Rights of Way and Dedications. The City shall promptly and reasonably cooperate with the Foundation regarding the grant by the City of any easements, rights of way or dedications affecting the Subject Property which are required by (a) any Governmental Authority (including the City) having jurisdiction over the Subject Property, or (b) public or private utilities, in connection with the development and/or alteration of the Subject Property by the Foundation.

**Section 4.6**　　Performance and Payment Bond. Prior to the commencement of Construction of any portion of the Project Improvements involving work in the public way or work that constitutes a "public work" under applicable state law and is required to be bonded under such state law, the City may require the Foundation to require that the applicable contractor (or, at the Foundation's election, the general contractor) be bonded for its performance and payment by sureties having an AA rating or better using a bond in a form reasonably acceptable to the City. The City shall be named as obligee or co-obligee on any such bonds.

**Section 4.7**　　City Resident Worker and MBE/WBE Requirements. The Foundation covenants and agrees to abide by, and contractually obligate the general contractor and each subcontractor engaged in connection with the Construction of the Project Improvements to abide by the terms set forth in Sections 1 and 2 (City Resident Construction Worker Employment Requirement) and Section 3 (MBE/WBE Commitment) of Exhibit F. The Foundation shall deliver to the City on a quarterly basis written progress reports detailing compliance with such requirements. If any such reports indicate a shortfall in compliance, the Foundation shall also deliver a plan to the Department which shall outline, to the Department's satisfaction, the manner in which the Foundation shall correct any shortfall.

**Section 4.8** _Prevailing Wage_. The Foundation covenants and agrees to pay, and to contractually obligate the general contractor and each subcontractor engaged in connection with the Construction of the Project Improvements to pay, not less than the prevailing wage rate as ascertained by the Illinois Department of Labor, to all employees. All such contracts shall list the specified rates to be paid to all laborers, workers and mechanics for each craft or type of worker or mechanic employed pursuant to such contract. If the Department of Labor revises such prevailing wage rates, the revised rates shall apply to all such contracts. Upon the City's request, the Foundation shall provide the City with copies of all such contracts entered into by the Foundation, the general contractor and any subcontractors to evidence compliance with this Section 4.8.

**Section 4.9** _City Inspection during Construction_. For the period commencing on the Commencement Date and continuing through the Final Completion Date for the Project Improvements, the Foundation shall permit access by an authorized representative of the City designated in writing by the City to all portions of the Project Improvements and the Subject Property at all reasonable times and upon reasonable prior notice for the purpose of determining whether the Foundation is constructing the Project Improvements in accordance with the terms of this Agreement and all applicable Laws.

**Section 4.10** _Barricades_. Prior to the commencement of any construction activity relating to the Project Improvements requiring barricades, the Foundation shall install barricades constructed in compliance with all applicable Laws. The Foundation shall erect all barricades so as not to interfere with or affect any bus stop adjacent to the Subject Property.

**Section 4.11** _Limited Purpose of Approvals_. Any approval given by the Department pursuant to this Agreement is for the purpose of this Agreement only and does not constitute the approval required by the City's Department of Buildings or any other City department, nor does such approval constitute an approval of the quality, structural soundness or safety of any Project Improvements located or to be located on the Property, or the compliance of said Project Improvements with any Laws, private covenants, restrictions of record, or any agreement affecting the Subject Property or any part thereof.

**Section 4.12** _Completion of the Project Improvements_. The Foundation, promptly following the Final Completion Date for the Project Improvements, shall deliver to the City a certificate in form and substance satisfactory to the City, signed by an authorized representative of the Foundation, certifying (except as to (b) below, which shall be provided by the Architect): (a) that all insurance required under this Agreement has been obtained; (b) that all Construction has been completed in accordance with the provisions of this Agreement and substantially in accordance with the Permit Plans; (c) that within ten (10) Business Days following the Final Completion Date specified in the certificate, the Presidential Center will be placed in service, and (d) all amounts payable with respect to the Construction of the Project Improvements have been paid or will be paid by a specified date.

**Section 4.13** _Site Closure_. In order to facilitate the safe, secure and efficient construction and development of the Presidential Center and the other Project Improvements by the Foundation, but subject to the rights of the City pursuant to Section 4.9 to inspect the Project Improvements and the Subject Property, for the period commencing on the Commencement Date and continuing

through the Final Completion Date for the Project Improvements, the Foundation shall be permitted to install and erect construction fencing and barricades, and otherwise prohibit or restrict access to the Subject Property in accordance with applicable Law.

**Section 4.14** Closure of Roads within OPC Site.

(a) Cornell Drive. The Foundation acknowledges that as of the date hereof Cornell Drive is an active roadway, and that the Cornell Parcel will not be made available to the Foundation for its use until such time as the City has obtained all approvals and/or permits required for the permanent closure of the Cornell Segment, and the Cornell Segment (or the applicable portion thereof) shall have been vacated with title thereto vested in the City. The City will use best efforts to obtain the approvals and/or permits required for such vacation and permanent closure, to vacate and permanently close the Cornell Segment, and to make the Cornell Parcel available to the Foundation for its use as herein provided, by December 31, 2020. The Foundation acknowledges, however, that the permanent closure of the Cornell Segment depends on the completion by the City of transportation improvements on Lake Shore Drive, Hayes Drive, and the portion of Stony Island Avenue located between East 63rd Street/Hayes Drive and the North Midway Plaisance Segment, and certain utility work within the right-of-way of the Cornell Segment. Prior to the permanent closure of the Cornell Segment, the City will work with the Foundation to secure IDOT's approval to temporarily close the west 24 feet of the roadway within the Cornell Segment (two southbound lanes) to traffic, it being understood that such temporary lane closures will be conditioned on the design, funding and implementation by the Foundation of a maintenance of traffic plan for such temporary lane closures (the "**Cornell MOT Plan**"). Upon securing such IDOT approval, the City will temporarily close the west 24 feet of the roadway within the Cornell Segment to traffic and make such portion of the Cornell Segment available to the Foundation for implementation of the Cornell MOT Plan and its use as herein provided. The City will use best efforts to secure the approvals and/or permits required for such temporary lane closures by the date that is the later to occur of (i) the 90th day following receipt of the Federal Governmental Determinations, and (ii) June 1, 2019.

(b) Midway Plaisance. The Foundation acknowledges that as of the date hereof the eastbound lanes of Midway Plaisance Drive between Stony Island Avenue and Cornell Drive (the "**South Midway Plaisance Segment**") are part of an active roadway, and will not be made available to the Foundation for its use until such time as the City has obtained all approvals and/or permits required for the permanent closure of the South Midway Plaisance Segment, and the South Midway Plaisance Segment shall have been vacated with title thereto vested in the City. The City will use best efforts to obtain the approvals and/or permits required for such closure by the date that is the later to occur of (i) the 30th day following receipt of the Federal Governmental Determinations, and (ii) March 15, 2019. The Foundation acknowledges, however, that the permanent closure of the South Midway Plaisance Segment depends on IDOT approval of a plan to temporarily re-route eastbound traffic from the South Midway Plaisance Segment to the westbound lanes of the Midway Plaisance (the "**North Midway Plaisance Segment**"), with such temporary re-routing involving the temporary conversion of the North Midway Plaisance Segment from one-way to two-way traffic. The City will work with the Foundation to secure IDOT approval

for the temporary redesign of the North Midway Plaisance Segment to accommodate eastbound and westbound traffic, it being understood that such temporary redesign and re-routing of traffic will be conditioned on the design, funding and implementation by the Foundation of a maintenance of traffic plan for such temporary re-design and re-routing (the "**Midway MOT Plan**"). The engineering, construction and maintenance work necessary for the temporary re-routing of traffic to North Midway Plaisance will be the responsibility of the Foundation until such time as the City completes the transportation improvements necessary to permanently reconfigure North Midway Plaisance to accommodate two-way traffic. Upon securing such IDOT approval, the City will make the South Midway Plaisance Segment available to the Foundation for its implementation of the Midway MOT Plan and its use as herein provided.

(c)     Turnover Dates. At such time as the City is prepared to make the Cornell Parcel (or any portion thereof) or the South Midway Plaisance Segment available to the Foundation as herein contemplated, the City shall so notify the Foundation, whereupon the City and the Foundation shall agree upon the date(s) on which the applicable portion(s) of the Cornell Parcel or the South Midway Plaisance Segment shall be made available to the Foundation (each such date, as applicable, being hereinafter referred to as a "**Turnover Date**"). Upon each applicable Turnover Date, the applicable portion of the Cornell Parcel or the South Midway Plaisance Segment shall be made available to the Foundation for construction of the Project Improvements and the use of the Subject Property thereafter as herein contemplated, whereupon it will become part of the Subject Property, subject to all of the rights and obligations applicable thereto set forth in this Agreement. Until such time as the applicable Turnover Date occurs and the applicable portion of the Cornell Parcel or the South Midway Plaisance Segment is made available to the Foundation as herein contemplated, such portion of the Cornell Parcel or the South Midway Plaisance Segment shall not be part of the Subject Property, and the Foundation shall have no rights or obligations with respect to such parcel pursuant to this Agreement.

(d)     Responsibility for Existing Roadway Improvements. Once each applicable Turnover Date shall have occurred, the Foundation shall be responsible for removing all then-existing pavement and related above-ground features from the Cornell Parcel and the South Midway Plaisance Segment, including curbs, street lights and signage. Any work taking place within the public right-of-way must be completed in accordance with latest edition of CDOT's Rules and Regulation for Openings in the Public Way, to the extent applicable to the work in question.

## ARTICLE V
## AUTHORITY TO EXECUTE AGREEMENT

At the Commencement Date of this Agreement, each party represents and warrants that (a) it has full right, power and authority to enter into this Agreement, (b) the person executing this Agreement on behalf of such party has the authority to do so, (c) this Agreement constitutes the legal, valid and binding obligation of such party enforceable in accordance with its terms, subject to Laws applicable generally to creditor's rights, municipalities, and applicable principles of equity, and (d) performance of this Agreement does not result in any breach of, or constitute any default under, any agreement or other instrument to which such party is a party, or by which such

party is bound. The City agrees that, if the City's authority to enter into this Agreement is challenged, the City will defend the validity and enforceability of this Agreement.

### ARTICLE VI
### USE AND CONDITION OF THE SUBJECT PROPERTY

**Section 6.1**    Permitted Use.  The Foundation, at all times during the Term, shall be permitted to use the Subject Property solely for the following purposes (all in accordance with the Museum Act and all applicable Laws):  (a) constructing, modifying, improving, maintaining, repairing and restoring the Project Improvements, including any Foundation-installed art and sculptures; (b) operating the Presidential Center, including the museum therein and all uses set forth in Exhibit E, in accordance with the Mission of the Presidential Center and the Museum Act's free admission requirements, and consistent with the purposes accorded to and limitations imposed on the Foundation by its 501(c)(3) status; (c) managing and maintaining the Green Space in accordance with Section 6.2; (d) hosting a public library branch and operating and maintaining other educational, cultural and exhibit spaces, including but not limited to a broadcast studio, a test kitchen and a teaching garden; (e) hosting performances, special exhibits and events, and otherwise offering recreational, instructional and cultural programming to support the Mission of the Presidential Center; and (f) operating a gift shop, providing food and beverage services, operating a public parking facility, and otherwise offering services to support the Presidential Center and serve its patrons and guests (all of the uses described in this clause (f) (the "**Ancillary Uses**") being subordinate to the other uses for which the Subject Property may be used pursuant to this Section 6.1).  Such Ancillary Uses shall include, in addition to those uses specified above, those ancillary uses which are present in other Museums in the Park.  The purposes described in clauses (a) through (f) of this Section 6.1 are collectively referred to in this Agreement as the "**Permitted Use.**"

**Section 6.2**    Public Access.

(a)    Subject to subsections (b) and (c) below and applicable security requirements imposed by Law or governmental policies (whether those of NARA, the Department of Homeland Security, or otherwise), (i) the Presidential Center Architectural Spaces shall be open to the public at a minimum in a manner substantially consistent with the manner in which other Museums in the Parks are open to the public, and (ii) the Presidential Center Green Space, the Green Space and the Plaza shall be open to the public during Chicago Park District hours.

(b)    The Foundation, in consultation with the City, may adopt reasonable rules ("**Rules**") for the health, safety and protection of the facilities and patrons of the Presidential Center Green Space and the Green Space, which may include, but not be limited to, prohibiting or regulating activities that may unreasonably disrupt pedestrian traffic flow or the enjoyment of the Presidential Center and its daily activities and special events.  The Foundation shall submit the Rules, and any proposed amendments thereto, to the Department for its review and approval, which approval shall not be unreasonably withheld.  The Department shall have thirty (30) Business Days to approve the Rules or propose changes.  If the Department proposes changes, the Foundation shall revise the Rules in good faith to respond to the Department's comments and resubmit the Rules to

the Department for approval. This process shall continue until the Rules are finalized. Such Rules shall promote access by the general public to, through and within the Presidential Center Green Space and the Green Space for recreational purposes, while concurrently addressing public safety and welfare considerations, the purpose and design of each portion of the Presidential Center Green Space and the Green Space, and the maintenance of sensitive landscaping.

    (c)    Subject to compliance with applicable Law, including the PD and any regulations governing PD amendments, the Foundation may use the Presidential Center Green Space and Plaza for:

    (i)    temporary exhibits and permanent sculpture and other works of art, provided the placement and number of such exhibits, sculptures and works of art may not materially obstruct the public's access to, through and within the Presidential Center Green Space or Plaza for the active and passive recreational uses described or depicted in the PD;

    (ii)    events and activities open to the public related to the Mission of the Presidential Center and the Presidential Center's programs, such as outdoor classes, films, concerts, music and dramatic performances, and other educational, recreational and cultural events and activities, provided that the Foundation shall preserve the public's access to, through and within the Presidential Center Green Space and/or Plaza (as applicable) to the greatest extent practicable during such events; and

    (iii)    private Foundation events that relate to or support the Presidential Center's Mission and programs ("OPC Events"), or private third-party events that are customary for support of the other Museums in the Park ("Support Events"); provided that: (x) no portion of the Presidential Center Green Space may be closed off for OPC Events more than eight (8) days per year and/or for Support Events more than four (4) days per year, and, during any such closures for private events in the Presidential Center Green Space, the Foundation shall preserve the public's access to, through and within the Presidential Center Green Space to the greatest extent practicable during such closures; and (y) no portion of the Plaza may be closed off for OPC Events and Support Events more than three (3) days per year, and, during any such closures in the Plaza that occur within the operating hours of the Forum Building, Museum Building and/or Library Building, public access to and from such buildings shall be preserved.

The Foundation shall conduct the events and activities described in Section 6.2(c)(ii) and (iii) above in accordance with standards and procedures set forth in a written agreement to be negotiated in good faith between the City, the Park District and the Foundation. This agreement shall address such matters as the advance notification by the Foundation to the City and the Park District of the scheduling of closures for events in the Presidential Center Green Space and/or Plaza with more than 50 people and the coordination among the parties on the advance scheduling of events so as to account for security considerations, the

avoidance of conflict with other events in and around Jackson Park and other logistical and public access considerations.

**Section 6.3**     <u>Compliance with Law</u>.

(a)     The Foundation shall not operate or occupy, or authorize the operation or occupancy of, the Subject Property or Project Improvements, in whole or in part, in a manner which would violate any certificate of occupancy issued for the Project Improvements, or make void or voidable any insurance obtained by or on behalf of the Foundation then in force with respect to the Subject Property or Project Improvements, or which would make it impossible to obtain fire or other insurance thereon required to be furnished by the Foundation under this Agreement, or which would constitute a public nuisance.

(b)     The Foundation shall not use or occupy, or authorize the use or occupancy of, the Subject Property or the Project Improvements, in whole or in part, in a manner which would violate any applicable Laws.

(c)     Without limiting the generality of the foregoing, the Foundation shall be responsible for compliance, including all costs of compliance, with the Americans with Disabilities Act of 1990 (42 U.S.C. §12101, *et seq.*) and any and all other applicable Laws related to the accessibility of the Project Improvements to persons with disabilities.

(d)     The Foundation shall not use or allow the Subject Property to be used for political fundraisers or use or occupy, or authorize the use or occupancy of, the Subject Property or Project Improvements, in whole or in part, in a manner that would be inconsistent with the Foundation's status as a tax exempt entity under Section 501(c)(3) of the Internal Revenue Code.

(e)     So long as artifacts owned by NARA are displayed within any portions of the Presidential Center, the Foundation agrees that any such portions of the Presidential Center will be built and maintained in accordance with NARA-imposed standards.

(f)     The Foundation shall not discriminate on the basis of race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military discharge status, or source of income, all as defined in the City of Chicago Human Rights Ordinance, Chapter 2-160 *et. seq.* of the Chicago Municipal Code, except as otherwise provided by said ordinance and as amended from time to time, in the use or occupancy of the Subject Property or any part thereof.

**Section 6.4**     <u>Right of Entry; Other Uses by City</u>.    The City and its authorized representatives, agents and employees shall have the right to enter upon the Subject Property at any and all reasonable times (which, in the case of any such entry into the interior portions of the Presidential Center Architectural Spaces, shall be within operating hours of the Presidential Center Architectural Spaces) for the purposes of inspection and observation, and for determining the Foundation's compliance with this Agreement. The City shall conduct such inspections and observations in a manner and at such times and intervals calculated to minimize disruption to the use and enjoyment of the Subject Property by the Foundation, its employees and patrons. Said

inspections may be made by persons identified to the Foundation as City employees or by independent contractors engaged by the City. Any inspections of the interior portions of the Presidential Center Architectural Spaces shall be made with prior notice of at least forty-eight (48) hours during operating hours (except in the case of emergency, where no notice is required) and at such reasonable times and intervals and for such reasonable duration as the City and the Foundation shall agree, and shall be conducted in accordance with the reasonable security protocols of the Foundation. Consistent with the use of the Subject Property for the Permitted Use, and with the public nature of the Presidential Center Green Space and the Green Space as described in Section 6.2 hereof, the City agrees that, except to the extent required by applicable Law and/or expressly provided in this Agreement (including the terms of this Section 6.4) or the other Subject Property Documents, the City (acting in its proprietary capacity as a party to this Agreement, as opposed to the exercise of its Governmental Functions, as more particularly described in Section 6.8 below) will not use or occupy the Subject Property during the Term for any purpose without the prior written consent of the Foundation.

**Section 6.5**    Annual IRS Form 990. The Foundation at all times shall maintain its status as a Section 501(c)(3) tax exempt organization, and provide or make available to the City its IRS Form 990 (or other applicable tax form for such tax-exempt organizations), including all supporting statements and schedules filed with the Internal Revenue Service in connection therewith, on an annual basis at the time it is filed with the Internal Revenue Service.

**Section 6.6**    Mechanic's Liens and Liabilities.

(a)    Neither the City nor the Foundation shall be liable for any labor or materials furnished or to be furnished to the other upon credit, and no mechanic's or other lien for labor or materials ("**Mechanic's Lien**") shall attach to or affect the rights or interests of the other in and to the Subject Property or the Project Improvements. Nothing in this Agreement shall be deemed or construed in any way as constituting the consent or request of the City, express or implied, by inference or otherwise, to any person to perform any labor or furnish any materials to the Subject Property or the Project Improvements, that would give rise to any Mechanic's Lien against the interest of the City in and to the Subject Property or the Project Improvements.

(b)    Any third party entering into a contract with the Foundation for Project Improvements to be located on the Subject Property, or any other party claiming under said third party, is hereby put on notice that it can in no way hold the City liable for satisfaction of any claims of any nature arising in any way out of a contract or other arrangement with the Foundation.

(c)    The Foundation shall not place, or permit to be placed, any Mechanic's Lien upon the City's interest or the Foundation's rights in the Subject Property or the Project Improvements or any part thereof, and shall cause any such Mechanic's Lien to be discharged or bonded over by appropriate legal proceeding promptly following the Foundation's receipt of notice of the filing or recording of same. If the Foundation elects to contest any such Mechanic's Lien, such right to contest shall be conditioned upon the Foundation obtaining a stay of the enforcement of such Mechanic's Lien pending such

contest or the provision of appropriate bond or other protection against any such enforcement.

**Section 6.7**    Condition of the Subject Property.

(a)    The Foundation acknowledges that, other than the representations, warranties and covenants contained in the Subject Property Documents: (i) the Foundation has inspected and accepts the Subject Property in its present condition as suitable for the Permitted Use; (ii) no covenants, representations or warranties, express or implied, of any kind, have been made by the City as to the condition of the Subject Property, including without limitation, any warranty of merchantability, habitability, suitability or fitness for a particular purpose; (iii) the Foundation is accepting the Subject Property in its "as is" and "where is" condition, and with all faults and defects, latent or otherwise, and makes no requirements of the City concerning the condition of the Subject Property, and (iv) the City has made no promises or covenants to improve the Subject Property in any manner.

(b)    Except for claims or causes of action arising from the City's breach of the representations, warranties and covenants contained in the Subject Property Documents, the Foundation, on behalf of itself and its successors, assigns, officers, directors, employees, members, managers, agents and representatives (collectively, the "**Foundation Parties**"), expressly releases, renounces and waives any claims or causes of action it or they may have against the City or the Park District, and their respective officers, elected officials, agents and employees, under any existing or future theory of law (federal, state or local, or by common law), whether grounded in tort or contract or otherwise, in any and all courts or other forums, of whatever kind or nature, whether known or unknown, foreseen or unforeseen, now existing or occurring after the Commencement Date, based upon, arising out of or in any way connected with, directly or indirectly, the structural, physical or environmental condition of the Subject Property, including, without limitation, the presence or suspected presence of hazardous or toxic materials, substances, wastes or other environmentally regulated substances, or other contaminants or pollutants in, on, under or about the Subject Property.

(c)    The provisions of this Section 6.7 shall survive the expiration or other termination of this Agreement.

**Section 6.8**    Police Powers.

(a)    The City is entering into this Agreement in its proprietary capacity (i.e., as an independent contracting party to the Foundation), and any obligations imposed or restrictions placed by this Agreement on the City shall be limited to that capacity and shall not relate to or otherwise affect any activity of the City in its governmental capacity, including, but not limited to, enacting Laws, inspecting structures, reviewing and issuing permits, and all other legislative, administrative, or enforcement functions of the City pursuant to applicable Laws.

(b)    The Foundation acknowledges that the City exercises police powers, taxation powers and other Governmental Functions of general application which affect the

Subject Property and the Project Improvements, and that nothing in this Agreement shall be construed to limit the City's police powers over the entire Subject Property. Any action, omission or circumstance arising out of the performance by the City of the City's Governmental Functions shall not cause or constitute a default by the City under this Agreement or give rise to any rights or claims against the City in its proprietary capacity (i.e., as a party hereunder), it being acknowledged that the Foundation's remedies for any injury, damage or other claim resulting from any such action, omission or circumstance arising out of the Governmental Functions of the City shall be governed by the Laws concerning claims against the City as a Governmental Authority. The operations of any private security firm retained by the Foundation on the Subject Property shall be subject to the City's police and regulatory powers.

**Section 6.9** _Ancillary Income._ The revenues collected by the Foundation from general and special admission fees, parking and other visitor services, third-party use fees, food and beverage sales and retail sales shall be used solely for (a) the use, maintenance and management of the Project Improvements and the Subject Property; or (b) deposit into the Endowment. The Foundation, upon the request of the Commissioner, shall provide the Commissioner with such accountings as the Commissioner shall reasonably request to demonstrate compliance with this Section 6.9.

**Section 6.10** _Admission Fees and Parking Rates._ The Foundation's general admission fee policies for admission to the museum situated at the Presidential Center (exclusive of special exhibitions or special events for which there may be a supplemental charge) for members of the public who are (a) City residents, or (b) low-income individuals and their families participating in the Supplemental Nutrition Assistance Program (or such equivalent program as may be implemented after the date hereof) from time to time, shall be substantially consistent with comparable general admission fee policies for such categories of patrons maintained from time to time by other Museums in the Park. The fees for visitor use of the Underground Parking Facility shall be substantially consistent with the parking rates charged from time to time to the general public in the parking garage of the Museum of Science and Industry or in the North Garage adjacent to the Field Museum and John G. Shedd Aquarium.

**Section 6.11** _Naming Rights._ The Foundation shall have the right to name (and to re-name from time to time) the Presidential Center and any components thereof, and any exhibits, art, sculptures and benches situated therein, together with the right to install signage containing and/or designating such names, subject to the PD and any approvals required thereunder; provided, however, the Foundation may not use corporate logos in any identification signage installed on the exterior portions of the Presidential Center. A principal purpose of the naming rights granted under this Section 6.11 is to assist the Foundation in raising funds for the construction, operation, maintenance and repair of the Project Improvements. The City agrees not to name (or authorize any other person or entity to name) the Subject Property or any component or element thereof.

## ARTICLE VII
## MAINTENANCE, REPAIRS AND ALTERATIONS.

**Section 7.1** _Maintenance._ The Foundation shall at all times during the Term, at its sole cost and expense, keep the Subject Property and the Project Improvements (interior and exterior,

including all sidewalks, lawns and landscaped areas, parking and loading areas and other public access areas located on the Subject Property) in good condition and repair, and in accordance with all applicable Laws. For improvements installed by the Foundation (or by the City at the Foundation's request in the case of non-standard streetscape elements and finishes) within the public right-of-way adjacent to the Subject Property, the City shall grant the Foundation a license, in a form acceptable to both the City and the Foundation, to maintain such improvements following the completion of Construction.

**Section 7.2**    Limitation on City Responsibility. Except for (a) damage or destruction caused by the City in its proprietary capacity as a party to this Agreement (and not in the exercise of its Governmental Functions) or (b) as otherwise provided in any Subject Property Document, the City shall not be obligated to maintain or make any repairs to the Subject Property or the Project Improvements during the Term, it being understood that the Foundation shall be responsible for the condition, repair, replacement, maintenance and management of the Subject Property and the Project Improvements during the Term, subject to the terms of this Agreement.

**Section 7.3**    Alterations.

(a)    The Foundation, at its sole cost and expense, shall have the right to make Alterations, so long as such Alterations are made in compliance with applicable Law, including the PD and any regulations governing PD amendments, and the requirements of Section 4.3, Section 4.6, and Section 4.8 (and Section 4.7 and Section 4.12 in connection with Alterations that require a PD amendment) of this Agreement are satisfied.

(b)    Consistent with the use of the Subject Property for the Permitted Use, the City agrees that, except to the extent required by applicable Law and/or expressly provided in the Subject Property Documents, the City will not make or perform alterations, modifications, changes, additions or improvements to the Subject Property (or demolish or remove any improvements thereon) without the prior written consent of the Foundation. Notwithstanding the foregoing, nothing herein shall limit the City's exercise of its police powers.

## ARTICLE VIII
## GOVERNMENTAL APPROVALS

The City, from time to time on the reasonable request of the Foundation, and to the extent necessary as the owner of the Subject Property, shall execute such documents or join in such petitions, applications and authorizations as may be appropriate related to the Construction of the Project Improvements in conformance with this Agreement.

## ARTICLE IX
## ENVIRONMENTAL

**Section 9.1**    Certain Environmental Definitions.

(a)    **"Environmental Conditions"** means conditions at, on, under, from, or affecting the Subject Property that relate to or arise out of, in any manner, the release or threatened release, discharge, use, ownership, possession, control, generation, treatment,

storage, disposal, handling, transportation, migration, existence, or presence of Hazardous Materials or other activities that impact or otherwise involve Hazardous Materials (including, without limitation, the later migration or degradation of such Hazardous Materials, whether or not known at any point in time) which conditions require Remediation under any Law.

(b)     "**Environmental Remediation Agreement**" means that certain Environmental Indemnification and Remediation Agreement between the City and the Foundation dated as of _____.

(c)     "**Hazardous Materials**" has the same meaning as is assigned to such term in the Master Agreement.

(d)     "**Remediation**" means, without limitation, investigation, characterization, testing, sampling, monitoring, corrective actions, removal actions, response actions, remedial actions, transportation, or disposal of Hazardous Materials, restoration, cleanup, and similar activities.

**Section 9.2**     Hazardous Materials.

(a)     The Foundation shall not, following the Commencement Date, permit any Hazardous Materials at or on the Subject Property, except those that are used, stored or otherwise maintained on the Subject Property for cleaning, along with other supplies ordinarily used in the Foundation's operations which might be considered Hazardous Materials, so long as the Foundation's use, storage, and maintenance of such Hazardous Materials is in compliance with all Laws and manufacturer's recommended standards and procedures, and such Hazardous Materials are present only in such quantities as are reasonably required by the Foundation for operations conducted on the Subject Property. The Foundation shall not dispose of Hazardous Materials in, on, or about the Subject Property.

(b)     The Foundation shall be solely responsible for any Hazardous Materials used, stored, or otherwise introduced by it (including, without limitation, Hazardous Materials that are released or disposed of at the Subject Property contrary to the provisions of this Agreement) at, on, under or emanating from, the Subject Property following the Commencement Date.

(c)     The Foundation shall, at its sole cost and expense, diligently undertake, and pursue until completion, all necessary Remediation with respect to Environmental Conditions that it or its agents, vendors, concessionaires, licensees, invitees or any of the Foundation Parties caused. The Foundation shall obtain from the appropriate regulatory authorities written confirmation that all necessary Remediation for which the Foundation has responsibility has been completed to attain cleanup standards protective of human health and the environment and appropriate for the current and anticipated use of the Subject Property and surrounding properties, as the case may be.

(d)     Nothing in this Agreement shall abrogate, impair or otherwise limit the liability of the City, if any, arising from or related to the representations and warranties

made by the City in the Subject Property Documents or the obligations of the City under the Subject Property Documents.

**Section 9.3**     Environmental Notices. Each party shall give prompt written notice to the other of:

(a)     any threatened or pending proceeding or inquiry by any Governmental Authority with respect to the presence of any Hazardous Materials at, under or emanating from the Subject Property or related to any loss or injury alleged to result from any Hazardous Materials;

(b)     all claims made or threatened by any third party against such party, or the Subject Property, relating to any loss or injury alleged to result from any Hazardous Materials or Environmental Condition; and

(c)     discovery of any Environmental Condition at, on, under or emanating from, the Subject Property (including, without limitation, any condition that could cause the Subject Property to be subject to any restriction on occupancy or use under any Law).

## ARTICLE X
## PROPERTY TAXES, IMPOSITIONS AND UTILITIES

**Section 10.1**   Payment of Taxes.

(a)     In light of the exempt status of the City, and the non-profit status of the Foundation, it is anticipated that there will be no Impositions assessed or imposed on the Subject Property or the Project Improvements during the Term. Subject to the balance of this Article X, however, in the event any such Impositions are assessed or imposed, the Foundation shall pay such Impositions levied on or against the fee interest in the Subject Property and any interest in the Subject Property and/or the Project Improvements (whether assessed against the Foundation or the City), before the same become delinquent, which during the Term may be assessed, levied, imposed upon, or arise from, or become due and payable out of or in respect of, or become a lien on, the fee interest in the Subject Property and any interest in the Subject Property or the Project Improvements, or any part thereof or any appurtenance thereto (an "**Imposition Lien**"). If the Foundation fails to timely pay any such Impositions, the City may, in its sole discretion, pay such Impositions, and the Foundation shall, upon demand by the City, reimburse such amount to the City, together with any interest, penalties or late fees accrued.

(b)     The Foundation may contest the amount or validity of any Imposition which the Foundation is obligated to pay under this Section 10.1 by appropriate legal proceedings, diligently pursued, provided that: (i) the Foundation, if required to be paid pending resolution of such contest, makes all such contested payments (which may be made by the Foundation under protest if the Foundation so desires) prior to delinquency, (ii) neither the Subject Property nor the Project Improvements nor any part thereof nor any interest therein is subject to being immediately sold, forfeited, lost or interfered with by virtue of such contest, and (iii) all expenses (including without limitation any fees, penalties or interest) which are assessed or incurred in connection with or as a result of any such proceedings

are paid by the Foundation when due. Upon the termination of such proceeding, the Foundation, upon the City's written request therefor, shall deliver to the City proof of the amount of the Imposition as finally determined and of payment thereof.

(c)     The Foundation shall be liable for Impositions levied or assessed against personal property, furniture or fixtures placed or situated on the Subject Property by the Foundation during the Term.

(d)     During the Term, the City shall reasonably cooperate with the Foundation with respect to the Foundation's efforts to (i) obtain and maintain exemptions from Impositions on the Subject Property, and (ii) minimize the effect of such Impositions, if any; provided, however, the City shall not be obligated to so cooperate if the City determines in its good faith judgment that such efforts by the Foundation or the City's cooperation in such efforts would materially and adversely affect the City's ownership interest in the Subject Property.

(e)     If any Imposition is imposed against the fee interest in the Subject Property or Project Improvements, the Foundation's rights to the Subject Property or the Foundation's rights to the Project Improvements after the City, directly or indirectly, sells, assigns, transfers, leases or otherwise alienates the fee interest in the Subject Property or any part thereof, and if such Imposition would not have been so imposed had the City still owned its interest in the Subject Property at the date of such Imposition or assessment, the Foundation shall have no obligation to pay such Imposition, and the City shall pay, or cause to be paid, such Imposition prior to delinquency. The City shall be entitled to protest any such Imposition so long as the payment of such Imposition is made prior to delinquency.

(f)     The City, as owner of the fee interest in the Subject Property and (after the Final Completion Date) Project Improvements, shall maintain an exemption from *ad valorem* real estate taxes and assessments to which it is entitled relative to the Subject Property and Project Improvements, except to the extent such taxes are the result of this Agreement or the operation of the Project Improvements.

**Section 10.2**   Utilities and Other Services.   The City shall provide reasonable access across property owned by the City where required in order to make available to the Subject Property access to utility facilities and services, including without limitation, water, gas, heat, light, electricity, telephone, sewer, sprinkler, trash removal and cable services. The City, however, shall not be required to furnish to the Foundation any such services, including, without limitation, security, janitorial, landscaping, trash removal, or other facility services, except to the extent such services are typically provided by or on behalf of the City to other non-residential owners and users within the City.

**Section 10.3**   Costs.   It is the purpose and intent of the City and the Foundation, that except to the extent of obligations of the City arising under the Subject Property Documents, and except to the extent resulting from or arising out of the gross negligence or willful misconduct of any of the City Parties or any breach of the City's obligations under this Agreement, all costs and expenses and obligations of every kind and nature whatsoever relating to events or occurrences at, or the use or condition of, the Subject Property and the Project Improvements which may arise or

become due during the Term shall be paid by the Foundation. The preceding sentence shall not be deemed to require the Foundation to pay or incur costs, expenses or obligations resulting from or arising out of the Governmental Functions of the City that are not generally directly payable or reimbursable by members of the public.

## ARTICLE XI
## PROHIBITION ON MORTGAGES AND OTHER LIENS

Neither the Foundation nor the City shall place, or permit to be placed, any Lien upon its respective rights or interests in the Subject Property or Project Improvements or any part thereof. Notwithstanding the foregoing, the Foundation shall have the right to enter into an assignment or pledge of income accruing to the Foundation, derived from activities permitted to be conducted by the Foundation under the terms of this Agreement, to secure a loan or other credit arrangements, provided the proceeds of such loan or other credit arrangement are used in connection with the Presidential Center or other Project Improvements.

## ARTICLE XII
## TRANSFER AND ASSIGNMENT

**Section 12.1** General Prohibition. The Foundation shall not transfer or assign (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise) its interest in this Agreement, enter into any agreement granting rights of use or occupancy, in whole or in part, of the Subject Property or any part thereof, sell its rights to the Project Improvements or any portion thereof, or grant any other rights or interest in this Agreement, the Subject Property or the Project Improvements without the prior written approval of the City.

**Section 12.2** Ancillary Use and Exceptions. Notwithstanding anything to the contrary set forth in this Article XII, the Foundation may:

(a)     Enter into use, license, space, occupancy or similar agreements for Ancillary Uses with third parties ("**Third-Party Vendors**"). Each use, license, space, occupancy or similar agreement with a Third-Party Vendor will provide that the use and occupancy of any portion of the Subject Property by the applicable Third-Party Vendor in all instances shall be subject to the terms of this Agreement, including the Permitted Use, and will require such Third-Party Vendor to provide commercially reasonable insurance coverage naming the Foundation and the City as additional insureds. The City shall have the right to approve, prior to execution, any occupancy agreements proposed to be entered into with Third-Party Vendors applicable to the Green Space; and

(b)     Enter into use, license, space, occupancy or similar agreements with the Chicago Public Library (through the City's Department of Fleet and Facilities Management or any successor department thereto), addressing the use and operation of any public library facilities included in the Presidential Center.

The Foundation shall promptly provide the City with copies of any occupancy agreements entered into pursuant to this Section 12.2.

**Section 12.3**   Prohibited Transfers Void Ab Initio.   Any attempt by the Foundation to sell, transfer, assign or otherwise convey an interest in this Agreement, the Subject Property or the Project Improvements in violation of the terms of this Agreement, by agreement or operation of law, shall be void and confer no rights on any third party.   Absent a written agreement with the City to the contrary, any assignee of the Foundation's interest in this Agreement shall be deemed to have assumed all of the obligations of the Foundation under this Agreement.   No transfer or assignment, with or without City consent, shall relieve the Foundation of its obligations or liability under or in connection with this Agreement, except where the City Council consents to the transfer or assignment and expressly relieves the Foundation of such obligations and liability.

**Section 12.4**   Assignment by the City.   The City shall have the right to sell, transfer or convey the Subject Property, and to assign its interest in this Agreement, to any other Governmental Authority; provided, that (a) the Governmental Authority that is the transferee to any such sale, transfer or conveyance, and/or assignee to any such assignment, shall assume the obligations and liabilities of the City under this Agreement arising and/or accruing after the date of such sale, transfer, conveyance or assignment; and (b) no such sale, transfer, conveyance or assignment shall relieve the City of its obligations or liability under or in connection with this Agreement.   Consistent with the use of the Subject Property for the Permitted Use, the City agrees not to (i) sell, transfer, assign or otherwise convey, directly or indirectly, the Subject Property or its interest in this Agreement, except as provided above to another Governmental Authority; or (ii) grant or confer any rights of use or occupancy of the Subject Property or any part thereof to any third party, except as expressly provided in this Agreement and/or the Subject Property Documents.

**ARTICLE XIII**
**INSURANCE**

**Section 13.1**   Property Insurance.

(a)      At all times during the Term, the Foundation shall maintain, at its sole cost and expense, a policy or policies of "causes of loss – special form" (formerly, "all risks") property insurance (or comparable coverage by whatever name denominated) on all Project Improvements in an amount equal to not less than 100% of the replacement costs of the Project Improvements against loss or damage by fire or other casualties.   Such policy or policies shall be endorsed to provide that the Foundation's insurance is primary in the event of any overlapping coverage with the insurance carried by the City, if any (with any policies of the City being excess, secondary and noncontributing).

(b)      At all times during the Term, the Foundation shall maintain, at its sole cost and expense, a policy or policies of causes of loss – special form (formerly, "all risks") insurance (or comparable coverage by whatever name denominated) on all personal property (including removable trade fixtures, supplies and movable furniture and equipment) located on the Subject Property or the Project Improvements, against loss or damage by fire or other casualties, in an amount equal to not less than 100% of the replacement costs of such personal property and endorsed to provide that the Foundation's insurance is primary in the event of any overlapping coverage with the insurance carried

by the City, if any (with any policies of the City being excess, secondary and non-contributing).

(c)    To the extent the Foundation is obligated to Demolish the Project Improvements or elects to restore the Project Improvements following a fire or other casualty pursuant to Article XIV hereof, the Foundation and/or the City shall cause the proceeds of all property insurance policies to be deposited into a separate segregated escrow account to be held in trust by an escrow agent approved by the City and the Foundation (which approval shall not be unreasonably withheld or delayed), and to be disbursed and applied in accordance with an escrow agreement, the terms and provisions of which shall be reasonably satisfactory to the City and the Foundation (the "**Casualty Restoration Escrow Agreement**"). The terms and provisions of the Casualty Restoration Escrow Agreement shall be consistent with the terms and provisions of this Agreement and shall contain certain conditions for the disbursement of the escrowed funds established by the City and the Foundation, which shall include provisions regarding customary (i) holdbacks or retainages of funds payable to engineering, architectural, construction and supply contractors to assure completion of work, (ii) waivers of lien (partial or full, as applicable) and contractors' sworn statements, (iii) engineer's and architect's inspections and certificates, (iv) title insurance coverage, and (v) other evidence of satisfactory progress or completion and payment for work. The Foundation shall deposit with the escrow agent under the Casualty Restoration Escrow Agreement any excess costs of the Demolition or restoration over the amount of insurance proceeds held by the escrow agent prior to commencement of the Demolition or restoration. At all times the undisbursed balance remaining on deposit with the escrow agent under the Casualty Restoration Escrow Agreement shall be at least sufficient to pay for the cost of completion of the Demolition or restoration free and clear of liens. All insurance proceeds in excess of the costs of Demolition or restoration shall be returned or paid to the Foundation upon the completion of the Demolition or restoration and the final payment in full for all costs and expenses relating to the completion of the Demolition or restoration.

(d)    During the Construction of any Project Improvements or material Alterations, the insurance required by Section 13.1(a) of this Agreement shall be in the form commonly known as "Builder's Risk" on an "all risk" basis, including without limitation, coverage against fire, lightning, wind damage, hail and collapse. The policy shall be obtained and maintained by the Foundation or its general contractor in a form and amount not less than 100% of the replacement costs of the Project Improvements. Coverage shall include all materials, supplies and equipment that are intended for specific installation in or on the Project Improvements while such materials, supplies and equipment are located in or on the Subject Property, in transit, or while temporarily located away from the Subject Property for the purpose of repair, adjustment or storage at the risk of one of the insured parties.

**Section 13.2    Liability Insurance.** At all times during the Term, the Foundation, at its sole cost and expense, shall maintain a policy or policies of commercial general public liability insurance (utilizing the then ISO form or an equivalent form) covering the Subject Property and the Project Improvements and the Foundation's use (and every Third-Party Vendor's use) thereof against claims for personal or bodily injury or death or property damage (including contractual

indemnity and liability coverage) occurring upon, in or about the Subject Property or the Project Improvements, with the premiums thereon fully paid on or before the due date, and such policies shall provide minimum limits of not less than $10 million (subject to adjustment pursuant to Section 13.7) combined single limit primary coverage per occurrence of bodily injury, property damage, or combination thereof. The Foundation shall cause such insurance policies to (a) contain an endorsement that the Foundation's insurance is primary and non-contributory for claims arising out of an incident or event occurring upon, in or about the Subject Property or the Project Improvements (with any policies of the City being excess, secondary and non-contributing); and (b) contain a provision naming the City as an additional insured and include coverage for the contractual liability of the Foundation to indemnify the City pursuant to the terms of this Agreement. Such additional insured coverage for the City may be provided by a policy provision or by an endorsement providing coverage at least as broad as Insurance Services Office (ISO) Additional Insured endorsement form CG2010 1185 or an equivalent or successor form. The Foundation may provide the coverage required through the use of a primary liability policy or through a combination of primary liability and umbrella excess liability policies.

  **Section 13.3**   Automobile Liability Insurance.   At all times during the Term, the Foundation, at its sole cost and expense, shall maintain a policy or policies of automobile liability insurance covering owned, non-owned and hired vehicles with limits of not less than $2 million per occurrence for bodily injury and property damage. The City shall be named as an additional insured on a primary, non-contributory basis. Such additional insured coverage for the City may be provided by a policy provision or by an endorsement providing coverage at least as broad as ISO form CA2048 or an equivalent or successor form. The Foundation may provide the coverage required through the use of a primary liability policy or through a combination of primary liability and umbrella excess liability policies.

  **Section 13.4**   Workers' Compensation and Employer's Liability Insurance.   At all times during the Term, the Foundation, at its sole cost and expense, shall maintain a policy or policies of (a) workers' compensation insurance in an amount not less than that necessary to satisfy all statutory limits and other requirements of law concerning such workers' compensation coverage for the Foundation's use and operations upon, in or about the Subject Property and the Project Improvements, , and (b) employer's liability insurance with limits of not less than One Million Dollars ($1,000,000.00) per accident, One Million Dollars ($1,000,000.00) each employee for bodily injury due to disease and One Million Dollars ($1,000,000.00) policy limit on bodily injury due to disease. Such policy shall contain a waiver of subrogation endorsement reasonably acceptable to the City and will include an Illinois Waiver of Kotecki Cap. The Foundation may provide the coverage required through the use of a primary liability policy or through a combination of primary liability and umbrella excess liability policies.

  **Section 13.5**   Certificates; Renewals.   The Foundation shall furnish the City certificates of insurance pertaining to all insurance required by this Article XIII to be carried by the Foundation, in form reasonably satisfactory to the City, prior to the commencement of the Term. Whenever requested by the City, the Foundation shall also reasonably satisfy the City that such insurance is in full force and effect and that the City is named thereunder as an additional insured.

  **Section 13.6**   Insurance Requirements.   The Foundation shall cause all insurance as required by this Article XIII to be procured from companies licensed to do business in the State

having an A.M. Best Rating of "A-VIII" or better (or an equivalent rating if Best's ratings are substantially revised or discontinued). All such policies shall contain a provision or endorsement that requires the applicable insurer to endeavor to provide at least 30 days prior written notice to the City prior to any such policy being cancelled (10 days prior written notice of cancellation due to non-payment of premiums therefor).

  **Section 13.7** <u>Adjustments to Insurance Coverages and Limits</u>. Notwithstanding anything to the contrary contained herein, the City and the Foundation from time to time, but in any case every ten (10) years during the Term, shall reexamine the insurance coverages and amounts required to be maintained by the Foundation hereunder, and will make such adjustments as are reasonably necessary to ensure that the insurance required to be maintained hereunder from time to time is sufficient to insure the parties hereto against appropriate risks with generally available insurance products priced at commercially reasonable rates.

  **Section 13.8** <u>Waiver of Subrogation</u>. Notwithstanding any provision to the contrary contained herein, each party hereto hereby waives and releases any and every claim which arises or may arise in its favor and against the other party hereto and/or such party's officers, directors, trustees, employees and agents during the Term or any extension or renewal thereof for any and all loss of, or damage to, any of its property or any injuries to or death of any person **(REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE IS THE RESULT OF OR CAUSED BY THE NEGLIGENT ACTS OR OMISSIONS OF THE RELEASED PARTY OR ANY STRICT LIABILITY)** which loss or damage is covered by valid insurance policies required under this Agreement, to the extent that such loss or damage is recovered under said insurance policies. Said waivers shall be in addition to, and not in limitation or derogation of, any other waiver or release contained in this Agreement with respect to any loss or damage to property of the parties hereto. Each party hereto hereby agrees immediately to give to each insurance company which has issued to it policies of property insurance written notice of the terms of said mutual waivers, if necessary, and to have said insurance policies properly endorsed, if necessary, to prevent the invalidation of said insurance coverages by reason of said waivers.

**ARTICLE XIV**
**DAMAGE OR DESTRUCTION**

  **Section 14.1** <u>Notice</u>. If all or any material part of the Project Improvements are destroyed or damaged by fire or other casualty, the Foundation shall promptly deliver written notice thereof to the City.

  **Section 14.2** <u>Restoration Obligation</u>.

    (a) <u>Material Damage</u>. If all or a portion of the Project Improvements is destroyed or damaged by fire or other casualty and such damage constitutes Material Damage (hereinafter defined), the Foundation shall have the right to terminate this Agreement as of the date of such casualty by delivering written notice of such termination to the City pursuant to <u>Section 16.4</u>, in which event the Foundation shall Demolish the Project Improvements, with any insurance proceeds first being applied to pay the costs of such Demolition. If the Agreement is not so terminated, then subject to delays resulting from Force Majeure Events and the availability of insurance proceeds therefor, the

Foundation shall restore the Project Improvements diligently, in a good and workmanlike manner and at its sole cost and expense, taking into account, in connection with the scope and design of such restoration, the amount of insurance proceeds available to the Foundation, it being the intent that following such restoration, the Project Improvements, including the Presidential Center, will be fully operable and open to the public. Such restoration shall commence promptly after the date on which claims made by the Foundation under property insurance covering such fire and other casualty loss shall have been settled or otherwise resolved. The Foundation shall in good faith diligently pursue all claims under such insurance.

(b)　　Non-Material Damage. If a portion of the Project Improvements is destroyed or damaged by fire or other casualty, and such damage does not constitute Material Damage, then subject to delays resulting from Force Majeure Events and the availability of insurance proceeds therefor, the Foundation shall restore the Project Improvements diligently, in a good and workmanlike manner and at its sole cost and expense, promptly after the date on which claims made by the Foundation under property insurance covering such fire and other casualty loss shall have been settled or otherwise resolved. The Foundation shall in good faith diligently pursue all claims under such insurance.

(c)　　Material Damage Defined. As used herein, the term "**Material Damage**" shall mean damage to the Project Improvements (i) which in the Foundation's good faith opinion, after consulting with appropriate architects, engineers and contractors, is not estimated to be completed within eighteen (18) months following the date of the receipt of insurance proceeds following such fire or other casualty; or (ii) which results from a cause not covered by insurance required to be maintained by the Foundation hereunder.

(d)　　No Modification of Insurance Requirements. Nothing in this Article XIV shall diminish or modify in any respect the Foundation's obligation to maintain insurance in accordance with Article XIII hereof.

**Section 14.3**　　Application of Insurance Proceeds. The proceeds of all insurance policies maintained by or on behalf of the Foundation, together with any claims, defenses and rights of settlement pertaining to such insurance policies, at all times shall be and remain the property of the Foundation, subject, however, to the escrow requirements set forth in Section 13.1(d) and the Foundation's obligation to either restore or Demolish the Project Improvements as aforesaid.

## ARTICLE XV
## CONDEMNATION

**Section 15.1**　　Taking.

(a)　　Material Taking. If all or a portion of the Subject Property or all or a portion of the Project Improvements is subject to a Taking, and such Taking constitutes a Material Taking (hereinafter defined), the Foundation shall have the right to terminate this Agreement by delivering written notice of such termination to the City pursuant to Section 16.4, in which event (i) this Agreement shall terminate as of the date the

condemning authority has the right to possession of the property or interest being condemned, and (ii) if a portion of the Project Improvements shall have been the subject of such Taking, then, at the City's option, the Foundation shall Demolish the remainder of the Project Improvements that were not the subject of the Taking. If the Agreement is not so terminated and all or a portion of the Project Improvements shall have been the subject of such Taking, then the Foundation shall restore the Project Improvements in accordance with the terms and provisions of Section 15.1(b) below.

(b) Non-Material Taking. If a portion of the Subject Property or the Project Improvements is subject to a Taking, and such Taking does not constitute a Material Taking, then this Agreement shall not terminate and the City and the Foundation shall cause the condemnation proceeds to be deposited into a separate, segregated escrow account to be held in trust by an escrow agent approved by the City and the Foundation (which approval shall not be unreasonably withheld or delayed), and to be disbursed and applied in accordance with an escrow agreement containing the same provisions, conditions and requirements as set forth in any Casualty Restoration Escrow Agreement described in Section 13.1(d) of this Agreement ("**Condemnation Restoration Escrow Agreement**"). Subject to delays resulting from Force Majeure Events and the availability of condemnation proceeds therefor, the Foundation shall restore the Project Improvements diligently, in a good and workmanlike manner and at its sole cost and expense, taking into account, in connection with the scope and design of such restoration, the amount of condemnation proceeds available to the Foundation, it being the intent that following such restoration the Project Improvements, including the Presidential Center, will be fully operable and open to the public. The Foundation shall in good faith diligently pursue any condemnation proceeds available to it and shall commence restoration promptly after the date on which the Taking shall have been settled or otherwise resolved and the condemnation proceeds applicable thereto shall have been deposited into escrow. When the restoration has been completed, any condemnation proceeds then remaining in the escrow account shall be allocated in accordance with the provisions of Section 15.2 below.

(c) Material Taking Defined. As used herein, the term "**Material Taking**" shall mean a Taking which in the Foundation's good faith judgment will render the remaining Subject Property and Project Improvements unsuitable for the continued use and operation by the Foundation of the Presidential Center.

**Section 15.2** Allocation of Condemnation Award. The entire award paid in connection with a Taking shall be (net of reimbursement to the City and the Foundation of all reasonable fees and expenses incurred in collecting the award, and, if applicable, the costs of Demolishing the Project Improvements in accordance with Section 15.1(a)) equitably apportioned between the City and the Foundation based on all relevant facts existing at the time of the Taking (including, without limitation, the Foundation's rights during the then-remaining portion of the Term with respect to the Subject Property and Project Improvements, as described herein), taking into account the Foundation's investment in the Project Improvements and other improvements to the Subject Property. Except as provided in the preceding sentence, neither the City nor the Foundation shall have any right in or to any award made to the other by the condemning authority.

Section 15.3    Cooperation.  In the event a Governmental Authority other than the City shall initiate or threaten to initiate any Taking, the Foundation and the City shall cooperate in defending and/or settling any such proceeding, but each of the City and the Foundation shall have the right to pursue and settle its own award in connection with such Taking.

Section 15.4    Temporary Requisition.  If the use or occupancy of the Subject Property or the Project Improvements shall be temporarily requisitioned by any Governmental Authority, civil or military, then this Agreement shall continue in full force and effect notwithstanding such requisition, and the Foundation shall be entitled to receive the entire Award payable by reason of such temporary requisition.

## ARTICLE XVI
## EVENT OF DEFAULT, TERMINATION AND OTHER REMEDIES

Section 16.1    Events of Default.  Each of the following occurrences shall constitute an "**Event of Default**" under this Agreement:

(a)      By the Foundation.  The Foundation fails to comply with, or observe, in any material respect, any term, condition, obligation, covenant or other provision of this Agreement, and (except for defaults specified in Section 16.2 and Section 16.3 which have their own cure periods) such failure shall continue for 90 days after written notice from the City to the Foundation specifying such failure (except that if the nature of such term, condition, obligation or covenant is such that more time is required in order to cure such failure, and the Foundation commences to cure within such 90 day period, then such period shall be extended beyond such 90 day period so long as the Foundation is using commercially reasonable efforts to cure such failure); or

(b)      By the City.  The City fails to comply with, or observe, in any material respect, any term, condition, obligation, covenant or other provision of this Agreement, and (except for defaults specified in Section 16.2 and Section 16.4 which have their own cure periods) such failure shall continue for 90 days after written notice from the Foundation to the City specifying such failure (except that if the nature of such term, condition, obligation or covenant is such that more time is required in order to cure such failure, and the City commences to cure within such 90 day period, then such period shall be extended beyond such 90 day period so long as the City is using commercially reasonable efforts to cure such failure).

Section 16.2    Termination of Agreement by Either Party.  Either the City or the Foundation may terminate this Agreement if, after the initial opening of the Presidential Center to the public, the Presidential Center ceases to be used for the Permitted Use, including at all times the operation of a museum, but excluding closures thereof for (a) the time period necessary to perform maintenance, repairs, restoration, renovations and Alterations, (b) the time period necessary to receive proceeds from any insurance policy covering any portion of the Subject Property or the Project Improvements in the event of a casualty, (c) the time period necessary to perform reconstruction in the event of a casualty or Taking in accordance with this Agreement, or (d) Force Majeure Events.  The City's right to terminate shall be expressly conditioned on such non-use continuing for 60 days following the date on which the Foundation receives a Termination

Exercise Notice from the City pursuant to Section 20.2, expressly stating the City's exercise of its right to terminate this Agreement should the Foundation fail to cure such non-use within such 60 day period. The Foundation's right to terminate shall be expressly conditioned on the Project Improvements being in compliance in all material respects with all applicable Laws on the date on which the Foundation is obligated to surrender the Subject Property to the City. Nothing contained in the preceding sentence shall be deemed to limit the Foundation's obligations under Section 7.1. Each of the City and the Foundation acknowledges and agrees that its right to terminate this Agreement upon the occurrence of the event specified in this Section 16.2 shall be the sole and exclusive remedy of the parties with respect to such event, with each party waiving all other remedies available to it at law or in equity; provided, however, the City shall be entitled to all remedies available under Law to recover all costs, expenses and disbursements (including attorneys' fees) incurred by the City in exercising its cure rights under Section 16.7, whether such costs, expenses and disbursements are incurred before or after any termination hereunder, with interest at the rate specified in Section 16.7.

    **Section 16.3**    Termination by the City. The City (but not the Foundation) may terminate this Agreement upon the occurrence of any of the following events:

        (a)    the Construction of the Presidential Center is not commenced by the first (1st) anniversary of the Commencement Date, which date shall be extended by one (1) day for each day by which such Construction is delayed as a result of Force Majeure Events (and which date may be extended further by up to one year by the Commissioner of the Department if the Foundation encounters unexpected delays or difficulties, as described in Section 4.1 above), and the City sends the Foundation a written notice pursuant to Section 20.2 of this Agreement describing such default and stating that if such default is not remedied within 90 days after such written notice is delivered, the City shall have the option to terminate this Agreement, and the Foundation fails to remedy such failure within 90 days after delivery of such written notice;

        (b)    the Project Improvements are not substantially completed (other than non-material Project Improvements, and subject to normal and customary punch list and finish items) and open to the public on or before the Outside Completion Date, which date shall be extended by one (1) day for each day by which such substantial completion is delayed as a result of Force Majeure Events (and which date may be extended further by up to one year by the Commissioner of the Department if the Foundation encounters unexpected delays or difficulties, as described in Section 4.1 above), and the City sends the Foundation a written notice pursuant to Section 20.2 of this Agreement describing such default and stating that if such default is not remedied within 90 days after such written notice is delivered, the City shall have the option to terminate this Agreement, and the Foundation fails to remedy such default within 90 days after delivery of such written notice;

        (c)    after the damage or destruction of all or part of the Project Improvements by fire or other casualty, following which the Foundation shall have not terminated this Agreement pursuant to Section 14.2 hereof, and the Foundation fails to rebuild, restore and repair such Project Improvements in accordance with said Section 14.2 of this Agreement, and the City sends the Foundation a written notice pursuant to Section 20.2 of this

Agreement describing such failure and stating that if such failure is not remedied within 90 days after such written notice is delivered, the City shall have the option to terminate this Agreement, and the Foundation fails to remedy such failure within 90 days after delivery of such written notice;

(d)      after a Taking of a portion of the Subject Property or the Project Improvements, following which the Foundation shall have not terminated this Agreement pursuant to Section 15.1 hereof, the Foundation fails to restore the Subject Property and the Project Improvements in accordance with said Section 15.1 of this Agreement and the City sends the Foundation a written notice pursuant to Section 20.2 of this Agreement describing such failure and stating that if such failure is not remedied within 90 days after such written notice is delivered, the City shall have the option to terminate this Agreement, and the Foundation fails to remedy such failure within 90 days after delivery of such written notice;

(e)      the Foundation fails to maintain the insurance required to be maintained by the Foundation pursuant to Article XIII of this Agreement, and the City sends the Foundation a written notice pursuant to Section 20.2 of this Agreement describing such failure and stating that if such failure is not remedied within thirty (30) days after such written notice is delivered, the City shall have the option to terminate this Agreement, and the Foundation fails to remedy such failure within thirty (30) days after delivery of such written notice;

(f)      (x) a Mechanic's Lien is filed against (i) the City's interest in the Subject Property due to the Foundation's failure to pay an obligation of the Foundation that is lienable, (ii) the Foundation's rights to the Subject Property, or (iii) the Project Improvements, and (y) a court of competent jurisdiction issues a final non-appealable order that the applicable interest or Project Improvements be sold to satisfy such lien and the applicable amount is not paid or bonded by the Foundation contemporaneously with the entry of such order (no cure period following delivery of written notice);

(g)      a judgment lien (other than a judgment in favor of the City) or a federal tax lien is filed against the Foundation's rights to the Project Improvements or the Foundation's rights to the Subject Property and a court of competent jurisdiction issues a final non-appealable order that such right of the Foundation be sold to satisfy such lien and the applicable amount is not paid or bonded by the Foundation contemporaneously with the entry of such order (no cure period following delivery of written notice);

(h)      the Presidential Center is abandoned by the Foundation, and the City sends the Foundation a written notice pursuant to Section 20.2 of this Agreement describing such default and stating that if such default is not remedied within thirty (30) days after such written notice is delivered, the City shall have the option to terminate this Agreement, and the Foundation fails to remedy such failure within thirty (30) days after delivery of such written notice; or

(i)     the Foundation rejects this Agreement or does not or is unable to assume this Agreement in a Bankruptcy Proceeding of the Foundation (no cure period following delivery of written notice).

**Section 16.4**  Termination by the Foundation.  The Foundation (but not the City) may terminate this Agreement upon the occurrence of any of the following events:

(a)     if all or a portion of the Project Improvements is or are destroyed or damaged by fire or other casualty and such damage constitutes Material Damage; or

(b)     if all or a portion of the Subject Property or the Project Improvements is or are subject to a Taking and such Taking constitutes a Material Taking.

**Section 16.5**  Termination as Remedy Procedure.

(a)     To exercise the right to terminate this Agreement following the occurrence of any of the events specified in Section 16.2, Section 16.3 and Section 16.4 of this Agreement giving rise to such right to terminate, any party having such termination right shall give written notice of such termination to the other party (a "**Termination Exercise Notice**") in the manner specified in Section 20.2 hereof.  If the event specified in Section 16.2, Section 16.3 and Section 16.4 above giving rise to the right to terminate this Agreement shall have been cured prior to the date on which the non-performing party shall have received such Termination Exercise Notice, such Termination Exercise Notice shall be null and void and of no force and effect.

(b)     This Agreement shall not terminate or be revoked for any reason other than those specified in Section 16.2, Section 16.3 and Section 16.4 above, and the City and the Foundation hereby waive their right to terminate or revoke this Agreement for any reason other than the reasons specified above.  The breach by the Foundation or the City of any other covenant, condition or provision of this Agreement, the Master Agreement or any other agreement of any kind shall in no event result in the termination or revocation of this Agreement.  The provisions of this Section 16.5 shall in no event prevent the City or the Foundation from exercising their remedies under the provisions of Section 16.6 of this Agreement.

(c)     The termination of this Agreement pursuant to this Article XVI shall be in addition to the expiration of the Term of this Agreement as provided in Section 2.2 of this Agreement.

**Section 16.6**  Other Remedies.  Except for the limitations on remedies provided in Section 16.2, if an Event of Default occurs under this Agreement, the non-defaulting party shall be entitled to all remedies available under Law (other than termination of this Agreement, which shall be available to the City and the Foundation only as provided in Section 16.2, Section 16.3 and Section 16.4 of this Agreement), including the right to sue for damages, specific performance and injunctive relief as a result thereof; provided, however, that notwithstanding the foregoing, or anything to the contrary contained in this Agreement:  (a) in no event shall either party have the right to terminate the other party's respective rights and/or interests under this Agreement without termination of this Agreement as a whole (and, in the case of any such termination, only as

provided in Section 16.2, Section 16.3 and Section 16.4 above); and (b) in no event shall the City have the right to eject or remove the Foundation from the Subject Property (or any portion thereof) except in accordance with judicial procedure.

**Section 16.7**    City's Cure Right.  If the Foundation fails to make any payment required to be made by the Foundation pursuant to Section 16.3(f) or Section 16.3(g) of this Agreement contemporaneously with the entry of the applicable order referenced therein, or fails to maintain insurance pursuant to Section 16.3(e) by the thirtieth (30th) day following its receipt of a written notice referred to in said Section 16.3(e), or fails to maintain the exterior portions of the Subject Property (including the Presidential Center Green Space, the Green Space and the exterior portions of the Project Improvements located thereon) pursuant to Section 7.1, and such failure is not remedied by the thirtieth (30th) day following the date the Foundation receives from the City a written notice pursuant to Section 20.2 of this Agreement describing such failure, the City, without obligation to do so and without thereby waiving such failure or any resulting Event of Default, may make such payment for the account of the Foundation or otherwise cure such failure, and the Foundation shall, on demand, pay all costs, expenses and disbursements (including attorneys' fees) incurred by the City in making such payment or curing such failure, with interest at the rate of ten percent (10%) annually from the date of the City's payment until the date of reimbursement by the Foundation.  Any such payment by the City shall not be a waiver of any rights the City may have under and pursuant to any provision of this Agreement.  This Section 16.7 shall survive the expiration or earlier termination of this Agreement.

**Section 16.8**    Remedies Cumulative.  Except for the limitations on remedies provided in Section 16.2, and subject to the terms of Section 16.6 above, each right, power and remedy of the City or the Foundation provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and (subject to the foregoing) shall be in addition to every other right, power or remedy provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by the City or the Foundation of any one or more of the rights, powers or remedies provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by the City or the Foundation of any or all such other rights, powers or remedies.

**Section 16.9**    No Waiver.  The failure of the City or the Foundation to insist upon strict performance of any obligation of the other party under this Agreement in one or more instances shall not be deemed a waiver of that party's right to insist upon the full and strict performance of the same or any other obligation of the other party at a subsequent time nor shall the failure of the City or the Foundation to seek redress for the violation of any obligation or covenant be deemed to preclude said party from seeking redress for any subsequent violation nor to prevent a subsequent act which would originally have constituted a violation from having all the force and effect of an original violation.

**Section 16.10** Notification.  The Foundation shall promptly send notice to the City of the determination that an Imposition required by Section 10.1 of this Agreement to be paid by the Foundation is owed or that a Mechanic's Lien, judgment lien or federal tax lien has been filed against the fee interest in the Subject Property or the Foundation's right to the Subject Property or

the Project Improvements. The Foundation shall periodically send the City notice of material developments in the filing of such liens or litigation or other legal proceedings relating thereto.

## ARTICLE XVII
## SPECIAL PROVISIONS

**Section 17.1**   No Merger of Title. There shall be no merger of the right, title or interests of the Foundation created by this Agreement with the right, title and interests of the City in the Subject Property by reason of the fact that the same person may acquire or hold (a) any right, title or interest created by this Agreement or any interest therein; and (b) the right, title and interests of the City in the Subject Property or any interest therein. No such merger shall occur unless and until all persons having any interest in (i) all of the right, title and interests created by this Agreement; and (ii) the fee estate in the Subject Property, join in a written instrument effecting such merger and shall duly record the same.

**Section 17.2**   Estoppel Certificates.

(a)     The Foundation agrees at any time and from time to time (but in any case not more frequently than quarterly), upon not less than 60 days prior written notice from the City, to execute, acknowledge and deliver, without charge, to the City, a statement in writing certifying that this Agreement is in full force and effect and is unmodified (or if there have been modifications, identifying the same by the date thereof and specifying the nature thereof), that there are no existing Events of Default of which the Foundation has received or delivered notice, that to the knowledge of the Foundation, no Event of Default by the City exists hereunder (or if any such Event of Default does exist, specifying the same), and that the Foundation to its knowledge has no claims against the City hereunder (or if the Foundation has any such claims, specifying the same).

(b)     The City agrees at any time and from time to time (but in any case not more frequently than quarterly), upon not less than 60 days prior written notice from the Foundation, to execute, acknowledge and deliver, without charge, to the Foundation (or the then current assignee of this Agreement), a statement in writing certifying that this Agreement is in full force and effect and is unmodified (or if there have been modifications, identifying the same by the date thereof and specifying the nature thereof), that there are no existing Events of Default of which the City has received or delivered notice, that to the knowledge of the City, no Event of Default by the Foundation exists hereunder (or if any such Event of Default does exist, specifying the same), and that the City to its knowledge has no claims against the Foundation hereunder (or if the City has any such claims, specifying the same).

**Section 17.3**   Annual Reporting. Not later than the annual date on which the Foundation provides to the City its IRS Form 990 (or other applicable tax form for Section 501(c)(3) tax-exempt organizations) as contemplated by Section 6.5, the Foundation shall provide to the Commissioner an annual report concerning the operations of the Presidential Center for the same year covered by the applicable IRS Form 990 addressing: (a) the extent of visitation to the Presidential Center, paid and unpaid, (b) the nature and scope of events and activities open to the public at the Presidential Center, (c) the total revenues arising from the activities described in

Case: 1:18-cv-03424 Document #: 49-6 Filed: 11/21/18 Page 56 of 114 PageID #:1303

Section 6.9 and the Foundation's disposition of such revenues, and (d) such other topics as may be mutually agreed upon between the parties.

**Section 17.4**    Advisory Operations Committee. The Foundation and the City shall, by the Final Completion Date, form an advisory committee concerning operations of the Presidential Center and Green Space. Such advisory committee shall consist of members in equal number (totaling no fewer than 4 and no more than 8) appointed by the Foundation and the City, and shall meet no less frequently than twice yearly to address ongoing operational matters pertaining to the Presidential Center and Green Space, and/or operational concerns arising from nearby and adjacent areas of Jackson Park. If any dispute between the Foundation and the City arises with respect to operational matters covered in this Agreement, the Foundation and the City shall attempt initially to resolve such dispute through a convening of the advisory committee.

**ARTICLE XVIII**
**SURRENDER; HOLDING OVER**

**Section 18.1**    Surrender of the Subject Property and the Project Improvements. Upon the expiration of the Term or other termination of this Agreement, without cost or charge to the City (a) the Foundation shall quit and surrender to the City the Subject Property and the Project Improvements (except for any Excluded Items which the Foundation elects to remove) and their respective appurtenances; (b) the Foundation shall remove the Foundation's personal property within one hundred twenty (120) days following the date of expiration or termination; and (c) title to all the Project Improvements (other than Excluded Items) shall remain vested in and belong to the City without any compensation to the Foundation or further action on the part of either party hereto. The Foundation shall, within five days after the City's request therefor, execute, acknowledge and deliver such documents as may be necessary or convenient in the City's discretion for the purpose of further evidencing that title to all of the Subject Property and (except for Excluded Items) the Project Improvements are vested in the City. Notwithstanding the foregoing, (x) the Foundation shall have no obligation to remove any of the Project Improvements (except to the extent required following a termination pursuant to Section 14.2(a) or Section 15.1(a) of this Agreement, or following a termination pursuant to Section 16.2 of this Agreement if necessary to cause the Project Improvements to comply in all materials respects with applicable Law) and (y) all Excluded Items, fixtures, trade fixtures and equipment, no matter how affixed to the Subject Property, may be removed by the Foundation in its discretion, at any time and from time to time, during the Term of this Agreement (it being agreed that, upon any such removal, the applicable Excluded Items and other items so removed shall cease to constitute Project Improvements for purposes hereof). Upon the expiration of the Term or other termination of this Agreement, at the City's request, the Foundation shall remove the Foundation's personal property, which removal shall be at the Foundation's sole cost and expense, and the Foundation shall repair all damage caused by such removal. All items not so removed shall be deemed to have been abandoned by the Foundation, and may be appropriated, sold, stored, destroyed or otherwise disposed of by the City without notice to the Foundation and without any obligation to account for such items. The City shall not be liable or responsible for any loss of or damage to any of the Foundation's personal property which may be on the Subject Property when the City takes occupancy of it, nor will the City be required to account for any of the Foundation's personal property.

     **Section 18.2**   <u>No Continued Occupancy</u>. Upon termination of this Agreement (whether by expiration of the Term or otherwise) the Foundation shall, at its sole cost and expense, immediately vacate the Subject Property and the Project Improvements. The Foundation has no right to retain occupancy of the Subject Property or any part thereof beyond the expiration or earlier termination of this Agreement. Notwithstanding the foregoing, the Foundation shall have a period of one hundred twenty (120) days following the expiration or termination of the Agreement to remove all Excluded Items, personal property and trade fixtures and no such period shall be deemed a holdover period. The insurance and indemnification provisions of this Agreement shall remain in full force and effect during such 120-day period. Except as so stated above, no occupancy by the Foundation after the expiration or other termination of this Agreement shall be construed to extend the Term.

**ARTICLE XIX**
**INDEMNIFICATION; LIABILITY**

     **Section 19.1**   <u>Indemnification by the Foundation</u>. The Foundation agrees to assume all risk of damage or loss to property and injury or death to persons by reason of or incident to the occupancy and/or use of the Subject Property or the Project Improvements, or the activities conducted by any of the Foundation Parties or Third-Party Vendors under this Agreement. The Foundation Parties and Third-Party Vendors expressly waive all claims against the City Parties (except claims arising from the gross negligence or willful misconduct of the City acting in its proprietary capacity as a party to this Agreement, and not in the exercise of its Governmental Functions, or a breach of the City's obligations under this Agreement) for any such loss, damage, personal injury or death caused by or occurring as a consequence of such occupancy and/or use of the Subject Property or Project Improvements or the conduct of activities (including activities performed by Third-Party Vendors) under this Agreement. Unless arising from the gross negligence or willful misconduct of the City or a breach of the City's obligations under this Agreement, the Foundation, on behalf of itself, the Foundation Parties and the Third-Party Vendors, hereby agrees to indemnify, defend and save the City, and its officers, elected officials, employees and agents (collectively, the **"City Parties"**) harmless from and against any and all liabilities, claims, suits, fines, penalties, damages, losses, charges, costs, expenses and fees (including attorney's fees) (collectively, **"Liabilities"**) which may be imposed upon, incurred by or asserted against the City Parties by any third party (including any employees of any of the Foundation Parties or Third-Party Vendors) by reason of any of the following occurring during the Term:

     (a)     the physical condition of the Subject Property (or any part thereof) or the Project Improvements (or any part thereof), or any use, occupation, operation, repair, maintenance or management of the Subject Property (or any part thereof) or the Project Improvements (or any part thereof) by the Foundation Parties or any concessionaire, licensee or invitee thereof (including, without limitation, any Third-Party Vendors);

     (b)     any act or omission on the part of the Foundation Parties or any concessionaire, licensee or invitee thereof (including, without limitation, any Third-Party Vendors), or any of its or their agents, contractors, servants, employees, licensees or invitees relating to the Subject Property or the Project Improvements or this Agreement;

(c)      any accident, injury (including death) or damage to any person or property occurring (i) in the Presidential Center, or any part thereof, regardless of the cause thereof, or (ii) in the Green Space, or any part thereof, and arising out of the physical condition of the Green Space, the maintenance of (or failure to maintain) the Green Space, or for any of the reasons specified in subsections (a), (b), (d) and (e) of this Section 19.1;

(d)      any gross negligence or willful misconduct on the part of the Foundation Parties or Third-Party Vendors; and

(e)      any breach of the Foundation's obligations under this Agreement.

Nothing in this Section 19.1, however, shall abrogate or otherwise limit any of the loss, cost or damage for which the City is responsible or otherwise liable pursuant to the Subject Property Documents.

Section 19.2    Indemnification by the City.  Unless arising from the gross negligence or willful misconduct of a Foundation Party or a Third-Party Vendor or a breach of the Foundation's obligations under this Agreement, the City, on behalf of itself and the City Parties, hereby agrees to indemnify, defend and save the Foundation Parties harmless from and against any and all Liabilities which may be imposed upon, incurred or asserted by any third party against the Foundation Parties by reason of any of the following occurring during the Term:

(a)      any use of the Subject Property by the City Parties;

(b)      any gross negligence or willful misconduct on the part of the City Parties (acting in the City's proprietary capacity as a party to this Agreement, and not in the exercise of its Governmental Functions), and

(c)      any breach of the City's obligations under this Agreement.

Nothing in this Section 19.2, however, shall abrogate or otherwise limit any of the loss, cost or damage for which the Foundation is responsible or otherwise liable pursuant to the Subject Property Documents.  Nor shall anything in this Section 19.2 be deemed to limit in any way the liability or non-liability provisions of the Local Government and Governmental Employees Tort Immunity Act (745 ILCS 10/1-101 et seq.), or any other immunities and defenses generally available to the City.

Section 19.3    Limitation of the City's Liability.  No agent, representative, official or employee of the City shall be personally liable to the Foundation, or any successor in interest to the Foundation, in the event of any default or breach by the City under the terms of this Agreement. IN NO EVENT SHALL THE CITY BE LIABLE FOR CONSEQUENTIAL OR SPECIAL DAMAGES ARISING FROM THIS AGREEMENT OR THE CITY'S PERFORMANCE OF ITS OBLIGATIONS HEREUNDER.

Section 19.4    Limitation of the Foundation's Liability.  No officer, director, trustee, member of the board of trustees, employee, agent, or representative of the Foundation shall have any personal liability under any provision of this Agreement.  If the Foundation breaches any of the Foundation's obligations under this Agreement or otherwise, the City shall look solely to the

Foundation and not to the assets, interests or rights of any officer, director, trustee, board member, employee, agent, or representative of the Foundation for satisfaction of the City's remedies on account thereof.   IN NO EVENT SHALL THE FOUNDATION BE LIABLE FOR CONSEQUENTIAL OR SPECIAL DAMAGES ARISING FROM THIS AGREEMENT OR THE FOUNDATION'S PERFORMANCE OF ITS OBLIGATIONS HEREUNDER.

**Section 19.5**   Survival.  The provisions of this Article XIX shall survive the expiration or other termination of this Agreement.

### ARTICLE XX
### MISCELLANEOUS

**Section 20.1**   Provisions Subject to Applicable Law.  All rights, powers and remedies provided herein may be exercised only to the extent that the exercise thereof does not violate any applicable Laws, and all such rights, powers and remedies are intended to be limited to the extent necessary so that they shall not render this Agreement invalid or unenforceable under any applicable Laws.

**Section 20.2**   Notice.  Any notice or communication required or permitted under this Agreement shall be given in writing, sent by (a) personal delivery; (b) commercial courier or delivery service with proof of delivery; or (c) United States regular, registered or certified mail, postage prepaid:

| | |
|---|---|
| If to the City: | City of Chicago<br>Department of Planning & Development<br>121 North LaSalle Street, Room 1000<br>Chicago, Illinois 60602<br>Attn:  Commissioner |
| With a copy to: | City of Chicago Department of Law<br>121 North LaSalle Street, Suite 600<br>Chicago, Illinois 60602<br>Attn:  Corporation Counsel |
| If to the Foundation: | The Barack Obama Foundation<br>5235 South Harper Court, Suite 1100<br>Chicago, Illinois 60615<br>Attn:  Executive Director |
| With a copy to: | Katten Muchin Rosenman LLP<br>525 West Monroe Street<br>Chicago, Illinois 60661 3693<br>Attn:  Seth R. Madorsky, Esq. |
| With an additional copy to: | Sidley Austin LLP<br>One South Dearborn Street<br>Chicago, Illinois 60603<br>Attn:  Scott E. Saef, Esq. |

or to such other address or to the attention of such other person as hereafter shall be designated in writing by the applicable party sent in accordance herewith. Any such notice or communication shall be effective when delivered during normal business hours. If delivery of a notice is refused, it shall be deemed to have been delivered at the time of such refusal of delivery.

**Section 20.3**   <u>Modification</u>. Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except as provided herein or by an instrument in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

**Section 20.4**   <u>Successors and Assigns</u>. This Agreement and all terms, provisions, covenants and conditions contained in this Agreement shall apply to, be binding upon and shall inure to the benefit of and be enforceable by each of the parties hereto and the respective successors and permitted assigns of the parties hereto.

**Section 20.5**   <u>Gender and Number; Other Interpretational Rules</u>. Words of any gender used in this Agreement shall be held and construed to include any other gender, and words in the singular or plural number shall be held to include the other, unless the context otherwise requires. For purposes of this Agreement, whenever the words "include," "includes," "including," "e.g.," or "for example" are used, they shall be deemed to be followed by the words "without limitation" (to the extent that such words do not, in fact, so follow). When this Agreement provides that a party's consent or approval shall not be "unreasonably withheld," the phrase shall be deemed to include "conditioned or delayed" (to the extent that such words are not, in fact, so included).

**Section 20.6**   <u>Titles and Subtitles</u>. The titles of the articles, sections, paragraphs and subparagraphs of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

**Section 20.7**   <u>Multiple Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which is an original, but all of which constitute one instrument.

**Section 20.8**   <u>Governing Law; Venue</u>. This Agreement shall be governed and interpreted and the rights of the parties to this Agreement governed in accordance with the Laws of the State applicable to an agreement executed, delivered and performed in the State. Each party to this Agreement hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Northern District of Illinois, and, if such court does not have jurisdiction, to the courts of the State of Illinois in Cook County, for the purposes of any action arising out of this Agreement, or the subject matter of this Agreement brought by any other party. Each party hereto hereby agrees to venue in Cook County, Illinois.

**Section 20.9**   <u>Rule of Construction Inapplicable</u>. The parties to this Agreement acknowledge and confirm that their respective attorneys have participated jointly in the review and revision of this Agreement and that this Agreement has not been written solely by counsel for one of the parties. The parties to this Agreement therefore stipulate and agree that the rule of

construction to the effect that any ambiguities are to or may be resolved against the drafting party shall not be employed in the interpretation of this Agreement to favor either party against the other.

**Section 20.10** Severability. If any provision of this Agreement or the application thereof to any person or circumstance is invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

**Section 20.11** No Joint Venture. Nothing in this Agreement shall be deemed or construed by the parties hereto, nor by any third party, as creating a relationship of principal and agent or of partnership or of joint venture between the parties hereto or otherwise, it being understood and agreed that no provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of independent contracting parties.

**Section 20.12** Recording. Either the City or the Foundation may file this Agreement and/or any amendment or renewal hereof for record in the Office of the Recorder of Deeds of Cook County, Illinois, or in any other public place, the cost of which shall be borne by the party so filing or recording this Agreement.

**Section 20.13** Professional Fees. If any party hereto institutes any action or proceeding against the other party with regard to this Agreement, the prevailing party in such action shall be entitled to recover from the losing party, in addition to the costs and expenses of and related to the suit, its actual reasonable attorneys' fees.

**Section 20.14** No Third-Party Beneficiaries. Nothing in this Agreement is intended or shall be construed to confer upon any person or entity (other than the parties hereto and their respective successors and permitted assigns) any benefit, right, remedy or cause of action under or by reason of this Agreement.

**Section 20.15** Force Majeure Event. Whenever a period of time is herein prescribed for action to be taken by either party hereunder, such party shall not be liable or responsible for, and there shall be excluded from the computation for any such period of time, any delays due to a Force Majeure Event. If a Force Majeure Event occurs which either the City or the Foundation intends to assert for purposes of this Section 20.15, such asserting party shall, after deciding to assert such event, promptly notify the other party of such event in writing.

**Section 20.16** Entire Agreement. This Agreement, together with all Exhibits attached hereto, embodies the entire agreement between the parties relative to the subject matter hereof, and there are no oral or written agreements between the parties, nor any representations made by either party, relative to the subject matter hereof which are not expressly set forth herein. This Agreement may be amended only by a written instrument executed by the parties hereto.

**Section 20.17** Survival. Each provision of this Agreement containing rights and obligations that by their nature require the payment of money or the performance of obligations after the expiration or earlier termination of the Term shall survive any such expiration or earlier termination.

**IN WITNESS WHEREOF,** this Use Agreement is executed by the City and the Foundation as of the Commencement Date.

**CITY OF CHICAGO,** an Illinois municipal corporation and home rule unit of government

By:          _____

David L. Reifman
Commissioner of Planning & Development

**THE BARACK OBAMA FOUNDATION,** a District of Columbia nonprofit corporation and tax exempt entity under Section 501(c)(3) of the Internal Revenue Code

By:          _____
Name:          _____
Its:          _____

[(Sub)Exhibit "A" referred to in this Use Agreement with
The Barack Obama Foundation constitutes Exhibit "A"
to ordinance printed on pages 85887
and 85888 of this *Journal*.]

[(Sub)Exhibits "B" and "D" referred to in this Use Agreement
with The Barack Obama Foundation printed on
pages 85943 and 85944 of this *Journal*.]

(Sub)Exhibits "C", "E" and "F" referred to in this Use Agreement with The Barack Obama
Foundation read as follows:

*(Sub)Exhibit "C".*
(To Use Agreement With The Barack Obama Foundation)

*Description Of The Mission Of The Presidential Center.*

The Obama Presidential Center ("OPC") is a core project of The Barack Obama Foundation. The central mission of the OPC is to house and operate a Presidential Museum that will present President and Mrs. Obama's story and the narrative of the Obama Administration in a broader historical context. Drawing from African American history, the history of civil rights, and the powerful place of Chicago in American history, the Museum will frame President and Mrs. Obama's lives and careers, the 2008 and 2012 presidential elections, and the Obama Presidency in the context of the movements and milestones that helped to shape the Nation over time.

Through the Museum experience, visitors from around the world will learn the story of our Nation's first African-American President and First Lady. Exhibits will take visitors through the lives of President and Mrs. Obama, illustrating President Obama's multicultural childhood in Hawaii and Indonesia, as well as the First Lady's family story and its ancestral connections to slavery and the Great Migration. Visitors will also experience the Obama Presidency firsthand. Exhibits will feature a rotating series of original artifacts from the Obama Administration as well as original artifacts from other sources and time periods that help tell the Obamas' story. Important White House rooms, such as a replica of the Oval Office, will be displayed—enhanced at times with technology, including virtual and augmented reality, to allow visitors to engage with key aspects of the Obama Presidency. And the Museum will bring President and Mrs. Obama's iconic speeches to life: visitors will see the original manuscripts of selected speeches and experience the speeches as delivered through an immersive multimedia installation. The Museum will also offer opportunities for visitors to participate in activities that connect them to the values and skills of civic engagement and community building that have inspired the Obamas' lives and careers.

Other important missions of the OPC are tied directly to its location on the South Side of Chicago: Educational  and community programming linked to the Obama Presidency and the lives of President and Mrs. Obama, which will interest visitors from around the world, will be easily available to residents of the South Side neighborhoods next to the OPC—the very communities where Mrs. Obama was raised, where President Obama began and developed his career as a community organizer, law professor, state senator, and U.S. Senator, and where the Obamas lived and raised their family.

The OPC will also provide educational and community programming linked to its mission on its campus beyond the Presidential Museum itself. As examples:

- A branch of the Chicago Public Library and a President's Reading Room, featuring curated collections and displays of archival material, will enhance reading and educational opportunities for the local community, and provide digital access to Obama Administration records.

- The Forum Building will house collaboration and creative spaces, including an auditorium, multipurpose meeting rooms, recording and broadcast studios, a winter garden, and a restaurant.

- The Program, Athletic, and Activity Center will host a variety of public programs including presentations, events, athletics, and recreation.

- A variety of new outdoor facilities—including a great lawn that can be used as a sledding hill, playgrounds, woodland walk, and formal gardens—will beautify and enhance the recreational opportunities on the site, creating a fun, safe environment for visitors to enjoy in all seasons.

Finally, the OPC will fulfill its mission to honor the history of the Obamas and the adjacent South Side communities by enhancing Jackson Park, not only beautifying the OPC site itself but also reconnecting it with the bordering elements of historic Jackson Park, previously separated by a busy, six-lane road. OPC visitors will be able to walk safely across parkland—without obstruction by traffic—to other beautiful parts of Jackson Park, past the lagoons, and onto the lakeshore.

*(Sub)Exhibit "E"*.
(To Use Agreement With The Barack Obama Foundation)

*Certain Uses Of The Presidential Center.*

- Museum containing artifacts and exhibits (including presidential artifacts and exhibits) presenting, among other themes, President and Mrs. Obama's story within the broader story of American history, the history of civil rights and the place of Chicago in American history
- Special exhibition areas
- Publicly accessible areas (which may include contemplative top floor space, interactive lower level space and wintergarden)
- Auditoriums
- Community collaborative workspaces (which may include media production areas)
- Programming areas
- Ancillary support areas, including food service and gift shops
- Conference, meeting and presentation spaces and multi-purpose meeting spaces
- Publicly accessible document areas (which may include presidential documents, and which may be electronic and/or digitally-based)
- Public library area
- Public and special interior and/or exterior events
- Hard-surfaced court for large-scale indoor events and for basketball, dance and other sports and recreation (including supporting areas)
- Accessory and non-accessory parking (in the Underground Parking Facility)
- Non-public areas supporting Foundation activities, including offices and back-of-house space (including mechanical areas)
- Publicly accessible ingress, egress and access
- Displays of art, sculpture and exhibits
- Organic garden
- Publicly accessible rooftops
- Sledding hill
- Great Lawn
- Landscaping, including grasses, trees, bushes and flowers
- Play areas, picnic areas and outdoor seating areas
- Exterior contemplative spaces
- Gradually sloped exterior areas and pathways accessible to persons with disabilities

*(Sub)Exhibit "F".*
**(To Use Agreement With The Barack Obama Foundation)**

*Construction Commitments.*

1.     <u>Employment Opportunity</u>.  The Foundation agrees, and shall contractually obligate its various contractors, subcontractors and any Affiliate of the Foundation operating on the Subject Property (collectively, the "**Employers**" and individually, an "**Employer**") to agree, that during the Construction of the Project Improvements:

(a)     Neither the Foundation nor any Employer shall discriminate against any employee or applicant for employment based upon race, religion, color, sex, national origin or ancestry, age, handicap or disability, sexual orientation, military discharge status, marital status, parental status or source of income as defined in the City of Chicago Human Rights Ordinance, Section 2-160-010 *et seq.* of the Municipal Code, as amended from time to time (the "**Human Rights Ordinance**").  Applicants will be hired and employed without discrimination based upon the foregoing grounds, and treated in a non-discriminatory manner with regard to all job-related matters, including, without limitation:  employment, upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.   The Foundation and each Employer agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the City setting forth the provisions of this nondiscrimination clause.   In addition, the Foundation and each Employer, in all solicitations or advertisements for employees, shall state that all qualified applicants shall receive consideration for employment without discrimination based upon the foregoing grounds.

(b)     To the extent feasible, the Foundation and each Employer shall (i) present opportunities for training and employment of low and moderate income residents of the City, and (ii) provide that contracts for work in connection with the Construction of the Project Improvements be awarded to business concerns which are located in or owned in substantial part by persons residing in, the City.

(c)     The Foundation and each Employer shall comply with all federal, state and local equal employment and affirmative action statutes, rules and regulations, including, without limitation, the Human Rights Ordinance and the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.* (1993), both as amended from time to time, and any regulations promulgated thereunder.

(d)     The Foundation, in order to demonstrate compliance with the terms of this <u>Section 1</u>, shall cooperate with and promptly and accurately respond to inquiries by the City, which has the responsibility to observe and report compliance with equal employment opportunity regulations of federal, state and municipal agencies.

(e)     The Foundation and each Employer shall include the foregoing provisions of subparagraphs (a) through (d) in every contract entered into in connection with the

Construction of the Project Improvements, and shall require inclusion of these provisions in every subcontract entered into by any subcontractors, so that each such provision shall be binding upon each contractor or subcontractor, as the case may be, during the Construction of the Project Improvements.

2.      City Resident Employment Requirement.    The Foundation agrees, and shall contractually obligate each Employer to agree, that during the Construction of the Project Improvements:

(a)      the Foundation and each Employer shall comply with the minimum percentage of total worker hours performed by actual residents of the City of Chicago as specified in Section 2-92-330 of the Municipal Code (at least fifty percent); provided, however, that in addition to complying with this percentage, the Foundation and each Employer shall be required to make good faith efforts to utilize qualified residents of the City in both unskilled and skilled labor positions.

(b)      The Foundation and the Employers may request a reduction or waiver of this minimum percentage level of Chicagoans as provided for in Section 2-92-330 of the Municipal Code in accordance with standards and procedures developed by the chief procurement officer of the City of Chicago.

(c)      "**Actual residents of the City of Chicago**" shall mean persons domiciled within the City of Chicago.  The domicile is an individual's one and only true, fixed and permanent home and principal establishment.

(d)      The Foundation and the Employers shall provide for the maintenance of adequate employee residency records to ensure that actual Chicago residents are employed on the Construction of the Project Improvements.  The Foundation and the Employers shall maintain copies of personal documents supportive of every Chicago employee's actual record of residence.

(e)      The Foundation and the Employers shall submit weekly certified payroll reports (U.S. Department of Labor Form WH-347 or equivalent) to the Department in triplicate, which shall identify clearly the actual residence of every employee on each submitted certified payroll.  The first time that an employee's name appears on a payroll, the date that the Foundation or the Employer hired the employee should be written in after the employee's name.

(f)      The Foundation and the Employers shall provide full access to their employment records to the chief procurement officer, the Department, the Superintendent of the Chicago Police Department, the inspector general, or any duly authorized representative thereof.  The Foundation and the Employers shall maintain all relevant personnel data and records for a period of at least three (3) years after the issuance of the Certificate of Completion.

(g)      At the direction of the Department, the Foundation and the Employers shall provide affidavits and other supporting documentation to verify or clarify an employee's actual address when doubt or lack of clarity has arisen.

(h)     Good faith efforts on the part of the Foundation and the Employers to provide work for actual Chicago residents (but not sufficient for the granting of a waiver request as provided for in the standards and procedures developed by the chief procurement officer) shall not suffice to replace the actual, verified achievement of the requirements of this Section 2 concerning the worker hours performed by actual Chicago residents.

(i)     If the City determines that the Foundation or an Employer failed to ensure the fulfillment of the requirements of this Section 2 concerning the worker hours performed by actual Chicago residents or failed to report in the manner as indicated above, the City will thereby be damaged in the failure to provide the benefit of demonstrable employment to Chicagoans to the degree stipulated in this Section 2.  If such non-compliance is not remedied in accordance with the breach, notice and cure provisions of Section 16.1(a) of the Agreement, the parties agree that 1/20 of 1 percent (.05%) of the aggregate hard construction costs set forth in the budget shall be surrendered by the Foundation to the City in payment for each percentage of shortfall toward the stipulated residency requirement. Failure to report the residency of employees entirely and correctly shall result in the surrender of the entire liquidated damages as if no Chicago residents were employed in either of the categories.  The willful falsification of statements and the certification of payroll data may subject the Foundation and/or the other Employers or employees to prosecution.

(j)     Nothing herein provided shall be construed to be a limitation upon the "Notice of Requirements for Affirmative Action to Ensure Equal Employment Opportunity, Executive Order 11246" and "Standard Federal Equal Employment Opportunity, Executive Order 11246," or other affirmative action required for equal opportunity under the provisions of the Agreement.

(k)     The Foundation shall cause or require the provisions of this Section 2 to be included in all construction contracts and subcontracts related to the construction of the Project Improvements.

3.     The Foundation's MBE/WBE Commitment.  The Foundation agrees for itself and its successors and assigns, and, if necessary to meet the requirements set forth herein, shall contractually obligate the general contractor to agree, that during the Construction of the Project Improvements:

(a)     Consistent with the findings which support, as applicable, (i) the Minority-Owned and Women-Owned Business Enterprise Procurement Program, Section 2-92-420 et seq., Municipal Code (the "**Procurement Program**"), and (ii) the Minority- and Women-Owned Business Enterprise Construction Program, Section 2-92-650 et seq., Municipal Code (the "**Construction Program**," and collectively with the Procurement Program, the "**MBE/WBE Program**"), and in reliance upon the provisions of the MBE/WBE Program to the extent contained in, and as qualified by, the provisions of this Section 3, during the course of Construction of the Project Improvements, at least 26% of the aggregate hard construction costs shall be expended for contract participation by minority-owned businesses and at least 6% of the aggregate hard

construction costs shall be expended for contract participation by women-owned businesses.

  (b)  For purposes of this Section 3 only:

    (i)  The Foundation (and any party to whom a contract is let by the Foundation in connection with Construction of the Project Improvements) shall be deemed a "contractor" and the Agreement (and any contract let by the Foundation in connection with Construction of the Project Improvements) shall be deemed a "contract" or a "construction contract" as such terms are defined in Sections 2-92-420 and 2-92-670, Municipal Code, as applicable.

    (ii)  The term "**minority-owned business**" or "**MBE**" shall mean a business identified in the Directory of Certified Minority Business Enterprises published by the City's Department of Procurement Services, or otherwise certified by the City's Department of Procurement Services as a minority-owned business enterprise, related to the Procurement Program or the Construction Program, as applicable.

    (iii)  The term "**women-owned business**" or "**WBE**" shall mean a business identified in the Directory of Certified Women Business Enterprises published by the City's Department of Procurement Services, or otherwise certified by the City's Department of Procurement Services as a women-owned business enterprise, related to the Procurement Program or the Construction Program, as applicable.

  (c)  Consistent with Sections 2-92-440 and 2-92-720, Municipal Code, the Foundation's MBE/WBE commitment may be achieved in part by the Foundation's status as an MBE or WBE (but only to the extent of any actual work performed on the Project Improvements by the Foundation) or by a joint venture with one or more MBEs or WBEs (but only to the extent of the lesser of (i) the MBE or WBE participation in such joint venture, or (ii) the amount of any actual work performed on the Project Improvements by the MBE or WBE); by the Foundation utilizing a MBE or a WBE as the general contractor (but only to the extent of any actual work performed on the Project Improvements by the general contractor); by subcontracting or causing the general contractor to subcontract a portion of the Construction of the Project Improvements to one or more MBEs or WBEs; by the purchase of materials or services used in the Construction of the Project Improvements from one or more MBEs or WBEs; or by any combination of the foregoing. Those entities which constitute both a MBE and a WBE shall not be credited more than once with regard to the Foundation's MBE/WBE commitment as described in this Section 3. In accordance with Section 2-92-730, Municipal Code, the Foundation shall not substitute any MBE or WBE general contractor or subcontractor without the prior written approval of the Department.

  (d)  The Foundation shall deliver quarterly reports to the City's monitoring staff during the Construction of the Project Improvements describing its efforts to achieve compliance with this MBE/WBE commitment. Such reports shall include, inter alia, the

name and business address of each MBE and WBE solicited by the Foundation or the general contractor to work on the Project Improvements, and the responses received from such solicitation, the name and business address of each MBE or WBE actually involved in the Construction of the Project Improvements, a description of the work performed or products or services supplied, the date and amount of such work, product or service, and such other information as may assist the City's monitoring staff in determining the Foundation's compliance with this MBE/WBE commitment. The Foundation shall maintain records of all relevant data with respect to the utilization of MBEs and WBEs in connection with the Construction of the Project Improvements for at least five (5) years after completion of the Project Improvements, and the City's monitoring staff shall have access to all such records maintained by the Foundation, on prior notice of at least five (5) Business Days, to allow the City to review the Foundation's compliance with its commitment to MBE/WBE participation and the status of any MBE or WBE performing any portion of the Construction of the Project Improvements.

(e)     Upon the disqualification of any MBE or WBE general contractor or subcontractor, if the disqualified party misrepresented such status, the Foundation shall be obligated to discharge or cause to be discharged the disqualified general contractor or subcontractor, and, if possible, identify and engage a qualified MBE or WBE as a replacement. For purposes of this subsection (e), the disqualification procedures are further described in Sections 2-92-540 and 2-92-730, Municipal Code, as applicable.

(f)     Any reduction or waiver of the Foundation's MBE/WBE commitment as described in this Section 3 shall be undertaken in accordance with Sections 2-92-450 and 2-92-730, Municipal Code, as applicable.

4.     Pre-Construction Conference and Post-Closing Compliance Requirements. Not less than fourteen (14) days prior to the Closing Date (as defined in the Master Agreement), the Foundation and the Foundation's general contractor and all major subcontractors shall meet with the Department monitoring staff regarding compliance with all construction employment requirements. During this pre-construction meeting, the Foundation shall present its plan to achieve its construction employment obligations, the sufficiency of which the City's monitoring staff shall approve as a precondition to the Closing (as defined in the Master Agreement). During the Construction of the Project Improvements, the Foundation shall submit all documentation required hereunder to the City's monitoring staff, including, without limitation, the following: (a) subcontractor's activity report; (b) contractor's certification concerning labor standards and prevailing wage requirements; (c) contractor letter of understanding; (d) monthly utilization report; (e) authorization for payroll agent; (f) certified payroll; (g) evidence that MBE/WBE contractor associations have been informed of the Project Improvements via written notice and hearings; and (h) evidence of compliance with job creation/job retention requirements.

10/31/2018 COMMUNICATIONS, ETC. 85943

*(Sub)Exhibit "B".*
(To Use Agreement With The Barack Obama Foundation)

*Depiction Of Subject Property.*



*(Sub)Exhibit "D".*
(To Use Agreement With The Barack Obama Foundation)

*Areas Of Presidential Center.*



10/31/2018                     COMMUNICATIONS, ETC.                          85945

*Exhibit "E".*
(To Ordinance)

*Master Agreement.*

This **MASTER AGREEMENT** ("**Agreement**") is made on or as of _____, 201__ (the "**Effective Date**"), by and between the **CITY OF CHICAGO**, an Illinois municipal corporation ("**City**"), acting by and through its Department of Planning and Development ("**DPD**"), having its principal offices at City Hall, 121 North LaSalle Street, Chicago, Illinois 60602, and **THE BARACK OBAMA FOUNDATION**, a District of Columbia nonprofit corporation (the "**Foundation**").

## RECITALS

A.     The City, as a home rule unit of government under the 1970 Constitution of the State of Illinois, has the authority to promote the health, safety and welfare of its inhabitants, and to enter into contractual agreements with third parties for the purpose of achieving the aforesaid purposes.

B.     A core project of the Foundation is the planning and development of the Obama Presidential Center (the "**Presidential Center**").

C.     The Presidential Center is designed as a campus consisting of four buildings and an underground parking facility, complemented by a plaza, play areas, pedestrian and bicycle pathways and other landscaped open space, as more particularly described in the Use Agreement (hereinafter defined) and in PD 1409 (hereinafter defined). The buildings include the Museum Building, the Forum Building, the Library Building and the Program, Athletic and Activity Center (as defined in the Use Agreement).

D.     The Foundation expects to receive all funds for construction of the Presidential Center from private fundraising.

E.     The City is the owner of certain real property in Jackson Park, which consists of approximately 19.3 acres and is more particularly described on Exhibit A attached hereto and depicted on Exhibit B attached hereto (the "**Property**").

F.     The City acquired the Property from the Chicago Park District, a municipal corporation organized and existing pursuant to the laws of the State of Illinois, 70 ILCS 1505/1 *et seq.* (the "**Park District**"), in order to facilitate the development of the Presidential Center.

G.     The Park District conveyed the Property to the City by deed dated _____, and recorded in the Office of the Recorder of Deeds of Cook County, Illinois on _____ _____ as Document No. _____.

H.     The deed from the Park District to the City contains a reversionary clause, providing that the Property will revert to the Park District if the Property is not used as part of the Presidential Center.

I.     The City and the Foundation plan to enter into a use agreement with respect to the Property in substantially the form attached hereto as Exhibit C (the "**Use Agreement**").

J.      The Foundation heretofore applied for and secured (i) approval of a planned development for the Property under the City of Chicago Zoning Ordinance, such planned development being designated as Institutional Planned Development No. 1409 ("**PD 1409**"), by ordinance adopted by the City Council on May 23, 2018, and published in the Journal of Proceedings of the City Council ("**Journal**") of such date on pages 77185 through 77214 (the "**PD Approval**"), and (ii) approval of Application No. 721 pursuant to the Lake Michigan and Chicago Lakefront Protection Ordinance set forth in Chapter 16-4 of the Municipal Code of Chicago for the proposed development of the Property for the Proposed Use (hereinafter defined) by resolution adopted by the Chicago Plan Commission dated May 17, 2018 (the "**LPO Approval**").

K.      The City Council, pursuant to an ordinance adopted on _____ and published at pages _____ through _____ in the Journal of such date, authorized the City to execute this Agreement, the Use Agreement and all other documents and instruments specified and contemplated herein, and to perform and observe all of the covenants and agreements of the City under such documents (the "**Ordinance**").

**NOW, THEREFORE**, for and in consideration of the mutual covenants and agreements set forth herein, together with other good and valuable consideration, the receipt and sufficiency of which are hereby confirmed and acknowledged by each of the parties hereto, and each of the parties intending to be bound thereby, the City and the Foundation agree as follows:

1.      Incorporation of Recitals.  The foregoing recitals constitute an integral part of this Agreement and are incorporated herein by this reference with the same force and effect as if set forth herein as agreements of the parties.

2.      City's Representations.  The City represents and warrants to the Foundation as follows, which representations and warranties shall be deemed to be remade as of the Closing Date (hereinafter defined):

          (a)      Title.  The City has good and indefeasible title to the Property, subject only to such matters as are of public record as of the Effective Date or that would be disclosed through an ALTA plat of survey of the Property, and such other liens, claims and encumbrances caused by or through the Foundation.

          (b)      Parties in Possession.  There are no parties in possession of any portion of the Property as lessees or, to the City's knowledge, tenants at sufferance.

          (c)      Other Third Party Rights.  There are no other contracts of sale or, to the City's knowledge, leases, license agreements or other agreements granting any third parties the right to purchase, use or occupy the Property.

          (d)      Proceeding by Governmental Authority.  There is no pending or, to the City's knowledge, threatened condemnation or eminent domain action or proceeding relating to the Property by any Governmental Authority.  As used herein, the term "**Governmental Authority**" means the United States, the State of Illinois, the County of Cook, the City of Chicago, and any agency, department, commission, board, bureau or instrumentality of any of them.

(e)   <u>Restrictive Covenants</u>.  To the knowledge of the City, the Proposed Use (hereinafter defined) of the Property would not violate any restrictive covenant or deed restriction (recorded or otherwise) affecting the Property, and the City is not aware of any proposed change in any Applicable Laws that might materially and adversely affect the Proposed Use of the Property by the Foundation.  As used herein, the term "**Applicable Laws**" means any law, statute, ordinance, rule, regulation, order or determination of any Governmental Authority, including applicable zoning ordinances and building codes, flood disaster laws, health laws, regulations of any board of fire underwriters (or other body exercising similar functions).

(f)   <u>Environmental</u>.  To the City's knowledge, except to the extent expressly described in the environmental reports specified in <u>Exhibit D</u> attached hereto, the Property:  (i) is not in violation of any Applicable Environmental Law (hereinafter defined); (ii) is not subject to any remedial obligations under any Applicable Environmental Law; (iii) has not been proposed for nor subject to any voluntary clean-up program; (iv) is not subject to any institutional controls limiting the uses to which the Property may be put or how construction may occur at the Property; (v) is not subject to any pending or threatened investigation or enforcement action under any Applicable Environmental Law; (vi) has not been found to have any recognized environmental conditions as that term is defined in ASTM Standard E-1527-13; and (vii) is not impacted by the presence of any Hazardous Material (hereinafter defined) in quantities that limit in any way its use for the construction or operation of the Presidential Center.  As used herein, the term "**Applicable Environmental Law**" means those applicable Federal, State, and local laws, as they exist on the date the representation is given, pertaining to health, safety or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("**CERCLA**"), and the Resource Conservation and Recovery Act of 1976, as amended ("**RCRA**").  The term "**Hazardous Material**" means:  (i) any "hazardous substance" as defined in CERCLA and regulations promulgated thereunder; (ii) any "hazardous waste" as defined in RCRA and regulations promulgated thereunder; (iii) any petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under the definition of hazardous substance in CERCLA as well as natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas), and other petroleum products and by-products; (iv) urea formaldehyde foam insulation, polychlorinated biphenyls, radon, perchlorate, and "source," "special nuclear" and "by-product" material as defined in the Atomic Energy Act of 1985, 42 U.S.C. §§ 3011 *et seq*.; (v) any material defined as hazardous or toxic under any statute or regulation of the State of Illinois or any agency thereof; and (vi) any other material or substance which is toxic, ignitable, reactive or corrosive and which is regulated by any Applicable Environmental Law; provided, all such terms shall be deemed to include all similar terms used in any Applicable Environmental Law or regulations thereunder (including by way of example, but not limitation, pollutant, contaminant, toxic substance, discharge and migration).

(g)   <u>No Unpaid Construction Obligations</u>.  There are no unpaid charges, debts, liabilities, claims or obligations arising from the Park District's or the City's

occupancy, ownership, use or operation of the Property which could give rise to any mechanic's or materialmen's or other statutory lien against the Property, or any part thereof, or for which the Foundation shall be responsible.

(h) <u>No Limitation on Use</u>. To the knowledge of the City, except for the review process associated with the Pre-Turnover Governmental Determinations (hereinafter defined) and any limitations imposed and consents required in connection with such Pre-Turnover Governmental Determinations, there exists no judicial, quasi-judicial, administrative or other proceeding or court order, deed restriction or restrictive covenant (recorded or otherwise) or other private limitation on, or consent required to permit use of the Property by the Foundation for the construction and operation of the Presidential Center and the other Project Improvements (as defined in the Use Agreement) as specified in the Use Agreement (herein called the "**Proposed Use**").

(i) <u>Litigation or Administrative Proceeding</u>. To the knowledge of the City, except for the pending litigation specified on <u>Exhibit E</u> attached hereto (the "**Pending POP Litigation**") and proceedings associated with the Pre-Turnover Governmental Determinations, there is no pending or threatened litigation or administrative proceedings which could materially adversely affect (i) title to the Property or any part thereof; (ii) the ability of the City to perform any of its obligations hereunder; (iii) the Proposed Use of the Property by the Foundation; or (iv) the Property.

(j) <u>No Adverse Fact</u>. To the City's knowledge, there exists no judicial or administrative action, or any action by adjacent landowners, or any natural or artificial conditions upon the Property, or any material adverse fact or condition relating to the Property or the Proposed Use by the Foundation, which would materially prevent, limit, or obstruct the Proposed Use.

(k) <u>No Commitments for Dedication</u>. Except as disclosed in the Commitment (hereinafter defined) and except for the Permitted Exceptions (hereinafter defined), the City has not made and, to the City's knowledge, the Park District has not made, any commitment to any Governmental Authority, utility company, school board, church or other religious body, or any homeowners or homeowners' association, or any other organization, group or individual, relating to the Property which would impose an obligation upon the Foundation or its successors or permitted assignees to make any contribution or dedications of money or land or to construct, install or maintain any improvements of a public or private nature on or off the Property. Except as disclosed in the Commitment and except for the Permitted Exceptions, to the knowledge of the City, no Governmental Authority has imposed any requirement that any developer of the Property pay directly or indirectly any special fees or contributions or incur any special expenses or obligations (collectively, "**Assessments**") in connection with any development of the Property or any part thereof.

(l) <u>Corporation</u>. The City is a municipal corporation organized and legally existing and in good standing under the laws of the State of Illinois. The execution and delivery of, and the City's performance under, this Agreement are within the City's

powers and have been duly authorized by all requisite corporate action. The person executing this Agreement on behalf of the City has the authority to do so. This Agreement constitutes the legal, valid and binding obligation of the City enforceable in accordance with its terms, subject to laws applicable generally to creditor's rights and applicable principles of equity. Performance of this Agreement will not result in any breach of, or constitute any default under, any agreement or other instrument to which the City is a party, or by which the City is bound.

(m) <u>Consent or Approval</u>. To the knowledge of the City, no consent or approval of any person or entity is required with respect to the execution and delivery of this Agreement by the City or the consummation by the City of the Closing (hereinafter defined) or the performance by the City of its obligations hereunder which has not been obtained.

(n) <u>No Service Contracts</u>. Neither the City nor the Park District has entered into any contracts related to the operation, ownership or management of the Property, including maintenance, service, construction, supply and equipment rental contracts, which could give rise to any mechanic's or materialmen's or other statutory lien against the Property, or any part thereof, or which, as applicable, would be an obligation of the Foundation after the Closing.

(o) <u>Employees</u>. There are no employees currently employed by the City or the Park District to manage, maintain or service the Property, or any portion thereof, whose contract with the City or the Park District would be an obligation of the Foundation after the Closing.

(p) <u>Contracts and Documents</u>. To the knowledge of the City, all contracts or documents delivered by the City to the Foundation in connection with this Agreement are, in all material respects, true, correct and complete originals or copies of such documents, and are in full force and effect, without default by (or notice of default to) any party.

(q) <u>Tax Exempt</u>. The City and the Park District are exempt from the obligation to pay real estate taxes or any other Impositions (as defined in the Use Agreement) in respect of the Property.

As used in this <u>Section 2,</u> the phrases "to the knowledge of the City," "to the City's knowledge," and "the City is not aware" or similar language, means the actual, current knowledge, after consultation with _____ of the Park District and Rebekah Scheinfeld of the Chicago Department of Transportation, but without independent investigation, of David L. Reifman, at the time such representations and warranties are made by the City hereunder. In order to remake such representations and warranties as of the Closing Date, Mr. Reifman again shall consult with _____ and Ms. Scheinfeld. If any of the specified individuals above, as of the Closing Date, shall no longer be in the employ of the Park District, the Chicago Department of Transportation or DPD, respectively, such individual(s) shall be replaced, for purposes of remaking such representations and warranties, by individuals who, in the good faith judgment of

the City, shall be in the best position to have knowledge of the matters to which such representations and warranties pertain.

     3.    Foundation's Representations. The Foundation represents and warrants to the City as follows, which representations and warranties shall be deemed to be remade as of the Closing Date:

     (a)   Corporation. The Foundation is a nonprofit corporation organized and legally existing and in good standing under the laws of the District of Columbia. The execution and delivery of, and the Foundation's performance under, this Agreement are within the Foundation's powers and have been duly authorized by all requisite corporate action. The person executing this Agreement on behalf of the Foundation has the authority to do so. This Agreement constitutes the legal, valid and binding obligation of the Foundation enforceable in accordance with its terms, subject to laws applicable generally to creditor's rights and applicable principles of equity. Performance of this Agreement shall not result in any breach of, or constitute any default under, any agreement or other instrument to which the Foundation is a party or by which the Foundation is bound.

     (b)   Consent or Approval. Except for the approval of the Foundation's Board of Directors, no consent or approval of any person or entity is required with respect to the execution and delivery of this Agreement by the Foundation or the consummation by the Foundation of the Closing or the performance by the Foundation of its obligations hereunder.

     (c)   Authority. The Foundation has all requisite authority and power (i) to select the Property as the location of the Presidential Center; and (ii) to plan, design, construct, complete, furnish and operate the Presidential Center on the Property, as contemplated herein.

     (d)   Litigation or Administrative Proceeding. Except for the Pending POP Litigation, there is no pending or, to the knowledge of the Foundation, threatened litigation or administrative proceedings which, if decided against the Foundation, would materially adversely affect (i) the ability of the Foundation to perform any of its obligations hereunder; or (ii) the Proposed Use of the Property by the Foundation.

     (e)   Contracts and Documents. To the knowledge of the Foundation, all contracts or documents delivered by the Foundation to the City in connection with this Agreement are true, correct and complete originals or copies of such documents, and are in full force and effect, without default by (or notice of default to) any party.

As used in this Agreement, the phrases "to the knowledge of the Foundation" and "to the Foundation's knowledge" or similar language mean the actual, current knowledge, without independent investigation, of Robbin Cohen, at the time such representations and warranties are made by the Foundation hereunder.

4.    <u>Title</u>.  Except to the extent set forth in <u>Section 2(a)</u> above, the City makes no warranty or representation with respect to the marketability or quality of title to the Property. The City shall furnish to the Foundation, within ten (10) business days following the Effective Date, copies of all abstracts of title, title reports, title insurance policies and plats of survey in the possession of the City and the Park District.  The City, however, is not under any obligation to furnish any new or additional abstracts of title, title reports, title insurance policies in respect of the Property.  The Foundation heretofore has been furnished with a title insurance commitment for the Property, with an effective date of June 5, 2017 (the "**Commitment**"), issued by Chicago Title Insurance Company.  If it wishes to obtain title insurance in respect of the Property, and such title insurance is available for the Foundation's interest under the Use Agreement, the Foundation shall be solely responsible for, and shall pay all costs associated with, updating the Commitment (including all search, continuation and later-date fees), obtaining a new title commitment from another title insurance company (the title insurance company selected by the Foundation to issue the Title Policy (hereinafter defined) being herein referred to as the "**Title Company**"), and, except for the City's obligations described below, obtaining such title insurance, extended coverage or any other endorsements it deems necessary (the "**Title Policy**"). The Foundation shall be responsible for obtaining any utility letters or other documents needed to obtain extended coverage and the City will cooperate with the Foundation in connection therewith.  The Foundation, at its own expense, shall obtain a plat of survey of the Property (the "**Survey**").

The Foundation shall have the right to object to matters that are not Permitted Exceptions (hereinafter defined) shown on the Commitment, the documents referred to in the Commitment (the "**Title Documents**"), and the Survey and in any subsequent updates thereof (herein collectively called "**Other Exceptions**").   Any Other Exceptions to which the Foundation objects by delivery of written notice to the City are herein collectively called "**Title Objections**." The City, at or prior to the Closing, shall remove or cause to be removed Title Objections to the extent such Title Objections (a) are (i) recorded against or affect the Property, and (ii) are mechanics or materialmen's liens, mortgage financing documents, liens evidencing monetary encumbrances or liens created or suffered to exist by the City or the Park District or any of their respective agents or affiliates or (b) are otherwise required to be removed pursuant to the terms of this Agreement (collectively, "**the Required Clearance Exceptions**").  To the extent any Title Objections affecting the Property may be removed by the exercise of the City's eminent domain authority, the City will make reasonable, good faith efforts to obtain City Council approval to exercise such authority.

In addition, the City may elect, but shall not be obligated, to remove or cause to be removed at its expense any other Title Objections.  If any such other Title Objections are not cured or insured over in a manner reasonably acceptable to the Foundation, or are incapable of being cured, the Foundation may waive such Title Objections or elect to terminate this Agreement prior to the Closing by providing written notice to the City.  After any such termination the only rights, duties, obligations and liabilities of the parties under this Agreement shall be those which survive termination, including but not limited to, <u>Section 8</u> (Inspections), <u>Section 17</u> (Real Estate Commissions) and <u>Section 37</u> (Survival) of this Agreement.  By effectuating the Closing on the Closing Date, the Foundation shall be deemed to have accepted all uncured Title Objections.  As used herein, the term "**Permitted Exceptions**" shall mean and include:  (a) applicable zoning and building ordinances and land use regulations, (b) the lien of

taxes and assessments not yet due and payable, (c) any exceptions to title caused by the Foundation, its agents, representatives or employees, (d) the standard exceptions in an ALTA title insurance policy, and (e) two (2) utility corridors, each including a no-build restriction, as follows: (i) a 20' easement along the northern boundary line of the Property, and (ii) a 20' easement along the eastern boundary line of the Property.[1]

5.     Covenants of the City.   The City, with respect to the Property, covenants and agrees with the Foundation that between the Effective Date and the Closing Date:

(a)     Maintenance and Operation.  The City shall not (i) initiate or support any zoning reclassification of the Property, any variance under existing zoning ordinances applicable to the Property, the imposition of any restrictive covenants or easements or other encumbrances on the Property, or the execution or filing of any subdivision plat affecting the Property, without in each instance the prior written permission of the Foundation; (ii) enter into or renew, extend, modify or replace any agreement or other contractual obligation with respect to or affecting the Property, without the prior written permission of the Foundation, provided that such permission shall not be required if such agreement or other contractual obligation does not have a term extending beyond the Closing Date; (iii) cause or permit any grading, excavation or construction upon the Property or any addition, alteration or removal of any improvements forming a part of the Property, without the prior written permission of the Foundation, provided that such permission shall not be required if such work is conducted either (A) as part of the performance by the City of its obligations hereunder or under the Environmental Remediation Agreement (hereinafter defined) or, prior to the Closing, in connection with roadway and utility relocation work, or (B) in the ordinary course of the present use of the Property and is necessary to the continued use and operation of the Property as a public park; and (iv) initiate or support any change in any Applicable Laws, rulings or orders applicable specifically to the Property (as opposed to real property generally) without the prior written permission of the Foundation.

(b)     Notification of Litigation.  The City shall promptly notify the Foundation of any litigation or administrative proceeding, of which the City becomes aware, concerning or affecting the Property or the use or operation thereof or the ability of the City to perform its obligations under this Agreement.

(c)     Notification of Violation of Laws.  The City shall promptly notify the Foundation in writing of any alleged violation of Applicable Laws relating to the Property of which the City becomes aware, and promptly provide to the Foundation copies of any notices which it receives from Governmental Authorities with respect to the alleged violation of any Applicable Laws relating to the Property.

(d)     Notification of Change of Laws.  The City shall promptly notify the Foundation in writing of any proposed or effectuated change in any Applicable Laws,

---

[1] City and Foundation to review and finalize plans for relocation of 12" CPD sanitary sewer line, which may include/require widening of portions of the easement area on the eastern boundary, at its southern end, to up to 30' in width, and may require an easement along the southern boundary of the Property.

rulings or orders, of which the City is or becomes aware, that might affect the Proposed Use of the Property by the Foundation.

(e)  No Lien or Assignment.  The City shall not: (i) without the prior written consent of the Foundation, create, place or permit to be created or placed, or through any act or failure to act, acquiesce in the placing of, or allow to remain, any deed of trust, mortgage, voluntary or involuntary lien, whether statutory, constitutional or contractual, security interest, encumbrance or charge, or conditional sale or other title retention document, against or covering the Property, or any part thereof, and should any of the foregoing become attached hereafter in any manner to any part of the Property without the prior written consent of the Foundation, the City shall cause the same to be promptly discharged and released; or (ii) sell, exchange, assign, transfer, convey or otherwise dispose of all or any part of the Property or any interest therein, or permit any of the foregoing.

(f)  Tax Exempt Status.  The City shall not take any action, or fail to take any action, that eliminates or places at risk the tax exempt status of the Property.

(g)  Agreements.  The City shall not execute any agreement affecting the Property without the express prior written approval of the Foundation, which approval shall not be unreasonably withheld, provided that such written approval shall not be required if such agreement (i) does not have a term extending beyond the Closing Date, (ii) is terminable by the City on not more than 10 days prior notice, (iii) will not be binding on the Property or the Foundation after the Closing Date, and (iv) will not hinder any investigations of the condition of the Property by the Foundation.

(h)  Marketing.  The City shall not market or show the Property to any prospective purchasers.

(i)  Covenant of Further Assurances.  The City shall (i) promptly correct any defect, error or omission which may be discovered in the contents of this Agreement or in any of the Exhibits hereto; and (ii) do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Agreement, provided that if such acts will require City Council approval, the City shall endeavor to obtain such approval and, if obtained, shall do such acts.

(j)  No Frustration of Representations.  The City shall not enter into, approve, or permit any agreement, or take any action or fail to take any action, which would cause any of the representations and warranties set forth in Section 2 above to no longer be true and correct in all material respects.

(k)  Covenant to Defend Validity of Agreement.  The City agrees that, if the City's authority to enter into this Agreement or to perform its obligations hereunder is challenged, the City will defend the validity and enforceability of this Agreement.

(l)  Covenant re Pre-Turnover Utility Relocation Work.  The City will diligently perform or cause to be performed such work specified in paragraph (A) of

Exhibit F attached hereto (the "**Pre-Turnover Utility Relocation Work**") in accordance with the schedule for performance set forth on Exhibit F.

(m)  Covenant re Other Utility Relocation Work.  The City will diligently perform or cause to be performed such other work specified in Exhibit F attached hereto (together with the Pre-Turnover Utility Relocation Work, the "**Utility Relocation Work**") in accordance with the schedule for performance set forth on Exhibit F.

6.  Covenants of the Foundation.  The Foundation covenants and agrees with the City that between the Effective Date and the Closing Date:

(a)  Payment of Pre-Construction Obligations.  The Foundation shall cause all uncontested and lienable debts and liabilities of the Foundation for labor, material and services incurred in connection with pre-construction obligations relating to the Property, and all other uncontested and lienable pre-construction obligations of the Foundation, including architectural, design and engineering, to be paid in accordance with the terms of payment therefor.  If the Foundation contests any such debts or liabilities, the Foundation shall furnish such security as the City may deem reasonably necessary to insure the ultimate payment of the contested amount.

(b)  Notification of Litigation.  The Foundation shall promptly notify the City of any litigation or administrative proceeding, of which the Foundation becomes aware, concerning or affecting the Property or the use or operation thereof or the ability of the Foundation to perform its obligations under this Agreement.

(c)  Notification of Violation of Laws.  The Foundation shall promptly provide to the City copies of any notices which it receives from Governmental Authorities (other than the City) with respect to the alleged violation of any Applicable Laws relating to the Property.

(d)  Covenant of Further Assurances.  The Foundation shall (i) promptly correct any defect, error or omission which may be discovered in the contents of this Agreement or in any of the Exhibits hereto; and (ii) do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Agreement; provided that if such acts will require Foundation board approval, the Foundation shall endeavor to obtain such approval and, if obtained, shall do such acts.

7.  Environmental Matters.  Contemporaneously with the execution of this Agreement, the City and the Foundation shall execute and enter into that certain Environmental Remediation and Indemnity Agreement in the form attached hereto as Exhibit G (the "**Environmental Remediation Agreement**").

8.  Inspections and Pre-Closing Access to Property.  The Foundation's obligation to accept the Property is conditioned upon the Foundation being satisfied with the condition (including, but not limited to, the legal, physical and environmental condition) of the Property for the construction and operation of the Presidential Center and the other Project Improvements. The Foundation shall have the right, at its sole expense, to enter the Property to inspect the same,

perform surveys, environmental assessments, surface and subsurface tests, and any other due diligence it deems necessary or desirable to satisfy itself as to the condition of the Property, subject, however, to (a) the terms and conditions of the Environmental Remediation Agreement, and (b) prior approval of the National Park Service and the Federal Highway Administration of any physical work to be conducted on or in the Property by or on behalf of the Foundation during the period preceding the City's receipt of the Pre-Turnover Governmental Determinations (hereinafter defined). The City, as owner of the Property and applicant in respect of the Pre-Turnover Governmental Determinations, will initiate communications with the National Park Service and the Federal Highway Administration in connection with seeking approval of any such physical work, and the City and the Foundation will cooperate in support of the efforts to obtain such approvals. The Foundation shall perform any inspections or tests during normal business hours, and the City (and the Park District) shall have the right to have a representative present. The Foundation also shall have the right, provided it obtains the prior consent of the City (and the Park District), which consent will not be unreasonably withheld, to maintain periodic community, media and/or fundraising events on the Property prior to the Closing. Prior to entering the Property, the Foundation shall provide proof of insurance as required by that certain Property Access Agreement dated as of May 20, 2015, among the City, the Park District and the Foundation. The Foundation shall promptly repair any damage to the Property caused by any actions of the Foundation or its agents or contractors and restore the Property to substantially the condition which existed immediately prior to such activity. The Foundation shall indemnify, defend (through an attorney reasonably acceptable to the City), and hold the City, the Park District and their respective officers, employees, agents and representatives (collectively, the "**City Parties**") harmless from any loss, injury, damage, claim, lien, cost or expense, including attorneys' fees and costs, sustained by the City Parties, or any one of them, caused as a result of or arising out of any such inspections, tests or special events by the Foundation or its representatives on the Property and such indemnification shall survive the termination of this Agreement (regardless of the reason for such termination) and shall survive the Closing. If the Foundation determines that it is not satisfied, in its sole discretion, with the condition (including, but not limited to, the legal, physical and environmental condition) of the Property, the Foundation may terminate this Agreement by written notice to the City any time on or subsequent to March 1, 2019 and prior to the earlier of (a) the Closing, or (b) the second anniversary of the Effective Date. After any such termination, the only rights, duties, obligations and liabilities of the parties under this Agreement shall be those which survive termination, including but not limited to, this Section 8 (Inspections), Section 17 (Real Estate Commissions) and Section 37 (Survival) of this Agreement.

9.    Governmental Determinations.

(a)    Foundation Obligations. The Foundation, at its sole expense, shall apply for and diligently pursue securing such permits, licenses and other approvals required to commence construction of the Presidential Center in accordance with Applicable Law, excluding the Pre-Turnover Governmental Determinations (hereinafter defined).

(b)    City Obligations. The City, at its sole expense, shall apply for and diligently pursue (i) securing final decision/approval documents under the National Environmental Policy Act ("NEPA") from the National Park Service for a conversion under the Urban Park and Recreation Recovery Act, (ii) securing final decision/approval

documents under NEPA from the Federal Highway Administration in anticipation of funding under the Federal-Aid Highway Act for roadway improvements in Jackson Park, and (iii) completion of a consultation process under Section 106 of the National Historic Preservation Act, including if necessary, entry by the City into a memorandum of agreement to address known adverse effects on historic properties (the "**Pre-Turnover Governmental Determinations**"). The Foundation shall cooperate with the City in furtherance of the City's efforts to obtain the Pre-Turnover Governmental Determinations, it being the intention of the City and the Foundation to obtain the Pre-Turnover Governmental Determinations prior to the Closing Date.

10.     Notification of Closing.  The closing of the transactions contemplated under this Agreement (the "**Closing**") shall occur on a date (the "**Closing Date**") designated by the Foundation. The Foundation shall designate the Closing Date by sending a notice (the "**Closing Notice**") thereof to the City at least 30 days prior to the designated Closing Date.

11.     Conditions to the Foundation's Obligation to Close.  The following shall be conditions precedent to the Foundation's obligation to close this transaction:

(a)     City's Representations, Warranties and Covenants.  On the Closing Date, all of the City's representations in Section 2 of this Agreement shall be true and correct as if made on the Closing Date (except to the extent any such representations and warranties are made with respect to a specific date, in which event such representation and warranty shall be true and correct in all material respects as of such date), and the City shall not be in material breach of any covenants, agreements or obligations required to be performed by the City on or before the Closing Date hereunder or under the Environmental Remediation Agreement.

(b)     Not Affected by Disaster.  On the Closing Date, neither the Property nor any material part thereof shall have been, or be threatened to be, materially adversely affected in any way as a result of fire, explosion, earthquake, disaster, accident, labor dispute, any action by the United States or any other Governmental Authority, flood, embargo, riot, civil disturbance, uprising, activity of armed forces, or act of God or public enemy.

(c)     No Condemnation.  On the Closing Date, neither the Property nor any part thereof shall be subject to any condemnation or threat of condemnation.

(d)     Building Permit.  On the Closing Date, no fact, condition or impediment shall exist which would prevent the Foundation from obtaining all necessary building permits from the appropriate Governmental Authorities for the Proposed Use on the Property.

(e)     Soil Tests.  The Foundation shall have obtained the written opinion of a duly licensed soil engineer to the effect that there are no soil compaction or expansion characteristics, rock, surface or subterranean, water, or other conditions which shall require soil treatment or replacement, blasting, water diversion, or structural

construction on the Property for the Proposed Use other than the minimum required by the applicable building codes of the City.

(f)     Title.  On the Closing Date, the Foundation shall be satisfied with the condition of title and the Title Company shall be unconditionally committed (but for receipt of payment of the applicable premium and related costs and expenses) to issue the Title Policy (if such a policy is available).

(g)     Survey.  On the Closing Date, there shall not exist any easement, right-of-way, encroachment, conflict or protrusion with respect to the Property that is not acceptable to the Foundation.

(h)     Pre-Development Permits.  On the Closing Date, the Foundation shall have obtained such permits, licenses and other approvals as are necessary for the Foundation to commence site work on the Property, excluding the Pre-Turnover Governmental Determinations (collectively, the "**Pre-Development Permits**"), and there shall be in existence no judicial, quasi-judicial, administrative or other proceeding which might materially adversely affect their validity.

(i)     Pre-Turnover Governmental Determinations and Pre-Turnover Utility Relocation Work.  On the Closing Date, the City shall have (i) obtained the Pre-Turnover Governmental Determinations, and (ii) completed the Pre-Turnover Utility Relocation Work; provided, that in the event that the Closing Date designated by the Foundation in the Closing Notice is earlier than the Target Utility Relocation Date (as defined in Exhibit F hereto), and the condition to Closing set forth in clause (ii) of this Section 11(i) above has not been satisfied as of the occurrence of the Closing, then the Foundation shall be deemed to have waived the condition to Closing set forth in said clause (ii) of this Section 11(i) (but any such waiver of such condition to Closing shall not be deemed to relieve the City from its obligation to perform the Pre-Turnover Utility Relocation Work as provided in this Agreement, it being understood that the City shall complete the Pre-Turnover Utility Relocation Work after Closing in such event).

(j)     Architect.  On the Closing Date, there has been no notice from the Architect to the Foundation that the Architect is unable to design the Presidential Center on the Property.

(k)     Consent or Approval.  On the Closing Date all approvals and/or consents of all persons and/or entities shall have been obtained by the Foundation that are necessary or required for the consummation of the Closing.

(l)     Environmental.  If the City shall have elected to submit the Property or any portion thereof to the SRP (as defined in the Environmental Remediation Agreement), the Illinois Environmental Protection Agency shall have issued a Remedial Action Plan approval letter with respect to the Property or applicable portion thereof in accordance with the Environmental Remediation Agreement.

If any one of the above conditions is not satisfied, the Foundation may, at its option, waive such condition or the Foundation may terminate this Agreement by giving written notice of such termination to the City. After any such termination, the only rights, duties, obligations or liabilities of the parties under this Agreement shall be those which survive termination, including but not limited to, Section 8 (Inspections), Section 17 (Real Estate Commissions) and Section 37 (Survival) of this Agreement. If, however, any of the above conditions is not satisfied as a result of a breach by the City of any of the covenants or agreements to be performed or observed by the City hereunder, the Foundation may exercise such rights and remedies, if any, that the Foundation may have pursuant to the terms of Section 14 below.

12.   Conditions to the City's Obligation to Close. The following shall be conditions precedent to the City's obligation to close this transaction:

(a)   Foundation's Representations, Warranties and Covenants. On the Closing Date, all of the Foundation's representations and warranties set forth in Section 3 of this Agreement shall be true and correct in all material respects as if made on the Closing Date (except to the extent any such representations and warranties are made with respect to a specific date, in which event such representation and warranty shall be true and correct in all material respects as of such date) and the Foundation shall not be in material breach of any material covenants, agreements or obligations required to be performed by the Foundation on or before the Closing Date hereunder.

(b)   Pre-Development Permits.   The Foundation shall have obtained the Pre-Development Permits, and there shall be in existence no judicial, quasi-judicial, administrative or other proceeding alleging a violation by the Foundation of Applicable Law which might materially adversely affect their validity.

(c)   Pre-Turnover Governmental Determinations. On the Closing Date, the City shall have obtained the Pre-Turnover Governmental Determinations.

(d)   Survey. The Foundation shall have furnished the City with a copy of the Survey.

(e)   Insurance. The Foundation shall have submitted to the City evidence of insurance coverage as required in the Use Agreement.

(f)   Plans. The Foundation shall have submitted to the City a copy of the plans and specifications prepared by the Foundation's architect (the "**Architect**"), as submitted to the City as the basis for obtaining PD Approval and the other then–issued Pre-Development Permits (the "**Current Plans**"), together with a certification of same from the Architect.

(g)   Budget. The Foundation shall have submitted to the City a written budget, prepared by the Foundation, showing the projected Total Construction Costs (as that term is defined in the Use Agreement) of the Presidential Center based on the Current Plans (the "**Projected Total Construction Costs**").

(h)    Construction Funds. The Foundation shall have submitted to the City a certification that the Foundation has received funds and/or gift pledge commitments in writing that in the aggregate equal or exceed the Projected Total Construction Costs of the Presidential Center.

(i)    MBE/WBE and City Residency Hiring Compliance Plan. The Foundation and the Foundation's general contractor and all major subcontractors shall have met with staff from DPD regarding compliance with the MBE/WBE, city residency hiring and other requirements set forth in the Use Agreement, and DPD shall have approved the Foundation's compliance plan in accordance therewith.

(j)    Endowment. The Foundation shall have established an endowment having as its sole purpose paying, as and when necessary, the costs to operate, enhance and maintain the Presidential Center and the other Project Improvements during the term of the Use Agreement.

If any one of the above conditions is not satisfied by the Closing Date, the City may, at its option, waive such condition or, if the City does not waive such condition, the Closing Date shall be deemed postponed until such later date designated by the Foundation in a subsequent Closing Notice. If any condition is not satisfied by the subsequent Closing Notice, then the Closing Date shall be deemed further postponed as described in the above sentence, and this procedure shall continue until the outstanding conditions are satisfied or waived. Postponements of the Closing Date, as contemplated in this paragraph are subject in all events to the City's and the Foundation's right to terminate this Agreement if the Closing shall have not occurred by the Outside Closing Date as contemplated in Section 14(a) below.

13.    The Closing. The Closing shall take place at the offices of the Foundation's legal counsel, Katten Muchin Rosenman LLP, in Chicago, Illinois, on the Closing Date specified in the Closing Notice.

(a)    Closing. In connection with the Closing:

(i)    Title Policy. If the Foundation has elected to obtain a Title Policy (and such Title Policy is available for the Foundation's interest under the Use Agreement), the Title Company shall issue the Title Policy.

(ii)    Closing Costs. The escrow fee charged by the Title Company shall be paid by the Foundation. The fee for any recording of the Use Agreement or a memorandum thereof shall be borne by the party that elects to effectuate such recording. Each party shall be responsible for the payment of its own attorneys' fees incurred in connection with the transaction which is the subject of this Agreement. All other costs and expenses incurred by the City and the Foundation prior to the execution of this Agreement shall be the sole responsibility of the party incurring such costs and expenses.

(iii)    Possession; Condition of Property at Closing. The City shall make the Property available to the Foundation at Closing, subject to Section 4.14 of the Use Agreement, in substantially the same condition as exists on the Effective

Date, except for (A) ordinary wear and tear and damage resulting from casualty or the Foundation's inspections; (B) such modifications to the Property resulting from the performance by the City of the Utility Relocation Work, roadway work, and such other obligations of the City set forth herein or in any other agreement executed by the City or the Park District; and (C) such other modifications to the condition of the Property as the Foundation shall have approved in writing.

(b)    City's Closing Deliveries.  At Closing, the City shall deliver or cause to be delivered the following:

(i)    Use Agreement.  The Use Agreement, substantially in the form of Exhibit C attached hereto, executed by the City.

(ii)    Non-Foreign Status Affidavit.  A non-foreign status affidavit, as required by Section 1445 of the Internal Revenue Code, executed by the City.

(iii)    Evidence of Authority.  Documentation to establish to the Foundation's reasonable satisfaction the due authorization of the City's execution of all documents contemplated by this Agreement.

(iv)    Update Certificate.  A certificate, executed by the City, certifying that as of the Closing Date all of the representations and warranties of the City contained herein are true and correct (with appropriate modifications of such representations and warranties to reflect any changes therein not known to the City as of the Effective Date) or identifying any representation or warranty which is not, or no longer is, true and correct and explaining the state of facts giving rise to the change.

(v)    Other Documents.  A closing statement, if applicable, executed by the City, and such other documents as may be reasonably required by the Title Company to effectuate the Closing.

(c)    Foundation Closing Deliveries.   At the Closing, the Foundation shall deliver or cause to be delivered the following:

(i)    Use Agreement.  The Use Agreement, substantially in the form attached hereto as Exhibit C, executed by the Foundation.

(ii)    Evidence of Authority.  Documentation to establish to the City's reasonable satisfaction the due authorization of the Foundation's execution of all documents contemplated by this Agreement.

(iii)    Economic Disclosure Statement.   An Economic Disclosure Statement, in the City's then current form, dated as of the Closing Date, to the extent then required by Applicable Laws.

(iv)    Update Certificate.  A certificate, executed by the Foundation, certifying that as of the Closing Date all of the representations and warranties of

the Foundation contained herein are true and correct (with appropriate modifications of such representations and warranties to reflect any changes therein not known to the Foundation as of the Effective Date) or identifying any representation or warranty which is not, or no longer is, true and correct and explaining the state of facts giving rise to the change.

(v)     Other Documents.  A closing statement, if applicable, executed by the Foundation, and such other documents as may be reasonably required by the Title Company to effectuate the Closing.

14.    Termination; Cure Obligation; Remedies.

(a)     Events of Termination.  This Agreement may be terminated at any time prior to the Closing (unless another time period is specified in the referenced section) in and under the following circumstances, by:

(i)     the Foundation under the provisions of Section 4 (Title), Section 8 (Inspections), or Section 11 (Conditions to the Foundation's Obligation to Close) of this Agreement;

(ii)     the mutual written consent of the Foundation and the City;

(iii)     either the Foundation or the City, if the Closing shall not have occurred on or before the date (the "**Outside Closing Date**") that is the seventh (7th) anniversary of the Effective Date, by delivery of written notice of such termination not later than the fifth (5th) business day following the Outside Closing Date; provided that the right to terminate under this Section 14(a)(iii) shall not be available to any party whose failure to fulfill any obligation hereunder has been the cause of, or resulted in, the failure of the Closing to occur by such date.

(b)     Procedures for Termination.   If a party is entitled to terminate this Agreement pursuant to Section 14(a) and chooses to do so, then such party shall deliver a notice to the other party to the effect that the notifying party thereby terminates this Agreement.  The notice delivered pursuant to the immediately-preceding sentence must be in writing and must specify in reasonable detail the factual basis for the termination of this Agreement.

(c)     Effect of Termination.  Upon a termination of this Agreement pursuant to this Section 14, neither the Foundation nor the City nor any of their respective directors, officers, employees, trustees, beneficiaries, agents, consultants, or attorneys (irrespective of when any such person held such status) shall have any further rights, duties, obligations or liabilities under this Agreement except for those which survive termination, including but not limited to, Section 8 (Inspections), Section 17 (Real Estate Commissions) and Section 37 (Survival) of this Agreement.

(d)     Cure Obligation.  Each party shall use commercially reasonable efforts (which shall include the reasonable expenditure of necessary funds) to cure, prior to

Closing, (i) all material breaches of representations and warranties of such party (or matters requiring modification thereto due to changed circumstances), and (ii) all Required Clearance Exceptions.

(e)  Remedies - The City.  The Foundation shall be in default under this Agreement if (i) all of the conditions to the Foundation's obligation to close, as specified in Section 11 of this Agreement, have been satisfied or waived, and (ii) the Foundation fails or refuses to execute and deliver any of the items required by Section 13 of this Agreement to be executed and delivered by the Foundation for any reason other than a default by the City hereunder or the termination of this Agreement by the Foundation or the City pursuant to the terms and provisions of this Agreement.  If the Foundation is in default under this Agreement as provided in this Section 14(e) or is in default under any other provision of this Agreement, the City, without regard to any limitations set forth elsewhere in this Agreement, shall have all of the rights and remedies available at law or in equity under the laws of the State of Illinois or other applicable law, **but not punitive, consequential or other special damages, recovery of which is hereby waived by the City.**

(f)  Remedies - The Foundation.  The City shall be in default under this Agreement if (i) all the conditions to the City's obligation to close, as specified in Section 12 of this Agreement, have been satisfied or waived, and (ii) the City fails or refuses to execute and deliver any of the items required by Section 13 of this Agreement to be executed and delivered by the City for any reason other than a default by the Foundation hereunder or the termination of this Agreement by the Foundation or the City pursuant to the terms and provisions of this Agreement.  If the City is in default under this Agreement as provided in this Section 14(f) or is in default under any other provision of this Agreement, the Foundation, without regard to any limitations set forth elsewhere in this Agreement, shall have all of the rights and remedies available at law or equity under the laws of the State of Illinois or other applicable law, **but not punitive, consequential or other special damages, recovery of which is hereby waived by the Foundation.**

(g)  Mediation of Disputes.  If there is a dispute between the City and the Foundation in relation to the provisions of this Agreement (a "**Dispute**"), and such Dispute is not resolved within 15 days after same has arisen, each of the City and the Foundation shall have the right to submit such Dispute to non-binding mediation.  Mediation of any Dispute may be initiated by either party by such party delivering a written demand therefor to the other.  With respect to such mediation, the City and the Foundation shall, within ten days after delivery of such written notice to the other party, agree upon a mediator who is (a) a reputable person actively engaged in the commercial real estate industry for a continuous period of not less than ten years; and (b) not an affiliate or one who has had material business dealings with either party.  If the parties are unable to agree upon a mediator, a mediator having the qualifications set forth above shall be appointed by the American Arbitration Association office in Chicago, Illinois.  Such mediation shall occur within 30 days after the mediator has been agreed upon or appointed and shall occur at a mutually acceptable location in Chicago, Illinois. The costs of such mediation services shall be shared equally by the City and the

Foundation (but each party shall bear the cost of its own travel and attorneys' fees). Notwithstanding the provisions of this <u>Section 14(g)</u>, the Foundation and the City may each exercise all remedies to which it is entitled while contemporaneously pursuing mediation pursuant to this <u>Section 14(g)</u>.

15.     <u>Further Agreements by the City</u>.  In addition to the obligations required to be performed under this Agreement by the City at the Closing, the City agrees to perform such other acts, and to execute, acknowledge, and/or deliver subsequent to the Closing such other supporting instruments, documents and other materials as the Foundation may reasonably request in order to effectuate the consummation of the transactions contemplated in this Agreement.

16.     <u>Further Agreements by the Foundation</u>.  In addition to the obligations required to be performed under this Agreement by the Foundation at the Closing, the Foundation agrees to perform such other acts, and to execute, acknowledge, and/or deliver subsequent to the Closing such other instruments, documents, and other materials as the City may reasonably request in order to effectuate the consummation of the transactions contemplated in this Agreement.

17.     <u>Real Estate Commissions</u>.  Each party hereto represents to the other that it has not authorized any broker or finder to act on its behalf in connection with the transaction contemplated under this Agreement and that it has not dealt with any broker or finder purporting to act on behalf of any other party.  Each party hereto agrees to indemnify and hold harmless the other party from and against any and all claims, losses, damages, costs or expenses of any kind or character arising out of or resulting from any agreement, arrangement or understanding alleged to have been made by such party or on its behalf with any broker or finder in connection with this Agreement or the transaction contemplated hereby.  Notwithstanding anything to the contrary contained herein, this <u>Section 17</u> shall survive the Closing or any earlier termination of this Agreement.

18.     <u>Notice</u>.   Any notice or communication required or permitted under this Agreement shall be given in writing, sent by (a) personal delivery; (b) commercial courier or delivery service with proof of delivery; (c) United States regular, registered or certified mail, postage prepaid; or (d) confirmed electronic transmission, addressed as follows:

|  |  |
|---|---|
| If to the City: | City of Chicago<br>Department of Planning & Development<br>121 North LaSalle Street, Room 1000<br>Chicago, Illinois 60602<br>Attn: Commissioner<br>E-mail: _____ |
| with a copy to: | City of Chicago Department of Law<br>121 North LaSalle Street, Suite 600<br>Chicago, Illinois 60602<br>Attn: Real Estate and Land Use Division<br>E-mail: _____ |

if to the Foundation:       The Barack Obama Foundation
5235 S. Harper Court, Suite 1100
Chicago, Illinois 60615
Attn: Robbin Cohen
E-mail: rcohen@obama.org

with a copy to:       Seth R. Madorsky
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661-3693
E-mail: seth.madorsky@kattenlaw.com

or to such other address or to the attention of such other person as hereafter shall be designated in writing by the applicable party sent in accordance herewith. Any such notice or communication may be given by a party to this Agreement or by a party's attorney, and shall be effective when delivered during normal business hours. If delivery of a notice is refused, it shall be deemed to have been delivered at the time of such refusal of delivery.

19.   <u>Professional Fees</u>. If any party hereto institutes any action or proceeding against the other party with regard to this Agreement, the prevailing party in such action shall be entitled to recover from the losing party, in addition to the costs and expenses of and related to the suit, its actual reasonable attorneys' fees.

20.   <u>Survival of Representations and Warranties</u>. All representations and warranties made in this Agreement shall be continuing and shall be true and correct on and as of the Closing Date with the same force and effect as if made at that time, and all of the representations, warranties and covenants contained in this Agreement shall survive the Closing and shall not merge with the Use Agreement and shall not be affected by any investigation, verification or approval by any party hereto or by anyone acting on behalf of any such party.

21.   <u>Titles and Subtitles</u>. The titles of the articles, sections, and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

22.   <u>ENTIRE AGREEMENT</u>. THIS AGREEMENT, TOGETHER WITH ALL EXHIBITS ATTACHED HERETO, EMBODIES THE ENTIRE AGREEMENT BETWEEN THE PARTIES RELATIVE TO THE SUBJECT MATTER HEREOF, AND THERE ARE NO ORAL OR WRITTEN AGREEMENTS BETWEEN THE PARTIES, NOR ANY REPRESENTATIONS MADE BY EITHER PARTY RELATIVE TO THE SUBJECT MATTER HEREOF WHICH ARE NOT EXPRESSLY SET FORTH HEREIN.

23.   <u>Amendments</u>. This Agreement may be amended only by a written instrument executed by the City and the Foundation.

24.   <u>Waiver</u>. Neither this Agreement nor any provision hereof may be waived, discharged or terminated except as provided herein or by an instrument in writing signed by the party against which the enforcement of such waiver, discharge or termination is sought, and then only to the extent set forth in such instrument.

25.     <u>Assignability</u>. The Foundation may not assign its interest in and to this Agreement. The City may not assign its interest in and to this Agreement, except to another Governmental Authority, provided that any such assignment shall not relieve the City of its obligations hereunder.

26.     <u>Successors and Assigns</u>. This Agreement and all terms, provisions, covenants and conditions contained in this Agreement shall apply to, be binding upon and shall inure to the benefit of and be enforceable by each of the parties to this Agreement and the respective successors and permitted assigns of the parties to this Agreement.

27.     <u>Days and Time</u>. Any reference in this Agreement to a "day" or "days" shall mean a calendar day or days, and not a business day or days, unless the provision expressly refers to a "business" day or day. In the event that a day or date or the last day of a period provided for or referred to in this Agreement shall fall on a Saturday, Sunday or legal holiday in the City of Chicago, then such day or date or the last day of such period shall be automatically extended to the next day which is not a Saturday, Sunday or legal holiday in the City of Chicago. If the term "business day" is used in this Agreement, such term means any day which is not a legal holiday in the City of Chicago.

28.     <u>Time</u>. Time is of the essence of this Agreement.

29.     <u>Gender and Number</u>. Words of any gender used in this Agreement shall be held and construed to include any other gender, and words in the singular or plural number shall be held to include the other, unless the context otherwise requires.

30.     <u>Severability</u>. If any provision of this Agreement or the application thereof to any person or circumstance is invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

31.     <u>Counterparts; Electronic Signatures</u>. This Agreement and any modification or amendment to this Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument. Receipt of an executed signature page to this Agreement or any modification or amendment of this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof.

32.     <u>Rule of Construction Inapplicable</u>. The parties to this Agreement acknowledge and confirm that their respective attorneys have participated jointly in the review and revision of this Agreement and that this Agreement has not been written solely by counsel for one of the parties. The parties to this Agreement therefore stipulate and agree that the rule of construction to the effect that any ambiguities are to or may be resolved against the drafting party shall not be employed in the interpretation of this Agreement to favor either party against the other.

33.     <u>No Joint Venture</u>. Nothing contained in this Agreement between the parties is intended by the parties to create a partnership or joint venture between the parties to this Agreement and any implication to the contrary is hereby expressly disavowed. It is understood and agreed that this Agreement does not create a joint enterprise, nor does it appoint either party

to this Agreement as an agent of the other for any purpose whatsoever. Neither party to this Agreement shall in any way assume any of the liability of the other for acts of the other or obligations of the other.

34.    No Third-Party Beneficiaries.  Nothing in this Agreement is intended or shall be construed to confer upon any person or entity (other than the parties hereto and their respective successors and permitted assigns) any benefit, right, remedy or cause of action under or by reason of this Agreement.

35.    Governing Law; Venue.  THIS AGREEMENT SHALL BE GOVERNED AND INTERPRETED AND THE RIGHTS OF THE PARTIES TO THIS AGREEMENT GOVERNED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS APPLICABLE TO AN AGREEMENT EXECUTED, DELIVERED AND PERFORMED IN SUCH STATE.  Each party to this Agreement hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Northern District of Illinois, and, if such court does not have jurisdiction, to the courts of the State of Illinois in Cook, County, for the purposes of any action arising out of this Agreement, or the subject matter of this Agreement brought by any other party.  Each party hereto hereby agrees to venue in Chicago, Illinois.

36.    Delays or Omissions.  Except as otherwise provided herein to the contrary, no delay or omission to exercise any right, power or remedy inuring to any party to this Agreement upon any breach or default of any party under this Agreement shall impair any such right, power or remedy of such party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  All remedies either under this Agreement or by law or in equity afforded to the parties to this Agreement shall be cumulative and not alternative.

37.    Survival.  Each provision of this Agreement containing rights and obligations that by their nature require the payment of money or the performance of obligations after the Closing or termination of this Agreement shall survive such Closing or termination.

*(Signature Page Follows)*

Case: 1:18-cv-03424 Document #: 49-6 Filed: 11/21/18 Page 95 of 114 PageID #:1342

**IN WITNESS WHEREOF,** this Master Agreement is executed by the City and the Foundation as of the Effective Date.

**CITY OF CHICAGO**, an Illinois municipal corporation

By: _____

David L. Reifman
Commissioner of Planning & Development

**THE BARACK OBAMA FOUNDATION**, a District of Columbia non-profit corporation

By: _____
Name: _____
Its: _____

[(Sub)Exhibit "A" referred to in this Master Agreement with
The Barack Obama Foundation constitutes Exhibit "A"
to ordinance printed on pages 85887 and
85888 of this *Journal*.]

(Sub)Exhibit "B" referred to in this Master Agreement with The Barack Obama
Foundation printed on page 85972 of this *Journal*.]

[(Sub)Exhibit "C" referred to in this Master Agreement with The Barack Obama
Foundation constitutes Exhibit "D" to ordinance printed
on pages 85891 through 85934 of this *Journal*.]

[(Sub)Exhibit "D" referred to in this Master Agreement with The Barack Obama Foundation
constitutes (Sub)Exhibit "B" to Environmental Remediation and Indemnity
Agreement printed on page 85982 of this *Journal*.]

[(Sub)Exhibit "G" referred to in this Master Agreement with The Barack
Obama Foundation constitutes Exhibit "F" to ordinance printed
on pages 85973 through 85981 of this *Journal*.]

(Sub)Exhibit "E" and "F" referred to in this Master Agreement with The Barack Obama
Foundation read as follows:

*(Sub)Exhibit "E".*
(To Master Agreement With The Barack Obama Foundation)

*Pending And Threatened Claims.*

Protect Our Parks, LLC; Charlotte Adelman; Maria Valencia and Jeremiah Jurevis, Plaintiffs vs. Chicago Park District and City of Chicago, Defendants (1:18-CV-03434), filed May 14, 2018, United States District Court, Northern District of Illinois.

*(Sub)Exhibit "F".*
(To Master Agreement With The Barack Obama Foundation)

*Utility Relocation Work.*

(A)   Pre-Turnover Utility Relocation Work.  The City shall use best efforts by the date (the "Target Utility Relocation Date") that is the later to occur of (i) the __ day following receipt of the Pre-Turnover Governmental Determinations, and (ii) June 1, 2019, to:

    (1)   abandon, or cause to be abandoned, the 12-inch water main owned by the Park District, as depicted on the plan attached hereto as Schedule 1 (the "Utility Work Site Plan"), at no cost to the Foundation, provided that, if the Foundation elects to remove abandoned section(s) of the main within the Property, such removal shall be at the Foundation's sole cost and expense; and

    (2)   abandon, or cause to be abandoned, the Park District electrical ducts and equipment, as depicted on the Utility Work Site Plan, and then relocate such facilities outside the boundaries of the Property and/or within the 20-foot perimeter easement on the north and east boundaries of the Property (the "Utility Corridor"), as depicted on the Utility Work Site Plan, and release all associated easements and related rights encumbering the Property, all at no cost to the Foundation, provided that, if the Foundation elects to remove abandoned section(s) of the facilities within the Property, such removal shall be at the Foundation's sole cost and expense; and

So long as the City uses best efforts to complete the Pre-Turnover Utility Relocation Work until such work is completed, the City's failure to complete the foregoing Pre-Turnover Utility Relocation Work by the Target Utility Relocation Date shall not be deemed a default under this Agreement.

(B)  Other Utility Relocation Work.  All utility lines known to exist as of the Effective Date on, under or over any portion of the Property, other than those specified in paragraph (A), shall be abandoned or relocated either outside the boundaries of the Property or within the Utility Corridor, and all associated easements and related rights encumbering the Property shall be released, all at no cost to the Foundation, provided that, if the Foundation elects to remove abandoned lines within the Property, such removal shall be at the Foundation's sole cost and expense.  All work with respect to the utility lines described in this paragraph (B) shall be conducted in accordance with a schedule hereafter approved by the City and the Foundation (and, where applicable, the Park District), it being contemplated by the Foundation and the City that such work shall be performed following the Closing in a coordinated manner with the construction of the Presidential Center and the other Project Improvements.

(C)  Reuse of Existing Lines.  If the Foundation, in consultation with the City and/or the Park District, determines in its sole discretion that it wishes to utilize in connection with its Proposed Use any utility lines to be abandoned or relocated by or on behalf of the City pursuant to paragraphs (A) and (B) above, and the Foundation specifically waives the City's obligation to abandon or relocate any such utility line(s) in a written instrument expressly citing the waiver of a portion of the requirements of Section 5, subsections (l) and (m) of the Master Agreement, the City shall be relieved of that portion of the Utility Relocation Work so waived by the Foundation, and the Foundation and the City shall cooperate in completing such documentation with the applicable utility service provider necessary to permit such utilization.

(D)  Identification of Unknown Underground Utility Facility.  If additional underground utility facilities are identified during construction on the Property, the Foundation shall notify the City and the Park District, and the City and the Park District will determine if the facility is active or abandoned.  The City shall relocate active facilities outside the boundaries of the Property or within the Utility Corridor, at its cost.  The Foundation shall remove abandoned facilities, as it elects, at its cost.

[Schedule 1 referred to in this Utility Relocation Work printed on pages 85970 and 85971 of this *Journal*.]



(Proposed locations of utilities are depicted on page 2.)

**LEGEND**
—— OPC SHEETING
- - - OPC SITE LIMITS

**UTILITY FACILITIES**

FACILITY 1.  CHICAGO PARK DISTRICT 12 INCH WATER MAIN
FACILITY 2.  CHICAGO PARK DISTRICT ELECTRICAL DUCTS AND EQUIPMENT
FACILITY 3.  CHICAGO PARK DISTRICT 12 INCH SANITARY SEWER
FACILITY 4.  CITY OF CHICAGO STORM SEWER FOR EASTBOUND MIDWAY PLAISANCE
FACILITY 5.  CITY OF CHICAGO ELECTRICAL FACILITIES FOR TRAFFIC SIGNALS AND ROADWAY LIGHTING
FACILITY 6.  CITY OF CHICAGO 36 INCH WATER MAIN
FACILITY 7.  CITY OF CHICAGO STORM SEWER FOR CORNELL DRIVE
FACILITY 8.  CITY OF CHICAGO STORM SEWER FOR WESTBOUND MIDWAY PLAISANCE

SCALE IN FEET
0   100   200   300

EXHIBIT F - SCHEDULE 1
UTILITY WORK SITE PLAN

1 OF 2

09/15/2018

*(Sub)Exhibit "F" -- Schedule 1.*
*(To Utility Relocation Work)*
*(Page 1 of 2)*

*Utility Work Site Plan.*



UTILITY FACILITIES

FACILITY 1.  CHICAGO PARK DISTRICT 12 INCH WATER MAIN
FACILITY 2.  CHICAGO PARK DISTRICT ELECTRICAL DUCTS AND EQUIPMENT
FACILITY 3.  CHICAGO PARK DISTRICT 12 INCH SANITARY SEWER
FACILITY 4.  CITY OF CHICAGO ELECTRICAL FACILITIES FOR TRAFFIC SIGNALS AND ROADWAY LIGHTING
FACILITY 5.  CITY OF CHICAGO 36 INCH WATER MAIN
FACILITY 6.  CITY OF CHICAGO STORM SEWER FOR CORNELL DRIVE
FACILITY 7.  CITY OF CHICAGO STORM SEWER FOR WESTBOUND MIDWAY PLAISANCE

LEGEND
OPC SHEETING
OPC SITE LIMITS

0   100   200   300
SCALE IN FEET

2 OF 2

EXHIBIT F - SCHEDULE 2
PROPOSED LOCATIONS OF UTILITIES

10/31/2018

COMMUNICATIONS, ETC.

(Sub)Exhibit F — Schedule 1.
(To Utility Relocation Work)
(Page 2 of 2)

Proposed Locations Of Utilities.

85971

85972          JOURNAL--CITY COUNCIL--CHICAGO          10/31/2018

*(Sub)Exhibit "B".*
(To Master Agreement With The Barack Obama Foundation)

*Site Plan Of Property.*



*Exhibit "F".*
(To Ordinance)

*Environmental Remediation And Indemnity Agreement.*

This **ENVIRONMENTAL REMEDIATION AND INDEMNITY AGREEMENT** ("**Agreement**") is made on or as of ___ _____, 201__ (the "**Effective Date**"), by and between the **CITY OF CHICAGO**, an Illinois municipal corporation ("**City**"), acting by and through its Department of Planning and Development ("**DPD**") and its Department of Fleet and Facilities Management ("**2FM**"), and **THE BARACK OBAMA FOUNDATION**, a District of Columbia nonprofit corporation (the "**Foundation**"). The City and the Foundation shall be collectively referred to herein as the "**Parties**," and each individually as a "**Party**."

## RECITALS

A.       A core project of the Foundation is the planning and development of the Obama Presidential Center (the "**Presidential Center**"), which is designed as a campus consisting of four buildings and an underground parking facility, complemented by a plaza, play areas, pedestrian and bicycle pathways and other landscaped open space, as more particularly described in the Use Agreement (as hereinafter defined) to be executed by the City and the Foundation (collectively, the "**Presidential Center**"). The buildings include the Museum Building, the Forum Building, the Library Building and the Program, Athletic and Activity Center (as defined in the Use Agreement).

B.       The Foundation evaluated multiple proposed sites for the Presidential Center, including a site within Washington Park (the "**Washington Park Site**"), and a site within Jackson Park (the "**Jackson Park Site**").

C.       The Foundation ultimately selected the Jackson Park Site for the home of the Presidential Center, and the City has obtained title to the Jackson Park Site from the Chicago Park District ("**Park District**"). The Jackson Park Site is legally described on Exhibit A attached hereto.

D.       The City and the Foundation plan to enter into a use agreement with respect to the Jackson Park Site granting to the Foundation the right to construct and operate the Presidential Center (the "**Use Agreement**").

E.       The Parties agree that the Foundation (i) has considered environmental issues as one of the factors in evaluating the proposed sites for the Presidential Center; (ii) has conducted Phase I and limited Phase II environmental investigations to identify the likelihood of any contamination exceeding Residential Remediation Standards (as hereinafter defined) at the Jackson Park Site; and (iii) if such contamination is identified during investigation or construction activities, will remediate any contamination exceeding Illinois EPA's Site Remediation Program ("**SRP**") standards for residential properties as set forth in 35 Illinois Administrative Code ("**IAC**") Part 742 ("**Residential Remediation Standards**").

**NOW, THEREFORE**, in consideration of the covenants set forth in this Agreement, the Foundation and the City agree as follows:

1.       Incorporation of Recitals; Definitions. The above recitals are incorporated as part of this Agreement as though fully set forth herein. All terms used in this Agreement which are defined in the Illinois Environmental Protection Act ("**Act**"), 415 ILCS 5/1 et seq. or regulations

promulgated thereunder will, unless otherwise defined, have the meanings provided in the Act and regulations. For purposes hereof, the term "**Master Agreement**" shall mean that certain Master Agreement dated of even date herewith between the City and the Foundation.

2.      Environmental Investigation Prior to Site Selection. The Foundation performed an environmental investigation of both the Washington Park Site and the Jackson Park Site prior to selecting the Jackson Park Site pursuant to that certain Property Access Agreement dated as of May 20, 2015, between the Foundation, the City and Park District. The Foundation has delivered to 2FM's Bureau of Environmental, Health and Safety Management ("**City's Environmental Bureau**") all Environmental Documents (as hereinafter defined) associated with its investigation of the Jackson Park Site, as identified in Exhibit B attached hereto, including an update (dated not more than 180 days prior to the City's acquisition of the Jackson Park Site from the Park District, and compliant with ASTM E-1527-13) to the Phase I Environmental Site Assessment prepared by Environmental Design International ("EDI") and dated January 12, 2018.

3.      Further Testing of the Jackson Park Site.  If the Foundation determines that additional sampling is needed to identify the presence of, or characterize the extent of, any contamination above the Residential Remediation Standards, or if during construction of the Presidential Center or the other Project Improvements (as defined in the Use Agreement) the Foundation discovers any environmental conditions at the Jackson Park Site, such as the presence of Hazardous Material (as defined in the Master Agreement) or an underground storage tank, that were in existence prior to the execution of the Use Agreement, then the Foundation shall notify the City and submit a proposed scope of work for supplemental testing. The City shall have the right to review and reasonably approve any proposed scope of work, it being the goal of the Parties that any contamination discovered on the Jackson Park Site be remediated to Residential Remediation Standards.  If the City and the Foundation fail to reach agreement regarding any additional sampling, including the scope of work to identify or characterize any environmental conditions at the Jackson Park Site, then the Parties shall attempt to resolve the dispute through mediation as provided by Paragraph 10. The City has pre-approved the Foundation's request to perform six additional soil samples prior to the execution of the Use Agreement, subject, however, to (a) the City's right to review and reasonably approve the scope of work to be submitted to the City by EDI, and (b) prior approval of the National Park Service and the Federal Highway Administration of any physical work to be conducted on or in the Jackson Park Site by or on behalf of the Foundation during the period preceding the City's receipt of the Pre-Turnover Governmental Determinations (as defined in the Master Agreement). The City, as owner of the Jackson Park Site and applicant in respect of the Pre-Turnover Governmental Determinations, will initiate communications with the National Park Service and the Federal Highway Administration in connection with seeking approval of any such physical work, and the Parties will cooperate in support of the efforts to obtain such approvals.

4.      Remediation. If any contamination above Residential Remediation Standards is identified or discovered pursuant to Paragraph 3, then the Foundation shall complete all investigation, excavation, removal, response, disposal, remediation and other activities necessary to achieve the Residential Remediation Standards ("**Remediation Work**"). The Parties agree that the Remediation Work shall be based on: (a) risk-based cleanup objectives for residential use; and (b) a soil management plan that addresses the future uses of the Jackson Park Site for the construction and operation of the Presidential Center and the other Project Improvements, which

will include, but are not limited to, below-ground supports and/or basement areas and green spaces ("**Property Uses**"). The Parties acknowledge that, in addition to any risk-based residential standard, due to the Property Uses, it may be necessary to remediate the Jackson Park Site to specific soil remedial objectives that shall guarantee the suitability of the Jackson Park Site for the Property Uses. Neither Party shall be required to agree to any conditions, including engineered barriers or institutional controls that in its reasonable judgment may impair the Property Uses. Notwithstanding the foregoing, the Parties agree to rely upon use and maintenance of engineered barriers and other institutional controls acceptable to the Illinois Environmental Protection Agency ("**Illinois EPA**") under its voluntary Site Remediation Program ("**SRP**") when compatible with design and use goals, and the Parties agree that the City's ordinance prohibiting installation and use of potable water wells is a proper institutional control for any No Further Remediation letter(s) issued by the Illinois EPA SRP pursuant to this Agreement.

5.     Performance of Remediation Work. The Foundation shall perform all Remediation Work in compliance with all applicable laws and regulations, and in a cost-effective and commercially reasonable manner so as to minimize Incremental Costs (as hereinafter defined in Paragraph 8 of this Agreement). At a minimum, any soil or soil gas not meeting the requirements of 35 IAC Section 742.305 must be removed; any underground storage tanks ("**USTs**") must be removed and closed in accordance with applicable regulations, including Title 41 of IAC Part 175; and any identified leaking USTs must be properly addressed in accordance with 35 IAC Part 734. The Foundation shall consult with the City's Environmental Bureau regarding the proposed scope, costs and methodology of all Remediation Work. The City and its representatives shall have the right to be present at the Jackson Park Site to observe the Remediation Work. In performing the Remediation Work, the Parties agree:

     (a)     Prior to commencing the Remediation Work, the Foundation shall prepare and deliver to the City's Environmental Bureau reasonable, good faith estimates of the Incremental Costs to complete the Remediation Work ("**Cost Estimates**"). The Cost Estimates shall be based upon bid packages or final engineering and architectural plans for the Presidential Center and the other Project Improvements and bid packages or final bids from the construction manager and subcontractors who will perform the work or, if such Remediation Work is required due to the discovery of contamination during construction activities, good faith estimates from the construction manager or subcontractors already on site, and such good faith estimates shall be reviewed and reasonably approved by the City. The Foundation shall cooperate and consult with the City's Environmental Bureau in developing the Cost Estimates, and shall provide the City's Environmental Bureau with regular updates of projected expenses for the Remediation Work. After developing the Cost Estimates, the Foundation shall notify the City's Environmental Bureau of any anticipated increases in the Cost Estimates prior to incurring such expenses. If the City and the Foundation fail to reach agreement regarding any Cost Estimates, then the Parties shall attempt to resolve the dispute through mediation as provided by Paragraph 10.

     (b)     The Foundation shall keep the City's Environmental Bureau informed of the status of the Remediation Work, including but not limited to providing the City's Environmental Bureau with copies of all reports, surveys, field data, correspondence and analytical results prepared by or for the Foundation (or otherwise obtained by the

Foundation) regarding the condition of the Jackson Park Site, including, without limitation, if applicable, any written communications delivered to or received from the Illinois EPA or other regulatory agencies with respect to the Remediation Work (collectively, "**Environmental Documents**").

(c)     The Foundation shall be solely responsible for the management, transportation, treatment, handling, storage and disposal of all wastes generated at the Jackson Park Site in connection with the Remediation Work, including, without limitation, completion of all manifests and other shipping and disposal documents. The City shall be deemed the generator on all manifests for the disposal of Hazardous Material and special waste resulting from the Remediation Work. The City's Environmental Bureau shall have the right to approve both disposers and disposal facilities, which approval shall not be unreasonably withheld. The Foundation shall furnish to the City's Environmental Bureau copies of all manifests and other information necessary to enable the City to fulfill its obligations as generator.

(d)     If within a reasonable time after discovery of contamination, the City determines that any portion of the Jackson Park Site should be enrolled in the SRP: (i) the Foundation shall enroll the Jackson Park Site (or the applicable portion thereof) in the SRP, and perform all necessary and proper work to obtain a Remedial Action Plan approval letter ("**RAP Approval Letter**") that covers all areas of the Jackson Park Site where environmental remediation may be required to achieve the Residential Remediation Standards; (ii) the City's Environmental Bureau shall have the right to review in advance and reasonably approve: (A) such scope, costs and methodology; and (B) all documents submitted to Illinois EPA under the SRP Program, as amended or supplemented from time to time, including, without limitation, the four documents that the Foundation, as the Remedial Applicant, shall be required to submit to the Illinois EPA for approval: the Site Investigation Report, the Remedial Objectives Report, the Remedial Action Plan, and the Remedial Action Completion Report (collectively, the "**SRP Reports**"); (iii) the Parties shall cooperate with Illinois EPA, including any Review and Evaluation Licensed Professional Engineer ("**RELPE**") approved by Illinois EPA, in its oversight of the investigation and any remediation; (iv) the Foundation shall ensure that all requirements of the SRP are satisfied and all information required for preparation of the Remedial Action Completion Report is collected during construction in an organized and timely manner, including, without limitation, all load tickets, gate receipts, waste manifests, disposal records, analytical data, permits, field logs, photographs and survey information for inclusion in the Remedial Action Completion Report.

6.     Community Relations. The Parties shall cooperate to inform the community as the activities contemplated hereunder progress and are completed.

7.     Indemnification.

(a)     The Foundation's Indemnification of the City. The Foundation shall indemnify, defend, and hold the City, and its respective affiliates, agents, employees, and invitees, harmless from any claims, loss, liability, damages or expense, including those arising from any property damage or personal injury, in each case caused by or arising from

activities hereunder of the Foundation and its employees, consultants, contractors, subcontractors, and agents, except to the extent of claims, loss, liability, damages or expense arising from the intentional acts or willful misconduct of the City, or any employee or agent of the City acting within the scope of its agency.

(b)      <u>The City's Indemnification of the Foundation</u>. The City shall indemnify, defend, and hold the Foundation and its respective affiliates, agents, employees and invitees, harmless from any claims, loss, liability, damages or expense, including those arising from any property damage or personal injury, in each case caused by or arising from activities hereunder of the City, and its employees, consultants, contractors, subcontractors, and agents, except to the extent of claims, loss, liability, damages or expense arising from the intentional acts or willful misconduct of the Foundation, or any employee or agent of the Foundation acting within the scope of its agency.

8.      <u>Reimbursement of Incremental Costs of Remediation and SRP Expenses</u>.

(a)      The City shall reimburse the Foundation for the following reasonable, necessary and documented costs:

(i)      environmental investigation costs of up to $75,000 for such costs incurred prior to the date hereof; and thereafter

(ii)      if the City determines that any portion of the Jackson Park Site shall be entered into the SRP, costs of (A) enrolling the Jackson Park Site in the SRP, (B) preparing the Comprehensive Site Investigation Reports, Remedial Objectives Reports, Remedial Action Plans and Remedial Action Completion Reports (collectively, **"CSIR/ROR/RAP/RACR"**), (C) submittal of CSIR/ROR/RAP/RACR to Illinois EPA and development of responses to Illinois EPA's comments and requests, including consulting fees and any SRP program and oversight fees, and (D) negotiation, review and filing of NFR Letter(s).; and

(iii)      Incremental Costs (as hereinafter defined) of the Remediation Work.

(b)      Actions by any RELPE shall be deemed to be actions of Illinois EPA, provided the City will not reimburse the Foundation for the cost of retaining a RELPE. Reimbursement of costs shall be due to the Foundation within 30 days of the Foundation's delivery of invoices or other documentation of costs to the City.

(c)      The term **"Incremental Costs"** means the additional costs the Foundation shall incur to construct the Presidential Center and the other Project Improvements attributable to the Remediation Work. These are costs the Foundation would not ordinarily incur but for the pre-existing environmental condition of the Jackson Park Site, including:

(i)      site investigation, laboratory analysis and reporting incurred due to the presence or suspected presence of contamination;

(ii)    development of a soil management plan for any reuse of contaminated soils onsite;

(iii)    incremental costs for (A) contaminated soil excavation, (B) contaminated soil hauling, (C) contaminated soil disposal, (D) dewatering of construction excavations, if the water needs to be treated or disposed of off-site; (E) in areas in which contaminated soil is removed, (1) clean fill sourcing (inclusive of Illinois EPA soil sampling requirements, laboratory analysis, and reporting costs, including such costs incurred before the soil arrives at the site), (2) clean fill hauling, placement, and compaction if not otherwise required for construction and (3) contractor tracking for, and reporting of, contaminated soil and related materials removed from the Jackson Park Site;

(iv)    construction of landscape (green space) barriers and other engineered barriers (such as parking lots or building foundations) in areas containing contaminated soil unless any such barriers would have been constructed as part of the Presidential Center or other applicable Project Improvements;

(v)    installation of soil gas barriers or vapor intrusion systems, and

(vi)    oversight of contaminated soil and material removal, as well as oversight of the resulting clean fill sourcing and placement.

(d)    The Foundation acknowledges and agrees that the term "Incremental Costs" does not include the costs of geotechnical sampling of fill material; erosion and sediment controls required for normal construction activities, including permits; storm water management plan preparation and implementation, including permits, unless such plan is required as a result of the environmental condition of the Jackson Park Site; attorney fees; delay or other consequential damages or the Foundation's in-house costs. The term also does not include costs associated with (i) the introduction of any Hazardous Material on, in, under or about the Jackson Park Site by the Foundation or its contractors, subcontractors or consultants (the "**Foundation Parties**"); (ii) any failure of the Foundation Parties to comply with any applicable laws or regulations or any permits issued thereunder; (iii) any failure of the Foundation Parties to comply with any obligation under this Agreement; (iv) the negligent exacerbation of any pre-existing environmental conditions by the Foundation Parties; and (v) any actual or alleged illness, disability, injury or death of any employee, agent, representative or invitee of the Foundation Parties, arising out of or allegedly arising out of exposure to any Hazardous Material now existing or hereafter introduced on, in, under or about the Jackson Park Site, where such exposure is attributable to the operations or activities of the Foundation Parties. Materials removed for geotechnical purposes are not considered Incremental Costs except as defined above.

9.    Jackson Park Site Access. The City shall grant the Foundation and its contractors and subcontractors access to the Jackson Park Site to perform activities contemplated hereunder pursuant to the terms of a separate Property Access Agreement among the Foundation, the City

and the Park District.

  10. <u>Dispute Resolution</u>. In the event that the Foundation and the City are unable to resolve a dispute under Paragraph 3 or Paragraph 5(a) within seven (7) days or another mutually agreed time period ("**Negotiation Period**"), then, at the written request of either Party, the Parties shall attempt to resolve the dispute as expeditiously as possible through confidential mediation with a third party consultant with expertise in the subject matter area of the dispute ("**Designated Consultant**"), who will review both Parties' positions. To select the Designated Consultant, the Foundation and the City shall informally agree on the selection of the Designated Consultant or, if the Foundation and the City are unable to agree on the Designated Consultant within seven (7) days after written notice from one Party to the other requesting mediation or another mutually agreed time period, each of the Foundation and the City shall select one (1) third party consultant with expertise in the subject matter area of the dispute and those two (2) consultants shall jointly select a third consultant with expertise in the subject matter area of the dispute and such third consultant shall act as the Designated Consultant hereunder. The Designated Consultant shall attempt to resolve the dispute within ten (10) days after being retained, based on review of the documents submitted by each Party in support of its position and a meeting with the Parties. The Designated Consultant shall not have worked for either the Foundation or the City within the last eighteen (18) months. Each Party shall bear its own fees and expenses attributable to the mediation, provided, however, that the costs, fees and expenses attributable to the Designated Consultant shall be borne equally (50/50) by the Foundation and the City. In the event either the Foundation or the City disagree with the Designated Consultant's resolution of a dispute involving $250,000 or more, either Party may seek judicial relief for the purpose of resolving such dispute. The Designated Consultant's decision in matters involving lesser amounts shall be binding upon the Parties.

  11. <u>Notices</u>. Any notice or communication required or permitted under this Agreement shall be given in writing, sent by (a) personal delivery; (b) commercial courier or delivery service with proof of delivery; (c) United States regular, registered or certified mail, postage prepaid; or (d) confirmed electronic transmission, addressed as follows:

| | |
|---|---|
| If to the City: | City of Chicago |
| | Department of Fleet & Facilities Management |
| | 30 North LaSalle Street, Suite 300 |
| | Chicago, Illinois 60602 |
| | Attn: Commissioner |
| | E-mail: _____ |
| with a copy to: | City of Chicago Department of Law |
| | 121 North LaSalle Street, Suite 600 |
| | Chicago, Illinois 60602 |
| | Attn: Real Estate and Land Use Division |
| | E-mail: _____ |
| if to the Foundation: | The Barack Obama Foundation |
| | 5325 South Harper Court, Suite 1140 |
| | Chicago, Illinois 60615 |

Attn: Robbin Cohen
E-mail: rcohen@obama.org

with a copy to:        Seth R. Madorsky
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661-3693
E-mail: seth.madorsky@kattenlaw.com

or to such other address or to the attention of such other person as hereafter shall be designated in writing by the applicable Party sent in accordance herewith. Any such notice or communication may be given by a Party to this Agreement or by a Party's attorney, and shall be effective when delivered during normal business hours. If delivery of a notice is refused, it shall be deemed to have been delivered at the time of such refusal of delivery.

12.     Governing Law; Venue. This Agreement shall be governed by the laws of the State of Illinois, and may not be amended except by the Parties' written agreement. The Parties hereby irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the courts of the State of Illinois or the United States located in the City of Chicago, Illinois for any actions, suits or proceedings arising out of or relating to the terms of this Agreement and the transactions contemplated hereby, and agree not to commence any action, suit or proceeding relating thereto except in such courts.

13.     Authority. Each Party confirms to the other Party that the person signing this Agreement on its behalf has the authority to execute and bind such Party to the terms of this Agreement.

14.     Counterparts. This Agreement may be executed in any number of counterparts, all of which together shall constitute one original Agreement. Facsimile or electronic signatures shall have the same force and effect as original signatures.

15.     Legal Relationship. This Agreement does not create any legal relationship among the Parties, such as a joint venture or partnership.

16.     Waiver. The waiver by a Party of the performance of any covenant or condition by another Party shall not invalidate this Agreement, nor shall it be considered a waiver by the Party of any other covenant or condition under this Agreement.

17.     Severability. In the event that any provision or provisions of this Agreement are deemed unenforceable, the remaining provisions shall remain in full force and effect.

**IN WITNESS WHEREOF,** this Environmental Remediation and Indemnity Agreement is executed by the City and the Foundation as of the Effective Date.

**CITY OF CHICAGO,** an Illinois municipal corporation

By: _____
      David L. Reifman
      Commissioner
      Planning and Development


By: _____
      David J. Reynolds
      Commissioner
      Fleet and Facilities Management

**THE BARACK OBAMA FOUNDATION,** a District of Columbia non-profit corporation

By: _____
      Name: _____
      Its: _____


[(Sub)Exhibit "A" referred to in this Environmental Remediation and Indemnity Agreement with The Barak Obama Foundation constitutes Exhibit "A" to ordinance printed on pages 85887 and 85888 of this *Journal*.]


(Sub)Exhibit "B" referred to in this Environmental Remediation and Indemnity Agreement with The Barak Obama Foundation reads as follows:

85982                    JOURNAL--CITY COUNCIL--CHICAGO                    10/31/2018

*(Sub)Exhibit "B".*
(To Environmental Remediation And Indemnity Agreement
With The Barack Obama Foundation)

*List Of Environmental Documents.*

| # | Document Name | Issuance Date | Prepared For | Prepared By | Notes |
|---|---|---|---|---|---|
| 1 | Phase I Environmental Site Assessment Report | 12-Nov-2014 | The University of Chicago | Environmental Design International, Inc. | Report based upon UofC site proposal boundary |
| 2 | Draft Limited Phase I Environmental Site Assessment Report | 7-July-2015 | The Obama Foundation | E. Cooney Associates, Inc. | Report based upon UofC site proposal boundary |
| 3 | Subsurface Exploration and Preliminary Geotechnical Engineering Report | 22-Sept-2015 | The Obama Foundation | GEI Consultants, Inc. | Report based upon UofC site proposal boundary |
| 4 | Draft Limited Phase II Environmental Site Assessment Report | 29-Dec-2015 | The Obama Foundation | E. Cooney Associates, Inc. | Report based upon UofC site proposal boundary |
| 5 | Phase I Environmental Site Assessment Report | 12-Jan-2018 | The Obama Foundation | Environmental Design International, Inc. | Report based upon Exhibit A Legal Description |
| 6 | Phase II Environmental Site Assessment Report | 12-Jan-2018 | The Obama Foundation | Environmental Design International, Inc. | Report based upon Exhibit A Legal Description |
| 7 | Update to Phase II Environmental Site Assessment Report | 22-Aug-2018 | The Obama Foundation | Environmental Design International, Inc. | Report based upon Exhibit A Legal Description |

*(Sub)Exhibit "G".*
(To Ordinance)

*Depiction Of Road Closures.*



*Exhibit "H"-1.*
(To Ordinance)

*Description Of Transportation Improvements.*

- **Lake Shore Drive:** Lake Shore Drive from 57th Street to Hayes Drive would be widened to the west by approximately 11' to provide a third southbound lane. This segment of roadway is currently unbalanced, with two southbound lanes and three northbound lanes. Additionally, bridge modifications are required at the 63rd Street underpass, the 59th Street underpass and the bridge over the 59th Street inlet to accommodate the widening. The intersections of Lake Shore Drive with 57th Street, Science Drive, and Hayes Drive would also require modification to accommodate the third southbound lane.

- **Hayes Drive:** Hayes Drive is currently one through lane and one parking lane in each direction. To increase capacity on Hayes Drive while minimizing parkland impacts, existing parking would be removed on Hayes Drive from Lake Shore Drive to Cornell Drive to provide two through lanes in each direction. Modifications are needed at the Lake Shore Drive/Coast Guard Drive, Richards Drive and Cornell Drive intersections to accommodate the additional through lanes as well as to accommodate the proposed closure of Cornell Drive north of Hayes Drive. The existing triangular, stop-controlled intersection at Hayes Drive and Richards Drive would be reconfigured to create a signalized T-intersection. Hayes Drive would be realigned at Cornell Drive to provide a through movement for predominant travel along the east and south legs through the intersection. The existing portion of Hayes Drive between Stony Island Avenue and Cornell Drive would be realigned to create a signalized T-intersection with the realigned Hayes Drive and would be widened to accommodate new turn lanes.

- **Stony Island Avenue:** To accommodate diverted traffic from the roadway closures and provide operational and mobility improvements, Stony Island would need to be widened from 59th Street to 68th Street.

  - Stony Island Avenue from 59th Street to 65th Street would be widened up to 20' to the east to provide a second through lane in each direction. The east curb lane area in front of the proposed OPC from 62nd Street to 60th Street would be 10 feet wide to accommodate bus loading and unloading.

  - Stony Island Avenue from 65th to 68th Streets would be widened up to 30' to the east to provide a consistent cross section with Stony Island further south, including three northbound lanes and four southbound lanes separated by a raised median, and on-street parking on the west side.

- All intersections on Stony Island Avenue from 59th to 68th Streets would be reconfigured to accommodate the roadway widening and provide additional turn lanes. To consolidate the four closely-spaced traffic signals on Stony Island Avenue at 60th Street, 59th Street and eastbound and westbound Midway Plaisance, westerly access at the intersections of 59th and 60th Streets would be converted to right-in/right-out only and the traffic signals would be removed. The removal of these traffic signals will improve safety and reduce congestion. The existing stop-controlled intersection at Stony Island Avenue/64th Street would be converted to a signalized intersection to enhance pedestrian safety and maintain traffic progression through interconnected signals on Stony Island Avenue. The intersection of 67th Street and Cornell Drive, adjacent to the intersection of 67th Street and Stony Island Avenue, would be removed.

- **Cornell Drive:** The three-lane, southbound-only segment of Cornell Drive from south of Hayes Drive to Stony Island Avenue would be widened up to 14' to accommodate two-way traffic and provide two lanes in each direction separated by a barrier median.

- **Midway Plaisance:** The westbound segment of Midway Plaisance would be widened up to 20' to accommodate two-way traffic and provide two lanes in each direction.

Shared-use underpasses for pedestrians and bicyclists are proposed as continuations of existing CPD trails within Jackson Park as envisioned in the SLFP. These underpasses enhance connectivity through the park and to the lakefront, as well as improve traffic safety and operations on the roadway overhead. The locations for new grade-separated pedestrian and bike connections include:

- At the intersection of Hayes Drive/Cornell Drive/63rd Street;
- On Hayes Drive between Richards Drive and Lake Shore Drive;
- On Jeffery Avenue between Marquette Drive and 67th Street; and
- At the intersection of South Shore Drive and 67th Street.

Case: 1:18-cv-03424 Document #: 49-6 Filed: 11/21/18 Page 114 of 114 PageID #:1361

*Exhibit "H"-2.*
(To Ordinance)

*Depiction Of Transportation Improvements.*

