IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINIOS,
EASTERN DIVISION

| | | |
|---|---|---|
| Protect Our Parks, Inc.; Charlotte Adelman; | ) | |
| Maria Valencia and Jeremiah Jurevis; | ) | No. 18-cv-03424 |
| Plaintiffs, | ) | |
| v. | ) | Honorable John Robert Blakey |
| | ) | |
| Chicago Park District and City of Chicago, | ) | Jury Demanded |
| Defendants. | ) | |

**<u>PLAINTIFF'S RESPONSE TO DEFENDANTS' MEMORANDUM IN SUPPORT OF
THEIR MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION
AND, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS</u>**

<u>/s/ Mark D. Roth</u>
Mark D. Roth

Roth Fioretti, LLC
Mark Roth
Robert Fioretti
Edward Campbell
311 S. Wacker Drive, Suite 2470
Chicago, IL 60606
Phone: (312) 922-6262
Fax: (312) 922-7747
Email: <u>mark@rothfioretti.com</u>
   <u>Rwfchicago@yahoo.com</u>
   <u>Ed@rothfioretti.com</u>

## TABLE OF CONTENTS

Page No.

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS .......................................................................................2

ARGUMENT .........................................................................................................11

I.     DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION SHOULD BE DENIED ................................................11

     A.    Plaintiffs Have Article III Standing To Protect Their State Law Property Interests ...........................................................................................12

     B.    Plaintiffs Have Standing Based on Aesthetic and Environmental Harm to Jackson Park................................................................................14

     C.    Plaintiffs Have Standing to Challenge Chicago's Unconstitutional Expenditure of Municipal Taxpayer Funds...........................................................15

II.    DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS SHOULD BE DENIED IN ITS ENTIRETY..................................................................17

     **A.**    **Plaintiffs' Due Process Claim States A Cause Of Action**..........................17

         1.)    Plaintiffs' Have State Law Property Interests...............................18

         2.)    Plaintiffs State a Claim For Deprivation of Their Property Rights Without Due Process of Law.............................................22

         3.)    The Plaintiffs' Due Process Violation is Not Dependent on the City and Park District's Blatant Violations of State Law.........................24

     B.    **Plaintiffs State a Claim for Public Trust Violation**...............................25

         1.)    The Museum Act Is No Defense To The Plaintiffs' Claim For Public Trust Violation; To The Contrary, Defendants Are In Violation Of The Museum Act, Which Wholly Supports And Strengthens The Plaintiffs' Claim...........................................................................................25

         2.)    The Defendants' Use Agreement Is No Defense To The Plaintiffs' Claim For Public Trust Violation; It Likewise Wholly Supports And Strengthens The Plaintiffs' Claim.............................................27

                 a. The lack of any rent obligation is a windfall to the Foundation that it is not jutified by its transfer of the Subject Improvements to the City, particularly since the Museum Act already grants municipalities a reversionary ownership interest on top of the benefits accorded pursuant to a legitimate lease…………..……..27

b. The Use Agreement otherwise confers greater material rights upon the Foundation and fewer to the City that would a legitimate lease compliant with the Museum Act……………………………...29

c. As evidenced by the terms of Use Agreement, the OPC is expected to generate profits for the Foundation that it can use to fund its private endeavors and objectives. ………………………31

3.)   None Of The Case Authority Pertaining To The Public Trust Doctrine Sanctions Dismissal Of This Lawsuit On The Pleadings, And Indeed The Relevant Case Authority Favors Plaintiffs………………………………32

4.)   Consequently, the Court Should Not Grant Judgment on the Pleadings to the Defendants on the Plaintiffs' Count II for Breach of the Public Trust…………………………………………………………………...34

**C.    Plaintiffs' Claim that the Defendants' Actions are Ultra Vires States a Cause of Action**…………………………………………………………36

1.)   The City Has No Authority to Transfer the  Jackson Park Site to the Park District on the Terms at Issue………………………………….......36

2.)   The Transaction Advanced by the Defendants is Ultra Vires because  the Use Agreement at Issue is Not a Lease, and Therefore the Museum Act Does Not Apply to the Use Agreement…………………...41

**D    Plaintiff's First Amendment Claim States a Cause of Action**………………..42

**E.    Plaintiffs' Claim That The Museum Act Is Unconstitutional**

**Special Legislation States a Cause of Action**…………………………………48

CONCLUSION.........................................................................................................................49

## <u>TABLE OF AUTHORITIES</u>

**Page No.**

*Aetna v. U.S.*,
444 U.S. 164, 179-80 and n.11 (1979) ................................................20

*Alexander v. City of Chi.*,
994 F.2d 333, 336 (7th Cir. 2012) .......................................................1

*Alschuler v. Dept. of HUD*,
686 F.2d 472, 476-77 (7th Cir. 1982) ................................................15

*Alt. Fuels, Inc. v. Director of Il. EPA*,
215 Ill. 2d 219, 238 (2004) ................................................................37

*Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009) .....................................................................1

*Bd. of Regents v. Roth*,
408 U.S. 564, 577 (1972) ..............................................................18,22

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, 570 (2007) .....................................................................1

*Big Sky Excavating, Inc. v. Ill. Bell Tel. Co.*,
217 Ill. 2d 221, 235 (2005) ...........................................................47,48

*Block v. Ill. Sec. State*,
2013 IL App (5th) 120157 ............................................................47,48

*Booth v. Lemont Mfg. Corp.*,
440 F.2d 385, 386 n2 (7th Cir. 1971) ................................................13

*Buttitta v. City of Chi.*,
9 F.3d 1198, 1201 (7th Cir. 1993). ...............................................17,18

*Carlson v. U.S.*,
126 F.3d 915, 924-25 (7th Cir. 1997) ................................................20

*Clay v. Ft. Wayne Cnty. Sch.*,
76 F.3d 873, 879 (7th Cir. 1996). ................................................16,17

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332, 349 (2006) ..................................................................16

*Daniel v. Cook Cnty.*,
833 F.3d 728, 742 (7th Cir. 2016). ............................................................................10

*Ezekiel v. Michel,*
66 F.3d 894, 897 (7th Cir. 1995) ..................................................................................1

*Fiala v. Wasco Sanitary Dist.,*
2014 Ill. App. Unpub. LEXIS 916 .................................................................13,18,19,20

*Freedom From Religion Found., Inc. v. Zielke,*
845 F.2d 1463, 1470 (7th Cir. 1988). ........................................................................16

*Friends of the Parks v. Chi. Park Dist.,*
786 N.E.2d 161 (N.D. Ill. 2003) .............................................................................13,14

*Friends of the Parks v. Chi. Park District,*
160 F. Supp. 3d 1060 (N.D. Ill. 2016) ........................................................................23

*Friends of the Parks v. Chi. Park District,*
No. 14 cv 9096, 2015 U.S. Dist. LEXIS 30291 (N.D. IL March 12, 2015) ...........12,18

*GE Capital Corp. v. Lease Res. Corp.,*
128 F.3d 1074, 1081 (7th Cir. 1997) ........................................................................8,10

*Hecker v. Deere & Co.,*
556 F.3d 575, 582-83 (7th Cir. 2009) ........................................................................10

*Hinrichs v. Speaker of House of Rep. of Ind. Gen. Assembly,*
506 F.3d 584, 600 fn.9 (7th Cir. 2007) ......................................................................16

*Hoover v. Wagner,*
47 F.3d 845, 847 (7th Cir. 1995). ..............................................................................12

*J.H. v. Johnson,*
346 F.3d 788, 793 (7th Cir. 2003) ..............................................................................25

*Janus v. AFSCME Council 31,*
585 U.S., 138 S.Ct. 2448, 2459-60 (2018). ..........................................................44,45

*Johanns v. Livestock Mktg. Ass'n.,*
544 U.S. 550, 558-62 (2005) ......................................................................................45

*Keller v. State Bar of Cal.,*
496 U.S. 1 (1990) ........................................................................................................45

*LaBella Winnetka, Inc. v. Vill. of Winnetka*,
628 F.3d 937, 943-44 (7th Cir. 2010). ...............................................17,18

*Lake Michigan Fed'n v. U.S. Army Corps of Engin'rs*,
742 F. Supp. 441 (N.D. Ill. 1990) ...............................................13,14,34

*Lujan v. Ezekiel of Wildlife*,
504 U.S. 555, 560-61 (1992). ...............................................11,12

*Moline Sch. Dist. No. 40 Bd. of Educ. v. Quinn*,
2016 IL 119704. ...............................................48,49

*New Mexicans for Bill Richardson v. Gonzales*,
64 F.3d 1495, 1500 (10th Cir. 1995). ...............................................42,43

*O'Brien v. Vill. of Lincolnshire*,
2018 U.S. Dist. LEXIS 207356 (N.D. Ill. December 7, 2018) ...............................................17,46

*Paepcke v. Public Bldg. Com.*,
46 Ill. 2d 330, 341-42 (1970) ...............................................passim

*Papasan v. Allain*,
478 U.S. 265, 283 (1986). ...............................................1

*People ex rel. Scott v. Chi. Park District*,
66 Ill. 2d 65, 78-80 (1976). ...............................................20,36

*People v. CT&T Co.*,
75 Ill. 2d 479, 492-93 (1979) ...............................................20

*Peterson v. Chi. Plan Comm'n*,
302 Ill. App. 3d 461 (1998) ...............................................20,21

*Pisciotta v. Old Nat'l Bancorp*,
499 F.3d 629, 633 (7th Cir. 2007) ...............................................1

*Reichelderfer v. Quinn*,
287 U.S. 315 (1932) ...............................................21

*Residences at River Bend Condo. Assn'n. v. City of Chi.*,
5 F.3d 982 (N. D. Ill. 2013) ...............................................21

*Sierra Club v. Morton*,
405 U.S. 727 (1972) ...............................................12,14

*South East Lake View Neighbors v. Dept. of HUD*,
685 F.2d 1027, 1034 (7th Cir. 1982). ........................................................15

*Stoner Mfg. Corp. v. YMCA*,
13 Ill. 2d 162 (1952). ..............................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308, 322 (2007). ......................................................................1,2

*TinleySparks, Inc. v. Vill. of Tinley Park*,
181 F. Supp. 3d 548 (N.D. Ill. 2015). ........................................................16

*Triple G Landfills, Inc. v. Bd. of Comm. of Fountain Cnty., Ind.*,
977 F.2d 287, 288-89 (7th Cir. 1992) ........................................................42

*U.S. v. SCRAP*
412 U.S. 669 (1973). ..............................................................................15

*U.S. v. United Foods*,
533 U.S. 405 (2001) ............................................................................44,45

*Village of Riverside v. MacLain*,
210 Ill. 308 (1908) ................................................................................21

*Yeadon Fabric Domes, LLC v. Roberts Env'l. Cntrl. Corp.*,
2016 U.S. Dist. LEXIS 95088 (N.D. Ill. July 21, 2016). ...............................1

*Zang v. Alliance Fin. Servs. of Ill., Ltd.*,
875 F. Supp. 2d 866, 882 (N.D. Ill. 2012) ................................................10

## INTRODUCTION

Defendants have filed a combined Rule 12(b)(1) Motion to Dismiss based on lack of subject matter jurisdiction, and a Rule 12(c) Motion for Judgment on the Pleadings. Defendants' Rule 12(b)(1) motion asserts that Plaintiffs lack standing to maintain their claims based on the allegations contained in the Complaint.

The standards are the same when a court decides a facial attack on standing and a motion for judgment on the pleadings. *Ezekiel v. Michel,* 66 F.3d 894, 897 (7th Cir. 1995); *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007). A motion for judgment on the pleadings only tests whether a plaintiff's factual allegations raise a right to relief above a speculative level. *Yeadon Fabric Domes, LLC v. Roberts Env'l. Cntrl. Corp.*, No. 15 CV 6679, 2016 U.S. Dist. LEXIS 95088 (N.D. Ill. July 21, 2016). The complaint will survive if a plaintiff alleges at least a plausible action. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A material question of fact requires denial of a motion to dismiss or a motion for judgment on the pleadings. *Alexander v. City of Chi.*, 994 F.2d 333, 336 (7th Cir. 2012).

Defendants' Rule 12(b)(1) Motion to Dismiss argues that Plaintiffs lack standing to pursue their claims based on the allegations in Plaintiffs' Complaint. As set forth in this Response Brief, the Plaintiffs' Complaint has alleged facts establishing that the Plaintiffs have Article III standing on several bases. Plaintiffs have standing to pursue each and every cause of action alleged in Plaintiffs' Complaint.

The Defendants' Motion for Judgment on the Pleadings requests that this Court take judicial notice of numerous documents. A court may take judicial notice of facts, and not convert a motion for judgment on the pleadings to a motion for summary judgment. *See e.g., Tellabs,*

1

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The court, however, must construe those facts that are the subject of judicial notice in the light most favorable to the plaintiff along with the well pleaded allegations of the complaint. *Papasan v. Allain*, 478 U.S. 265, 283 (1986).

The Defendants' instant Motion for Judgment on the Pleadings goes well-beyond requesting that this Court take judicial notice of facts. Instead, the Motion is based in large part on hearsay <u>opinions</u> by the Chicago City Council in an Ordinance touting claimed benefits of the Obama Presidential Center, which such ordinance was both enacted after the present lawsuit was filed and which was purposefully intended to evade the allegations contained in Plaintiffs' Complaint.

The Defendants' Motion for Judgment on the Pleadings is simply improper. Significant, material questions of fact exist when considering the pleadings and those portions of documents subject to proper judicial notice. Further, as established in this Response Brief, Plaintiffs have, and may, state colorable actions as to each count alleged in the Complaint.

## STATEMENT OF FACTS

The Plaintiffs in this case are Protect our Parks, Inc., an Illinois nonprofit park advocacy organization, Charlotte Adelman, Maria Valencia and Jeremiah Jurevis. Complaint at ¶ 18-22. All of the Plaintiffs are citizens of the State of Illinois, and Valencia and Jurevis are also citizens of the City of Chicago. *Id*.

In 1869 the Illinois General Assembly passed "An Act to Provide for the Location and Maintenance of a Park for the Towns of South Chicago, Hyde Park and Lake." Complaint at ¶ 27. The statute provided for the formation of a board of public park commissioners to be known as the "South Park Commissioners." The act authorized the commissioners to select certain lands

2

and that those lands "when acquired by said Commissioners, as provided by this act, shall be held, managed and controlled by them and their successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever." Pursuant to the granted authority the commissioners proceeded to acquire, among other lands, the land which is now known as Jackson Park. *Id.*

The Illinois Legislature enacted the Park District Consolidation Act in the year 1934, which consolidated the existing park districts, including the South Park District, into the Chicago Park District. Complaint at ¶ 28. The Park District accordingly holds Jackson Park as a public park to be free to all persons forever, and in trust for the benefit of the citizens of the City of Chicago and State of Illinois. Complaint at ¶ 29.

Historic Jackson Park is one of the outstanding links in the City's inspired 26-mile-long Chicago lakefront public park system, extending from the North side to the South side, that has served to bring distinction to the City and earn international acclaim for its enlightened dedicated preservation of limited and invaluable lake shore land as open, clear and free public park space. Complaint at ¶ 30. Jackson Park itself is notable for being the largest public park on the South side of Chicago, a facility which is heavily used and enjoyed by local residents and much needed in the notably park starved and densely populated neighborhoods of Southside Chicago when compared to the many lake shore park developments located on the North side. Complaint at ¶ 31. This North/South disparity in public park services had previously resulted in a federal court decree specifically requiring more equal Chicago Park System park investment in underprivileged and ignored sections of the South side public park system. *Id.*, Exhibit D to Complaint.

That Jackson Park exists and has survived and thrived to this day is a miracle story of the genius, dedication, and persistence of many public spirited people from Daniel Burnham, Frederick Law Olmsted, to Aaron Montgomery Ward and numbers of dedicated public servants who have had the wisdom to seize the opportunity to use the groundwork of the Columbian Exposition of 1893 to create and preserve the unique beauty of the Jackson Park that exists today. Complaint at ¶ 33, Exhibit F to Complaint.

The Chicago Park District proudly displays on its website an historic newspaper article describing how "early leaders foresaw the importance of saving lakefront property as open space" and adopted the inscription "Public Ground - A Common to Remain Forever Open, Clear, and Free of any Building or Other Obstruction Whatever" that "established a legal precedent for lakefront protection." Complaint at ¶ 34, Exhibit G to Complaint.

The Park Commissioners know their public mission and their sworn duty. The Chicago Park District brags on its website that:

> One of America's best kept secrets is Chicago's historic park system. Even Chicagoans who routinely enjoy its diverse open spaces-from the magnificent lakeshore parks to intimate neighborhood settings-may be surprised about their parkland legacy. We invite you to learn more about the history of Chicago parks, which are second to none in America and abroad. . .

Complaint at ¶ 35, Exhibit H to Complaint.

Among the many accolades given to Jackson Park is the one given at the annual meeting of the American Society of Landscape Architects, at which Defendant Chicago Park District's own historian, Julia Sniderman Bachrach, now retired, appeared as a panel member:

> Jackson Park is a nationally significant landscape on the south side of Chicago, famed for its connections to Frederick Law Olmsted and Daniel Burnham, and as the site of the 1893 World's Columbian Exposition. This session will discuss techniques for preserving this valuable historic resource. Jackson Park is one of the most significant and complex historic landscapes in Chicago and the nation.

4

> Originally designed by Olmsted & Vaux in 1871, the site was redeveloped by Olmsted and Daniel H. Burnham, and the Wooded Island in the park is considered one of '150 great places in Illinois.'

Complaint at ¶ 36, Exhibit I to Complaint.

Jackson Park was listed on the National Register of Historic Places on December 15, 1972. Complaint at ¶ 37. The Army Corps of Engineers is engaged in a $10 million rehabilitation and ecological restoration of Jackson Park that had been awarded by the Park District in 2014, and such was the concern of residents and historians alike that the project might violate the historic vision of Olmsted that private money in the area of $250,000 was used to hire one of the country's premier Olmsted experts to work alongside the Army Corp of Engineers to insure that the historic integrity of Jackson Park was maintained down to the individual plants selected. Complaint at ¶ 39.

The City has already spent millions on these areas which have promoted area wildlife such as Monarch butterflies, herons, and countless other species of migrating birds who use the area for rest and food as well as others who now call this area their permanent home, under protection of the rules and regulations adopted pursuant to the International Migratory Bird Treaty of March 2001. Complaint at ¶ 40.

The Chicago Lakefront on the southwest shore of Lake Michigan plays a major role in providing habitat for millions of migratory birds. In the last century and a half, the conversion of much of the adjoining land to agriculture and urban uses has only increased the importance of the lakefront open space with its canopy of trees and shrubs. Complaint at ¶ 41. The City of Chicago recognized these facts with the signing of the "Urban Conservation Treaty for Migratory Birds" with the U.S. Fish and Wildlife Service ("USFWS") on March 25, 2000. Complaint at ¶ 40, Exhibit J to Complaint. This treaty commits USFWS to a long-term partnership with the City of

Chicago and its conservation partners, including the Chicago Park District and citizen conservation groups, for the benefit of migratory birds. Complaint at ¶ 41.

The Chicago Park District worked with Friends of the Parks, other open space and conservation organizations and park advisory councils, to develop guidelines for the lakefront as a crucial stopover point for migratory birds. The Park District Board of Commissioners adopted "Lakefront Bird Habitat Guidelines." Complaint at ¶ 42. These guidelines are being used by the District, its contractors and subcontractors, to protect and promote bird habitat in Chicago's lakefront parks. Since 1973, regular Wooded Island Bird Tours have been conducted. Accessible, minimally disturbing nature paths were provided at the lagoons. Bob-o-Link Meadow and Woods, east of the East Lagoon and south of the Music Court Bridge are part of the Natural Areas of Jackson Park and declared a nature sanctuary. At the south end along the lagoon shore are cattails so important to wildlife, as well as a variety of wildlife friendly plants. Complaint at ¶ 42.

On February 11, 2015, the Park District Board voted to approve the transfer of approximately 20 acres of land in Jackson Park (the "Jackson Park Site") to the City of Chicago. Complaint at ¶ 49 and (Dkt. No. 49-7 PageID #:1369). The original purported purpose of the City and Park District's transfer of public Jackson Park land to a private Barack Obama Foundation ("Foundation") was widely proclaimed by the City and Park District to enable construction of an official federal Presidential Library, pursuant to The Presidential Libraries Act of 1955, as amended in 1986 (44 U.S.C. § 2112) and the Presidential Records Act of 1978. Complaint at ¶ 2. The City of Chicago accordingly passed an Ordinance reciting these exact reasons for approving the construction of a desired national "Presidential Library" on what was known to all to be irreplaceable Jackson Park land (the "2015 Ordinance"). Complaint at ¶ 3.

Further, the City of Chicago announced plans to enter into a long term ground lease for the Jackson Park Site with the Foundation, for a term of 99 years with the right to indefinitely renew the lease. *Id.*

In August 2016, the City and the Park District publically announced that the Obama Presidential Library, promised to include all of the former President's official records, would be built in Jackson Park. Complaint at ¶ 4. Then, in May 2017, the Obamas did an about face and abandoned all plans for building a "Presidential Library." *Id.* Instead, the Foundation proposed to build the "Obama Presidential Center" ("OPC"). Complaint at ¶ 4. The Foundation proposed that the OPC would now consist of a building, which would not be a "Presidential Library," but a 235 feet tall (equivalent of 23 stories), monumental obelisk tower that the Foundation described as a personal "Museum," together with a "forum building" for meetings, an "athletic center" building, a library, a 450 car "parking garage" and other satellite physical structures, and an outdoor plaza to host food trucks in the historic formerly pristine park. Complaint at ¶ 14. The 2015 Ordinance in effect at the time provided that the Foundation would conduct all operations on the Jackson Park Site pursuant to the terms of a long term, presumably 99 year, renewable "Lease." Complaint at ¶ 3.

The construction of the intrusive museum tower along with multiple obstructive buildings on the Jackson Park site would destroy the pristine open environment of the Jackson Park Site. Complaint at ¶ 52. Moreover, the City of Chicago will be saddled with the massive 235-foot structure for centuries. *Id.* This precedent will consequently open the door to progressively more intrusive destruction of the public park and destroy the ability of the citizens of Chicago and the State of Illinois to enjoy and benefit from this dedicated public park. *Id.*

Plaintiffs' Complaint alleges that at all times, Chicago Mayor Rahm Emanuel, who had served as former President Obama's personal Chief of Staff in his time in office, in his present position as Mayor of Chicago, has acted as the Chief Executive moving party and intermediary negotiating with the Foundation and arranging the details of the proposed public park land transfer arrangements taking place between the City, the Park District, and the private Obama Foundation. Complaint at ¶ 24. The Complaint outlines some of the ways in which the City of Chicago collaborated with the Park District and the Foundation to push through the ill-conceived plan of approving the OPC in Jackson Park. Complaint at ¶ 1-17.

The Plaintiffs filed the instant lawsuit on May 14, 2018. (Dkt. No. 1). The City requested, and was granted, numerous extension of time to respond to the Complaint. (Dkt. Nos. 15, 19). The City only filed its Answer to the Complaint on October 22, 2018 (Dkt. No. 38), and filed the present Motions on November 21, 2018 (Dkt. No. 48).

The Defendants began demolition activities related to the OPC in August 2018, while this case was pending. (Dkt. No. 23). That construction work involved cutting down numerous century old trees in Jackson Park and demolishing an athletic field in order to accommodate the OPC. *Id.* The Defendants admitted that the work was taking place, but the City initially denied in Court that the work was related to the Foundation.[1] Exhibit A hereto at page 8, lines 6-15. The City later backtracked, and admitted that the work was directly related to the OPC. Exhibit B hereto at page 9-10.

---

[1] The Plaintiffs request that this Court take judicial notice of the Court transcripts dated August 14, 2018 and September 20, 2018, copies of which are attached hereto as Exhibits A and B, respectively. This Court may take judicial notice of transcripts in the case, because they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *GE Capital Corp. v. Lease Res. Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) (*quoting* Fed. R. Evid. 201(b) and acknowledging proper judicial notice of court records, including transcripts).

On October 31, 2018, the City enacted an ordinance that amends the 2015 Ordinance, [2] approving a new plan related to the OPC. The 2018 Ordinance contains as attachments several agreements, including a "Use Agreement." The "Use Agreement" replaces the "Lease" referenced in the 2015 Ordinance. The Use Agreement [3] contains the terms under which the Foundation will construct and use the OPC. The 2018 Ordinance also attaches and references an Environmental Remediation and Indemnification Agreement ("Environmental Agreement"). [4] Section 8 of the Environmental Agreement provides, among other thing, that the City of Chicago is using tax payer dollars now to reimburse the Foundation for environmental costs that the Foundation previously incurred related to the OPC Site. [5] The Environmental Agreement also states that the City will pay for all environmental remediation costs related to building the OPC. *Id.* Moreover, the City is undertaking and paying for all permanent road alterations and changes to the Midway Plaisance and other roads in the location of the planned OPC before the OPC is constructed, pursuant to Section 4.14 of the Use Agreement. [6]

The Defendants' Motion for Judgment on the Pleadings is based, in large part, on the Defendants' contention that the "Presidential Center," because of its location in Jackson Park, will provide certain benefits to for the City of Chicago. The only alleged "evidence" related to the Defendants' argument is based on what the Defendants characterize as the City Council's "findings" contained in the 2018 Ordinance. The Defendants attempt to use these purported "findings," which are not facts but rather are opinions, for the truth of the matters asserted in the findings. For example, the Defendants' Motion is based in large part on the claim that locating

---

[2] Dkt. No. 49-6, PageID #:1257.
[3] Dkt. No. 49-6, PageID #:1266-309.
[4] Dkt. No. 49-6, PageID #:1348-56.
[5] Dkt. No. 49-6, PageID #:1352.
[6] Dkt. No. 49-6, PageID #:1278.

the OPC in Jackson Park would "create direct and indirect economic benefits," "attract cultural tourism to the South Side," and "enhance the park's recreational value." There is no admissible evidence before this Court to support that contention -- other than the notion that the City Council said so and therefore it must be true.

Judicial notice is a powerful tool that must be used with caution. *Daniel v. Cook Cnty.*, 833 F.3d 728, 742 (7th Cir. 2016). The court looks first to the purpose for which defendant wants to notice the documents attached to a motion, as the purpose for which a document is judicially noticed matters. *Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009) (contrasting propriety of taking judicial notice of public filings to show what was disclosed, which is proper, and assuming the truth of contested factual representations in those documents, which is not).

The effect of taking judicial notice of facts is to preclude a party from introducing contrary evidence." *Gen. Elec. Capital Corp*, 128 F.3d at 1083. Therefore, Defendants want this Court to take judicial notice of certain claimed benefits of locating the OPC in Jackson Park, therefore precluding the Plaintiffs from presenting the very contrary evidence alleged in the Complaint. The alleged benefits to locating the OPC in Jackson Park, as opposed to any number of other locations in the south side of the City, is one of the key, disputed issues in this case and is therefore not the proper subject of judicial notice. *Zang v. Alliance Fin. Servs. of Ill., Ltd.*, 875 F. Supp. 2d 866, 882 (N.D. Ill. 2012) (disputed factual findings may not be the subject of judicial notice).

Further, as alleged in the Complaint, there are other, existing facilities and land that would provide the same or greater benefits than locating the OPC in Jackson Park. For example, the South Shore Cultural Center, does or could readily provide essentially the same social service

programs being proposed for the Obama Center. Further, the University of Chicago, which had proposed the OPC in Jackson Park itself already owns private land in Woodlawn and Hyde Park being used and available for a development of a presidential center. Complaint at ¶ 15. The Complaint also alleges that there is an abundance of locations that are non-public park readily available for a Presidential Center and would provide the same or greater benefits. Complaint at ¶ 16. Thus, taking judicial notice of the City Council's opinions contained in its findings is improper because the facts related to the benefits of locating the OPC in Jackson Park are disputed and are contrary to the allegations contained in the Complaint which are taken as true in deciding a motion for judgment on the pleadings.

Moreover, a court may only properly take judicial notice of "facts" under Rule 201 Fed. R. Evid. 201. The City Council's "findings" are opinions, and are not "facts" that are subject to judicial notice. Further, the City Council's opinions are being used to prove the truth of those opinions, which is classic, inadmissible hearsay. Fed. R. Evid. 801(c); 802.

## ARGUMENT

### I.

### DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION SHOULD BE DENIED

In predicable fashion, Defendants Rule 12(b)(1) motion centers on the issue of standing, a standard claim in the Defendants' playbook in this type of litigation. Defendants concede that standing is determined based on federal law.

Standing exists where a plaintiff can show: (1) a concrete and particularized injury that is actual or imminent; (2) a causal connection between the injury and the defendant's action; and (3) a likelihood that the injury can be redressed if the court finds in the plaintiff's favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "All that a plaintiff need show to establish

11

standing to sue [in the Article III sense] is a reasonable probability – not a certainty – of suffering tangible harm unless he obtains the relief that he is seeking in the suit." *Hoover v. Wagner*, 47 F.3d 845, 847 (7th Cir. 1995). Federal law clearly establishes that Plaintiffs have standing, and that the Defendants' Rule 12(b)(1) motion be denied.

First, and largely conclusive, this Court has recently rejected the exact same type of standing challenge from these exact same Defendants regarding plaintiffs raising similar public trust property and due process claims. *See, Friends of the Parks v. Chi. Park District,* No. 14 cv 9096, 2015 U.S. Dist. LEXIS 30291 (N.D. IL March 12, 2015); and *Friends of the Parks v. Chi. Park District,* 160 F. Supp. 3d 1060 (N.D. Ill. 2016) (referred to as "*Friends of the Parks,*" or collectively the "*Lucas Museum* Opinions").[7]   Relatedly, the *Lucas Museum* Opinions are consistent with other determinations in similar circumstances, such as *Lake Michigan Fed'n v. U.S. Army Corps of Engin'rs*, 742 F. Supp. 441 (N.D. Ill. 1990), in which the plaintiffs, a not-for-profit corporation and individual taxpayers, brought a successful public trust suit to enjoin construction by a private party on public trust land.

Second, and separately, Plaintiffs have standing under *Sierra Club v. Morton*, 405 U.S. 727 (1972), and its progeny. Third, Plaintiffs, as taxpayers of the City of Chicago, have standing to assert a First Amendment violation based on the City of Chicago's compelled subsidation of private speech.

A.    Plaintiffs Have Article III Standing To Protect Their State Law Property Interests.

---

[7]  The Defendants effort to distinguish *Lucas Museum* Opinions by stating that cases it cited predated certain Seventh Circuit authority fails to note that the *Lucas Museum* Opinions themselves were issued after the Seventh Circuit issued the opinions cited by Defendants, and made with full knowledge and consideration of those decisions.   Moreover, those Seventh Circuit decisions are distinguishable because they do not involve public trust issues such as those raised here.

Plaintiffs have standing to bring claims to protect their state law property interest in the restriction that the State of Illinois legislature placed on the use of the Jackson Park Site. Illinois state courts, and this Northern District of Illinois Court, have ruled that each citizen or taxpayer of Illinois owns a fractional beneficial interest in the property which the Chicago Park District owns and accordingly holds in trust for them. *See, e.g., Paepcke v. Public Bldg. Com.*, 46 Ill. 2d 330, 341-42 (1970); *Friends of the Parks,* 2015 U.S. Dist. LEXIS 30291 at *26; *Friends of the Parks,* 160 F. Supp. 3d at 1064; *see also Fiala v. Wasco Sanitary Dist.,* 2014 Ill. App. Unpub. LEXIS 916 at *9-*11.

In *Paepcke,* the Illinois Supreme Court addressed the standing of a group of taxpayers who sued to prevent the implementation of plans to construct facilities on public parks. The court held that the plaintiffs had standing to contest the proposed construction because they are beneficiaries of lands held in the public trust:

> If the "public trust" doctrine is to have any meaning or vitality at all, the members of the public, at least taxpayers who are the beneficiaries of that trust, must have the right and standing to enforce it. To tell them that they must wait upon governmental action is often an effectual denial of the right for all time. The conclusion we have reached is in accord with decisions in other jurisdictions, *see e.g., Robbins v. Department of Public Works*, 355 Mass. 328, 244 N.E.2d 577, and *Gould v. Greylock Reservation Com.*, 350 Mass. 410, 215 N.E.2d 114, wherein plaintiffs' rights as residents in a trust of public lands were enforced without question.

*Id.*; *see also Booth v. Lemont Mfg. Corp.*, 440 F.2d 385, 386 n2 (7th Cir. 1971) (citing *Paepcke* and noting that no special injury was needed to provide the requisite standing in a public trust suit); *Friends of the Parks v. Chi. Park Dist.*, 786 N.E.2d 161 (N.D. Ill. 2003) (plaintiffs brought public trust suit related to renovations made to stadium owned and operated by Chicago Park District); *Lake Michigan Fed'n v. U.S. Army Corps of Engin'rs*, 742 F. Supp. 441 (N.D. Ill.

1990) (plaintiffs, a not-for-profit corporation and individual taxpayers, brought public trust suit to enjoin construction of lake fill by private university).[8]

Consistent with this state property right, courts have recognized that Plaintiffs have suffered injury to and have to standing to bring a federal constitutional due process claim. *See*, *Friends of the Parks,* 2015 U.S. Dist. LEXIS 30291; *Friends of the Parks,* 160 F. Supp. 3d at 1064 (ruling that Plaintiffs had standing to assert federal due process claim and state law claims).

B.  Plaintiffs Have Standing Based on Aesthetic and Environmental Harm to Jackson Park.

Plaintiffs also have Article III standing for a separate and independent reason. Plaintiffs have alleged facts related to the harm to their aesthetic and environmental interests in Jackson Park. Specifically, Plaintiffs have alleged that the OPC will interfere with and harm the natural environment in existing Jackson Park.

---

[8] Defendants' reliance on *Hollingsworth v. Perry*, 570 U.S. 693 (1970), to argue that Plaintiffs have not alleged a "concrete and particularized injury" is misplaced. In *Hollingsworth*, same-sex couples sued California officials, alleging that Proposition 8, which banned same-sex marriage, violated their constitutional rights. The state officials refused to defend the law in court (though they continued to enforce it), and the district court permitted the original proponents of Proposition 8 to intervene and defend it. After a bench trial, the district court ruled in plaintiffs' favor, struck down Proposition 8, and enjoined California officials from enforcing the law. The Ninth Circuit affirmed, and the Supreme Court, in a 5-4 decision, dismissed the case for lack of Article III standing. The Court explained that the intervenors had no direct stake in the litigation, but merely a "generalized grievance," as it stated that "[i]n the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Hollingsworth,* 570 U.S. at 2663.

*Hollngsworth* is inapplicable to the present case. The Plaintiffs at bar are asserting their own rights, not a third party's rights. Further, Plaintiffs have more than just a generalized grievance; Plaintiffs have a beneficial ownership interests in the restriction on the use of the Jackson Park Site. That right is a "property right" capable of enforcement, as this court in the *Lucas Museum* Opinions*,* and *Lake Michigan Federation* has held (consistent with the decision in *Illinois Central R.R. Co. v. Ill.,* 146 U.S. 387 (1892)) as it determined that plaintiffs had standing to assert their respective actions.

14

The United States Supreme Court in *Sierra Club* ruled that aesthetic and environmental interests may be sufficient to satisfy the injury in fact requirement. According to the Supreme Court in *Sierra Club*:

> aesthetic and environmental well-being . . . are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process.

405 U.S. at 734.

This principle has been reaffirmed by the Supreme Court on numerous occasions. *See e.g., U.S. v. SCRAP*, 412 U.S. 669 (1973). The doctrine has also been recognized by the Seventh Circuit. *See e.g., Alschuler v. Dept. of HUD*, 686 F.2d 472, 476-77 (7th Cir. 1982); *South East Lake View Neighbors v. Dept. of HUD*, 685 F.2d 1027, 1034 (7th Cir. 1982).

The threat of injury to the aesthetic and environmental well-being of Jackson Park is both real and immediate. The Defendants have approved construction of the OPC on what is now pristine park land. Consistent with those approvals, the Defendants have already begun demolition activities to accommodate the OPC, and they have destroyed century old trees in Jackson Park. (Docket No. 23). Thus, the injury is direct, has already occurred, and further injury is imminent. A causal connection exists between the injury and the Defendants' actions and that injury will be redressed if this Court finds in the Plaintiffs' favor. Plaintiffs' have standing to represent and defend Jackson Park as a protected historic landmark, since lack of standing as Defendants allege would mean that there would never be an existing available review process to challenge the wrongful acts of the Park District and City with respect to public properties dedicated as public parks, and unlawful conversions of all public park land would be forever capable of repetition but always evading review.

C.    Plaintiffs Have Standing to Challenge Chicago's Unconstitutional Expenditure of Municipal Taxpayer Funds.

To establish municipal taxpayer standing, the Seventh Circuit has held that all that is required is an allegation that plaintiff is a taxpayer and the municipality is improperly spending tax revenues. *Hinrichs v. Speaker of House of Rep. of Ind. Gen. Assembly*, 506 F.3d 584, 600 fn.9 (7th Cir. 2007); *Freedom From Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1470 (7th Cir. 1988). Defendants' argue that Plaintiffs do not have standing as taxpayers because Plaintiffs only suffered a generalized injury applicable to all taxpayers, and the tax referenced in the Museum Act will not be collected from the OPC, as the Park District will not control the OPC. That argument fails for at least three reasons.

First, it is a well-settled principle that "the interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate." *Hinrichs*, 506 F.3d at 592 (*quoting Frothingham v. Mellon*, 262 U.S. 447, 486−87 (1923)). The interest of "federal taxpayers with respect to the federal treasury [is] 'very different' from that of a municipal taxpayer challenging an allegedly illegal use of municipal funds." *TinleySparks, Inc. v. Vill. of Tinley Park*, 181 F. Supp. 3d 548 (N.D. Ill. 2015). *See also, DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 349 (2006) (approving taxpayer standing of municipal residents to enjoin the "illegal use of the moneys of a municipal corporation," relying on "the peculiar relation of the corporate taxpayer to the corporation" to distinguish such a case from the general bar on taxpayer suits.).

Second, the Seventh Circuit has explicitly ruled that "municipal taxpayer challenges to municipal actions . . . are not subject to the same stringent standing requirements as state and federal taxpayers seeking to challenge state and federal actions, respectively." *Hinrichs*, 506 F.3d

16

at 600 n.9. Finally, the Seventh Circuit has ruled that municipal taxpayers have standing to bring claims against municipalities when they bring "a good-faith pocketbook action." *Clay v. Ft. Wayne Cnty. Sch.*, 76 F.3d 873, 879 (7th Cir. 1996). "A good-faith pocketbook action" means "municipal taxpayers have standing when they object to a disbursement of funds occasioned solely by the alleged unconstitutional conduct." *Clay*, 76 F.3d at 879. *See also*, *O'Brien v. Vill. of Lincolnshire*, No. 18-cv-01310, 2018 U.S. Dist. LEXIS 207356 (N.D. Ill. December 7, 2018) (finding municipal taxpayer standing to challenge use of tax payer money to fund speech allegedly unconstitutional under First Amendment).

Here, the 2018 Ordinance, the Use Agreement and the Environmental Agreement (all attached to Defendants' Motion) establish that City of Chicago taxpayer dollars have been and will be spent to fund the construction-related costs of the OPC and the City is using City tax dollars to fund permanent road alterations necessitated solely by the OPC. Therefore, Plaintiffs have sustained, and will sustain, an injury in fact sufficient to establish standing. Furthermore, the use of City tax dollars related to the OPC is a compelled subsidation of private speech and is a violation of the First Amendment as explained in Section II. B of this Response Brief.

## II.
## DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS SHOULD BE DENIED IN ITS ENTIRETY

### A.
### Plaintiffs' Due Process Claim States A Cause Of Action.

Count I of Plaintiffs' Complaint alleges a Fourteenth Amendment due process claim. "Due process is a flexible concept which 'calls for such procedural protections as the particular situation demands.'" *Buttitta v. City of Chi.*, 9 F.3d 1198, 1201 (7th Cir. 1993). In order to state a Fourteenth Amendment procedural due process claim, Plaintiffs must only allege that "(1) [they]

17

had a constitutionally protected property interest, (2) [they] suffered a loss of that interest amounting to a deprivation, and (3) the deprivation occurred without due process of law." *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 943-44 (7th Cir. 2010). The Constitution does not create property interests; rather, protected property interests must derive from an independent source such as state law. *Buttitta*, 9 F.3d at 1201 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985), and *Bd. of Regents v. Roth*, 408 U.S. 564, 570 (1972)). The Plaintiffs in this action have alleged all of the elements of a Fourteenth Amendment due process cause of action, and this court has previously recognized a due process claim under similar circumstances.

As further explained below, the Plaintiffs due process claim is that the Jackson Park Site contains a restriction placed on the property by the State of Illinois. The restriction on the property is that the property shall be used for as a "public park . . . free to all persons forever." The Plaintiffs are fractional beneficial owners of the Jackson Park Site, and have a state property right to enforce the restriction that the Illinois legislature placed on the property. The Complaint alleges that the Illinois legislature has not released the restriction on the property. Therefore, the Defendants' plan wherein they transfer possession of the Jackson Park Site to the City in order for the City to implement the 2018 Ordinance and Use Agreement transferring use of the property to the Foundation, for a use that is inconsistent with the Illinois legislature's restriction, deprives the Plaintiffs of their property without due process of law.

1.)     Plaintiffs' Have State Law Property Interests.

Illinois state courts, and this Northern District of Illinois Court, have ruled that each citizen or taxpayer of Illinois owns a fractional beneficial interest in the property which the Chicago Park District owns and accordingly holds in trust for them. *See, e.g.*, *Paepcke,* 46 Ill. 2d

18

330, 341-42; *Friends of the Parks,* 2015 U.S. Dist. LEXIS 30291 at \*26; *Friends of the Parks,* 160 F. Supp. 3d at 1064; *see also Fiala*, 2014 Ill. App. Unpub. LEXIS 916 at \*9-\*11.  The Illinois Supreme Court's opinion in *Paepcke* held that parkland owned by the Chicago Park District is subject to the public trust doctrine, and that the residents have a right to enforce the public trust on parkland.  *Paepcke* also held that residents have a property right to enforce a restriction on the use of public parkland, unless that restriction has been expressly and specifically released.

In *Paepcke*, the Park District sought to convey to the City of Chicago Public Building Commission land in Washington Park for the Commission to construct a middle school to be leased to the Chicago Board of Education.  The Illinois legislature deeded Washington Park to the South Park Commissioners (predecessor to the Chicago Park District), with the express restriction that "when acquired by said Commissioners, as provided by this act, shall be held, managed and controlled by them and their successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever."  The court found that "[s]uch a dedication having been made by the sovereign, the agencies created by it hold the properties in trust for the uses and purposes specified and for the benefit of the public." *Paepcke*, 46 Ill. 2d at 336.  The *Paepcke* court then ruled that citizens have a public property right to enforce a restriction on park land owned by the Chicago Park District, which in *Paepcke* the plaintiffs sought to enforce though an alleged breach of the public trust.

Following the precedent of *Paepcke* and other authorities, this Court in the *Lucas Museum* Opinions ruled that individual citizens of the State of Illinois and a park advocacy group, Friends of the Parks, had a property interest in land held by the Chicago Park District, which the Park District sought to lease to a non-profit organization for construction of the Lucas

19

Museum. In that case, Judge Darrah ruled, on two separate occasions, that each taxpayer of Illinois has a fractional beneficial interest in the property that the State of Illinois holds in trust for them, so as to create a protectable property interest. *Friends of the Parks,* 2015 U.S. Dist. LEXIS 30291 at *26; 160 F. Supp. 3d at 1064. *See also, Fiala,* 2014 Ill. App. Unpub. LEXIS 916 at ¶ 23 (Illinois Appellate Court ruled that resident has state law property interest in sanitary district's property).

Thus, as held in *Paepcke,* the *Lucas Museum* Opinions*,* and *Fiala,* Plaintiffs are the beneficial owners, if not full owners, of the Jackson Park Site — and while not the holders of legal title, each citizen is the "real party in interest" as to his or her fractional share. *See also, Carlson v. U.S.*, 126 F.3d 915, 924-25 (7th Cir. 1997) (quoting *People v. CT&T Co.*, 75 Ill. 2d 479, 492-93 (1979)) ("in regard to an Illinois land trust, for tax purposes 'true ownership lies with the beneficiaries though title lies with the trustee'").

As beneficial owners, Plaintiffs have the right—a property right—to exclude uses of the property that are inconsistent with the dedicated, and restricted, right of use. That is literally the meaning of a property right. *See, e.g., Kaiser Aetna v. U.S.*, 444 U.S. 164, 179-80 and n.11 (1979) (noting that the "right to exclude" is "universally held to be a fundamental element of the property right"). The Illinois courts have also expanded the uses which these property interests protect. For example, in *People ex rel. Scott v. Chi. Park District,* the Illinois Supreme Court recognized the right to preserve open space as a natural resource. 66 Ill. 2d 65, 78-80 (1976).

Defendants' authorities are to no avail. For example, Defendants rely on the case of *Peterson v. Chi. Plan Comm'n*, 302 Ill. App. 3d 461 (1998), for the proposition that the Plaintiffs do not have a property interest in the restriction on the use of the land at issue. However, in that case, the plaintiffs, who were appealing on a *writ of certiorari* to review the administrative

decision of the Plan Commission (and therefore procedurally inapposite), did not allege the property interest restriction placed on the portion of Jackson Park at issue in this case, nor could the Plaintiffs have done so. The Museum of Science & Industry was built before the State of Illinois deeded land containing the restriction at issue to the South Park Commissions (now the Chicago Park District). The Museum was built for the Columbian Exposition which occurred in 1893, three years before Jackson Park was deeded to the Park District and prior to the time that the Illinois legislature placed the restriction on the property. *See*, https://en.wikipedia.org/wiki/Museum_of_Science_and_Industry_(Chicago). Thus, *Peterson* has no application to the present facts.

Similarly inapposite is Defendants' citation to *Reichelderfer v. Quinn*, 287 U.S. 315 (1932), for the proposition that neighboring landowners have no property interest in a public park. The *Reichelderfer* Court held that under federal law, as opposed to state law, no easement of light or air exists. The Court also ruled that because Congress dedicated the land as a park, Congress could also dedicate a part of that park for use as an engine house. The Court distinguished its decision from cases such as the Illinois Supreme Court case in *Village of Riverside v. MacLain*, 210 Ill. 308 (1908). In the *Riverside* case and its progeny, the Illinois Supreme Court has consistently held that owners of land adjacent to land dedicated as a park have a state law property interest and a right to have the track preserved as parkland. *See also, Stoner Mfg. Corp. v. YMCA*, 13 Ill. 2d 162 (1952).

Defendants' reliance on *Residences at River Bend Condo. Assn'n. v. City of Chi.*, 5 F.3d 982 (N. D. Ill. 2013), is similarly misplaced. The *Residences* Court held that the procedural requirements in a zoning statute did not constitute a substantive property right. The *Residences* decision is a far cry from the Plaintiffs' property interests in the restriction on the Jackson Park

21

Site which was conferred by statute and which exists in a deed of which the Plaintiffs are fractional beneficial owners of the property.[9]

2.)     Plaintiffs State a Claim For Deprivation of Their Property Rights Without Due Process of Law.

Property rights created by state law—whether an easement, a restriction, or a beneficial interest – are protected by the Due Process Clause. *See, Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Here, as described above, the Plaintiffs are residents of the State of Illinois, with protectable state law property interest in the Jackson Park Site, and in enforcing restrictions on the use of the Jackson Park Site on the property. As alleged in the Complaint, and as the Defendants admit, the Jackson Park Site contains a restriction that the property is held in trust for the people of the State of Illinois to be used "as a <u>public park</u>, for the recreation, health and benefit of the public, and <u>free to all persons forever</u>." (Emphasis added).

As alleged, the City and the Park District are depriving the Plaintiffs of their property interest in Jackson Park and in the restriction placed on Jackson Park by the Illinois legislature by allowing the Foundation to use the Jackson Park Site in violation of the restriction on the

---

[9] Indeed, many of the decisions cited in the *Residence* opinion actually support Plaintiffs position that Plaintiffs have a property interest in enforcing the restriction on the Jackson Park site. As the *Residences* court noted,

> where state law gives people a benefit and creates a system of nondiscretionary rules governing revocation or renewal of that benefit, the recipients have a secure and durable property right, a legitimate claim of entitlement." *Chi. United Indus., Ltd. v. City of Chi.,* 669 F.3d 847, 851 (7th Cir. 2012). . . It is well-established, for example, that a property owner whose real property is subject to land use regulation has a protected property interest under the Fourteenth Amendment. *See River Park, Inc. v. City of Highland Park,* 23 F.3d 164, 166 (7th Cir. 1994).

*Residences*, 5 F.3d at 986.

property.  The Illinois legislature has not specifically and expressly released the restriction on the Jackson Park Site.

The action is analogous to the District Court's decisions in the *Friends of the Parks*, 160 F. Supp 3d 1060.  The Plaintiffs in *Friends of the Parks* brought suit against the Chicago Park District for a procedural due process violation, violation of the public trust and other causes of action.  The Park District proposed to enter into a ground lease with the Lucas Museum pursuant to which the Museum would have exclusive control over formerly submerged land in the City of Chicago.  The Illinois legislature did not specifically approve the Park District entering into a long-term lease with the Lucas Museum.

The City and Park District filed a 12(b)(6) motion to dismiss, arguing that the Illinois Park District and Museum Act, 70 ILCS 1290/1 *et seq.*, authorized the construction of the museum and the long-term ground lease. The District Court disagreed, and denied the City and Park District's Motion to Dismiss. The City and Park District again filed a motion to dismiss after the Illinois legislature amended the Museum Act.  The Court once again found that the amendment to the Museum Act did not authorize the ground lease to the Lucas Museum. The District Court held:

> Plaintiffs, however, plead that the General Assembly, in enacting the legislation purportedly transferring control of the property, did not "refer specifically to the alienation, forfeiture or disposition of the land that is subject of the ground lease." (FAC ¶ 53.) Plaintiffs have alleged that, by failing to provide specific approval for the transfer of the subject land, the General Assembly has acted in violation of Plaintiffs' right to due process. ***Construing the allegations in Plaintiffs' favor, Plaintiffs have sufficiently stated a procedural due-process claim under the Fourteenth Amendment***. Thus, Defendants' Motion to Dismiss is denied with respect to Count I.

160 F. Supp 3d at 1064-65.  (emphasis supplied)

23

The same rationale and holding is directly applicable, and determinative of the Defendants' motion. The Museum Act does not refer to lifting the specific restriction placed on the Jackson Park Site by the Illinois legislature. Here, like in the Lucas Museum case, the Museum Act is completely silent as to the express removal of any restriction on Jackson Park that would remove what the Illinois Supreme Court has termed a "restriction" on the use of the Jackson Park Site. Plaintiffs' Complaint has alleged, and which is taken as true on a motion for judgment on the pleadings, that the Foundation's use of the Jackson Park Site is inconsistent with the restriction placed on the property at issue.

Further, the Museum Act does not even apply to the transaction at bar. As established in in the following Section II.B. of this Response related to the Defendants' violation of the public trust doctrine, the Defendants are in violation of the Museum Act. Therefore, the Museum Act is not a defense to the due process violation. Further, Section II.C.2.) of this Response Brief establishes that the Museum Act only allows a city or park district to enter into a "lease" to allow the operation of a museum in a park. The City has expressly, and explicitly, admitted that the Use Agreement between the City and the Foundation is not a lease. Moreover, as shown in Section II.E. of this Response Brief, the Amendment to the Museum Act is unconstitutional special legislation.

3.) <u>The Plaintiffs' Due Process Violation is Not Dependent on the City and Park District's Blatant Violations of State Law.</u>

The City and the Park District argue that the claimed state law violations may not form the basis for a federal due process action. State law does not create duties under the federal constitution, and violations of state law are by themselves insufficient to impose liability under §

1983. *See, e.g., J.H. v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003) (collecting authority). However, Plaintiffs' due process claim is not dependent upon a duty imposed by state law.

**B.**
**Plaintiffs State a Claim for Public Trust Violation.**

1.) <u>The Museum Act Is No Defense To The Plaintiffs' Claim For Public Trust Violation; To The Contrary, Defendants Are In Violation Of The Museum Act, Which Wholly Supports And Strengthens The Plaintiffs' Claim.</u>

The Museum Act is not a defense to the Plaintiffs' Count II claim for Breach of the Public Trust. To the contrary, it wholly supports and strengthens the Plaintiffs' claim. First, the Museum Act's express terms affirm that the land comprising public parks must be held in trust and closely safeguarded by municipalities and may only be relinquished for development by private persons under very strict and limited circumstances. The Museum Act expressly states that, first and foremost, it is the "corporate authorities of cities and park districts", who are principally authorized "to purchase, erect and maintain within any such public park edifices to be used as aquariums or as museums of our, industry, science, or natural or other history, including presidential libraries…" *See,* 70 ILCS 12901. Furthermore, any private corporation or society which contracts "to erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate its aquarium or museum within any public park" must do so "under the control or supervision of" the city or park district. *See, Id.*

Second, the 2016 Amendment to the Museum Act, which Defendants obtained in order to expand its scope to encompass the erection of "presidential libraries, centers, and museums," constitutes unconstitutional special legislation. (*See,* Section II.E., *infra*.) Third, the Park District's transfer of the Jackson Park Site to the City in order for the City to enter into the "Use Agreement" are *ultra vires* acts that violate the Property Transfer Act and the Museum Act. (See

25

Section II.C., *infra*.)  Insofar as the recently amended Museum Act is concerned, even assuming *arguendo* that it were entirely valid, its express terms act to bar the Defendants' scheme outright. As previously indicated, the Museum Act, 720 ILCS 1290/1, sets forth the general rule that <u>only</u> the corporate authorities of cities and park districts having existing control or supervision over a public park are permitted to purchase, erect and/or maintain museum edifices therein including but not limited to presidential libraries.  By extension, the directors and trustees of a private corporation or society organized for the purpose of constructing, maintaining, and operating any such museum facility may only do so "under the control or supervision" of the city or park district.  *See, Id.*

    As explained further below, the Defendants' scheme does not contemplate that the OPC will be constructed, maintained and/or operated under the City or the Park District's control or supervision, but rather that it will be under the control and supervision of the Foundation, pursuant to the "Use Agreement" that the Foundation entered into with the City.  In order to avoid the general rule that bars their scheme under the Museum Act, Defendants are thus banking upon the narrow exception to the general rule that permits the directors or trustees of a private corporation or society organized for the construction or maintenance and operation of a museum to do so independent of municipal control and supervision, so long as they enter into a valid <u>lease</u>.  The Museum Act states in relevant part that:

> "Notwithstanding the [foregoing], a city or park district may enter into a <u>lease</u> for an initial term not to exceed 99 years, subject to renewal, allowing a corporation or society as hereinabove described to erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate its aquarium or museum, together with grounds immediately adjacent to such aquarium or museum, and to use, possess, and occupy grounds surrounding such aquarium or museum as hereinabove described for the purpose of beautifying and maintaining such grounds in a manner consistent with the aquarium or museum's purpose, and on the conditions that (1) the public is allowed access to such

26

grounds in a manner consistent with its access to other public parks, and (2) the city or park district retains a reversionary interest in any improvements made by the corporation or society on the grounds, including the aquarium or museum itself, that matures upon the expiration or lawful termination of the lease…"

70 ILCS 1290/1 (emphasis supplied).

However, by the Defendants' own admission, the Foundation has not entered into a lease with either the City or the Park District. Indeed, Defendants emphatically insist to the contrary that "the agreement between the OPC and the City *is not a lease"* and they go on to argue at length why their "Use Agreement" is not a lease. (*See*, Plaintiff's Motion, p. 31.) And, absent a lease, Defendants do not fit within the narrow exception to the general rule, pursuant to the Museum Act, that a private entity may not independently construct, maintain and/or operate a museum within a public park. Therefore, far from sanctioning the Defendants' conduct, the Museum Act acts to bar it entirely.

2.) The Defendants' Use Agreement Is No Defense To The Plaintiffs' Claim For Public Trust Violation; It Likewise Wholly Supports And Strengthens The Plaintiffs' Claim.

While Defendants have thus maneuvered themselves out of compliance with the Museum Act, their lack of a lease does not actually accomplish their stated intention of relinquishing the Foundation's control over the OPC, for the benefit of the public. Clearly, a legitimate lease between the Foundation and the City or Park District would net far greater benefits to the public than does their "Use Agreement".

a. The lack of any rent obligation is a windfall to the Foundation that it is not justified by its transfer of the Subject Improvements to the City, particularly since the Museum Act already grants municipalities a reversionary ownership interest on top of the benefits accorded pursuant to a legitimate lease.

Under a legitimate lease, the Foundation would have to pay reasonable rent for this sizable 19.3 acre parcel of the Park District's well-situated and valuable property, the market

27

value of which is also sizable, certainly as compared to the token $10.00 that it is now paying in consideration for the entire 99-year term. And, just because the Foundation has agreed to transfer ownership of its planned improvements to the City does not automatically make it the sort of windfall for the public that Defendants claim it is.  The structures that the Foundation plans to build, particularly the towering 235-foot[10] Museum Building, are by all accounts designed and shall be built to fully house the OPC in order to suit its particular purposes.  Defendants have not explained any independent benefit that the public is supposed to derive from these structures if and when the public ever in fact takes possession of them.  At some point before the end of the extended 99-year term, their infrastructure will obviously be outdated and, ultimately, they will become a drain on the public's resources, one way or another (whether they are updated and maintained in perpetuity or eventually demolished).

Moreover, the Museum Act expressly requires any lessee private museum shall turn over ownership of all improvements that it builds upon park property at the conclusion or termination of the lease term. Section 1 of the Museum Act permits a lease where "(2) the city or park district retains a reversionary interest in any improvements made by the corporation or society on the grounds, including the aquarium or museum itself, that matures upon the expiration or lawful termination of the lease." While, in theory, the Defendants' Use Agreement offers the added benefit of immediately transferring ownership of the improvements to the City upon their completion, as opposed to the "expiration or lawful termination of the lease" as called for under the Museum Act, in practical terms this is plainly a distinction without any meaningful

---

[10] The Defendants characterize the 235 foot structure as "12 stories," but in actuality is over 23 stories in height.

difference because the municipality obviously cannot take possession of these structures until the OPC has vacated them, in either case.

Therefore, contrary to the Defendants' arguments to the effect that the City will receive some extra windfall consideration by virtue of the Foundation's transfer of the improvements, the City is not actually receiving <u>any</u> additional consideration that it was not already entitled to receive had Defendants simply entered into a proper lease, in compliance with the Museum Act. Conversely, if Defendants had entered into a proper lease under which the Foundation was required to pay a reasonable, market-rate rent, then the public would stand to receive a substantial, tangible benefit to help offset its loss of invaluable inner-city parkland that it does not presently have.

     b.    <u>The Use Agreement otherwise confers greater material rights upon the Foundation and fewer to the City that would a legitimate lease compliant with the Museum Act.</u>

Indeed, Defendants' Use Agreement is similarly flawed on its face and inferior to a legitimate lease in at least one other material respect besides the lack of any rent obligation. For instance, the language pertaining to "termination" evidences that the Foundation has the unilateral right to simply abandon the premises, without cause, while conversely the City has no corresponding right to summarily evict the OPC from the premises without cause. Section 16.2 of the Use Agreement[11] states in relevant part that:

> Either the City or the Foundation may terminate this agreement if, after the initial opening of the Presidential Center to the public, the Presidential Center ceases to be used for the Permitted Use, including at all times the operation of a museum…. The city's right to terminate shall be expressly conditioned on such non–use continuing for 60 days following the date on which the Foundation receives a Termination Exercise Notice from the City pursuant to Section 20.2, expressly stating the City's exercise of its right to terminate this agreement to the foundation for your such non-use within such 60 day

---

[11] Dkt No. 49-6, PageID#:1297-98.

period. The Foundation's right to terminate shall be expressly conditioned on the Project Improvements being in compliance in all material respects with all applicable laws on the date on which the Foundation is obligated to surrender the subject property to the City.

Thus, while the City may certainly take steps to terminate the Agreement if the Foundation stops operating the OPC as a museum, the decision to cease operations lies solely with the Foundation, and there is no enforcement mechanism by which the City may compel the Foundation to keep the museum open and maintain possession. To the contrary, Section 16.2 also provides that with limited exception, each party's "right to terminate this Agreement" under Section 16.2 "shall be the sole and exclusive remedy of the parties with respect to such event, with each party waving leaving all other remedies available to at law or in equity". *See Id.* So, for all intents and purposes, the Foundation may vacate the premises and "surrender the Subject Property to the City" at its sole discretion with no penalty. And, inasmuch as Section 7.1 of the Agreement[12] provides that the Foundation is only responsible for the payment of maintenance and repair costs through the applicable "Term", and not after "Termination," all future obligations for the payment of utilities, maintenance and operations of the OPC facility will fall squarely upon the City and its taxpayers. *See, Id.* at Section 7.1. This stands in stark contrast to the limited circumstances under which the City is permitted to terminate the agreement for cause, pursuant to Sections 16.2 and 16.3 of the Use Agreement.[13]

However, notwithstanding the Foundation's lack of any rent obligations and its apparent right to terminate the Use Agreement at its sole, absolute and unilateral discretion at any time, it

---

[12] Dkt No. 4906 PageID#:1285-86.

[13] Section 16.4 of the Use Agreement also specifies additional circumstances pursuant to which the Foundation may terminate the Agreement, including destruction of the improvements by fire or other casualty. However, the Agreement as a whole and in particular Section 16.5, "Termination as Remedy Procedure" make clear that the parties' respective rights to terminate are cumulative "following the occurrence of any of the events in Section 16.2, Section 16.3 and Section 16.4."

nonetheless enjoys the basic benefits, such as: "the right to occupy, use, maintain, operate and alter" the "Presidential Center Architectural Spaces", the Presidential Center Green Space" and "Green Space." (*See Id.,* at Section 2.1[14]) Plus, the Foundation has apparent unfettered discretion to make "Alterations"[15] to the Subject Property "the right to construct and install the Project Improvements (including the Presidential Center)" thereby permanently defacing the existing parkland. *See Id.*[16]

    c.)   <u>As evidenced by the terms of Use Agreement, the OPC is expected to generate profits for the Foundation that it can use to fund its private endeavors and objectives.</u>

    The terms of the Use Agreement also evidence that the OPC is expected to generate a financial benefit for the Foundation, above and beyond simply meeting its basic costs of operation. While the Agreement indeed provides in Section 6.9, that the "Ancillary Income" from admission fees, parking, third-party use fees, food and beverage sales etc. shall be used to fund the use, maintenance and operations of the OPC, these are certainly not the only moneymaking opportunities contemplated. For instance, Section 6.11[17] governs "Naming Rights" and provides in relevant part that:

> The foundation shall have the right to name (and to rename from time to time) the presidential Center in any components thereof, and any exhibits, art, sculptures and benches situated therein, together with the right to install signage containing and/or designating such names…

---

[14] Dkt No. 49-6 PageID#:1274.

[15] Pursuant to the introductory Recitals, "'Alterations' means any alterations, modifications, changes, additions, improvements, demolition and/or removal of or to the Project Improvements or Subject Property made following completion of construction of the Project Improvements."

[16] The Defendants argue that other museums exist in parks under the control of the Park District and Defendants imply that those agreements are on the same terms as the Use Agreement here. However, by way of illustration, the agreement between the Park District and the Museum of Contemporary Art expressly states that it is a "net lease." See, <u>Exhibit C</u> hereto (page 3), which lease was produced by the Defendants pursuant to this Court's Order and which the Plaintiffs request this Court take judicial notice.

[17] Dkt No. 49-6, Page ID#:1286.

Section 6.11 goes on to state that "[**a**] principal purpose of the naming rights granted under this section 6.11 is to assist the Foundation in raising funds for the construction, operation, repair of the Project Improvements" (*see, Id.*. emphasis supplied), and by implication these numerous and potentially lucrative naming rights are not solely intended to fund the museum operations and so the Foundation will undoubtedly maximize their profit-making potential. Section 6.2[18] also provides that the OPC will promote and host "private Foundation events that relate to or support the Presidential Center's Mission and programs", and such private events present ample opportunity for the Foundation to use the OPC in order to solicit sizable donations that may or may not ever end up benefiting the taxpaying citizens of the surrounding community to whom this public trust property rightfully belongs. Moreover, the potential for abuse of such ill-defined guidelines are magnified under the lengthy 99-year term within which countless such "private events" may occur with no clear means of oversight available to the general public.

3.)    None Of The Case Authority Pertaining To The Public Trust Doctrine Sanctions Dismissal Of This Lawsuit On The Pleadings, And Indeed The Relevant Case Authority Favors Plaintiffs.

Defendants cite to *Paepcke*, 263 N.E.2d 11, but its relevance is obviously limited owing to its substantially dissimilar facts. *Paepcke* did not involve the transfer of public trust property to any private entity, but rather the municipality's construction of a public school upon park property. The principal relevance of *Paepcke* is that the Illinois Supreme Court expanded the public trust doctrine from one designed to preserve navigation, commerce, and fishing (*i.e.*, addressing submerged Lake Michigan land) to one concerned more broadly with any public decision to reallocate public resources "to more restricted uses or to subject public uses to the self-interest of private parties." *Paepcke,* 46 Ill. 2d at 336-37. The *Paepcke* Court thereby

---

[18] Dkt No. 49-6, Page ID#:1280-81.

expanded standing to taxpayers to challenge a public project on the ground that they own fractional interests in that public property. *Paepcke*, 46 Ill. 2d at 341. Therefore, application of the public trust doctrine is not limited to formerly submerged lands as Defendants errantly claim.

Defendants also cite extensively to *Friends of the Parks v. Chi. Park Dist*., 203 Ill. 2d 312, which also involves dissimilar facts. That case did not concern the Museum Act but rather the Illinois Sports Facilities Authority Act, 70 ILCS 3205/1, *et seq*., as it applied to the renovation of Soldier Field, home to the Chicago Bears, and also the construction of a new parking lot on adjacent park property. Given the deteriorating infrastructure of the stadium, the critical need for additional parking for use by the public, and the fact that the stadium would remain subject to the primary control of the Chicago Park District, the appellate court found that the proposed development did not violate the public trust doctrine. *Id.* at 327-28. None of which is very relevant to our case, which involves the entirely unnecessary destruction and redevelopment of a largely unspoiled section of Historic Jackson Park in order to build OPC, for that could be equally if not better served by locating the OPC elsewhere.

The Court should instead follow the holding of the *Lucas Museum* Opinions*, 2015 U.S. Dist. LEXIS 30291; 160 F. Supp. 3d 1060, the recent case involving the proposed construction of the Lucas Museum Narrative Art (the "LMNA"), in which the District Court denied a motion to dismiss the complaint quite similar to the one filed by Defendants in our case. As in our case, the plaintiffs therein made sufficient claims that the public trust property was being improperly transferred to a private museum foundation in order to serve private purposes. As the Court explained:

> Under the public trust doctrine, the State cannot "abdicate its trust over property in which the whole people are interested . . . so as to leave them entirely under the use and control of private parties. (citations omitted). The purpose of the public trust doctrine "is to

police the legislature's disposition of public lands." "If courts were to rubber stamp legislative decisions, the doctrine would have no teeth. The legislature would have unfettered discretion to breach the public trust as long as it was able to articulate some gain to the public. (citations omitted).

Three basic principles can be distilled from this body of public trust case law. First, courts should be critical of attempts by the state to surrender valuable public resources to a private entity. . . . Second, the public trust is violated when the primary purpose of a legislative grant is to benefit a private interest. . . . Finally, any attempt by the state to relinquish its power over a public resource should be invalidated under the doctrine.

*Id.* at 1067 (citing *Lake Michigan Federation,* 742 F. Supp. at 445.

As in our case, the LMNA involved the proposed destruction and redevelopment of valuable park property adjacent to the Chicago lakefront. But, other than relatively minor distinction that the proposed site of the LMNA museum directly abutted the lakefront, the pertinent facts are substantially similar. In particular, the *Lucas* court found that the proposed 99-year lease term for the LMNA arguably surrendered control of the public trust property to the private foundation constituted a violation of the public trust doctrine, and thus holding that "Plaintiffs have sufficiently plead that the proposed Museum is not for the benefit of the public but will impair public interest in the land and benefit the LMNA and promote private and/or commercial interests… Plaintiffs have plausibly stated a claim for a violation of the public trust doctrine." *See, Id.* at 1068-69.

4.) <u>Consequently, the Court Should Not Grant Judgment on the Pleadings to the Defendants on the Plaintiffs' Count II for Breach of the Public Trust.</u>

Plaintiffs have, at minimum, adequately pled the Defendants' violation of the public trust. *See, Id.* Plaintiffs have alleged, among many other pertinent allegations, that the Park District and the City's actions and threatened actions of transferring the Jackson Park site from the Park District to the City and the City then executing a long-term agreement for only nominal consideration, transfers the use and control of the Jackson Park site to the Foundation which is a

private, non–governmental entity. Complaint at ¶ 91. The Foundation will have control over public land for not just decades but centuries to come. *Id.* Plaintiff also alleges that "[t]he action to transfer use and control of this unique and priceless lakefront Jackson Park public property site is an unconstitutional taking as there exists a significant amount of non-park, non-public trust land, on which to beneficially locate a private Presidential Center." Complaint at ¶ 92.

The Plaintiffs' allegations are bolstered by the above analysis of the Use Agreement, the terms of which reveal unheard of preferential treatment accorded to the Foundation by the City by virtue of their unequal respective rights and obligations. As the *Lucas* court explained, "courts should be critical of attempts by the state to surrender valuable public resources to a private entity." In this particular instance, that rule could not be more apt. The well-known affiliation between former Pres. Obama and Mayor Rahm Emanuel, his former Chief of Staff, the City's legendary reputation for patronage, insider deals and corrupt public officials, not to mention the Obamas' long-standing ties to the community all point to the need for this Court to invoke the highest level of scrutiny to this transaction, as opposed to the limited scrutiny that Defendants would prefer.

What sits at the heart of a public trust case is thus not necessarily the question of whether a property sits on submerged Lake Michigan land, but rather the actions of and influences upon the trustee/fiduciary – legislative and executive officials– in their decision making relative to the use and disposition of such property. Courts must therefore ensure that such transactions involving public trust property are fair and proper, and not tainted with conflicts, insider favoritism, or self-dealing favoring a private party. The City's self-serving recitation of a public purpose is by no means conclusive of the existence of such purpose. *See, e.g., People ex rel. Scott,* 66 Ill. 2d at 67.

**C.**

**Plaintiffs' Claim That The Defendants' Actions Are *Ultra Vires* States A Cause Of Action**

1.)     The City Has No Authority to Transfer the  Jackson Park Site to the Park District on the Terms at Issue.

The Defendants' Motion to Dismiss, and page 10 of the 2018 Ordinance, assert that the Local Government Property Transfer Act, 50 ILCS 605/0.01 *et seq.* ("Property Transfer Act"), allows the City to transfer the Jackson Park Site to the Park District for the total sum of $1.00, which in turn the Foundation will improve, use and occupy for at least the next 99 years.  The Property Transfer Act, however, does not allow the Park District to transfer the Jackson Park Site to the City in order to permit the City to transfer to the Foundation the right to improve, use and occupy the Jackson Park Site.

Section 2 of this Property Transfer Act provides as follows:

> If the territory of any municipality shall be wholly within, coextensive with, or partly within and partly without the corporate limits of any other municipality, or if the municipality is a school district and the territory of the school district is adjacent to the boundaries of any other school district, and the first mentioned municipality (herein called "transferee municipality"), shall by ordinance declare that it is necessary or convenient for **it** to use, occupy or improve any real estate held by the last mentioned municipality (herein called the "transferor municipality") in the making of any public improvement or for any public purpose, the corporate authorities of the transferor municipality shall have the power to transfer all of the right, title and interest held by it immediately prior to such transfer, in and to such real estate, whether located within or without either or both of said municipalities, to the transferee municipality upon such terms as may be agreed upon by the corporate authorities of both municipalities, in the manner and upon the conditions following: (Emphasis added).

Pursuant to Section 2 of the Property Transfer Act, if a transferee municipality, such as the City of Chicago, desires to obtain land from another "municipality," a park district, the City may obtain the property if the City declares in an ordinance that it is necessary or convenient for "**it** [the City] to use, occupy or improve. . ."  Thus, under the plain wording of Section 2 of the

36

Property Transfer Act, the transferee municipality (Chicago) must "use, occupy or improve" the real estate at issue. *See, Alt. Fuels, Inc. v. Director of Il. EPA,* 215 Ill. 2d 219, 238 (2004)(courts give effect to the statute's plain meaning).

Here, the City, by its own admission, is not "using, occupying or improving" the Jackson Park Site: it is the Obama Foundation, not the City, that is "using, occupying or improving" the Site. Page 10 of the 2018 Ordinance provides that the City's acquisition of the Jackson Park Site from the Park District was done for the purpose of the City's "subsequent long-term authorization to the Foundation for use of the OPC Site." The 2018 Ordinance and the Use Agreement provide that the City is granting the Foundation the right to occupy the Jackson Park Site and it is the "Foundation's obligation to construct, operate and maintain the OPC, at its sole cost and expense…" (2018 Ordinance at page 11). The 2018 Ordinance also provides that the Use Agreement permits the Foundation to "use" the Jackson Park Suite for at least the original 99 year term.

The Use Agreement itself states that the Foundation will "improve" the Jackson Park Site by building various structures, including a Forum Building; a Program, Athletic and Activity Center; a Library, and a Museum Building, and the surrounding green space comprising the Jackson Park Site, all of which are included within the definition of "Project Improvements" in the Use Agreement.

Section 2.1 of the Use Agreement then specifically provides that:

. . . the City hereby gives and grants to the Foundation for the Term the following rights with respect to the Subject Property:
(a) the right to construct and install the Project Improvements (including the Presidential Center);
(b) the right to occupy, use, maintain, operate and alter the Presidential Center Architectural Spaces; and

(c) the right to <u>use, maintain, operate and alter</u> the Presidential Center Green Space and Green Space. (Emphasis added)[19]

Further, the Museum Act, which the City and Park District claim is the sole authorization for the transaction allowing the Foundation to improve, operate and use the Jackson Park Site, requires that any private entity operating an aquarium or a museum must improve, operate and use the aquarium or museum, not the City or Park District.

A city or park district may enter into a lease for an initial term not to exceed 99 years, subject to renewal, **allowing a corporation** or society as hereinabove described **to** erect, enlarge, ornament, build, rebuild, rehabilitate, **improve**, maintain, and **operate** its aquarium or museum, together with grounds immediately adjacent to such aquarium or museum, and to **use,** possess, and occupy grounds surrounding such aquarium or museum as hereinabove described for the purpose of beautifying and maintaining such grounds in a manner consistent with the aquarium or museum's purpose. . .

Therefore, the Property Transfer Act requires that the City use, occupy or improve the Jackson Park Site in order for the transfer of the Jackson Park Site from the Park District to the City to be valid. The Museum Act contains the exact opposite requirements from the Property Transfer Act. The Museum Act requires that in the Foundation must use, occupy and improve the Jackson Park Site. The Defendants want it both ways. The Defendants argue that the City is using, occupying and improving the Jackson Park Site for the purpose of the Property Transfer Act, but then necessarily argue that the Foundation is using, occupying and improving the Jackson Park Site so the Museum Act applies and allows the Foundation to operate the OPC in

---

[19] Additional provisions of the Use Agreement conclusively establish that the Foundation, not the City, will "use, occupy and improve" the Jackson Park Site. For example, Section 4.1 of the Use Agreement provides that the Foundation, at its sole costs and expense, will design and construct all improvements on the Jackson Park Site. Section 6.1 of the Use Agreement provides that the Foundation shall solely construct, modify and improve all of the building and landscaping on the Jackson Park Site. Section 6.3 of the Use Agreement provides prohibitions on the Foundation's use and occupancy of the property. Those restrictions include such prohibitions as the Foundation using the property in ways that would void insurance coverage, and the Foundation using the property in a manner which would violate any laws, and other such similar provisions.

Jackson Park. At the very least, material questions of fact exist as to whether the City of Chicago

has the right to use, occupy or improve the Jackson Park Site. Those material questions or fact

preclude entry of judgment on the pleadings, as discussed *supra*.

If this were all not enough, the Park District's transfer of the Jackson Park Site to the City

violates an additional, separate provision of the Property Transfer Act. Section 2(b) of the

Property Transfer Act, 50 ILCS 605/2(b), provides that:

> (b) If any such real estate shall be held by the transferor municipality subject to or
> limited by any restriction, and the transferee municipality shall desire the use,
> occupation or improvement thereof free from said restriction, the transferor
> municipality (or the transferee municipality, in the name of and for and on behalf
> of the transferor municipality, but without subjecting the transferor municipality
> to any expense without the consent of its corporate authorities), shall have the
> power to secure from its grantor, or grantors, their heirs, successors, assigns, or
> others, a release of any or all of such restrictions upon such terms as may be
> agreed upon between either of said municipalities and the person or persons
> entitled to the benefit of said restrictions. Upon the recording of any such release,
> the transferor municipality shall then have the powers granted in paragraph (a) of
> this Section.

Therefore, if a transferor park district desires to transfer property limited by a restriction to a

transferee municipality, the park district may only do so with the agreement of both the

transferee municipality <u>and</u> "the person or persons entitled to the benefit of said restrictions."

The term "restriction" is defined in the Property Transfer Act as follows:

> The term "restriction" shall mean any condition, limitation, qualification,
> reversion, possibility of reversion, covenant, agreement or restraint of whatever
> kind or nature, the effect of which is to restrict the use or ownership of real estate
> by a municipality as defined in (c) above.

50 ILCS 605/1(d).

The statute transferring Jackson Park to the Park District contained an express condition

that Jackson Park be maintained as a "public park" and "free to all persons forever," and that

language is a "restriction" under Section 1(d) of the Property Transfer Act. The Illinois Supreme

Court has expressly found that the statute transferring the land at issue in Jackson Park to the now Chicago Park District containing the restriction that the land "when acquired by the Commissioners, as provided by this act, shall be held, managed and controlled by them and their successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever" is a restriction on the property, and "restrictive language" on the use of the of the property. *Paepcke,* 46 Ill. 2d at 333, 336. The *Paepcke* court also ruled that this same language specified that this "restrictive language" provided that the land is devoted to park purposes. *Id.* Thus, the language contained in the Act is a restriction placed on the property by the Illinois legislature.

The buildings contemplated by the 2018 Ordinance and the Use Agreement will alter the use from that of a "public park . . . free to all persons forever." The buildings will not at all times be free to all persons forever, as alleged in the Complaint.

The beneficiaries of the restriction on the use of Jackson Park as "a public park . . . free to all persons forever" are the citizens of the State of Illinois. There is no evidence before this Court that the State of Illinois has released any restriction on Jackson Park Site for the contemplated transaction at issue, and further there is no evidence that the State has "recorded such a release," as required under the Property Transfer Act. Thus, the Park District and City's purported transfer of the Jackson Park Site is improper under the very statute that the City and Park District allege authorize the sale of the Jackson Park Site.

2.)     The Transaction Advanced by the Defendants is *Ultra Vires* because the Use Agreement at Issue is Not a Lease, and Therefore the Museum Act Does Not Apply to the Use Agreement.

The 2015 Ordinance expressly states that the City would enter into a "lease" with the Foundation for the Foundation to improve and operate the OPC. Dkt No. 1-1, pageID#:39. The

2018 Ordinance then retracts the use of the term "lease," and instead the 2018 Ordinance approves a "Use Agreement" between the City and the Foundation. The City and the Foundation's term of a "Use Agreement" instead of a "Lease" is strategic and deliberate. Under Illinois law, an entity leasing property from a municipality is not automatically exempt from taxation and may be taxed on the fair market value of the lease, even if the lessee is a 501(c)(3) organization. *See* 35 ILCS 200/15-60. The evidence here from the Use Agreement itself reveals that the Obama Foundation is *not* paying fair value for anything associated with the spaces that it is being given. In fact, the Foundation is only paying a total of <u>10 cents a year</u> for over 19 acres of parkland in the City of Chicago -- nowhere near the fair market value.

The Museum Act, 70 ILCS 1290/1, solely authorizes a city or park district to enter into a "lease" to allow the construction and operation of an aquarium or a museum: ". . . a city or park district may enter into a **lease** for an initial term not to exceed 99 years. . . allowing a corporation or society as hereinabove described to erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate its aquarium or museum. . ." (Emphasis added).

However, the City expressly admits that the Use Agreement is not a lease. Page 31 of the City's Memorandum in support of its Motion (Page ID#:1199) expressly states: "Whatever the merits of that conclusion, the City will, in this case, own the OPC's buildings, and the agreement between the OPC and the City *is not a lease*." (Emphasis in original). The City explicitly admits that the Use Agreement is not a lease. Therefore, the Museum Act's express, unequivocal provision authorizing a city to enter into a "lease" does not apply. The Museum Act is accordingly not applicable to the transaction at issue. The City's entering into the Use Agreement is improper and unauthorized. The Plaintiffs' *ultra vires* claim, Count III of the Complaint, states a cause of action. Further, Count IV of Plaintiffs' Complaint seeking a

declaration that the Museum Act does not apply to the transaction at issue states a cause of action.

## D.
## Plaintiffs' First Amendment Claim States A Cause Of Action

Defendants argue that Plaintiffs' first amendment claim is not ripe because construction will not be completed on the Obama Center for several years. As further explained below, the argument is wrong because the City and State are currently spending taxpayer monies towards the OPC, a project which includes a platform for, and advancement of, the former President's political agenda.

The ripeness doctrine seeks to avoid the premature adjudication of cases when the issues posed are not fully formed, or when the nature and extent of the law's application are not certain." *Triple G Landfills, Inc. v. Bd. of Comm. of Fountain Cnty., Ind.*, 977 F.2d 287, 288-89 (7th Cir. 1992). To determine whether an issue is ripe for judicial adjudication, two questions are asked: (1) whether the relevant issues are "sufficiently focused" and developed so as to permit judicial resolution, without awaiting further factual development of the issues posed and (2) whether the postponement of the judicial resolution would cause hardship and injury to the parties. *Id.* The customary ripeness analysis is relaxed in circumstances involving First Amendment considerations. *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1500 (10th Cir. 1995).

Plaintiffs' First Amendment claim is ripe for adjudication. Section 8 of the Environmental Agreement (Dkt No. 49-6, PageID#: 1352). provides that the City of Chicago is using tax payer dollars <u>now</u> to reimburse the Foundation for environmental costs that the Foundation previously incurred related to the OPC Site. The same section of the Environmental

Agreement states that the City will pay for all environmental remediation costs related to building the OPC. Moreover, the City is undertaking and paying for all permanent road alterations in the location of the planned OPC before the OPC is constructed, pursuant to Section 4.14 of the Use Agreement. (Dkt No. 49-6, PageID#: 1278). Further, as the Court is aware from prior motion practice, the Defendants have already begun work on the Jackson Park Site directly related to the OPC. (Docket No. 23)

As alleged, and admitted in Defendants answer,[20] former President Obama has, and will continue to, advance certain political causes and candidates in the Democratic Party. The Obama Foundation is intertwined with President Obama, and as Defendants admit the Foundation is "an academic institute to enhance the pursuit of the [former] President's initiatives beyond 2017". (Emphasis added") Complaint at ¶ 116. To this point, and as alleged (which is to be accepted as true) "[f]ormer President Obama has made it known that he intends to use his Center as a 'bully pulpit' to continue his political activities by raising money for the Democratic Party, endorsing individual candidates for election, speaking out on controversial partisan political issues, and being outspoken in critiquing the actions of succeeding presidents and elected members of Congress with whom he disagrees." Complaint at ¶ 117.

However, not all taxpayers in the State of Illinois and City of Chicago support Democratic candidates and policies. Those persons who do not support Democratic candidates and policies are still forced to pay taxes that are and will be used for the OPC to enhance the former President's stature and political influence. Such circumstances are recognized as implicating the First Amendment.

---

[20] Defendants' Answer admits the allegations of paragraph 116 of Plaintiffs' Complaint.

In *Janus v. AFSCME Council 31*, 585 U.S. ___, 138 S.Ct. 2448, 2459-60 (2018), the United States Supreme Court held that the government cannot force a citizen to subsidize private speech with which the citizen disagrees. As the *Janus* Court explained, the Illinois law which "forced [public employees] to subsidize a union, even if they choose not to join and strongly object to the positions the union takes in collective bargaining and related activities...violates the free speech rights of non-members by compelling them to subsidize private speech on matters of substantial public concern." *Janus*, 138 S. Ct. at 2459-2460. Because the First Amendment freedoms of speech and association include the rights to "refrain from speaking" and to "eschew association for expressive purposes," whenever the government "prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree," it undermines American democratic government and the "search for truth." *Id.* at 2463-64. Hence, "compelling a person to subsidize the speech of other private speakers raises similar First Amendment concerns;" and "because the compelled subsidization of private speech impinges on First Amendment rights, it cannot be casually allowed." *Id.* at 2464. In the present case, taxpayers paying for the OPC, while former President Obama continues to endorse Democratic political causes and candidates, whether at the OPC or not, is a classic first amendment violation.

The law applicable to the facts at issue provides that the government violates the First Amendment when it compels individuals to subsidize the speech of a private party. *See e.g., Janus*, 138 S.Ct. at 2459-60; *U.S. v. United Foods*, 533 U.S. 405 (2001) (sustaining compelled-subsidy challenge to assessment, the only purpose of which was to fund mushroom advertising); *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990) (sustaining compelled-subsidy challenge to state bar membership dues used to finance certain ideological and political activities that were not

44

prescribed by law or developed under official government supervision).  In these compelled subsidation cases, whether the speech is a violation of the First Amendment is determined by the degree of government control over the message. *Johanns v. Livestock Mktg. Ass'n.*, 544 U.S. 550, 558-62 (2005)(when "the government sets the overall message to be communicated and approves every word that is disseminated" it may rely on the government speech doctrine, even if a private party assists in "developing specific messages").

Defendants cite a line of cases related to the "government speech doctrine" for Defendants' argument that the Plaintiffs' Complaint does not state a claim for a first amendment violation.  The government speech doctrine provides that the government itself may adopt policy positions and promote them without having to equally promote opposing policies advocating the opposite viewpoint. *See e.g., Johanns*, 544 U.S. 550. The government speech doctrine, however, is not at issue in this case.[21]

The facts and circumstances at issue fit within the compelled subsidation cases.  Here, the former President is supporting causes and candidates associated with the Democratic Party.  The former President has avowed to continue to do so, and to use the Obama Presidential Center,

---

[21]A comparison of the circumstances in *Johanns* and *Keller* illustrate the differences between compelled subsidization in permissible government controlled speech and impermissible private speech.  In *Johanns*, the Supreme Court considered whether compelled subsidation of advertisements promoting the sale of beef products was Constitutional. 544 U.S. at 550. The threshold issue was whether the advertising was the federal government's own speech and thus exempt from First Amendment scrutiny.  544 U.S. at 553. The Supreme Court looked at two factors: (1) whether the government set the message and (2) whether it approved and controlled the communicated message. *Id.* at 560-62. The Supreme Court reasoned that this speech, from start to finish, was established by the federal government. *Id.* This should be juxtaposed with the circumstances in *Keller*, where the state bar's speech to which the members objected was not prescribed by law and was not developed under the government's supervision. The speech was purely private.  Therefore, mandatory dues to fund that private speech violated the First Amendment.  *Keller*, 496 U.S. at 11-13.

whether directly or indirectly, to further his political purposes. The Foundation is the former President's own foundation, and even the Defendants admit that its purpose is to further the former President's initiatives. The City of Chicago is supporting and subsidizing that private speech by using taxpayer money for the construction related to the "Obama Presidential Center." Forcing Chicago taxpayers, and taxpayers of the State of Illinois, to fund the Obama Presidential Center violates the free speech rights of those taxpayers who disagree with the political opinions and causes espoused by the former President and the candidates endorsed by the former President. The speech itself is private speech, as Mr. Obama no longer holds public office, his speech is not prescribed by law, and was not developed under the government's supervision. When taxes are used to fund that private speech, the collection of the tax violates the First Amendment. *See, O'Brien,* 2018 U.S. Dist. LEXIS 207356 (question of whether tax paid to Village which was used to fund organization's activities was a violation of First Amendment turns on whether speech is private speech or government speech).

**E.**

**Plaintiffs' Claim That The Museum Act Is Unconstitutional Special Legislation States A Cause Of Action**

Count V of Plaintiffs' Complaint alleges that the Amendment to the Museum Act's provisions related to "presidential libraries, centers and museums" was specifically drafted to benefit the Foundation and was enacted solely to locate the OPC in Jackson Park, and that such classification is arbitrary, and therefore unconstitutional special legislation.

In assessing whether a statute violates the prohibition against special legislation, courts apply a two-part analysis. First, a determination is made as to whether the statutory classification at issue discriminates in favor of a select group. If it does, then courts must consider whether the classification is arbitrary. *Big Sky Excavating, Inc. v. Ill. Bell Tel. Co.*, 217 Ill. 2d 221, 235

(2005). Certainly for purposes of the considering Defendants' Motion for Judgment on the Pleadings, Plaintiffs have alleged such a violation.

As to the first prong of the analysis, there is no question that the statutory classification was enacted solely to benefit one, and only one, entity. Plaintiffs' Complaint alleges, and Defendants admit, that the City of Chicago's Corporation Counsel, Stephen Patton, specifically stated that the City of Chicago's Law Department drafted the amendment to the Museum Act for the purpose of allowing the Foundation to locate the OPC in Jackson Park. Complaint at ¶110, 111; Answer at ¶110, 111. The Complaint further alleges that Stephen Patton issued a written statement that the Illinois legislature enacted the same legislation drafted by the City designed to benefit only the Foundation locating the OPC in Jackson Park. Complaint at ¶ 111.

That portion of the Amendment to the Museum Act that was expressly drafted solely to benefit locating the OPC in Jackson Park authorizes the following "edifices" in public parks: "Aquariums or museums of art, industry, science, or natural or other history, including presidential libraries, centers and museums." (Emphasis added). The Museum Act provides that "presidential libraries, centers and museums" are a subset of "museums of . . . other history." Further, by listing each separate edifice, a "presidential library," a "center" and "museums," are each distinct edifices. That is true because each word in a statute should be interpreted so that no word is rendered superfluous. *Block v. Ill. Sec. State,* 2013 IL App (5th) 120157 ¶ 12.

Problematically, the classification of edifices consisting of a "presidential library" or a "center" is itself undefined and arbitrary. The ordinance does not contain any definition of a "presidential library" or a "center." The Obama Library will not be a "presidential library" in the sense as existed at the time of the Amendment to the Museum Act. *See*, Thirteen Presidential Foundation's Amicus Brief [Dkt. No. 56-1 at page 3] (PageID#1768); Complaint at ¶ 4.

47

Moreover, the Museum Act does not define a "center," and therefore a "center" is apparently whatever the Foundation decides constitutes a "center."

In any event, in looking at the second prong, the statute must not be arbitrary, and must bear a rational relationship to the purpose of the statute in order to survive a challenge that the statute is unconstitutional special legislation. *See e.g., Big Sky Excavating, Inc.* (finding that statute only intended to benefit Illinois Bell Telephone and analyzing statute on rational relationship basis). The fact that statute must bear a rational relationship to its stated purpose is illustrated in the Illinois Supreme Court's opinion in *Moline Sch. Dist. No. 40 Bd. of Educ. v. Quinn*, 2016 IL 119704. In *Moline School District*, a municipality enacted an ordinance providing a tax benefit upon an Illinois aviation company that was considering expanding its operation in Iowa. The ordinance was intended to entice the aviation company to expand in Illinois, rather than Iowa. The ordinance was challenged on the basis of being special legislation.

The Illinois Supreme Court found the ordinance unconstitutional special legislation. The Supreme Court acknowledged the aviation company's unique situation, but noted that the aviation company was not required to use the tax savings from the ordinance to expand its operations in Illinois. Therefore, there was no relationship between a tax incentive to entice the company to expand in Illinois when the tax savings was not required to be used expand in Illinois.

In the matter at bar, the Illinois legislature's claimed basis for enacting the Amendment to the Museum Act is found within the Amendment itself, which states:

> It is hereby reaffirmed and found that the aquariums and museums as described in this Section, and their collections, exhibitions, programming, and associated initiatives, serve valuable public purposes, including, but not limited to, furthering human knowledge and understanding, educating and inspiring the public, and expanding recreational and cultural resources and opportunities.

48

70 ILCS 1290/1.

Here, there is no rational relationship between locating a "presidential library," a "center" or "museums" on public parkland, rather than on any municipal land or private property, to the alleged benefits stated in the Museum Act that museums "serve valuable public purposes." There is no rational basis to conclude that a presidential library or a center in a public park provides any benefit over a library or center located on municipal land that is not a park, or even on privately owned land. Put differently, the public purpose of "museums" exists independent of whether the museums are located in a park or in any other location. Therefore, just like the special legislation at issue in *Moline School District,* the legislation is unconstitutional special legislation.[22]

## CONCLUSION

Defendants request that this Court deny Defendants' Motion. Further, Defendants have presented various documents and facts that did not exist at the time Plaintiffs filed their original Complaint. Therefore, Plaintiffs request that this Court grant the Plaintiffs leave to file an Amended Complaint conforming to the present state of the relevant facts. Plaintiffs also request such other and further relief as this Court deems just.

---

[22] The Thirteen Presidential Foundation's Amicus Brief states that the benefit of what they term the new model for presidential libraries and museums adopted by the Foundation in the present case, is that the former president's records are now digitalized, where on-line users can review documents from anywhere in the world and not have to visit a physical location. The benefit of a presidential library or museum has no relationship whatsoever to its physical location or more specifically in a park.

/s/Mark D. Roth

Mark D. Roth
Robert Fioretti
Edward Campbell
Roth Fioretti LLC
311 S. Wacker, Suite 2470
Chicago, IL 60606
(312) 922-6262
Mark@rothfioretti.com
Rwfchicago@yahoo.com
Ed@rothfioretti.com

50