# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FRIENDS OF THE PARKS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 14-CV-9096 |
| | ) | Judge John J. Darrah |
| CHICAGO PARK DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S MEMORANDUM IN SUPPORT
OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

**INTRODUCTION**

Plaintiffs' challenges to the proposed Lucas Museum of Narrative Art ("Museum") are premature, based on erroneous factual and legal assumptions, and otherwise entirely meritless. At the outset, Plaintiffs' claims fail to satisfy the Article III requirements of ripeness and standing because they are contingent upon future events, namely the approval of the Museum by the Chicago Plan Commission, the Chicago City Council, and the board of Defendant Chicago Park District. Even if Plaintiffs' claims were justiciable, they are substantively deficient. Plaintiffs allege a due process violation based on their assertion that the land in question is held in trust by the State of Illinois and that the approval of the Illinois General Assembly is required but has not been obtained. But this claim, like their state law "*ultra vires*" claim, fails because title to the land is actually held by the Park District, and the Illinois General Assembly long ago granted the Park District the authority to locate museums on this land. Plaintiffs further allege that the Museum violates their equal protection rights, but that claim likewise fails because they do not allege, nor can they, that similarly situated groups are being treated differently. Finally, Plaintiffs assert that the proposed location of the Museum violates the public trust doctrine, but

that doctrine does not apply because the Park District will retain control over the land, and the Museum has myriad public benefits. Plaintiffs' Complaint should therefore be dismissed.

## BACKGROUND

On May 16, 2014, the Mayor's Lucas Cultural Arts Museum Site Selection Task Force recommended the parking lots south of Soldier Field as the site for the Museum. Compl. ¶¶ 13, 15. On May 20, 2014, the Mayor publicly endorsed the Task Force's recommendation. *Id.* ¶ 14. The Park District thereafter entered into a memorandum of understanding ("MOU") with the non-profit corporation that would operate the Museum ("LMNA"). *Id.* ¶¶ 16-17 & Ex. A.

The purpose of the MOU is to "outline the preliminary terms that have been discussed between the Park District and LMNA regarding the beautification and use of the Museum Site . . . and the construction, use and operation of the [M]useum." Compl. Ex. A, Recital G. It provides that the Museum "will be located in the Museum Campus in the area generally lying between East Waldren Drive on the north and the McCormick Place Lakeside Center (East Building) on the south (the "Project Area")," which "is now used for structured and surface parking." *Id.* ¶ 1. The exact location of the Museum in the Project Area will be determined at a later time. *Id.* The MOU states that "[t]he land on which the Museum will be located is owned by the Park District," *id.* Recital C, and provides that the Park District will continue to own the land after construction of the Museum, *see id.* ¶¶ 3, 10.

The MOU explains that "[t]he proposed development will not proceed unless and until the parties have negotiated, executed and delivered mutually acceptable agreements following public review and hearing processes and subject to all applicable governmental approvals, including City Council action and Park District board approval." *Id.* Recital G. One such agreement is a "development agreement" between LMNA and the Park District that will outline

2

"the terms and conditions of the construction and financing of the Museum and the respective roles and responsibilities of each party." *Id.* ¶ 9. A separate "operating agreement" will govern "the use of the Museum Site." *Id.* ¶ 10. Both agreements require approval by the Park District's board. *Id.* ¶¶ 9, 19. Additionally, Planned Development No. 778 ("PD 778") governs the zoning of the Project Area and would have to be amended by the City Council to permit the Museum's construction. *See* City Council Journal of Proceedings dated Mar. 28, 2001 at 56415-56440. Furthermore, because the Project Area is located within the area governed by the Lake Michigan and Chicago Lakefront Protection Ordinance, Municipal Code of Chicago ("MCC") § 16-4-010, *et seq.* ("Lakefront Protection Ordinance"), the approval of the Plan Commission is also required. *Id.* ¶ 12.

In Count I of their Complaint, Plaintiffs allege that the Project Area is land recovered from Lake Michigan and that Defendants have violated due process by "acting to build or approve the building of the [Museum] without the prior authorization of the General Assembly." Compl. ¶ 42. In Count II, they claim that Defendants "created or will create a new right" in the lakefront property "for the benefit of the LMNA," *id.* ¶ 45, in violation of equal protection, *id.* ¶¶ 46-47. In Count III, Plaintiffs allege that, in taking steps to improve the lakefront land without the approval of the General Assembly, Defendants have committed an "*ultra vires*" act. *Id.* ¶¶ 48-51. Finally, Count IV asserts that the Museum's construction violates Illinois's public trust doctrine. *Id.* ¶¶ 52-56. Plaintiffs ask the Court to enjoin the conveyance of any interest in or control over the Project Area to LMNA or any other organization or individual and to enjoin the City from approving the Museum or allowing it to be built in the Project Area. *Id.* at 12.

## LEGAL STANDARDS

Rule 12(b)(6) permits dismissal when the plaintiff fails to state a claim upon which relief

3

can be granted. *See* Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[W]here a plaintiff attaches documents and relies upon the documents to form the basis for a claim or part of a claim, dismissal is appropriate if the document negates the claim." *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 754 (7th Cir. 2002).

Rule 12(b)(1) allows dismissal when the Court lacks subject matter jurisdiction over a plaintiff's claim. *See* Fed. R. Civ. P. 12(b)(1). The plaintiff bears the burden of establishing that the Court has subject matter jurisdiction, and when such jurisdiction is challenged, the plaintiff must provide competent proof of jurisdictional facts to support its allegations. *See Thomas v. Gaskill*, 315 U.S. 442, 446 (1942); *Kontos v. Dep't of Labor*, 826 F.2d 573, 576 (7th Cir. 1987).

## ARGUMENT

### I. Plaintiffs Have Not Alleged A Justiciable Controversy.

#### A. Plaintiffs' Claims Are Not Ripe for Adjudication.

Plaintiffs' claims are not ripe for adjudication, and, as a result, this Court lacks subject matter jurisdiction and should dismiss the Complaint pursuant to Rule 12(b)(1). In determining whether a claim is ripe, a court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Plaintiffs' claims are entirely contingent on the occurrence of future administrative and legislative action and are therefore not fit for judicial review. *See Corey H. v. Bd. of Educ. of the City of Chicago*, 534 F.3d 683, 689 (7th Cir. 2008) (claims founded on "contingent future events that may not occur as anticipated, or indeed may not occur at all," are not ripe).

As the MOU makes clear, any proposal to construct the Museum in the Project Area cannot proceed until it receives the approval of both the Plan Commission and the City Council. Compl. Ex. A, ¶ 12. Because the Project Area is located within the area governed by the Lakefront Protection Ordinance, the Park District must apply to and receive approval from the Plan Commission. MCC § 16-4-100, -150. Moreover, the Project Area is located in PD 778, which currently does not allow for the construction of a museum in the Project Area. Pursuant to the Chicago Zoning Ordinance, the Park District therefore must apply to the City for an amendment to PD 778. *See id.* § 17-13-0602. If such an application is filed, the matter would be heard by both the Plan Commission and the City Council's Committee on Zoning, Landmarks & Building Standards before the City Council ultimately votes on whether to approve the zoning amendment. *Id.* §§17-13-0604, - 605, -0606, -0607. Plaintiffs do not allege—nor can they—that any of these approvals have been applied for, much less granted by, the Plan Commission or the City Council.

Other necessary events likewise have not yet occurred. Under the MOU, the Park District and LMNA must negotiate and execute development and operating agreements, which require the Park District's board's approval. Compl. Ex. A, ¶¶ 9, 10, 19 & Recital G. Plaintiffs do not plead that such agreements have been negotiated, finalized, or submitted to the Park District's board for approval. Moreover, as the MOU and Plaintiffs' allegations demonstrate, the Museum is only in its initial development stages and is subject to changes which could be material to Plaintiffs' claims. For example, the MOU states that it "is intended to provide a general framework for the subsequent negotiation of definitive agreements regarding the development and operation of the Museum [and] does not address all material terms of the definitive agreements contemplated hereby and all terms of such agreements will be the subject

5

of further negotiation." *Id.* ¶ 19. For these reasons, Plaintiffs' claims are not yet ripe for review.

Moreover, Plaintiffs cannot claim that they will suffer any hardship if the issues they raise are not considered until the proposed project has received all necessary approvals. As explained above, the Museum cannot legally locate in the Project Area absent the approval of the Plan Commission under the Lakefront Protection Ordinance, *see* MCC § 16-4-150, the City Council's approval of an amendment to PD 778, *id.* § 17-13-0607, and the Park District's board's approval of the development and operating agreements, Compl. Ex. A, ¶¶ 9, 19. Assuming that applications are submitted, the Plan Commission, the City Council, and the Park District's board will hold public hearings before voting on them. *See* MCC §§ 16-4-100, 17-13-0604-A-E, 17-13-0606. Thus, Plaintiffs cannot legitimately fear governmental action without notice, and they will not be harmed if their claims are deferred until the necessary approvals have been applied for and obtained.

### B. Plaintiffs Lack Standing to Bring Their Claims.

For similar reasons, Plaintiffs also lack standing to bring any of their claims. "Article III standing requires an injury-in-fact capable of being redressed by a favorable decision of the court." *Bond v. Utreras*, 585 F.3d 1061, 1072-73 (7th Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). An "injury in fact" is an "invasion of a legally-protected interest" that is not only "concrete" and "particularized," requiring that it "must affect the plaintiff in a personal and individual way," but also "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (1992) (citation and internal quotation marks omitted). And without a "certainly impending" injury, standing does not exist. *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). Moreover, "[t]he litigant must clearly and specifically set forth facts sufficient to satisfy these Art[icle] III . . . requirements." *Id.* at 155-56.

6

Here, Plaintiffs cannot meet their burden of demonstrating that they have suffered an injury or that one is impending. As set forth above in Part I.A, the Museum requires the approval of the Plan Commission under the Lakefront Protection Ordinance, the amendment of PD 778 by the City Council, and the approval of development and operating agreements. Absent the filing of and granting of such applications, no injury to Plaintiffs has occurred or is imminent. And although standing may exist where there is a "probability of harm" in the future, *520 S. Michigan Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006), Plaintiffs cannot show that harm is probable because it cannot be presumed at this juncture that applications will actually be submitted, that they will be approved, or what will be approved. For these reasons, Plaintiffs do not have standing to bring their claims.

    **C.**    **An Injunction Barring the City Council's Consideration of the Proposal Would Violate the Separation of Powers Doctrine.**

The Court should not permit Plaintiffs' claims to proceed at this juncture for the additional reason that doing so would violate the separation of powers doctrine. Article III's limits on the jurisdiction of the federal courts "define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government." *Flast v. Cohen*, 392 U.S. 83, 95 (1968); *see also New Orleans Water Works Co. v. City of New Orleans*, 164 U.S. 471, 481 (1896) ("[A] court of equity cannot properly interfere with, or in advance restrain, the discretion of a municipal body while it is in the exercise of powers that are legislative in their character.").

As discussed above, the Museum cannot locate in the Project Area unless and until it receives, *inter alia*, zoning approval by the City Council. *See* Part I.A, *supra*. Plaintiffs, however, ask this Court to "enjoin" the City "from authorizing, approving, or taking any role in the construction of any new building or development" in the Project Area. Compl. ¶ 1. Plaintiffs

7

therefore seek to supersede and negate the legislative authority of the City Council before it can even consider a zoning application to amend PD 778. Under the separation of powers doctrine, the Court cannot enjoin the City Council from taking legislative action; its powers are limited to determining whether such legislative action, once taken, is lawful. *See New Orleans*, 164 U.S. at 481 ("If an ordinance be passed, and is invalid, the jurisdiction of the courts may then be invoked for the protection of private rights that may be violated by its enforcement."); *Associated Gen. Contractors of Am. v. City of Columbus*, 172 F.3d 411, 415 (6th Cir. 1999) ("The *New Orleans* Court made clear that the role of the court is to intervene, if at all, only after a legislative enactment has been passed."); *Bank of New York Mellon v. City of Richmond*, No. C 13-03664 CRB, 2013 WL 5955699, at *3 (N.D. Cal. Nov. 6, 2013) ("[T]o intervene before the [City Council acts] would stretch the role of the judiciary beyond what is contemplated by Article III."). Article III requires that the democratic process be permitted to play out before the federal courts step in. Because the Court cannot grant Plaintiffs the relief they seek without running afoul of the separation of powers doctrine, Plaintiffs' claims should be dismissed pursuant to Rule 12(b)(1).

II. **Plaintiffs' Substantive Claims Should Be Dismissed Under Rule 12(b)(6).**

    A. **Plaintiffs Fail to State a Due Process Claim (Count I).**

In Count I, Plaintiffs claim that the City has violated the Due Process Clause of the Fourteenth Amendment by "acting to build or approve the building of the LMNA without the prior authorization of the General Assembly." Compl. ¶ 42. To state a procedural due process claim, Plaintiffs must demonstrate (1) a constitutionally protected property interest, (2) the deprivation of that interest, and (3) that the deprivation occurred without due process of law. *See LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 943-44 (7th Cir. 2010).

8

As a threshold matter, Plaintiffs' due process claim fails because they cannot allege a property interest protected by the federal constitution. Plaintiffs allege that because the lakefront was "recovered from the waters of Lake Michigan," it is "held solely by the State of Illinois in trust for the public," Compl. ¶ 1, and, under Illinois's public trust doctrine, "every citizen of the State has an equal beneficial interest" in the property, *id.* ¶ 2. Plaintiffs' alleged "beneficial interest" in the lakefront land is not a constitutionally protected property interest. "'[P]roperty' interests protected by procedural due process" must be "legitimate claim[s] of entitlement," *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972), that are secure interests, rather than "abstract concern[s]," *id.* at 578. Illinois's public trust doctrine creates no such secure entitlements. Instead, it places restrictions on the use of certain types of public land. *See Friends of the Parks v. Chi. Park Dist.*, 203 Ill. 2d 312, 325-26, 786 N.E.2d 161, 169-70 (2003); *see also* Section II.D, *infra*. But those restrictions apply to government actions; they do not vest any securely held constitutionally protected property interest in any particular individual.

Even if Plaintiffs could assert a protected property interest, they do not allege a due process violation. Plaintiffs claim that their "beneficial interest" in the lakefront may not be diminished or conveyed without authorization from the General Assembly. Compl. ¶¶ 42-43. These allegations state, at most, a violation of state law. *See PPL Montana, LLC v. Montana*, 132 S. Ct. 1215, 1235 (2012). The Seventh Circuit has repeatedly emphasized that federal courts should not conflate violations of state law with violations of the federal Constitution. *See Coniston Corp. v. Vill. of Hoffman Estates*, 844 F.2d 461, 467 (7th Cir. 1988) ( "A violation of state law is not a denial of due process of law."). *See also Tenny v. Blagojevich*, 659 F.3d 578, 583 (7th Cir. 2011) ("Federal courts do not sit to compel a state's compliance with its own law."); *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 166-67 (7th Cir. 1994) ("Failure to

9

implement state law violates that state law, not the Constitution."). Plaintiffs cannot base a federal due process claim on an alleged violation of the public trust doctrine or a lack of authorization from the General Assembly because those claims arise, if at all, under state law.[1]

Finally, Plaintiffs incorrectly allege that because the State of Illinois holds the land as "public trust property," the General Assembly must authorize the use of the land. Compl. ¶ 23. That is not correct. As explained in Part II of the Park District's Memorandum in Support of Its Motion to Dismiss ("Park District Mem."), which the City adopts and incorporates herein, the land in question is owned by the Park District and is subject to its control and authority, not that of the state. *See also* 70 ILCS 1230/4 (vesting "the right, title and interest" of reclaimed land from Lake Michigan in the board of park commissioners); 70 ILCS 1505/12 (vesting "title to all lands" held by preexisting park commissions in the Chicago Park District). And even were the state's approval of improvements to the land required, the state has already explicitly authorized the use of Park District land for museums. *See* Park District Mem., Part II (citing Park District Aquarium and Museum Act, 70 ILCS 1290/1). For all of these reasons, Plaintiffs' due process claim in Count I should be dismissed.

### B. Plaintiffs Fail to State an Equal Protection Claim (Count II).

In Count II, Plaintiffs claim that "Defendants have created or will create a new right" in the lakefront property "for the benefit of the LMNA," Compl. ¶ 45, and that the creation of this "special right" violates the Equal Protection Clause of the Fourteenth Amendment, *id.* ¶¶ 46-47.

---

[1] For this reason, courts in this circuit have rejected due process challenges based on the allegedly improper use of public property or funds by public entities. *See, e.g., Booth v. Lemont Mfg. Corp.*, 440 F.2d 385, 386-87 (7th Cir. 1971) (rejecting due process claim based on deprivation of taxpayers' alleged "equitable interest" in public property); *Marshall v. Cnty. of Cook*, No. 10 C 6843, 2011 WL 5980454, at *2 (N.D. Ill. Nov. 29, 2011) (alleged misallocation of court filing fees did not constitute a due process violation); *Devereaux v. Moore*, No. 10 C 7121, 2011 WL 2790175, at *5 (N.D. Ill. July 15, 2011) (alleged conversion of fees by the Cook County Recorder, in violation of state law, did not rise to a due process violation).

10

Plaintiffs' claim, however, does not fall within either of the types of equal protection claims that courts have recognized. Equal protection challenges typically concern "governmental classifications that affect some groups of citizens differently from others." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008) (internal quotation marks omitted). Less common are class-of-one equal protection challenges, which assert that an individual has been "irrationally singled out," regardless of any group affiliation, for discriminatory treatment. *Id*. A "class-of-one" plaintiff must show that (1) "he has been intentionally treated differently from others similarly situated," and (2) "there is no rational basis for the difference in treatment." *Fares Pawn, LLC v. Ind. Dept. of Fin. Insts.*, 755 F.3d 839, 845 (7th Cir. 2014) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

Plaintiffs' equal protection challenge fails under either theory. Plaintiffs do not allege that they are part of a group of citizens that has been subjected to discriminatory treatment. Nor do they allege that the City has treated them, as individuals, differently from anyone else similarly situated. To the contrary, they base their alleged equal protection injury on the fact that they, along with *every other Illinois citizen*, have an "equal beneficial interest" in the lakefront land. Compl. ¶ 2. Thus, by Plaintiffs' own admission, they have been treated exactly the same as all other Illinois citizens. These allegations do not state an equal protection claim.

Nor may Plaintiffs base an equal protection claim on the allegedly favorable treatment of LMNA. A benefit conferred upon a third party does not give rise to an equal protection claim where the plaintiff was not similarly situated to the third party and sought no similar benefit. *See, e.g., Hi Pockets, Inc. v. Music Conservatory of Westchester, Inc.*, 192 F. Supp. 2d 143, 158 (S.D.N.Y. 2002) (plaintiff could not allege an equal protection claim based on city's grant of a building permit to another entity). Furthermore, in *Engquist*, the Supreme Court explained that a

11

class-of-one equal protection challenge is inappropriate where state action does not involve the application of a clear standard, but rather—as will necessarily be the case with the approval of the Museum, should it occur—"discretionary decisionmaking based on a vast array of subjective, individualized assessments." 553 U.S. at 603. In such situations, "treating like individuals differently is an accepted consequence of the discretion granted," and "allowing a challenge based on the arbitrary singling out of a particular [entity] would undermine the very discretion that [public] officials are entrusted to exercise." *Id.* For all of these reasons, the City's actions with respect to LMNA and the Museum cannot form the basis of an equal protection challenge.

C. **The Improvement of the Project Area Is Not an *Ultra Vires* Act (Count III).**

In Count III, Plaintiffs allege that, in taking steps to improve the lakefront land without the approval of the Illinois General Assembly, the City has committed an *ultra vires* act. Compl. ¶¶ 48-51. For the reasons set forth in Part II of the Park District's Memorandum, which the City adopts and incorporates herein, the prior approval of the Illinois General Assembly is not required before actions are taken that affect the Project Area because it is owned by the Park District. Moreover, the General Assembly has already authorized the Park District to enter into agreements such as the MOU. Count III should therefore be dismissed pursuant to Rule 12(b)(6).

D. **The Museum Does Not Contravene the Public Trust Doctrine (Count IV).**

In Count IV, Plaintiffs allege that the proposal to locate the Museum in the Project Area violates the public trust doctrine. That doctrine, however, does not bar the use of park property that remains in the control of the Park District and is used for a project that has a public benefit. *See Friends of the Park*, 203 Ill. 2d 312, 786 N.E.2d 161. Here, the Park District retains ownership of the land, and the Museum, like the other museums on Park District land located in

the same area, such as the Field Museum, the Shedd Aquarium and the Adler Planetarium, will be open to the public and will provide numerous public benefits.

The public trust doctrine has been applied to bar the conveyance of public land to a private entity for private use. *See Illinois Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 444 (1892) (public land conveyed to private railroad for railroad's use); *People ex rel. Scott v. Chicago Park Dist.*, 66 Ill. 2d 65, 360 N.E.2d 773 (1976) (public property sold to a steel mill for construction of a steel plant). These transactions relinquished public land to private parties for a private use. That is not what is proposed here.

The Illinois Supreme Court has rejected a public trust argument involving the same park land at issue here. In *Friends of the Parks*, 203 Ill. 2d 312, 786 N.E.2d 161, the court upheld a statute allowing for public funds to be spent improving Soldier Field, which is owned by the Park District but used by the Chicago Bears. Friends of the Parks claimed that the statute violated the public trust doctrine because it allowed "a private party (the Bears) to use and control Soldier Field for its primary benefit with no corresponding public benefit." *Id.* at 325, 786 N.E.2d at 169. The Court disagreed and concluded that there was no violation of the public trust doctrine. *Id.* at 327, 786 N.E.2d at 170. It noted that:

> Neither the Act, the implementing agreements, nor the project documents provide for a conveyance of the Soldier Field property to the Bears. There is no abdication of control of the property to the Bears. The Park District will continue in its previous capacity as landlord under a lease agreement with the Bears and will continue in its existing role as owner of the remainder of the Burnham Park property.

*Id*. The Court also explained that "Soldier Field will continue to be used as a stadium for athletic, artistic, and cultural events. With improved parking, the public will gain better access to the stadium, the museums, and the lakefront generally. The public will now enjoy a fully

13

renovated, multiuse stadium instead of a deteriorating 78-year-old facility. These results do not violate the public trust doctrine even though the Bears will also benefit from the completed project." *Id.* at 328, 786 N.E.2d at 170.

The same reasoning applies here. The Park District has not relinquished the land, and the primary purpose of the MOU benefits the public, not a private interest. First, the MOU provides that the Park District retains ownership of the Museum site, *see* Compl. Ex. A ¶ 10, and that the Park District "retains police control over the entire Project Area under its jurisdiction, including the Museum Site." *Id*. ¶ 3. And if LMNA fails to operate the Museum consistent with the operating agreement, LMNA's rights in the Museum terminate and all rights to use the property revert to the Park District. *Id.* ¶ 7.

Second, and most importantly for purposes of the public trust doctrine, the Museum will provide undeniable public benefits. Plaintiffs have not and cannot allege that use of the park land for a museum will not benefit the public. Museums, like the Field Museum, the Adler Planetarium, and the Shedd Aquarium, have been located on park land in the same area of Burnham Park at issue here for decades, and the General Assembly has specifically authorized the use of park lands for museums. *See* 70 ILCS 1290/1.

In addition, Plaintiffs attach the MOU to their Complaint, and the MOU demonstrates that the Museum will benefit the public. The MOU requires that the Museum "be open to the public and used solely and exclusively for the purpose of operating and maintaining a museum consistent with the educational and cultural mission of LMNA . . . ." *Id* ¶ 2. The MOU also provides that the Museum will expand cultural and educational opportunities in Chicago, increase the green space in the Project Area, and improve access to Northerly Island Park. *See*

14

Compl. Ex. A, Recital E & ¶¶ 14-15.[2] It also requires the Museum to "operate in compliance with the Park District Aquarium and Museum Act, 70 ILCS 1290/1 *et seq.*" *Id.* ¶ 3. The Park District Aquarium and Museum Act requires that museums located in a public park be open without charge to any children enrolled in school in grades between kindergarten through twelve, when they are accompanied by a teacher, and be open without charge to any residing in Illinois for a period equivalent to 52 days, at least six of which must be in the summer. 70 ILCS 1290/1. And, ensuring these benefits, LMNA's right to use the property terminates if it does not follow these requirements. Compl. Ex. A ¶ 7. There can be no question that the Museum will provide clear benefits to the public, and it therefore does not violate the public trust doctrine. Count IV should be dismissed.

## CONCLUSION

For these reasons, the City respectfully requests that the Court dismiss Plaintiffs' Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6) and grant the City such further relief as it deems just and appropriate.

Date: December 12, 2014         Respectfully submitted,

William Macy Aguiar             STEPHEN R. PATTON,
Ellen W. McLaughlin             Corporation Counsel of the City of Chicago
City of Chicago, Department of Law
30 North LaSalle Street, Suite 1230     By:    /s/William Macy Aguiar
Chicago, Illinois 60602                        Senior Counsel
(312) 744-7686 / 742-5147

Attorneys for Defendant City of Chicago

---

[2] Contrary to the Plaintiffs' allegations, the MOU demonstrates that the Project Area is not a "free and open space with access to navigation, boating, fishing, commerce and other activities on Lake Michigan." Compl. ¶ 54. The Project Area instead is currently improved with structured and surface parking lots for Soldier Field. *Id.* Ex. A, ¶ 1. Thus, Plaintiffs cannot show that replacement of the parking lots with the Museum will interfere with the public's use of "open space." In any event, the public trust doctrine protects against relinquishing public land for private use and has nothing to do with preserving open space.