IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINIOS,
EASTERN DIVISION

| | | |
|---|---|---|
| Protect Our Parks, Inc.; Charlotte Adelman; | ) | |
| Maria Valencia and Jeremiah Jurevis; | ) | No. 18-cv-03424 |
|     Plaintiffs, | ) | |
| v. | ) | Honorable John Robert Blakey |
| | ) | |
| Chicago Park District and City of Chicago, | ) | Jury Demanded |
|     Defendants. | ) | |

**PLAINTIFF'S SUBMISSION PURSUANT TO THIS COURT'S
JANUARY 22, 2019 AND JANUARY 31, 2019 ORDERS**

 

/s/ Mark D. Roth
Mark D. Roth

Roth Fioretti, LLC
Mark Roth
Robert Fioretti
311 S. Wacker Drive, Suite 2470
Chicago, IL 60606
Phone: (312) 922-6262
Fax: (312) 922-7747
Email: mark@rothfioretti.com

## I.
## OBJECTION TO CONVERSION

The Defendants' Motion for Judgment on the Pleadings should not be converted, but should instead be denied as a Rule 12(c) Motion. As noted in Plaintiffs' Response in Opposition to Defendants' Motion, the Defendants' 12(c) motion was itself improper, relying upon countless documents outside of the record which are not the proper subject of judicial notice and cannot be relied upon to support the pending motion. Further, a Rule 12(c) motion cannot resolve factual disputes, which are also implicated here.

The documents instead reflect that there are factual disputes that need to be resolved. Factual issues include, but are not limited to, the circumstances associated with locating the OPC in Jackson Park; alleged benefits regarding locating the OPC in Jackson Park, as opposed to any number of other locations in the south side of the City; whether the agreement providing for such transfer is a lease; whether and how speech issues have been implicated. To the extent the Defendants tendered documents relate to those issues, as Defendants' attempt to suggest, the documents are not the proper subject of judicial notice. *See, Zang v. Alliance Fin. Servs. of Ill., Ltd.*, 875 F. Supp. 2d 866, 882 (N.D. Ill. 2012) (disputed factual findings may not be the subject of judicial notice). Defendants' presentation (including based on the improperly tendered documents) represent an effort to seek resolution of factual disputes, but a Rule 12(c) motion is not an appropriate vehicle to do so. Having chosen this vehicle for resolution despite its impropriety under the circumstances, Plaintiffs believe it appropriate that the Rule 12(c) Motion should simply be denied.

However, as further discussed below, if the Court does convert Defendants Rule 12(c) Motion, then the Motion must either be denied without prejudice at this time (or at least entered

and continued) and the Plaintiffs given an opportunity to conduct discovery, as outlined in the Rule 56(d) Affidavit attached hereto as Exhibit A.

## II.
## SUMMARY JUDGMENT MUST BE DENIED BASED ON THE STATE OF THE CURRENT RECORD

A.  If The Pending Rule 12 Motion Is Converted To A Rule 56 Summary Judgment Motion, Such Motion Must Be Denied At This Time Because The Defendants Have Precluded Discovery That Is Necessary For The Creation Of An Adequate Record.

Summary judgment presupposes the existence of an adequate record. *Doe v. Abington Friends Sch.*, 480 F.3d 252, 257 (3d Cir. 2007). Therefore, "summary judgment is appropriate only after 'adequate time for discovery.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Discovery is usually essential in a contested proceeding prior to summary judgment because "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by," *inter alia*, "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

The Plaintiffs have not been afforded an opportunity to conduct discovery and, in fact, Defendants have actively sought at every turn to prevent the Plaintiffs from obtaining discovery. (See, Roth Affidavit *Exhibit A*) To the contrary, the Defendants' *modus operandi* in this case has been to avoid discovery on the merits at all cost. The Defendants delayed any and all discovery virtually from the inception of this suit back in May 2018. Then, when Plaintiffs were able to finally issue discovery Plaintiffs, initial discovery requests were ignored and not answered, and then subject to another motion to stay discovery, which was granted in large measure other than two narrow categories which were then superficially addressed by the Defendants. Exhibit A And, Defendants' MIDP Disclosures, which for much of the case were deferred and/or stayed, when ordered to be submitted, were totally barren of any meaningful disclosure (discussed in Section

2

III, *infra*). Having thwarted discovery to this point, the Defendants should not be allowed to seek summary judgment on the incomplete record that they created.

Initially, on May 30, 2019 the Defendants filed a motion for an extension of time to respond to the Complaint and the defer MIDP disclosures. [Dkt No. 14] The motion was set for hearing on June 5, 2018. This Court granted the Defendants' Motion before the hearing in an order dated June 4, 2018 [Dkt No. 17]. The Court required that the Defendants file a motion to dismiss by July 9, 2018. On June 28, 2018, the Defendants filed a motion for a further extension to file their motion to dismiss and to defer MIDP disclosures. [Dkt No. 19]. This Court granted the Defendants' motion, and stayed the answer date and MIDP until the next court date. [Dkt No. 22].

While the Defendants made the representation to the Court orally and in writing that no construction in connection with OPC would occur, the Defendants brazenly began construction related to the Obama Center. The Plaintiffs accordingly moved to lift the stay to require that the Defendants answer the Complaint and proceed with the litigation. [Dkt No. 23]. During the hearing, the Defendants denied that the construction activities at issue related to the OPC. Plaintiffs were then forced to bring another motion to correct the record to advise the Court of the Defendants' misrepresentation regarding the start of construction. [Dkt. No. 28]. Only after that hearing on Plaintiffs' motion on September 20, 2018 was discovery allowed to commence even before the parties' MIDP disclosures. [Dkt No. 31].

With discovery allowed to commence, on September 27, Plaintiffs served subpoenas for documents on the Obama Foundation and the University of Chicago. [Dkt Nos. 34-5]. The very next day after Defendants filed their answer, and Plaintiffs were then aware of the admissions and denials to the allegations the Plaintiffs' Complaint, Plaintiffs served the Defendants with interrogatories and requests to produce. [Dkt No. 39]. The parties came before the Court on a

3

status hearing on October 24, 2018 [Dkt No. 40]. At that hearing, the Court ruled that initial MIDP discovery shall be completed on or before November 21, 2018. *Id.* On October 31, 2018, the Plaintiffs served supplemental requests to produce to both Defendants. [Dkt No. 41].

Rather than provide responsive discovery on November 21, 2018, the Defendants filed a motion to dismiss for lack of subject matter jurisdiction and motion for judgment on the pleadings. The Defendants did not file answers or objections to any of the Plaintiffs' written discovery requests at any time. Instead, the Defendants filed a motion to stay all discovery pending a resolution on the Defendants' motions. [Dkt No. 50]. On that day, both parties made their MIDP disclosures. [Dkt Nos. 46-7], but the Defendants answers to the MIDP disclosures were completely void of detail or responsiveness. Exhibit A at ¶ 21 and Exhibit 3 to Exhibit A.

The Court heard the motion to stay discovery on November 29, 2018. Other than ordering an extraordinary limited number of documents related to two categories, the Court stayed all further discovery. [Dkt No. 64]. Plaintiffs received the documents (which were also incomplete) but such discussions and production were related to respond to what is a Rule 12(c) motion, not a motion for summary judgment. Plaintiffs have never received discovery from the Defendants with the exception of the documents that this Court required the Defendants to produce to respond to the Rule 12(c) motion. Exhibit A at ¶ 22. Plaintiffs have never received documents and depositions necessary to respond to a summary judgment motion. *Id.* Defendants, in fact, have never even responded to Plaintiffs written discovery, and Plaintiffs have been precluded from obtaining deposition testimony. Exhibit A

The possibility of converting the current Rule 12 motion to a summary judgment should not be another weapon for Defendants to curtail the process and avoid discovery. This Court should therefore deny Defendants' Motion at this time. *See, Sara Lee Corp. v. Litton Ind. Automn.*

4

*Sys., Inc.*, No. 91 C 0971, 1991 U.S. Dist. LEXIS 12914 N.D. Ill. September 17, 1991 (denying motion and considering motion as one for summary judgment only after reasonable time to conduct discovery).

B.     **If Converted, The Motion For Summary Judgment Must Be Denied To Allow Plaintiffs An Opportunity For Discovery.**

Under Federal Rule of Civil Procedure 56(d), a court may deny or continue a motion for summary judgment pending further discovery. *See also Woods v. City of Chicago*, 234 F.3d 979, 990 (7th Cir. 2000) (stating same for Rule 56(d)'s predecessor, Rule 56(f)). Such action is appropriate "if the nonmovant submits an affidavit demonstrating why it cannot yet present facts sufficient to justify its opposition to the motion." *Id.*

Where, as here, a party faces a summary judgment motion before discovery has occurred, the party takes "the proper course when it file[s a verified] Rule 56([d]) [motion], stating that it could not properly oppose summary judgment without a chance to conduct discovery." *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council Baltimore*, 721 F.3d 264, 281 (4th Cir. 2013). "Further, such motions are <u>broadly favored</u> and should be <u>liberally granted</u> in order to protect non-moving parties from premature summary judgment motions." *McCray v. Md. DOT*, 741 F.3d 480, 484 (4th Cir. 2014) (internal quotation marks omitted) (emphasis added); *see also In re PHC, Inc. S'holder Litig.*, 762 F.3d 138, 144 (1st Cir. 2014) ("'Typically, when the parties have no opportunity for discovery, denying the Rule 56([d]) motion and ruling on a summary judgment motion is likely to be an abuse of discretion.'" (quoting *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008))); *Greater Balt. Ctr.*, 721 F.3d at 280 ("Chief among its errors was the district court's award of summary judgment to the [plaintiff] without allowing the [defendant] any discovery."); *Doe v. Abington Friends Sch.*, 480 F.3d 252, 257 (3d Cir. 2007) ("District courts usually grant properly filed Rule 56([d]) motions as a matter of course." (internal

5

quotation marks omitted)); *Burlington N. Santa Fe R.R. Co. v. Assiniboine & Sioux Tribes of the Fort Peck Reservation*, 323 F.3d 767, 773 (9th Cir. 2003) ("Where, however, a summary judgment motion is filed so early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any Rule 56([d]) motion fairly freely."); *Wichita Falls Office Assocs. v. Banc One Corp.*, 978 F.2d 915, 919 n.4 (5th Cir. 1992) ("[C]ontinuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence." (internal quotation marks omitted)).

In the present case, as the Court is aware, discovery has been thwarted by the Defendants. Beyond these circumstances, the undersigned attorney has submitted a Rule 56(d) Affidavit in support of the additional discovery that Plaintiffs would need to properly respond to a motion for summary judgment. *See,* Roth Affidavit, Exhibit A hereto. Plaintiffs accordingly request that this Court afford the Plaintiffs an opportunity to conduct the discovery outlined in the Affidavit, and subsequently allow Plaintiffs time to file a substantive response to the converted motion.

C.    If The Court Does Not Allow Time For The Plaintiffs To Conduct Discovery, Which Is Essential To Plaintiffs' Response, Then The Court Should Consider The Following Facts Which Require Denial Of The Motion

Without waiving Plaintiffs' request for discovery, the Plaintiffs submit the following facts, which further demonstrate the existence of questions of fact that also requires denial of the converted motion for summary judgment. Additional facts will be obtained through discovery as discussed *supra*.

1.    The 2018 Ordinance makes reference to recommendations and assertions of a study from the University of Chicago in reliance upon the placement of the OPC in Jackson Park. The study from the University of Chicago ("UofC") discussed three sites for the location of the OPC:

6

Washington Park, Woodlawn (Jackson Park), and the South Shore Cultural Center. *See,* Roth Declaration (Exhibit B, at ¶ 3)

2. UofC engaged Anderson Economic Group ("AEG") to conduct a review of the potential economic impact of the Presidential Center at each of the three locations proposed by UofC. Exhibit B, at ¶ 4

3. UofC actually recommended the Washington Park site, *not* Jackson Park, as the best location for the OPC, because of Washington Park's greater potential for a positive economic impact on the City, and because the OPC could locate on the Washington Park site without occupying Park District land. Exhibit B, at ¶ 5

4. UofC's findings opined that: "The Washington Park Site pairs the greatest need with the greatest opportunity." Exhibit B, at ¶ 6

5. UofC's findings concluded that "Unlike the other two proposed sites, which are situated entirely within the City's park system, the Washington Park site includes a portion of land on the city grid owned by the University of Chicago, and the Chicago Transit Authority. This provides an opportunity for the Foundation to develop the Presidential Center without occupying Park District land." Exhibit B, at ¶ 7

6. UofC found, based on the economic analysis by AEG: "Of all the proposed sites, the Washington Park neighborhood is the one with the greatest potential for economic development and growth." Exhibit B, at ¶ 8

7. UofC findings noted that:

> The (Washington Park site) neighborhood has nearly 270 acres of vacant land and limited existing retail, recreational, and food amenities. The influx of new demand from Presidential Center visitors and the affordability of local properties could spur a significant amount of development near the site to the scale of up to 2,000 new residences and 1.5 million square feet of commercial and community development

7

> potential. With no nearby hotel or accommodations currently available for visitors to the Presidential Center, the demand could support a new hotel.
>
> The Presidential Center's presence, the revitalization efforts on Garfield Boulevard by the University and other partners, and targeted investments by the City of Chicago could drive the creation of new businesses around arts and culture, including performance and gallery spaces, eclectic restaurants, and new retail outlets. In addition to the commercial development, Garfield Boulevard could accommodate several new community nonprofits, a creative incubator space to support the further development of cultural entrepreneurs, enhanced recreational facilities, and a hotel and conference center, dramatically increasing the number of people who work in the area. Most of this development could take place along Garfield Boulevard and Dr. Martin Luther King Jr. Drive. Residential programs led by the city could expand housing in the area and bring new residents to the neighborhood. The Presidential Center's presence will also help the City direct and target much-needed infrastructure improvements in the area, including redesigned CTA "L" line stations, revived streetscapes, park improvements, and a potential new Metra station, further expanding the neighborhood's capacity for economic development.
>
> Because the Washington Park neighborhood has experienced such a large decline in population in recent years, the negative impacts of development are likely to be minimal. With significant vacant land throughout the neighborhood, economic development in the region is unlikely to displace local residents.

Exhibit B, at ¶ 9

8.     UofC's findings recognized that the Washington Park Site was the only proposed site that is "connected to a CTA train and a bus hub, and Garfield Boulevard with provides access to the Dan Ryan Expressway, less than a mile away." Exhibit B, at ¶ 10

9.     UofC's study on the three proposed locations for the OPC states:

> **Transforming Washington Park**
>
> The Washington Park site pairs the greatest need with the greatest opportunity, creating the potential for true transformation. Washington Park is the least developed among the sites proposed. Within half a mile of the site, scattered businesses provide 1,400 jobs, though the retail, recreation, and food service industries are all small in the area. No hotels or other forms of accommodation are within one mile of the site.
>
> Yet, of all the sites, this is the only one connected to a CTA train and bus hub, and Garfield Boulevard, which provides access to the Dan Ryan Expressway, less than

8

a mile away. This combination of private and public transportation routes makes the site the most accessible of the three. A Library at this location offers the opportunity to remake Garfield Boulevard and Dr. Martin Luther King Jr. Drive into the grand thoroughfares they once were.

Additionally, the site is linked to nearby cultural institutions, including the DuSable Museum of African American History, the George Washington Memorial, and the University of Chicago's Arts Block, where mentoring and community development programming will promote local growth and vibrancy. Washington Park itself receives a million and a half visitors on a single day for the Bud Billiken Parade every year.

As a result of this blend of under-resourcing and strong potential, of all the sites, Washington Park would best accommodate the new businesses that would be in demand if the Barack Obama Presidential Library were built in the heart of the South Side. A well-planned development strategy would transform the neighborhood, providing jobs, enhanced infrastructure, and educational opportunities for youth.

Exhibit B, at ¶ 11

10. The AEG study commissioned by UofC found:

Given the influx of new demand that would occur if the Obama Library were built at this location (Washington Park) and the affordability of local properties, we would expect to see a significant amount of development occur near this site if the presidential library were to locate here. We expect that the City of Chicago would make infrastructure improvements near the Obama Library, as well, which are sorely needed in this area. Of all the proposed sites, this one would most amenably accommodate *new* businesses and investment that might come in to the area due to the presence of a presidential library.

Exhibit B, at ¶ 12

11. The AEG study commissioned by UofC found the following with respect to the

Woodlawn (Jackson Park) location:

There is not a current base of industry in place that would serve the demand of visitors to Jackson Park within half a mile of the proposed location. There is some room for growth, but a lot of the nearby land is taken up by public parks or large institutions and developments. We would expect to see development in the area similar to what might occur near Washington Park to meet more local demand from tourism, but this would be somewhat more constrained since there is already a lot of residential and publicly-owned property in the region.

9

Exhibit B, at ¶ 13

12. Jackson Park is subject to a restriction that Jackson Park "shall be held, managed and controlled by them and their successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever." Exhibit B, at ¶ 14

13. There are numerous other locations that are suitable for the location of the OPC with significant are real benefits, as set forth in the same U of C study that is cited by the Ordinance. Exhibit B, at ¶ 15

14. There is no other situation where a brand-new institution in a new building and a new campus has been situated in a historic Chicago park. The settings and context for eleven Museums in Chicago Parks were all very different from that being proposed for the OPC. The museums in the park utilized reclaimed historic buildings, or were constructed on sites of previously existing buildings that became available, or were constructed on former railyards or empty non-parkland or former cemetery locations. Exhibit B, at ¶ 16

15. Section 8 of the Environmental Remediation and Indemnification Agreement ("Environmental Agreement") provides that the City of Chicago is using taxpayer dollars now to reimburse the Foundation for environmental costs that the Foundation previously incurred related to the OPC Site. Exhibit B, at ¶ 17

16. Section 8 of the Environmental Agreement provides that the City will pay for all environmental remediation costs related to building the OPC. Exhibit B, at ¶ 18

17. The Jackson Park Site contains potential environmental contamination. A Phase I environmental report states that the Jackson Park Service Yard, which is owned by the Park District and is immediately south of the Jackson Park Site, had two leaking underground storage tanks.

y

Further, the Phase I environmental report identified numerous potentially contaminated sites within a one-quarter mile of the Jackson Park Site. Exhibit B, at ¶ 19

18. The City has undertaken to pay for permanent road alterations and changes to the Midway Plaisance and other roads in the location of the planned OPC in conjunction with the construction of the OPC, pursuant to Section 4.14 of the Use Agreement. Exhibit B, at ¶ 20

19. Plaintiff, Maria Valencia is a resident of the City of Chicago, and pays City of Chicago taxes. She objects to using City of Chicago tax dollars to fund the OPC, and object to funding alterations necessitated by the OPC. Valencia objects to the City of Chicago using tax dollars to fund the OPC while President Obama endorses political candidates and Democratic party causes. Exhibit B, at ¶ 21-23.

20. Plaintiff, Protect our Parks, consists of Chicago residents and taxpayers who have a dedicated interest in preserving, protecting, and advancing the Chicago public park system and have engaged in legal action to insure the continued availability of open, clear and free public parks as a retreat and place of recreation available for themselves, their families, friends, neighbors, and fellow Chicago citizens and taxpayers, and as an established attraction for visitors to the city. The membership of Protect Our Parks includes men and women of all ages, all races, and a variety of ethnic backgrounds and political affiliations, all who have joined in making contributions to support the pending lawsuit. In addition to the basic objection to the taking of dedicated public park land in historic landmarked Jackson Park for the 99-year benefit and use of a private party, the membership of Protect Our Parks is also opposed and objects to the use of their public tax payments to facilitate construction of a facility with a 235-foot tower in the public park and the unambiguous purpose of continuing to promote and advance a personal political agenda with which they may disagree. Exhibit B, at ¶ 24

22. Former President Obama has, and will continue to, advance certain political causes and candidates in the Democratic Party. Exhibit B, at ¶ 25

23. The Obama Foundation is "an academic institute to enhance the pursuit of the [former] President's initiatives beyond 2017". Exhibit B, at ¶ 26

24. The City of Chicago Law Department drafted the amendment to the Museum Act for the purpose of allowing the Foundation to locate the OPC in Jackson Park. Exhibit B, at ¶ 27

25. The Use Agreement between the City of Chicago and the Foundation is not a lease. Exhibit B, at ¶ 28

26. The City of Chicago's Corporation Counsel, Stephen Patton, admits that the City of Chicago's Law Department drafted the amendment to the Museum Act for the purpose of allowing the Foundation to locate the OPC in Jackson Park. Exhibit B, at ¶ 29

### III.
### IF THE COURT CONVERTS THE MOTION, THE DEFENDANTS SHOULD BE BARRED UNDER RULE 37 FROM PRESENTING ANY ADDITIONAL EVIDENCE IN SUPPORT OF A MOTION FOR SUMMARY JUDGMENT

This case is subject to the Court's Mandatory Initial Discovery Program ("MIDP"). The parties made their MIDP disclosures on November 21, 2018. A copy of the Defendants' MIDP Disclosure is attached to Exhibit A, as Exhibit 4.

The Defendants' MIDP Disclosure does not disclose the identity of any person whatsoever who has knowledge of facts to support the Defendants' claims or defenses. Further, the MIDP disclosure requests the identification of any documents that may exist that are relevant to the claims or defenses in the litigation. The Defendants disclosed that only the 14 documents the Defendants referenced in their Motion for Judgment on the Pleadings, plus an unnamed document described as "The land in Jackson Park comprising the proposed OPC site."

Defendants, having failed to disclose any witnesses whatsoever, should be precluded from submitting any declarations or affidavits of any witness in support of a motion for summary judgment. Further, Defendants have taken the position that the only documents relevant to their claims and defenses are the documents referenced in their Rule 12(c) motion. Defendants accordingly should be precluded from presenting any additional documentary evidence in support of a motion for summary judgment.

The MIDP Standing Order requires the exclusion of any evidence that is not disclosed in a party's MIDP disclosure. Section A.9. of the MIDP Order states: "Rule 37(c)(1) shall apply to mandatory discovery responses required by this Order."

Rule 37(c)(1) states:

> (c) FAILURE TO DISCLOSE, TO SUPPLEMENT AN EARLIER RESPONSE, OR TO ADMIT.
> (1) *Failure to Disclose or Supplement.* If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> (B) may inform the jury of the party's failure; and
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)—(vi).

Rule 37(c)(1) provides that a party shall not be allowed to present evidence that was not previously disclosed in a mandatory disclosure. The sanction of exclusion is both automatic and mandatory, unless the non-disclosing party can show that its failure to disclose was either justified or harmless. *See, Keach v. U.S. Trust Co.,* 419 F.3d 626, 639 (7th Cir. 2005); *Salgado by Salgado v. General Motors Corp.,* 150 F.3d 735, 742 (7th Cir. 1998).

This Court is required to preclude the Defendants from using any non-disclosed material in a motion for summary judgment. Further, the Defendants cannot show that the non-disclosure

was justified or harmless. The City and Park District have adamantly resisted any discovery and have refused to answer Plaintiffs' written discovery and to produce documents requested by the Plaintiffs. Further, Plaintiffs would be prejudiced by the use of any non-disclosed documents in a summary judgment motion.

## CONCLUSION

For the reasons set forth herein, the Plaintiffs request that this Court deny Defendants' Rule 12(c) Motion. In the alternative, if the Court converts the Motion, then the Plaintiffs request time to take discovery and to file a brief in response to the Defendants' Motion. Further, Plaintiffs request that this Court enter an order that Defendants are precluded from submitting any additional material in support of their Motion, pursuant to this Courts standing MIDP Order and Federal Rule of Civil Procedure 37(c)(1). Plaintiffs also request such other and further relief as this Court deems just.

Respectfully submitted,

/s/Mark Roth
Mark Roth

Mark Roth
Robert Fioretti
Roth Fioretti LLC
Attorney No. 37547
311 S. Wacker, STE 2470
Chicago, Illinois 60606
(312) 922-6262
mark@rothfioretti.com
rwfchicago@yahoo.com

14