IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

| | |
|---|---|
| Protect Our Parks, Inc.; Charlotte Adelman; Maria Valencia; and Jeremiah Jurevis; <br><br> Plaintiffs, <br><br> v. <br><br> Chicago Park District and City of Chicago, <br><br> Defendants. | No. 18 CV 03424 <br><br> Judge John Robert Blakey |

### DEFENDANTS' RESPONSE TO PLAINTIFFS' RULE 56(D) SUBMISSION

Defendant City of Chicago ("City"), by its attorneys, Edward N. Siskel, Corporation Counsel for the City, and Mayer Brown, LLP, and Defendant Chicago Park District ("Park District"), by its attorney, Burke, Warren, MacKay & Serritella P.C., respectfully submit this response to that portion (pp. 5-6 and Ex. A thereto) of Plaintiffs' Submission Pursuant To This Court's January 22, 2019 and January 31, 2019 Orders (Dkt. No. 85) asserting, pursuant to Fed. R. Civ. P. 56(d), that discovery is necessary prior to addressing summary judgment ("Rule 56(d) Submission").

### INTRODUCTION

As Defendants demonstrated in their motion for judgment on the pleadings, all of Plaintiffs' claims can be resolved as a matter of law without further factual development. To decide Plaintiffs' claims, the key sources for the Court to consult are a statute (the Museum Act) and the official legal documents governing the OPC (the Planned Development Ordinance, the Operating Ordinance, and the Use Agreement) – the terms of which Plaintiffs do not dispute. Under the legal doctrines governing Plaintiffs' claims, these documents definitively establish

how the Foundation will be permitted to use the Jackson Park site for the OPC and are therefore all that is needed to assess whether operating the OPC in Jackson Park is lawful.

In their response to Defendants' motion for judgment on the pleadings, Plaintiffs argued (without citing any caselaw in support) that judgment based on these documents is improper because there are open fact issues material to their claims. The Court specifically asked Plaintiffs what discovery they would need to oppose Defendants' argument that judgment is proper based on the official governing documents. See Ex. A hereto (Nov. 29, 2018 transcript of proceedings), at 3-5. Plaintiffs responded that they needed the agreements governing the other museums in Chicago parks, and studies concerning the public benefits and detriments of the OPC. See id. The Court granted Plaintiffs' request in full, see id. at 14, and Defendants accordingly produced the materials Plaintiffs had requested. Nevertheless, despite their claim that such discovery was critical to their opposition, Plaintiffs cited none of that material in their response to Defendants' motion for judgment on the pleadings, aside from referencing one of the museum agreements in a footnote. See Dkt. No. 65-1, at 31 n.16.

Now, Plaintiffs contend that 11 additional categories of wide-ranging and burdensome discovery are necessary following the conversion of Defendants' motion to one for summary judgment, despite the fact that Defendants' position is unchanged: This case can be (and should be) decided based on the same universe of statutory and governing legal documents previously identified by Defendants. The fundamental failure in Plaintiffs' shifting attempts to obtain discovery and avoid a ruling in this case remains the same: Plaintiffs' Rule 56(d) Submission fails to identify any legal anchor in the governing caselaw for the relevance, let alone materiality, of the facts they wish to develop through discovery. As Defendants explain below, those facts are not material under the governing law, and Plaintiffs certainly cannot meet their burden under

2

Rule 56(d) of showing that the facts are "essential" to Plaintiffs' opposition to summary judgment. Plaintiffs' request is nothing more than an effort to delay a ruling on the merits in this case while they pursue ever-expanding strands of immaterial discovery, and it should be denied. The parties should proceed to brief summary judgment apace.

## STANDARD

Plaintiffs ask the Court to defer ruling on Defendants' converted motion for summary judgment to allow for additional discovery pursuant to Federal Rule of Civil Procedure 56(d). A party invoking Rule 56(d) has the burden to "show[] by affidavit or declaration that, for specified reasons, it cannot present facts *essential* to justify its opposition." Fed. R. Civ. P. 56(d) (emphasis added). The party seeking discovery must therefore do more than merely identify the facts that it believes additional discovery might uncover. That party must also demonstrate that the discoverable material would be, at a minimum, material to the party's claims under the governing substantive law. See Sterk v. Redbox Automated Retail, LLC, 770 F.3d 618, 628 (7th Cir. 2014) (affirming denial of Rule 56(d) motion where discovery topics were not material to summary judgment); Woods v. City of Chicago, 234 F.3d 979, 990 (7th Cir. 2000) (affirming denial of Rule 56(f) (Rule 56(d)'s precursor) motion where party seeking discovery failed "to demonstrate why the [discovery] that he sought w[as] likely to generate any genuine issue of material fact"); W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co., 928 F. Supp. 2d 976, 982 (N.D. Ill. 2013) (denying Rule 56(d) motion where evidence sought "would have no bearing" on legal claims at issue, which could "be resolved as a matter of law without additional development of the record"). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (defining material facts as those that would "affect the outcome of the suit under the governing law").

**ARGUMENT**

I.  **Discovery regarding the sufficiency of the Jackson Park site and the availability of alternative sites is not material.**

Much of Plaintiffs' requested discovery (Items 1, 2, 5, 7 & 8) goes to whether Jackson Park is a worthwhile location for the OPC when compared to alternative locations, or whether the City has extracted sufficiently valuable concessions from the Foundation to justify its use of the site. See Dkt. No. 85-2 (Plaintiffs' Rule 56(d) Submission), Ex. A thereto. Item 1 posits that the reason Jackson Park was selected was not the public benefits of the site, but rather so-called "self-dealing" between the Mayor and the Obamas based on their prior relationship. Item 2 suggests that the University of Chicago concluded that there are "other, more suitable locations for the OPC, which are not on public trust parkland, but provide actual public benefits." Item 5 seeks discovery regarding the costs of environmental remediation and road alteration work associated with "locating the OPC in Jackson Park and other potential sites," on the theory that the City will be paying "significant" expenses for the OPC. Item 7 seeks information regarding the fair market and rental value of the Jackson Park site, to probe whether the benefits conferred by the Foundation under the Use Agreement are the "fair value that the City could obtain if it entered into a fair market value transaction." And Item 8 seeks facts relating to the geological features of the site, such as its load bearing capacity and water table, on the supposition that the land may not be physically viable for the OPC.

All of these lines of discovery are immaterial to Plaintiffs' claims. First, they are categorically irrelevant under the version of public trust doctrine that applies to land (such as the OPC site) that was not previously submerged, because the only question for the Court is whether the General Assembly has authorized the development at issue. See Defendants' Memorandum

4

in Support of Their Motion for Judgment on the Pleadings ("Mem."), Dkt. No. 49-1, at 22-25. That is the case here, as the Museum Act authorizes presidential centers on public parkland.

And, second, even if the Court were to apply the version of public trust doctrine that applies to previously submerged land, the discovery is not material. The Illinois Supreme Court's governing decision in Friends of the Parks v. Chicago Park District, 203 Ill. 2d 312 (2003) ("FOP"), makes this clear. There, the Court concluded that the Soldier Field renovations satisfied public trust analysis based on the public benefits of the renovation plan as apparent from the governing legal documents. See id. at 327-28. In doing so, FOP held that courts are to afford substantial deference to the legislature's judgment that a particular project is in the public interest. See id. at 328 (disputes over whether a project serves a public purpose are to be resolved by "the legislature and not the courts," and "courts must deal with legislation as enacted and not with speculative considerations of legislative wisdom"). See also id. at 320 ("This court has long recognized that what is for the public good and what are public purposes are questions which the legislature in the first instance must decide."). So long as a public purpose is served, courts do not second guess the legislature and ask whether more public benefits could have been obtained, or whether the public benefits would be greater if a project were located elsewhere. Cf. Empress Casino Joliet Corp. v. Giannoulias, 231 Ill. 2d 62, 87 (2008) (explaining that so long as a project provides a public benefit, "the question of how much benefit the public derives is for the legislature, not the courts").

Here, the governing legal documents establish all that is required under FOP's analysis. Plaintiffs do not (and cannot) dispute that – as is evident from the terms of the Operating Ordinance and the Use Agreement – the OPC will be a campus including a museum and other buildings, as well as a plaza, a great lawn, and other open spaces, all of which will provide an

array of historical, educational, and cultural offerings as well as places for simple recreation and relaxation.  See Mem. at 7-9.  Further, the OPC will enhance the green space of the existing site by closing a portion of Cornell Drive that currently separates the site from the rest of Jackson Park, converting the road into new parkland, and connecting the site to the lagoons to the east, as well as the rest of Jackson Park.  See Mem., Ex. 1 thereto (PD Ordinance), at 77199-77200.  And the Foundation – not Defendants or their taxpayers – will construct and operate the OPC at its sole expense, and will transfer ownership of the buildings to the City at no cost.  See Mem. at 9.  The public's ability to enjoy these physical buildings, open spaces, and programming of the OPC campus are precisely the sort of tangible public benefits evident from the face of the governing documents that ended the inquiry in FOP.  See 203 Ill. 2d at 328 (upholding Soldier Field renovations because the "public would enjoy" a renovated stadium providing athletic, artistic, and cultural events, as well as "better access to the stadium, the museums, and the lakefront generally").

Illinois courts have followed the same approach in similar contexts.  In Independent Voters of Illinois Independent Precinct Organization v. Ahmad, 2014 IL App (1st) 123629, for example, the plaintiffs claimed that a City contract allowing a private entity to operate the City's parking meters violated the Illinois constitution's requirement that public funds be spent for public purposes.  The court affirmed dismissal of that claim at the pleading stage, based on the public benefits that were apparent from "[its] reading" of the relevant contract terms – terms which, like the Use Agreement here, had been approved by the City Council as part of an ordinance authorizing the project.  Id. ¶ 42.  See also id. ¶¶ 42-44, 51-52 (discussing public benefits provided by sections 2.1 and 7.6(a) of contract, and concluding that "[g]iven the public benefits provided by the [contract]," plaintiffs' claim "was rightly dismissed"); Empress Casino

6

Joliet, 231 Ill. 2d at 88-90 (rejecting challenge to statute under the public purpose clause of the Illinois constitution where public benefits were apparent from the statute's terms). Resolving this case based on the public benefits apparent from the face of the Operating Ordinance and Use Agreement is particularly appropriate because Plaintiffs do not dispute that the Use Agreement "contains the terms under which the Foundation will construct and use the OPC." Dkt. No. 65-1, at 9.

Nothing in FOP suggests that the fact issues that Plaintiffs wish to develop here – i.e., the availability of alternative sites, whether those sites would provide greater public benefits, whether preparing the selected site for construction would be too costly to taxpayers, and whether the private entity should contribute more to the project – are relevant to the public trust analysis. Indeed, such an approach runs head-first into the judicial deference to legislative determinations of public interest that FOP mandates. And that deference is both important and sensible. If courts were to ignore this approach and instead conduct detailed, post hoc factual inquiries scrutinizing anew the pros and cons (based on the court's views) of a project, or alternative conceptions of a project, courts would become de facto planning commissions. That is not the proper role of the courts, and is squarely inconsistent with the Illinois Supreme Court's holdings regarding the public trust doctrine.

One only need examine a document submitted (and heavily relied on) by Plaintiffs to understand the folly of Plaintiffs' approach. Plaintiffs claim that a University of Chicago report "recommended" locating the OPC in Washington Park, to the exclusion of supporting the Jackson Park site. See Dkt. No. 85, at 7. But the report identified numerous public benefits from locating the OPC in Jackson Park. Indeed, the report concluded that "[t]he Woodlawn site represents the best combination of majesty and transformation, drawing on the resources of the

7

parkland and lakefront, transportation infrastructure, abundant nearby educational institutions, and the incredible local leadership of the Woodlawn community to revitalize the neighborhood." Dkt. No. 85-10, at 117. The report added that the Jackson Park location "affords an opportunity to make the Presidential Center a central anchor for the South Side's cultural institutions and parks" and that "[t]hrough the interconnected system of parks, the [Jackson Park] site will link together the green spaces, cultural institutions, and neighborhoods to the west and south." Id. at 65. Further, the report observed that the Woodlawn neighborhood "is poised for significant economic development, and the Presidential Center could be the catalyst that enhances and ties together the various planned development projects. Id. at 131. The report also found that "[t]he neighborhood has 130 acres of vacant land that could support new residential, commercial, and retail opportunities." Id. at 117. To be sure, the report identified benefits from locating the OPC at the Washington Park site, too. Yet Plaintiffs would have the Court conduct a full, de novo inquiry into whether the Washington Park site actually provides more benefits, all toward overturning the decisions of the City's public bodies, made after lengthy public hearing and debate, that locating the OPC in Jackson Park is in the public interest. That is precisely the kind of choice committed to the people's representatives under public trust analysis.

For these reasons, and consistent with the governing caselaw, the Court should reject Plaintiffs' latest attempt to take discovery regarding the comparative costs and benefits of the OPC site and other potential sites. The core concern of public trust analysis is whether the legislature's chosen use of a public resource has a public purpose, not whether the public benefits would be even greater if an alternative conception of the project were pursued. See FOP, 203 Ill. 2d at 325 (analyzing whether Soldier Field renovation plan "allows a private party (the Bears) to use and control Soldier Field for its primary benefit with no corresponding public benefit"). The

8

question for the Court is simply whether, giving deference to the City Council's determination, the OPC project in Jackson Park has a public purpose.

Finally, Plaintiffs provide no basis for their hypothesis that the City's approval of the OPC is the product of improper dealing based on the affiliation between President Obama and Mayor Emanuel. To the contrary, the undisputed record shows that the OPC has been vetted and approved by numerous public planning bodies after open, public hearings where opponents were free to critique the project, including the Use Agreement. See Mem. at 5-6. Plaintiffs' speculation about communications between the Mayor and the Foundation is immaterial to public trust analysis, because it is the City's official ordinances and the Use Agreement that govern the Foundation's use of the Jackson Park site. Individual statements by City officials cannot alter the terms of legislation, such as the Operating Ordinance, enacted by the City Council. And both the Operating Ordinance and the Use Agreement make clear that it is the Use Agreement, and not statements by individual City personnel, that provides the terms governing the OPC. See Dkt. No. 49, Ex. 5 thereto (Operating Ordinance), at 85886 (authorizing City to "grant rights of use of the OPC site . . . to the Foundation in accordance with [and] subject to the terms of . . . the Use Agreement"); Dkt. No. 49, Ex. 5 thereto, Ex. D thereto (Use Agreement), § 20.16 (stating that Use Agreement "embodies the entire agreement between the parties" and that "there are no oral or written agreements between the parties, nor any representations made by either party, relative to the subject matter hereof which are not expressly set forth herein").

For all of these reasons, there is no basis to prolong this case in order to conduct discovery into matters outside the face of the governing legal documents.

## II. The other discovery sought by Plaintiffs is immaterial.

Plaintiffs' other lines of desired discovery are equally immaterial and should be rejected.

9

Item 3 seeks discovery regarding the terms of the Use Agreement in order to discern whether that agreement is a lease or some other sort of contract. According to Plaintiffs, that question is critical because the Museum Act authorizes third parties to operate museums only if the agreement is a lease. But Plaintiffs' premise is wrong; the Museum Act is not limited to leases, but instead more generally authorizes municipalities "to contract" with third parties to operate museums. 70 ILCS 1290/1. For this reason alone, it is not material whether the Use Agreement is a lease. And putting the language of the Museum Act to the side, Plaintiffs seek this discovery only to the extent that Defendants contend the Use Agreement *is* a lease, but, as Plaintiffs recognize, Defendants' position is that the Use Agreement *is not* a lease. See Plaintiffs' Rule 56(d) Submission, Ex. A thereto, ¶ A.3. Thus, the discovery is unnecessary under Plaintiffs' own formulation of the issues – the parties agree that the Use Agreement is not a lease. Regardless, whether the Use Agreement is a lease is a question that can be answered simply by analyzing the terms of the document; additional discovery is unnecessary.

Similarly, Item 11 seeks discovery into the agreements between the Park District and the other museums operating in Chicago parks. The purpose is purportedly to determine whether the OPC's Use Agreement "is consistent with other museums' occupancy of parkland." Again, the terms under which each museum occupies parkland are set forth on the face of the governing contracts, and whether the OPC's terms are "consistent" with the terms governing the other museums can be deduced merely by comparing the relevant agreements' text. Additional discovery is immaterial.

Item 4 seeks discovery concerning whether the amendment to the Museum Act that the General Assembly enacted had been drafted by the City for the purpose of facilitating the OPC's location in Jackson Park. Plaintiffs contend that this legislative history is a "necessary" element

10

of their special legislation claim under the Illinois constitution. But as Defendants have explained, special legislation turns on the *text* of the enactment at issue, not the subjective intent of the legislation's drafters or proponents. See Mem. at 36-37. It simply does not matter whether the City proposed the text adopted by the General Assembly. What matters is whether the text that was enacted creates an unlawful classification under special legislation doctrine. See id.

Item 6 seeks discovery into the "numerous potential money making opportunities for the Foundation" allegedly afforded by the Use Agreement. Plaintiffs contend that this is relevant to whether City taxpayers are "liable to pay for the OPC in Jackson Park." But Plaintiffs are simply incorrect that taxpayers will pay "for the OPC." As the Use Agreement makes clear (and as explained above) the OPC's construction and operation will be entirely funded by the Foundation. Further, Plaintiffs do not identify any terms of the Use Agreement that will provide the Foundation with "numerous" money making opportunities.[1] Regardless, as FOP makes clear, any private benefits to the Foundation are permissible in light of the overwhelming benefits to the public. See Mem. at 32-33. Similarly, even if public tax revenue were being used to build or operate the OPC, that too would be lawful. See FOP, 203 Ill. 2d at 316-17

---

[1] In their response to Defendants' motion for judgment on the pleadings, Plaintiffs cited the Use Agreement's provisions regarding naming rights (section 6.11) and the Foundation's ability to hold private events relating to the OPC (section 6.2). See Dkt. No. 65-1, at 32. But as Plaintiffs recognize, the naming rights provision states that a "principal purpose" of naming rights is to enable the Foundation to "rais[e] funds for the construction, operation, maintenance and repair" of the OPC. Id. at 32. Rather than pose a public trust problem, allowing the Foundation an additional revenue stream to pay for the OPC strengthens its ability to provide the center's public benefits. Similarly, the Foundation's ability to host private events "that relate to or support the Presidential Center's Mission and programs" is, by definition, tethered to the OPC's mission rather than other, private Foundation purposes. Further, section 6.9 of the Use Agreement requires that revenues collected by the Foundation from third-party use fees "be used solely for" the OPC buildings or site, or deposited in the endowment established for operating, enhancing, and maintaining the OPC.

11

(explaining that substantial public revenues would be used for Soldier Field renovation plan). More importantly, because the Foundation's operation of the OPC is governed by the Use Agreement, any alleged revenue opportunities available to the Foundation would be specified in, and controlled by, that agreement's terms; there is no basis for discovery into matters outside the face of the contract.

Item 9 seeks discovery into the use of the OPC, including whether President Obama will have space available for his sole use. Plaintiffs contend that this is relevant to whether Plaintiffs will be subsidizing political speech, in violation of their First Amendment rights. But none of the discovery sought is material to Plaintiffs' First Amendment claim. Defendants have already explained that the claim is not even ripe, for it relies on speculation that President Obama and the Foundation would violate the terms of the Use Agreement and federal tax law to use City funds for future partisan political activity at the OPC. See Mem. at 19-20; Defendants' Reply in Support of Their Mot. to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. No. 83), at 8-10. Moreover, the discovery is not material to the merits of Plaintiffs' claim, because compelled support of government – even government programs to which one objects – does not violate the First Amendment, as Defendants have explained. Governments may lawfully spend tax revenues in ways that benefit private entities and individuals, even if those private entities proceed to express ideas about matters of public concern that Plaintiffs disagree with. See Mem. at 20-21.

Finally, item 10 seeks open-ended discovery concerning the maps Defendants attached to their dispositive motion. As Defendants explained, those maps are official government maps maintained on official government websites. See Dkt. No. 48 at 3-6. They are therefore subject to judicial notice, and the maps themselves conclusively demonstrate that the OPC site is not located on reclaimed land that was formerly submerged under Lake Michigan. See id. at 6-8.

Plaintiffs, for their part, provide no basis to doubt the authenticity of the maps or to dispute what they show about the status of the site's land. Nor do they explain why they would expect Defendants to have any discoverable information on the historical status of the land apart from what is already in the public record. Indeed, to date, Plaintiffs have never advanced any reason for believing the site of the OPC was formerly submerged or provided any basis for the conclusory assertion in their complaint that Jackson Park (in general) "is on formerly submerged land." Compl. ¶ 45. In any event, the site's historical status as submerged or unsubmerged land is a matter of public record that Plaintiffs can investigate themselves without needing discovery from the City.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' request for leave to take discovery under Fed. R. Civ. P. 56(d).

Date: February 13, 2019

Respectfully submitted,

BURKE, WARREN, MACKAY & SERRITELLA, P.C.
Counsel for the Chicago Park District

EDWARD N. SISKEL
Corporation Counsel for the City of Chicago

By: /s/ Joseph P. Roddy

By: /s/ Andrew Worseck

Richard W. Burke
Joseph P. Roddy
Elizabeth Meyer Pall
Susan M. Horner
Burke, Warren, MacKay & Serritella, P.C.
330 North Wabash Avenue, Suite 2100
Chicago, Illinois 60611
(312) 840-7000
Attorneys for Defendant Chicago Park District

John Hendricks
Deputy Corporation Counsel
Andrew W. Worseck
Chief Assistant Corporation Counsel
Justin Tresnowski
Assistant Corporation Counsel
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-6975 / 4-7129 / 4-4216
Attorneys for Defendant City of Chicago

                    Michael A. Scodro
                    Britt M. Miller
                    Jed W. Glickstein
                    Mayer Brown LLP
                    71 South Wacker Drive
                    Chicago, IL 60606
                    (312) 782-0600 (Telephone)
                    (312) 701-7711 (Facsimile)
                    Attorneys for Defendant City of Chicago

## CERTIFICATE OF SERVICE

I, Andrew Worseck, an attorney, hereby certify that on this, the 13th day of February, 2019, I caused copies of **Defendants' Response To Plaintiffs' Rule 56(d) Submission** to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois using the CM/ECF system, which will send notification of such filing to all parties that have appeared in this action

/s/ Andrew W. Worseck