**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

PROTECT OUR PARKS, INC.,
CHARLOTTE ADELMAN,
MARIA VALENCIA, and
JEREMIAH JUREVIS,

        Plaintiffs,

        v.

CHICAGO PARK DISTRICT and
CITY OF CHICAGO,

        Defendants.

Case No. 18-cv-3424

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

This order does not address the true facts of this case. Nor does it decide the legal merits of Plaintiffs' key claims. Instead, as with many rulings on motions to dismiss, this order merely clears away portions of the case that do not belong. As explained below, this Court grants in part, and denies in part, Defendants' motion to dismiss for lack of subject matter jurisdiction. [48]. Specifically, Count VI is dismissed with prejudice as to Plaintiff Adelman, and without prejudice as to Plaintiffs Parks, Valencia, and Jurevis (subject to reassertion should their First Amendment claims ever become ripe). Plaintiffs' aesthetic and environmental harm theory, to the extent it is included in Count I, also fails.

As to the remaining counts and legal theories, this Court makes no comment on the likelihood of success or failure, but this Court assures all involved that it will address what is left of the matter upon the dispositive motions to be filed at the close

of discovery. If dispositive motions are granted in full, the case will end; and if they are denied, the parties will receive a short trial date.

This case remains set for a case management conference on February 27, 2019, at 10:30 a.m., in Courtroom 1203. At that hearing, this Court will rule on any discovery disputes, set a 45-day close of fact discovery, and calendar a firm six-week schedule for the final briefing and resolving of dispositive motions.

## I.   The Complaint's Allegations[1]

This dispute arises out of the City of Chicago and the Chicago Park District's efforts to bring the Obama Presidential Center (OPC) to the City's South Side. Because this opinion is limited to the issue of subject matter jurisdiction, this Court provides only a summary of the relevant facts.

The First Amended Complaint [91] names the involved parties.[2] The Plaintiff Protect Our Parks, Inc. (Parks) is a nonprofit park advocacy organization dedicated to preserving, protecting, and improving Chicago's parks and forest preserves. [91] ¶ 18. Plaintiff Charlotte Adelman is a resident of Wilmette, Illinois. *Id*. ¶ 20. Plaintiffs Maria Valencia and Jeremiah Jurevis are residents of the City of Chicago. *Id*. ¶¶

---

[1] This Court takes these alleged facts from Plaintiffs' First Amended Complaint [91], exhibits attached to the complaint, and documents that are "central to the complaint and are referred to in it." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

[2] At the parties' motion hearing on February 14, 2019, this Court denied in part, and granted in part, Plaintiffs' late request to file a first amended complaint. [90]. Based upon Plaintiffs' counsel's representations, this Court granted leave to amend the original complaint, [1], solely to clarify that Protect Our Parks, Inc., actually consists of taxpaying members. [90]. Because this amendment does not affect the substance of Defendants' arguments in their motion to dismiss for lack of subject matter jurisdiction, [49-1], nor Plaintiffs' arguments in their response memorandum, [65-1], this Court considers and applies Defendants' motion to dismiss, [48], to Plaintiffs' First Amended Complaint, [91], for purposes of this opinion.

21–22.[3]  Defendant Chicago Park District (Park District) is "a body politic and corporate" entity established by the Chicago Park District Act, 70 ILCS 1505/3.  *Id.* ¶ 23.  Defendant City of Chicago (City) is a body politic and municipal corporation.  *Id.* ¶ 24.

In 1869, the Illinois General Assembly passed "An Act to Provide for the Location and Maintenance of a Park for the Towns of South Chicago, Hyde Park and Lake."  *Id.* ¶ 27.  The statute provided for the formation of a board of public park commissioners to be known as the "South Park Commissioners."  *Id.*  The Act authorized these commissioners to select certain lands, which, when acquired by said Commissioners "shall be held, managed and controlled by them and their successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever."  *Id.*  Pursuant to this authority, the commissioners acquired the land now known as Jackson Park.  *Id.*  The Illinois Legislature enacted the Park District Consolidation Act in 1934, which consolidated the existing park districts, including the South Park District, into the Chicago Park District.  *Id.* ¶ 28; 70 ILCS 1505/1.  The Park District therefore holds Jackson Park in the public trust.  [91] ¶ 29.

The Jackson Park site selected for the OPC lies on the western edge of Jackson Park and includes existing parkland bounded by South Stony Island Avenue on the west, North Midway Plaisance on the north, South Cornell Drive on the east, and East Hayes Drive on the south.  [49-2] at 77196; [49-8] ("Report to the Planning

---

[3] For clarity purposes, this Court will refer to all four parties collectively as "Plaintiffs," and to Plaintiffs Adelman, Valencia, and Jurevis as "Individual Plaintiffs."

Commission") at 2. In addition to the various structures that will comprise the OPC, the site will include new parkland created by vacating portions of streets adjacent to existing parkland. [49-2] at 77195, 77198; [91-4] ("Part Two: Character of the Proposal, VI. Narrative") at 3. In total, the site will comprise 19.3 acres. [91] ¶ 50.

In January 2015, Chicago Mayor Rahm Emanuel introduced an ordinance authorizing the transfer of the relevant land in Jackson Park to the City for use by the Obama Foundation (Foundation) to build and operate the OPC. *Id*. ¶ 111; [91-2]. The Chicago Plan Commission and Chicago City Council reviewed the matter, held public hearings, and subsequently approved this inter-governmental land transfer. [91] ¶¶ 13, 111. As part of its approval, the City Council passed an "Operating Ordinance" allowing the City to accept title to the Jackson Park site from the Park District and to enter into agreements governing the Foundation's use of the site. [49-6]. One of the agreements authorized by the Operating Ordinance—the Use Agreement—sets the terms by which the Foundation may use the Jackson Park site for the OPC. *Id*. (Exhibit D).

On May 14, 2018, Plaintiffs brought this action, seeking to enjoin an alleged "contrived collaboration" among Defendants to construct the OPC on a specific site within Jackson Park. [91] ¶ 1. In their six-count complaint, Plaintiffs assert: (1) a claim under 18 U.S.C. § 1983 for violation of due process (Count I); (2) an Illinois state law claim for breach of the public trust (Count II); (3) an Illinois state law *ultra vires* action claim (Count III); (4) an Illinois state law special legislation claim (Count V); and (5) a claim for violation of the First Amendment to the U.S. Constitution (Count

VI). [1]; [91]. The complaint also seeks declaratory judgment as to the Illinois Museum Act's applicability to the OPC (Count IV). *Id.*

On November 21, 2018, Defendants moved, pursuant to Federal Rule of Civil Procedure 12(b)(1), to dismiss the complaint for lack of subject matter jurisdiction; in the alternative, Defendants moved for judgment on the pleadings pursuant to Rule 12(c).[4] [48]. Various parties then filed amicus briefs for and against the motion to dismiss.

This Court's standing order regarding motions to dismiss states, in relevant part:

> When a motion to dismiss is filed, the non-moving party has a right to amend its pleading once within 21 days. Fed. R. Civ. P. 15(a)(1)(B). If the non-moving party elects not to amend its pleading to address the purported deficiencies raised by the motion (or seek leave to amend its pleading again), then the motion to dismiss will proceed in its normal course and, if the moving party prevails, the Court may dismiss the case with prejudice and not provide further opportunity to amend the pleading absent extraordinary circumstances.

At the parties' motion hearing on November 29, 2018, [64], this Court asked Plaintiffs if, in light of the standing order, they planned to amend their complaint or file a response to the motion to dismiss. In response, Plaintiffs declined the opportunity to amend, stating: "No. We're going to file a response, your Honor." *Id.* The parties and this Court, relying upon Plaintiffs' decision not to amend, set a briefing schedule for the motion to dismiss. *Id.* Plaintiffs filed their response memorandum, [65-1] on

---

[4] On January 22, 2019, upon proper notice to parties, this Court issued an order converting Defendants' 12(c) motion to a Rule 56 motion for summary judgment, [79], which will be considered separately from the present 12(b)(1) motion, after the completion of discovery and any necessary supplemental briefing.

January 11, 2019, and Defendants filed their reply memorandum, [82], on February 1, 2019.

As to Defendants' 12(b)(1) motion to dismiss, this Court now grants in part and denies in part the motion for the reasons set forth below.

## II. Legal Standard

Like Rule 12(b)(6), Rule 12(b)(1) requires this Court to construe Plaintiffs' complaint in the light most favorable to Plaintiffs, accept as true all well-pleaded facts, and draw reasonable inferences in their favor. *Yeftich v. Navistar, Inc.*, 772 F.3d 911, 915 (7th Cir. 2013); *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). Statements of law, however, need not be accepted as true. *Yeftich*, 722 F.3d at 915.

Defendants' Rule 12(b)(1) motion is a facial challenge, as opposed to a factual challenge, to subject matter jurisdiction. [48] ¶ 2; [65-1] at 1; *see also Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). Unlike factual challenges, facial challenges "require only that the court look to the complaint and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Apex*, 572 F.3d at 443. And in doing so, this Court may consider not just the "allegations set forth in the complaint itself," but also documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

6

## II.    Analysis

Defendants' 12(b)(1) motion to dismiss argues that: (1) Plaintiffs lack Article III standing to bring their Due Process Clause and First Amendment claims; and (2) Plaintiffs' First Amendment claim is unripe.  [49-1] at 12.

Article III of the Constitution limits "federal judicial power to certain 'cases' and 'controversies.'"  *Silha v. ACT, Inc.*, 807 F.3d 169, 172−73 (7th Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559−60 (1992)).  This case-or-controversy limitation "requires a claim that is ripe and a plaintiff who has standing."  *Ind. Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007).  These concepts are related yet distinct: "Whereas ripeness is concerned with *when* an action may be brought, standing focuses on *who* may bring a ripe action."  *Id.* (citing *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1298 n.1 (3d Cir. 1996)).  This Court first addresses Defendants' standing arguments before turning to the issue of ripeness.

### A.    Plaintiffs' Due Process Claim (Count I)

To establish Article III standing, a plaintiff must show that: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Silha*, 807 F.3d at 173 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180−81 (2000)); *Lujan*, 504 U.S. at 560−61.  The party invoking federal jurisdiction bears the burden of establishing the elements of Article III standing.  *Lujan*, 504 U.S. at 561.

7

Plaintiffs base their Due Process claim upon three theories. First, Plaintiffs cite to *Sierra Club v. Morton*, 405 U.S. 727 (1972), arguing that they have standing to bring a Due Process claim based upon aesthetic and environmental harm to Jackson Park. [65-1] at 14.

Second, in the alternative, Plaintiffs base their Due Process claim upon the public trust doctrine. Specifically, Plaintiffs allege that they, as state taxpayers, maintain a fractional, beneficial interest in the Jackson Park site that the Park District holds in trust for them. [91] ¶ 82.[5] Therefore, building and operating the OPC site in Jackson Park will deprive or diminish the "beneficial ownership interest of Plaintiffs and other citizens . . . without the required protective procedure, and in violation of their rights in such property under the Due Process Clause." *Id.* ¶ 83.

Third, Plaintiffs allege that Defendants' actions constitute an "unlawful taking" of Jackson Park in violation of the Takings Clause of the Fifth Amendment, as incorporated into the Due Process Clause of the Fourteenth Amendment. *Id.* ¶ 85. Because Defendants' motion to dismiss does not challenge Plaintiffs' Takings Clause

---

[5] The Supreme Court articulated the "classic statement of the public trust doctrine" in *Illinois Central Railroad Co. v. State of Illinois*, 146 U.S. 387 (1892). *Lake Michigan Fed'n v. United States Army Corp. of Eng'rs*, 742 F. Supp. 441, 444 (N.D. Ill. 1990). In that case, the Court held that the public's interest in navigable waters precluded the Illinois legislature from transferring land under Lake Michigan to the Illinois Central Railroad. 146 U.S. at 453. The title to these submerged lands was "different in character from that which the State holds in lands intended for sale." *Id.* at 452. Specifically, the title was "held in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties." *Id.* The Court concluded that "the State can no more abdicate its trust over property in which the whole people are interested . . . so as to leave them entirely under the use and control of private parties . . . than it can abdicate its police powers in the administration of government and the preservation of peace." *Id.* at 453.

claim based upon subject matter jurisdiction, *see generally* [49-1] at 19, this Court need not consider it at this time.

### i. Plaintiffs' Aesthetic and Environmental Harm Theory

Defendants argue that Plaintiffs' "aesthetic and environmental harm" theory fails because they do not allege that the OPC will cause an individual injury sufficient to confer standing under Article III. [83] at 7−8. This Court agrees.

### a. Individual Plaintiffs Cannot Establish Standing

Environmental plaintiffs "adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Sierra Club v. Franklin Cty. Power of Ill., LLC*, 546 F.3d 918, 925 (7th Cir. 2008) (citing *Laidlaw*, 528 U.S. at 183). Here, Plaintiffs allege only that the OPC will interfere with and harm Jackson Park's existing natural environment. *See, e.g.*, [91] ¶ 52. But, the "relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181. Individual Plaintiffs fail to allege that: (1) they use, visit, or enjoy Jackson Park in any way; and (2) that the alleged aesthetic and environmental harm will affect them personally. *See generally* [91]; *Cf. Franklin Cty. Power*, 546 F.3d at 925 (finding that Sierra Club established Article III standing because one of its members stated that she visited the land at issue every other year and would no longer do so due to the alleged environmental harm); *Bensman v. United States Forest Serv.*, 408 F.3d 945, 961−62 (7th Cir. 2005) (affirming district court's determination that plaintiff did not assert a sufficient aesthetic or recreational

interest in a project area to constitute a concrete and particularized injury, as he lived far from the project areas, and did not claim that the projects would prevent him from using areas of the national parks at issue).  Thus, Individual Plaintiffs' allegations fail to provide a sufficient basis to establish standing for any aesthetic or environmental harm.

### b.    Plaintiff Parks Cannot Establish Standing

For this same reason, Plaintiff Parks cannot establish standing based upon aesthetic or environmental harm.

An organization establishes standing to sue on behalf of its members "if (1) at least one of its members would otherwise have standing; (2) the interests at stake in the litigation are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the lawsuit."  *Id.* at 924 (citing *Laidlaw*, 528 U.S. at 181).  When an environmental organization serves as a plaintiff, it establishes this first prong by alleging "that its members use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."  *Nat'l Wildlife Fed'n v. United States Army Corp. of Eng'rs*, No. 14-590-DRH-DGW, 2014 WL 6685235, at *5 (S.D. Ill. Nov. 25, 2015) (citing *Laidlaw*, 528 U.S. at 183).

Parks' environmental harm theory fails because the amended complaint lacks any allegation that its members use, visit, or otherwise enjoy Jackson Park in any manner.  *See generally* [91].  Absent such information, Parks cannot establish organizational standing to sue based upon aesthetic or environmental harm.

10

ii.     **Plaintiffs' Public Trust Doctrine Theory**

a.     **Individual Plaintiffs Establish Standing**

Defendants argue that Individual Plaintiffs fail to establish Article III standing based upon the public trust doctrine, because their interest as alleged trust beneficiaries belongs to "each citizen," meaning the interest is common to all Illinois residents. [49-1] at 14. Therefore, Defendants contend, Individual Plaintiffs lack the required "personal stake," or injury, that Article III standing requires. *Id.*; *see Los Angeles v. Lyons*, 461 U.S. 95, 101−02 (1983) ("Plaintiffs must demonstrate a personal stake in the outcome. . . . Abstract injury is not enough.") (internal quotation marks omitted). Not so.

If "the 'public trust' doctrine is to have any meaning or vitality at all, the members of the public, at least taxpayers who are the beneficiaries of that trust, must have the right and standing to enforce it." *See Friends of the Parks v. Chicago Park Dist.*, No. 14-cv-09096, 2015 WL 1188615, at *3 (N.D. Ill. 2015) (citing *Paepcke v. Public Bldg. Com.*, 263 N.E.2d 11, 18 (Ill. 1970) (holding that a group of taxpayers who sued to prevent the implementation of plans to construct facilities on public parks had standing under the public trust doctrine)). Therefore, alleging that "rights under the public trust doctrine are being deprived without procedural due process . . . so as to violate the federal Constitution," sufficiently establishes Article III standing. *Id.* In other words, plaintiffs alleging that "lands held in the public trust are imminently in danger of being altered by the actions of defendants" have identified a

11

"concrete injury" that can be "redressed by a favorable court decision." *Id*. (citing *Lujan*, 504 U.S. at 560−61).

Here, Individual Plaintiffs allege that Defendants have placed Jackson Park—land held in the public trust—in imminent danger of alteration, and thus that Defendants are depriving them of their rights under the public trust doctrine without procedural due process. *See* [91] ¶¶ 6, 58−86. Therefore, Individual Plaintiffs, as Illinois taxpayers and beneficiaries of the public trust, have established Article III standing as to their Due Process claim under the public trust doctrine.

Defendants rely upon two cases for the principal that Individual Plaintiffs cannot establish Article III standing. Both are distinguishable. First, Defendants cite to *Hollingsworth v. Perry*, 570 U.S. 693, 705−07 (1970), in which the Court explained that third-party intervenors defending Proposition 8 lacked standing because their only interest was to "vindicate the constitutional validity of a generally applicable California law." And while the Court found that the California Constitution and election laws did give plaintiffs a "'unique,' 'special,' and 'distinct' role" during the initiative process, once voters approved the proposition, petitioners no longer had that same unique role in its enforcement. *Id*. at 706−07. Here, in contrast, courts have held that the public trust doctrine gives Individual Plaintiffs an enforcement role. *See Lake Michigan Fed'n v. U.S. Army Corps of Engineers*, 742 F. Supp. 441, 446 (N.D. Ill. 1990) ("If courts were to rubber stamp legislative decisions, . . . , the [public trust] doctrine would have no teeth."); *Friends of Parks*, 2015 WL 1188615, at *3. Thus, *Hollingsworth* does not apply.

12

Second, Defendants rely upon *Illinois ex rel. Ryan v. Brown*, 227 F.3d 1042 (7th Cir. 2000), in which Illinois taxpayers and citizens brought suit on behalf of the State of Illinois against a leasing company, seeking to recover under the federal Racketeer Influenced and Corrupt Organization Act (RICO) for damages inflicted as part of an alleged bribery scheme. On appeal, the Seventh Circuit found that plaintiffs could not establish standing under RICO because the action belonged to the state, rather than plaintiffs who "suffered only in the general way that all taxpayers suffer when the state is victimized by dishonesty." *Id*. at 1045. Therefore, the state, and not plaintiffs, should have brought suit. *Id*. at 1045–46. Significantly, in *Brown*, the Court limited its standing decision, and explained that while the state could reinforce its enforcement power under RICO through citizen suits authorized by state law, the decision to do so could "not affect the scope of standing for purposes of RICO." *Id*. at 1046. This case, in comparison, does not involve RICO or plaintiffs suing on behalf of a state. Instead, Individual Plaintiffs are exercising their recognized enforcement power under the public trust doctrine to bring suit *against* the state, based upon procedural due process. Thus, *Brown* is neither controlling nor persuasive here. [6]

---

[6] Plaintiffs also cite *Ngueyn ex rel. United States v. City of Cleveland* for the principle that the public trust doctrine cannot establish Article III standing. No. 1:09 CV 452, 2016 WL 1031096 (N.D. Ohio Mar. 15, 2016) (aff'd sub nom. *United States ex rel Nguyen v. City of Cleveland*, Nos. 16-3379/3420, 2017 WL 4677202 (6th Cir. Mar. 3, 2017)); [49-1] at 15. But the *Ngueyn* plaintiff did not raise a procedural due process claim based upon the public trust doctrine. *Id*. Further, that plaintiff's allegations merely concerned the continued operation of an airport without the necessary permit under the Clean Air Act. *Id*. at *8 ("In Ohio, the public trust doctrine charges the State with the responsibility to manage certain lands for the benefit of the public. This concept has no application here."). Here, Plaintiffs' claims invoke procedural due process and directly relate to the State's management of land held in the public trust. Thus, *Nguyen* is not persuasive.

Because Individual Plaintiffs, as Illinois taxpayers and beneficiaries of the public trust, have established Article III standing as to their Due Process claim, this Court denies Defendants' motion to dismiss Count I for lack of subject matter jurisdiction [48] as to Individual Plaintiffs.

### b.     Plaintiff Parks Establishes Standing

Similar to Plaintiffs' environmental harm theory, Parks must plead facts regarding its members' interests to establish Article III standing on their behalf. *Franklin Cty. Power*, 546 F.3d at 924.

Parks has met this burden with respect to its public trust doctrine claim, because Plaintiffs' First Amended Complaint asserts that Parks' members reside in the City of Chicago and pay city taxes. [91] ¶ 19. Based upon this allegation, this Court can draw the reasonable inference that Parks members pay Illinois state taxes in addition to city taxes. Thus, Parks alleges that at least one of its members, as a taxpayer, has standing to bring a due process claim based upon the public trust doctrine in this case. Certainly, Parks' stated purpose of preserving, protecting, and improving Chicago's parks and forest preserves is germane to the issues in this case. *Id*. ¶ 18. And there is no contention that Plaintiffs' Due Process claim, or their requested relief, requires an individual member's participation in this lawsuit.

Because Plaintiff Parks has established Article III standing to sue on behalf of its members as to the Due Process claim, this Court denies Defendants' motion to dismiss Count I for lack of subject matter jurisdiction [48] as to Plaintiff Parks.[7]

---

[7] Because Plaintiffs' related state-law claims (Counts II through V) derive from the same "common nucleus of operative fact" as their Due Process claim, this Court retains jurisdiction over them based

### B. Plaintiffs' First Amendment Claim (Count VI)

Defendants argue both that: (1) Plaintiffs lack standing to bring their First Amendment claim; and (2) the First Amendment claim is unripe. [49-1] at 15−16, 19. This Court addresses each argument in turn.

Plaintiffs' First Amendment claim alleges that they will pay municipal taxes, the proceeds of which will fund political speech with which they disagree, because of the OPC. Plaintiffs rely upon a series of prospective events to support this theory.

First, Plaintiffs point to Section 2 of the Park District Aquarium and Museum Act, 70 ILCS 1290/2, which states that "[e]ach board of park commissioners . . . is hereby authorized . . . to levy annually a tax" for purposes of "establishing, acquiring, completing, erecting, enlarging, ornamenting, building, rebuilding, rehabilitating, improving, operating, maintaining and caring for" aquariums, museums, and their buildings and grounds. [91] ¶ 119. According to the Act, such tax— "shall be in addition to all other taxes which such board of park commissioners is . . . authorized to levy on the aggregate valuation of all taxable property within the park district." 70 ILCS 1290/2.

Second, Plaintiffs allege that President Obama:

intends to use his Center as a 'bully pulpit' to continue his political activities, by raising money for the Democrat[ic] Party, endorsing individual candidates for election, speaking out on controversial partisan political issues, and being outspoken in critiquing the actions of succeeding presidents and elected members of Congress with whom he disagrees.

---

upon supplemental jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995)).

[91] ¶ 117.  And third, Plaintiffs allege that "on information and belief, the Obama Foundation will not pay real estate taxes." *Id*. ¶ 120.

Therefore, Plaintiffs allege that the Park District's Board of Commissioners will choose to levy an annual, municipal-level[8] tax to support the OPC's operations, forcing "individuals who politically disagree with Mr. Obama . . . to contribute money to him to successfully pursue all his personal political and other initiatives and objectives," thus violating their First Amendment rights of speech and assembly.  *Id*.

### i.  Plaintiff Adelman Cannot Establish Standing

Litigants seeking to establish municipal taxpayer standing must satisfy "two threshold criteria": (1) they are municipal taxpayers; and (2) the municipality has used tax revenues on the allegedly unconstitutional acts.  *Freedom from Religion Found. v. Zielke*, 845 F.2d 1463, 1470 (7th Cir. 1988).  With respect to the second requirement, municipal taxpayers have standing to bring claims against municipalities "only when they bring 'a good-faith pocket action.'"  *Clay v. Fort Wayne Cmty. Sch.*, 76 F.3d 873, 879 (7th Cir. 1996) (quoting *Doremus v. Bd. of Educ.*, 342 U.S. 429, 434 (1952)).  In other words, municipal taxpayers must "object to a disbursement of funds occasioned solely by the alleged unconstitutional conduct."  *Id.*

---

[8] The Park District is a distinct "body politic and corporate" entity, separate and apart from the City of Chicago.  70 ILCS 1505/3.  Nevertheless, Plaintiffs assume, without explanation or legal authority, that a park district tax constitutes a municipal tax for purposes of their First Amendment claim.  *See* [65-1] at 16−17.  As discussed below, this Court need not address whether such a tax could constitute a municipal tax; even if Plaintiffs' alleged Park District tax could be defined as a municipal tax, Plaintiffs' First Amendment claim remains unripe.

Municipal taxpayers cannot establish standing "absent some allegation by the plaintiffs of an illegal use of tax revenues." *Id.*[9]

Plaintiff Adelman is a Wilmette resident. [91] ¶ 20. As such, she will not pay any sort of municipal tax in support of the OPC, and therefore cannot establish Article III standing as a municipal taxpayer. Count VI is therefore dismissed with prejudice as to Plaintiff Adelman.

As Chicago residents, Plaintiffs Valencia and Jurevis do pay City of Chicago taxes. *Id.* ¶¶ 21−22. And Plaintiff Parks has established organizational standing through its members, who it alleges pay City of Chicago taxes. [91] ¶ 19; *Franklin Cty. Power*, 546 F.3d at 924. Their First Amendment claim, however, is nonetheless non-justiciable, as discussed below, because it lacks ripeness.

### ii.    Plaintiffs' First Amendment Claim Lacks Ripeness

Defendants also challenge Plaintiffs' First Amendment claim as unripe for judicial review. *See, e.g.*, [83] at 8. Ripeness encompasses both "the Constitution's case-or-controversy requirements as well as discretionary prudential considerations." *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011). Ripeness issues arise "when a case involves uncertain or contingent events that may not occur

---

[9] In their response memorandum, Plaintiffs assert, for the first time, that the City will use taxpayer dollars to fund environmental remediation and road work related to the OPC site. [65-1] at 9; [91] ¶¶ 115−120. Even if Plaintiffs did include such an allegation in their Complaint, and even if the City does use taxpayer dollars in this manner, Plaintiffs cannot establish that such conduct is an illegal use of tax revenues; municipal spending on environmental costs and roadwork does not constitute illegal activity in and of itself. *Clay*, 76 F.3d at 879. Absent any allegation relating such environmental and roadwork spending to some future, unlawful partisan political expression on behalf of the OPC, Plaintiffs cannot establish municipal taxpayer standing based upon this theory. *Id.* Moreover, as is discussed below, Plaintiffs' entire First Amendment theory—based upon speculative, future OPC political activity—is unripe.

17

as anticipated, or not occur at all." *Id.* Whether a claim is sufficiently ripe depends upon "'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983) (quoting *Abbott Labs v. Gardner*, 387 U.S. 136 (1967)). Claims that present "purely legal issues" are normally fit for judicial decision. *Wis. Right to Life*, 664 F.3d at 148.

Plaintiffs' First Amendment claim rests upon multiple levels of wild factual speculation. First, with respect to the alleged annual tax, the Use Agreement between the City and Foundation expressly prohibits the Park District from enacting an annual tax to support the OPC. [49-6] (Exhibit D). The Agreement states that the Foundation "shall, at its sole cost and expense, design and construct the Project Improvements[10] . . . ." *Id.* § 4.1. The City "shall not be liable or otherwise responsible in any manner . . . for any of the Total Construction Costs, [or] any of the Soft Costs . . . for any other costs, expenses . . . or liabilities arising out of the planning, design, construction, furnishing, or operation of the Project Improvements." *Id.* § 4.2. Moreover, the Foundation shall, at all times during its 99-year term, "at its sole cost and expense, keep the Subject Property and the Project Improvements . . . including all sidewalks, lawns and landscaped areas, parking and loading areas and other public access areas . . . in good condition and repair." *Id.* § 7.1. Here, Plaintiffs' First Amendment claim presumes that the Park District's Board of Park Commissioners

---

[10] "Project Improvements" mean, "collectively, the Presidential Center Architectural Spaces and all other improvements constructed, installed or located on the Subject Property [the Jackson Park site] by the Foundation." [49-6] Exhibit D Art. I.

will violate the City's Use Agreement to levy an annual tax supporting the OPC, without any indication that such a violation is planned or contemplated.

Second, with respect to partisan political behavior, the Use Agreement provides that:

> The Foundation shall not use or allow the Subject Property to be used for political fundraisers or use or occupy, or authorize the use or occupancy of, the Subject Property or Project Improvements, in whole or in part, in a manner that would be inconsistent with the Foundation's status as a tax exempt entity under Section 501(c)(3) of the Internal Revenue Code.

*Id.* § 6.3(d). And the Foundation's tax-exempt status means that it cannot "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3). Therefore, Plaintiffs ask this Court to find that President Obama, through the Foundation and the OPC, will, at some undefined time and in an undefined manner, disregard both the Use Agreement and applicable tax law by engaging in partisan political activities at the OPC. This Court declines Plaintiffs' invitation to predict the future.

Disputes "must have ripened into a legal case before a federal court can act; the case must not lie merely in the future." *Jones v. Griffith*, 870 F.2d 1363, 1366 (7th Cir. 1989). Both the annual tax and any partisan political behavior on behalf of the OPC are purely speculative, future events. And dismissing Plaintiffs' First Amendment claim against Defendants will not prejudice Plaintiffs. If, at some point in the future, the Park District's Board of Commissioners levies an annual municipal tax to support the OPC's operations, and the OPC violates both federal law and the

Use Agreement by engaging in partisan political activity, Plaintiffs will have a ripe claim and thus suffer no hardship. Acting on Plaintiffs' First Amendment claim now, on the other hand, will force Defendants "to incur the time and costs of litigating a dispute that there is no reason to believe will arise." *Ratajczak v. Beazley Solutions, Ltd.*, No. 13-C-045, 2014 WL 3057158, at *4 (N.D. Ill. July 7, 2014).

For these reasons, Plaintiffs' First Amendment claim lacks ripeness, and this Court cannot retain subject matter jurisdiction over that claim. *Biddison v. City of Chicago*, 921 F.2d 724, 726 (7th Cir. 1991) ("If a case is not ripe for purposes of article III, we should dismiss the case for lack of subject matter jurisdiction."). This Court grants Defendants' motion to dismiss Count VI for lack of subject matter jurisdiction [48] as to Plaintiffs Valencia, Jurevis, and Parks without prejudice. *See Forseth v. Village of Sussex*, 199 F.3d 363, 373−74 (7th Cir. 2000) (affirming the dismissal of federal claims without prejudice for lack of ripeness).

## IV. Conclusion

For the reasons explained above, this Court grants in part and denies in part Defendants' motion to dismiss for lack of subject matter jurisdiction. [48]. Count VI is dismissed with prejudice as to Plaintiff Adelman, and without prejudice as to Plaintiffs Parks, Valencia, and Jurevis. *See, e.g.*, *Peters v. Fair*, 427 F.3d 1035, 1038 (6th Cir. 2005) ("[T]he district court improperly dismissed [Plaintiff's federal] claims with prejudice. It should have been dismissed without prejudice, thereby allowing the plaintiff to reassert this claim, should it become ripe in the future."). Plaintiffs'

aesthetic and environmental harm theory, included in Count I, also fails. All other dates and deadlines stand.

Dated: February 19, 2019

Entered:

John Robert Blakey
United States District Judge