**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PROTECT OUR PARKS, INC., CHARLOTTE ADELMAN, MARIA VALENCIA, and JEREMIAH JUREVIS, | |
| Plaintiffs, | Case No. 18-cv-3424 |
| v. | |
| CHICAGO PARK DISTRICT and CITY OF CHICAGO, | Judge John Robert Blakey |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

This dispute arises out of the City of Chicago (City) and the Chicago Park District's (Park District) efforts to bring the Obama Presidential Center (OPC) to the City's South Side. Plaintiffs sue to prevent construction of the OPC on a specific site within Jackson Park. [91] ¶ 1. Following this Court's ruling on Defendants' Rule 12(b)(1) motion to dismiss, [92], the parties completed full discovery and filed cross-motions for summary judgment, [112] [122]. On June 11, 2019, this Court held a hearing, and heard oral argument only on those issues and counts which required consideration beyond the briefs.

This order addresses the merits of the case. In doing so, this Court faces the same challenge presented to the Illinois Supreme Court in *Paepcke v. Public Building Commission of Chicago*, 263 N.E.2d 11 (Ill. 1970). As they put it:

1

> [T]his court is fully aware of the fact that the issues presented in this case illustrate the classic struggle between those members of the public who would preserve our parks and open lands in their pristine purity and those charged with administrative responsibilities who, under the pressures of the changing needs of an increasingly complex society, find it necessary, in good faith and for the public good, to encroach to some extent upon lands heretofore considered inviolate to change. The resolution of this conflict in any given case is for the legislature and not the courts. The courts can serve only as an instrument of determining legislative intent as evidenced by existing legislation measured against constitutional limitations. In this process the courts must deal with legislation as enacted and not with speculative considerations of legislative wisdom.

*Id*. at 21. With this principle in mind and for the sound reasons set forth below, this Court grants Defendants' motion for summary judgment, [122], and denies Plaintiffs' motion for summary judgment, [112]. The facts do not warrant a trial, and construction should commence without delay. This case is terminated.

## I. Background

The following facts come from Plaintiffs' Rule 56.1 statement of facts, [112-1], Defendants' Rule 56.1 statement of facts, [124], Plaintiffs' statement of additional material facts, [136], and Defendants' statement of additional material facts, [139].[1]

### A. The Parties

Plaintiff Protect Our Parks, Inc. is a nonprofit park advocacy organization located in Chicago. [112-1] ¶ 1; [124] ¶ 1. Its members include individuals who reside in the City of Chicago and pay taxes to the City. *Id*. Plaintiff Adelman resides in

---

[1] Both parties submitted their responses to each other's statements of material facts and their own statements of additional facts within the same docket number. *See* [136] [139]. Unless otherwise noted, all cites to [136] and [139] in this opinion refer to the parties' statements of additional facts.

Wilmette, Illinois. *Id.* Plaintiffs Valencia and Jurevis reside in the City of Chicago. *Id.*

Defendant Park District exists as a body politic and corporate entity established by Illinois law, pursuant to the Chicago Park District Act, 70 ILCS 1505/.01, *et seq.* [112-1] ¶ 2; [124] ¶ 2. Defendant City is a body politic and municipal corporation. [112-1] ¶ 3; [124] ¶ 3.

**B.    Selecting the OPC Site**

In March 2014, the Barack Obama Foundation (Foundation) initiated a search for the future site of the OPC. [112-1] ¶ 4. Both the University of Chicago and the University of Illinois Chicago (UIC) proposed potential locations. *Id.* ¶¶ 5, 19. UIC proposed two sites, generally located at: (1) the North Lawndale neighborhood; and (2) the east end of the school's campus. *Id.* ¶ 19; [126-2] at 105098. The University of Chicago proposed three sites, generally located at: (1) the South Shore Cultural Center[2]; (2) Jackson Park; and (3) Washington Park. [112-1] ¶ 5; [126-2] at 105098. At this time, the Park District owned both the Jackson Park and Washington Park parkland identified in the University of Chicago's proposal. [126-2] at 105098.

In addition to these sites, nine entities from several locations throughout the country submitted proposals for the OPC, resulting in a total of 14 potential sites. [112-1] ¶ 25. The Foundation performed an analysis of the proposals from all submitting entities, evaluating the sites based upon the following criteria:

- Project Site and Access: desirability of site, surrounding community, control of site, local accessibility, global accessibility

---

[2] The City and Park District later eliminated the South Shore site from consideration as a potential location. [112-1] ¶ 7.

- Project Execution: education impact, tourism impact, economic development impact, enhancements to the physical environment

- Community Engagement: engagement plan, quality/breadth of partners, means of engagement

- Indications of Support: partnership structure, alignment of mission, financial capacity.

*Id*.; [117-5] at 5. The Foundation assigned numerical scores to each site based upon the above evaluation criteria, and ranked the sites based upon these scores. [112-1] ¶ 26; [117-5] at 8–9. The Washington Park Site received the highest score at 122 out of 150; the Jackson Park site received the second highest score at 121 out of 150; and the UIC's proposed locations received a combined score of 120 out of 150, putting it in third place. *Id*.

On July 29, 2016, the Foundation issued a press release announcing that it chose Jackson Park as the OPC site. [124] ¶ 13; [114-16].

### C.    The OPC Site

#### i.    Site Location

The site selected for the OPC within Jackson Park comprises 19.3 acres, or 3.5 percent of the 551.52 acres comprising Jackson Park. [124] ¶ 6. It lies on the western edge of Jackson Park and includes existing parkland bounded by South Stony Island Avenue to the west, East Midway Plaisance Drive North to the north, South Cornell Drive to the east, and South 62nd Street to the south. *Id*. ¶ 7. The OPC site also includes land within the park that currently exists as city streets: the portion of East Midway Plaisance Drive North between Stony Island Avenue and South Cornell

4

Drive, and a portion of South Cornell Drive between East Midway Plaisance Drive South and East Hayes Drive. *Id.* As part of the OPC construction, these street portions would be closed and removed "to restore" the landscape's connection to the Lagoon and Lake." *Id.* ¶¶ 7, 40.

The site lies approximately half a mile from Lake Michigan, separated by: (1) six-lane Cornell Drive; (2) the lagoons and Wooded Island of Jackson Park; (3) Jackson Park's golf driving range and other grounds; (4) Lake Shore Drive; and (5) a pedestrian and bike path. *Id.* ¶ 7. It sits entirely above ground, although the parties dispute whether the site formerly sat beneath Lake Michigan. *Id.* ¶ 9; [136] ¶ 9 (Plaintiffs' response).

### ii. Site Components

The OPC will consist of a campus containing open green space, a plaza, and four buildings: (1) the Museum Building; (2) the Forum Building; (3) a Library Building; and (4) a Program, Athletic, and Activity Center. [124] ¶¶ 23, 26. It will also include an underground parking garage. *Id.* ¶ 23.



[91] ¶ 50.

The Museum will comprise the OPC's principal building and "central mission."
[124] ¶ 24. It seeks to "tell the stories of the first African American President and
First Lady of the United States, their connection to Chicago, and the individuals,
communities, and social currents that shaped their local and national journey." *Id*.
¶ 25. In doing so, the Museum will feature artifacts and records from President
Obama's presidency, including items on loan from the National Archives and Records
Administration (NARA). *Id*. ¶¶ 24−25; [125-5] (Exhibit D, Recital J).

The Forum Building will contain collaboration and creative spaces, including
an auditorium, meeting rooms, recording and broadcasting studios, and a winter
garden and restaurant. [124] ¶ 27.

The Library Building will include a branch of the Chicago Public Library and
a President's Reading Room, featuring curated collections and displays of archival

material, including digital access to Obama Administration records.  *Id*. ¶ 28; [125-5] (Exhibit D, (Sub) Exhibit "C").

The Program, Athletic, and Activity Center will host public programs such as "presentations, events, athletics, and recreation." [124] ¶ 29; [125-5] (Exhibit D, (Sub) Exhibit "C").

The OPC's green space will include features such as: (1) play areas for children; (2) "contemplative spaces for young and old"; (3) a sledding hill; (4) a sloped lawn for picnicking, recreation and community and special events; (5) walking paths; and (6) a nature walk along the lagoon.  [124] ¶ 30.  The Foundation will also "preserve and enhance" the existing Women's Garden and Lawn, keeping it open and available as green space.  *Id*.

### iii.  Site Accessibility

According to the Use Agreement between the City and Foundation, discussed in detail below, the OPC buildings must "be open to the public at a minimum in a manner substantially consistent with the manner in which other Museums in the Parks are open to the public."  *Id*. ¶ 26; [125-5] (Exhibit D, § 6.2(a)(i)).  All other portions of the OPC, such as the green space, must remain open to the public during regular Park District hours.  [124] ¶ 30; [125-5] (Exhibit D, § 6.2(a)(ii)).

The OPC will charge fees for entry into the Museum and for the parking garage.  [112-1] ¶ 43.  It will, however, provide free public access to many interior spaces within the OPC, including portions of the garden and plaza levels in the Museum Building and the top floor of the Museum Building.  [124] ¶ 26.  Moreover,

the Foundation must operate the OPC in accordance with the free admission requirements of Illinois' Park District Aquarium and Museum Act, which mandates free admission to all Illinois residents at least 52 days out of the year and to all Illinois school children accompanied by a teacher. *Id.* ¶ 37. The admission fee policy for members of the public who are City residents, or low-income individuals and their families participating in the Supplemental Nutrition Assistance Program (or equivalent program), must also be "substantially consistent with comparable general admission fee policies" for such individuals maintained by "other Museums in the Park." [125-5] (Exhibit D, § 6.10).

### D. OPC Municipal Approval Process

#### i. Jackson Park's Creation

In 1869, the General Assembly passed "An Act to Provide for the Location and Maintenance of a Park for the Towns of South Chicago, Hyde Park and Lake" (1869 Act). [112-1] ¶ 17; Private Laws, 1869, vol. 1, p. 358. The statute provided for the formation of a board of public park commissioners to be known as the "South Park Commissioners." *Id.* The Act authorized these commissioners to select certain lands, which, when acquired by said commissioners, "shall be held, managed and controlled by them and their successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever." Private Laws, 1869, vol. 1, p. 360. Pursuant to this authority, the commissioners acquired the land now known as Jackson Park. [112-1] ¶ 17; [139] ¶ 17 (Defendants' response). The Illinois Legislature enacted the Park District Consolidation Act in 1934, which consolidated

the existing park districts, including the South Park District, into the Chicago Park District. 70 ILCS 1505/1.

### ii. Transfer From the Park District to the City

In early January of 2015—before the Jackson Park site selection—the Foundation expressed "concerns regarding the City's lack of control" over the proposed Jackson and Washington Park sites and indicated that "consolidating ownership of the sites and local decision-making authority in the City was a prerequisite to a successful bid." [126-2] at 105098–99.

Subsequently, in February 2015—in an open meeting during which members of the public spoke and submitted written comments—the Park District's Board of Commissioners voted to approve the transfer of "approximately 20 acres of property" located in Washington Park or Jackson Park to the City. [124] ¶ 11; [125-4] at 4, 11. Following this meeting, the OPC site's boundaries within Jackson Park shifted to the north and east. [124] ¶ 11.

In February 2018, after a public meeting, the Board of Commissioners confirmed authority to transfer the reconfigured site to the City. *Id*.

In March 2015, the City Council enacted an ordinance "authorizing the execution of an intergovernmental agreement between the City of Chicago and the Chicago Park District necessary to acquire selected sites in order to facilitate the location, development, construction and operation" of the OPC. [124] ¶ 12; [126-2] at 105096. In October 2018, following the Jackson Park selection, the City Council passed an ordinance finding it "useful, desirable, necessary and convenient that the

City acquire the OPC site from the Park District" for the "public purpose" of constructing and operating the OPC. [124] ¶ 12; [125-5] at 85886 § 2.

### iii. City Council Approval

In January 2018, the Foundation applied to the City for a zoning amendment to build the OPC on the Jackson Park site as a "planned development"—a designation required for certain institutional and campus-oriented projects. [124] ¶ 13; [126-3]. The Foundation also applied for approval under the City's Lake Michigan and Chicago Lakefront Protection Ordinance (LPO). [124] ¶ 13. The City's Department of Planning and Development (DPD) subsequently reviewed both applications and prepared a report (DPD Study) as required by the City's Municipal Code. *Id*. The DPD Study recommended approving both applications. *Id*.

On May 17, 2018, the Chicago Plan Commission—which reviews proposals involving planned developments and the Lakefront Protection Ordinance within the City—held a public hearing on the Foundation's application for a planned development zoning amendment and for approval under the LPO. *Id*. ¶ 14; [126-5]. Representatives from the City and the Foundation testified at the hearing, and over 75 members of the public commented on the proposals. [124] ¶ 14. The presentation from DPD staff included a slideshow depicting various renderings of the OPC proposal. *Id*.

At the conclusion of this hearing, the Plan Commission found that the OPC project conformed with the LPO and approved the Foundation's application under the LPO. *Id*. ¶ 15. In doing so, the Plan Commission adopted the DPD Study as its

findings of fact. *Id*. Under the City's Municipal Code, the Plan Commission serves as the final decisionmaker as to whether a project complies with the Lakefront Plan of Chicago and the purposes of the LPO. *Id*.; Municipal Code of Chicago (MCC) § 16-4-100(e).

Also at the May 17 hearing, the Plan Commission recommended approval of the Foundation's application for a zoning amendment. [124] ¶ 16. Again, the Plan Commission adopted the DPD Study as the Commission's own findings of fact. *Id*. Under the City's Municipal Code, after considering a zoning amendment application, the Plan Commission must refer the application to the City Council, which serves as the final decisionmaker on the amendment. *Id*.; MCC § 17-13-0607.

Accordingly, on May 22, 2018, the City Council's Committee on Zoning, Landmarks and Building Standards held a public hearing to consider the zoning amendment. [124] ¶ 17. Following testimony from City and Foundation representatives and public comments, the Committee voted to recommend approval. *Id*. The next day, the full City Council approved the amendment, enacting an ordinance that authorized construction of the OPC as a Planned Development; this ordinance controls the size and layout of the OPC's buildings. *Id*. ¶ 18.

In October 2018, the City Council considered and approved two additional ordinances for the OPC project. *Id*. ¶ 19. First, it considered the Operating Ordinance, which allows the City to accept title to the Jackson Park site from the Park District and to enter into agreements with the Foundation governing the Foundation's use of the site. *Id*. On October 11, 2018, the City Council's Committee

on Housing and Real Estate held a public hearing on the Operating Ordinance, during which City and Foundation representatives testified about the ordinance and members of the public commented. *Id*. The Committee voted unanimously to recommend adopting the Operating Ordinance, and the full City Council unanimously approved it on October 31, 2018. *Id*.

Second, the City Council considered an ordinance authorizing the City to vacate portions of East Midway Plaisance Drive South and Cornell Drive within Jackson Park for conversion into parkland as part of the OPC site. *Id*. ¶ 20. On October 25, 2018 the City Council's Committee on Transportation and Public Way held a public hearing on the ordinance, during which City and Foundation representatives again testified, and members of the public commented. *Id*. The Committee voted unanimously to recommend adopting the ordinance, and the full City Council unanimously approved it on October 31, 2018. *Id*.

### iv.    The Use Agreement

One of the agreements authorized by the Operating Ordinance includes the Use Agreement, which sets out the terms by which the Foundation may use Jackson Park for the OPC. *Id*. ¶ 21; [125-5] (Exhibit D). The Use Agreement does not transfer ownership of the OPC site, nor does it lease the site to the Foundation. *See generally* [125-5] (Exhibit D); [112-1] ¶ 46. Rather, section 2.1 of the Use Agreement provides the Foundation with the following rights with respect to the OPC site for a 99-year term:

12

(a) the right to construct and install the Project Improvements[3] (including the Presidential Center);

(b) the right to occupy, use, maintain, operate and alter the Presidential Center Architectural Spaces[4]; and

(c) the right to use, maintain, operate and alter the Presidential Center Green Space and Green Space.[5]

[125-5] (Exhibit D, §§ 2.1–.2).

The Foundation will construct the OPC's buildings at its own expense and upon completion, transfer ownership of the buildings and other site improvements to the City at no charge. *Id*. §§ 2.1, 4.4; [124] ¶ 34. The Foundation will also maintain the OPC site and buildings at its sole expense for the entire life of the Use Agreement. [124] ¶ 35; [125-5] (Exhibit D, §§ 2.2, 7.1). The City is not required to enter into the Use Agreement until the Foundation establishes an endowment for the OPC and the site, and confirms that it has funds or commitments sufficient to pay the projected construction costs. [124] ¶ 36.

As to consideration, the Use Agreement provides:

The consideration for this Agreement is Ten and 00/100 Dollars ($10.00) payable by the Foundation on the Commencement Date, the receipt and

---

[3] The Use Agreement defines "project improvements" as the Presidential Center Architectural Spaces and all other improvements constructed, installed, or located on the OPC site by the Foundation in accordance with the Use Agreement. [125-5] (Exhibit D, Art. I). The "Presidential Center" includes the "Presidential Center Architectural Spaces" and the "Presidential Center Green Space," as well as all other improvements and fixtures constructed, installed, or located by the Foundation in accordance with the Use Agreement. *Id*.

[4] "Presidential Center Architectural Spaces" includes the Museum Building, the Forum Building, the Library Building, the Program, Athletic and Activity Center, the Underground Parking Facility, the Plaza, and all "other facilities and improvements ancillary to any of the foregoing," such as loading/receiving areas and service drives. [125-5] (Exhibit D, Art. I).

[5] "Presidential Center Green Space" means all portions of the Presidential Center other than the Presidential Center Architectural Spaces. [125-5] (Exhibit D, Art. I). "Green Space" means all portions of the OPC site excluding the Presidential Center. *Id*.

> sufficiency of which, when taken together with the construction, development, operation, maintenance and repair of the Presidential Center and the other Project Improvements by the Foundation, the vesting of ownership of the Project Improvements by the Foundation in the City (as contemplated herein), as well as the material covenants and agreements set forth herein to be performed and observed by the Foundation, are hereby acknowledged by the City.

[125-5] (Exhibit D, Art. III).

With respect to operating the OPC, the Use Agreement prohibits the Foundation from using the OPC for political fundraisers or in any manner inconsistent with its status as a tax exempt entity under Section 501(c)(3) of the Internal Revenue Code. *Id*. at § 6.3(d); [124] ¶ 21. The Foundation must use revenues collected from general and special admission fees, parking and other visitor services, third-party use fees, food and beverage sales, and retail sales for the OPC's operations and maintenance, or deposit such revenues into an endowment for those purposes. [124] ¶ 21; [125-5] (Exhibit D, § 6.9).

In addition, the Foundation must provide the City with an annual report on the OPC's operations, and in conjunction with the City, form an Advisory Operations Committee to address ongoing operational issues related to the OPC and any concerns arising from nearby and adjacent areas of Jackson Park. [124] ¶ 21; [125-5] (Exhibit D, §§ 17.3−.4). If the Foundation ceases to use the OPC for its permitted purposes—essentially, operating the OPC—under the Use Agreement, the City may terminate the Agreement. [124] ¶ 21; [125-5] (Exhibit D, §§ 6.1, 16.2).

### E.    OPC Studies

The City did not perform a comparative analysis of the economic or other community impact on the City as a result of building the OPC at one particular location versus another. [112-1] ¶¶ 28−29. Rather, the DPD Study looked at the Jackson Park site specifically, while studies performed by private institutions analyzed the impact of generally placing the OPC in Chicago and the State of Illinois. [124] ¶¶ 13, 55−56.

The DPD Study first looked at the environmental and community impact of placing OPC on Jackson Park. Generally, it concluded that the OPC would increase recreational opportunities on the South Side of Chicago, bring more visitors to Jackson Park and the surrounding communities, increase the use of surrounding open space, and improve safety. *Id.* ¶ 53. Specifically, it found that by closing certain streets within Jackson Park, and by expanding or reconfiguring other streets in and around Jackson Park, the OPC would, for example: (1) improve access by pedestrians through the park, across the lagoons to the lake, *id.* ¶ 39; (2) offer unimpeded pedestrian and bike access to the Museum of Science and Industry from the South Side," *id.* ¶ 40; (3) replace some of the land currently occupied by Cornell Drive with a "restful Woodland Walk," *id.* ¶ 41; (4) create new pedestrian access points and ADA compliant design features, *id.* ¶ 42; and (5) reduce air and noise pollution, improve existing bird habitats, and attract new wildlife to the OPC site area, *id.* ¶ 47. In total, the DPD Study found that the roadway work conducted in connection with the OPC

will create a net gain of an additional 4.7 acres of publicly available park space throughout Jackson Park. *Id.* ¶ 45.

The DPD Study also addressed the OPC's economic benefits. It found that the OPC would create nearly 5,000 new, local jobs during construction, and more than 2,500 permanent jobs once the OPC opens. *Id.* ¶ 54. Deloitte Consulting LLP similarly completed a report, commissioned by the Chicago Community Trust,[6] assessing the OPC's economic impact on the State of Illinois and City, as well as the South Side. *Id.* ¶ 55. It projected that the OPC's construction and operation would create an increase of $11.3 million in revenue generated on an annual basis from state and local taxes within Cook County. *Id.* A study commissioned by the University of Chicago and conducted by Anderson Economic Group also projected that by building the OPC on the South Side, tax revenue for the City and for Chicago Public Schools would increase by a combined $5 million annually. *Id.* ¶ 56.

### F. OPC Costs

The City has estimated the costs for roadway alterations and other infrastructure work in Jackson Park at $174 million to $175 million. [112-1] ¶ 33; [127-5] at 22−23. According to Defendants, portions of this estimated cost will go towards infrastructure improvements in areas of Jackson Park not adjacent to the OPC to further the Park District's broader South Lakefront Plan. [139] ¶ 33 (Defendants' response); [128-4] at 012159. A traffic impact study conducted by Sam Schwartz Engineering, DPC demonstrates that the Washington Park site would have

---

[6] The Chicago Community Trust serves as a "community foundation dedicated to making the Chicagoland region more vibrant through service." [128-5] at 5.

also required substantial roadway alterations, although it did not estimate a specific cost. [139] ¶ 1; [139-4].

In 2015, the City estimated costs for environmental remediation to the OPC site within Jackson Park at $1,246,083 to $1,852,831. [112-1] ¶ 34; [114-9] at 011749. Comparably, the City estimated environmental remediation costs for the proposed Washington Park site at $2,506,836 to $6,959,946. *Id.* Other estimated costs related to constructing the OPC in Jackson Park include: $3,285,843 for relocating utilities, [112-1] ¶ 35; $367,800 for relocating a water main and fire hydrant, *id.* ¶ 36; and $4,972.72 for architectural/engineering services, *id.* ¶ 37.

### F.   Procedural History

On February 19, 2019, this Court granted in part and denied in part Defendants' motion to dismiss based upon lack of subject matter jurisdiction. [92].[7] Plaintiffs' remaining claims assert: (1) a violation of due process under 18 U.S.C. § 1983 (Count I); (2) breach of the public trust under Illinois law (Count II); (3) *ultra vires* action under Illinois law (Count III); (4) a request for declaratory judgment as to the inapplicability of the Illinois Museum Act (Count IV); and (5) a special legislation claim under Illinois law (Count V). [91].

---

[7] This Court previously granted six motions for leave to file briefs as *amici curiae* in relation to Defendants' motion to dismiss or for judgment on the pleadings [48]. *See* [77]. Following the parties' cross-motions for summary judgment, the *amicus* authors requested that this Court consider their original briefs at the summary judgment stage. *See* [113] [131] [132] [134]. This Court has carefully considered all *amicus* briefs in relation to the parties' cross-motions for summary judgment, [54-1] [56-1] [61-1] [69-1] [73] [75].

Following full discovery, the parties filed cross-motions for summary judgment on May 3, 2019, [112] [122], their responses on May 17, 2019, [137] [138], and their replies on May 24, 2019, [141] [143].

## II.    Legal Standard

Summary judgment is proper where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). The non-moving party has the burden of identifying the evidence creating an issue of fact. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

18

Cross-motions for summary judgment "do not waive the right to a trial;" rather, this Court treats "the motions separately in determining whether judgment should be entered in accordance with Rule 56." *Marcatante v. City of Chicago, Ill.*, 657 F.3d 433, 438−39 (7th Cir. 2011).

## III. Analysis

Defendants move for summary judgment on all five of Plaintiffs' remaining claims. [123-1]. Plaintiffs, on the other hand, move for partial summary judgment on their due process (Count I), public trust doctrine (Count II), and *ultra vires* (Count III) claims. [120] at 15.[8] This Court analyzes each remaining count in turn, beginning with Plaintiffs' public trust claim.

### A. Count II: Breach of the Public Trust

#### i. Public Trust Origins

The public trust doctrine traces its roots back to English common law, during the time when "the existence of tide waters was deemed essential in determining the admiralty jurisdiction of courts in England." *Ill. Cent. R.R. Co. v. State of Illinois*, 146 U.S. 387, 435 (1892); *see also Propeller Genesee Chief v. Fitzhugh*, 53 U.S. 443, 454−55 (1852). In England, no navigable stream existed "beyond the ebb and flow of the tide," nor were there any locations, outside of tide-waters, "where a port could be established to carry on trade with a foreign nation, and where vessels could enter or

---

[8] Even though Plaintiffs' motion for summary judgment lists Count IV in its motion for summary judgment, Plaintiffs later fail to address the merits of that count, and thus, waiver applies. *Compare* [112] (moving for summary judgment on Count IV) *with* [120-1] at 15 (memorandum of law excluding Count IV from the claims upon which Plaintiffs move for summary judgment); *See generally* [120-1].

depart with cargoes." *Propeller Genesee*, 53 U.S. at 454−55. Accordingly, the public maintained an interest in the use of tide-waters, and only the crown could "exercise such dominion over the waters as would insure freedom in their use so far as consistent with the public interest." *Ill. Cent.*, 146 U.S. at 436. Non-tide waters, however, could be privately owned. *Id.*

The Supreme Court offered the "classic statement" of how U.S. courts should apply this common law principle in *Illinois Central Railroad. Lake Michigan Fed'n v. United States Army Corp. of Eng'rs*, 742 F. Supp. 441, 444 (N.D. Ill. 1990). In 1869, the Illinois legislature granted Illinois Central Railroad, in fee simple, title to over 1,000 acres of submerged land extending into Lake Michigan about one mile from a portion of Chicago's shoreline, and authorized the railroad to operate a rail line over the property. *Ill. Cent.*, 146 U.S. at 444. After the railroad improved the property and began operations, the legislature repealed the enabling legislation and revoked its original grant. *Id.* at 438.

In rejecting the railroad's challenge to the State's action, the Court first held that the common law distinction between tide and non-tide waters no longer applied; the Great Lakes, while unaffected by the tide, still facilitated commerce "exceeding in many instances the entire commerce of States on the borders of the sea." *Ill. Cent.*, 146 U.S. at 436. Accordingly, the public trust doctrine, founded upon "the necessity of preserving to the public the use of navigable waters from private interruption and encroachment," applied equally to "navigable fresh waters," including the Great Lakes. *Id.* at 436−37.

Second, the Court found that while the State owned the submerged land, it could not transfer that land to the railroad because the State's title was "held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties." *Id.* at 452−53. Thus, the Court concluded that "the control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining." *Id.* at 453.

### ii.   The OPC Site Sits Upon Never-Submerged Land

As an initial matter, the parties dispute whether under the public trust doctrine, the OPC site constitutes land that was never submerged under Lake Michigan or land that was formerly submerged under the Lake. As is discussed below, this determination directs what level of deference this Court gives to the State in applying the public trust doctrine under Illinois law.

Both parties concede that as early as 1822, and at the time the state authorized the creation of Jackson Park in 1869, the OPC site sat above Lake Michigan. [124] ¶¶ 8−9; [136] ¶ 9 (Plaintiffs' response); [124-5] (Excerpt of 1822 Map of Federal Township, including Far West Section 13 in which the OPC site is located). Nevertheless, Plaintiffs contend that the OPC site constitutes formerly submerged land, based solely upon an Illinois State Archaeological Survey (ISAS) Technical Report. [136] ¶ 9 (Plaintiffs' response). Plaintiffs fail to note, however, that the map

to which they site in the ISAS report documents the "Late Pleistocene and early Holocene lake levels." [136-3] at 10. In other words, Plaintiffs invite this Court to find that because the OPC site may have been submerged approximately 11,000 years ago, it constitutes "formerly submerged" land for purposes of the public trust doctrine. [136-3] at 7−10.

Respectfully, this Court declines Plaintiffs' invitation. The Illinois Supreme Court has held that the date of Illinois' admission into the Union serves as the date it "became vested with the title to the beds of all navigable lakes and bodies of water within its borders." *Wilton v. Van Hessen*, 94 N.E. 134, 136 (Ill. 1911). Put differently, this Court must ask whether land was submerged as of the date Illinois achieved statehood.

Defendants' map, obtained from the Illinois State Archives, demonstrates that as early as 1822, the OPC site sat above Lake Michigan. [124] ¶ 9; [124-5]. Plaintiffs fail to offer any evidence or argument to demonstrate that just four years earlier— when Illinois entered the Union—the OPC site sat beneath the Lake. *See generally* [137]. In fact, the page to which Plaintiffs cite in the ISAS report includes a map from the "Early Nipissing" period showing that as recently as 4,000 years ago, Jackson Park sat above ground. [142] ¶ 9; [136-3] at 10.[9] As such, the factual record confirms that the OPC site constitutes never-submerged land under the public trust doctrine. This Court now turns to the merits of the parties' public trust arguments.

---

[9] Plaintiffs conceded this point at oral argument.

22

### iii.    The Public Trust Doctrine Applies to the OPC Site

Defendants first argue that because *Illinois Central* referred only to "navigable waters," and because the OPC site sits upon never-submerged land, the OPC cannot fall within *Illinois Central*'s application of the public trust doctrine.  [123-1] at 18.

But Illinois courts have extended the public trust doctrine to Chicago parkland, including land within Jackson Park, because of the 1869 Act's directive that such land "shall be held, managed and controlled by them and their successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever."  *See Clement v. Chi. Park Dist.*, 449 N.E.2d 81, 84 (Ill. 1983) (affirming lower court's approval of a golf driving range in Jackson Park under a public trust doctrine analysis); *Paepcke*, 263 N.E.2d at 15−19 (Ill. 1970) (applying public trust doctrine to park land in Washington and Douglas Parks).  Thus, consistent with prior caselaw, this Court analyzes the OPC site under the public trust doctrine.

### iv.    Deference

Next, Plaintiffs argue that this Court should apply a general level of "heightened scrutiny" when analyzing the OPC site under the Illinois public trust doctrine.  [120-1] at 16−17.  Not so.  Illinois public trust cases require courts to apply the doctrine using varying levels of deference, based upon the property's relationship to navigable waterways.  *See, e.g.*, *Paepcke*, 263 N.E.2d at 15−19 (applying public trust doctrine to never-submerged park land); *Friends of the Parks v. Chicago Park Dist.*, 786 N.E.2d 161, 169−170 (Ill. 2003) (applying public trust doctrine to formerly submerged land); *Lake Michigan Fed'n*, 742 F. Supp. at 444−46 (applying public trust

23

doctrine to presently submerged land). In fact, Plaintiffs recognize that such levels of deference exist when asserting that the OPC site sits upon formerly submerged land. *See, e.g.*, [136] ¶ 9; [91] ¶ 45.

The below analysis, therefore, finds that the OPC does not, as a matter of law, violate the public trust under the level of scrutiny applied to never-submerged lands. In the alternative, this Court also finds that, even under the heightened levels of scrutiny (applied to formerly submerged and submerged lands), the OPC still does not violate the public trust.

### a. Never-Submerged Land: *Paepcke* Requires Deference to the Illinois Legislature

The Illinois Supreme Court recognizes that Illinois legislators retain significant control over never-submerged land they themselves choose to designate within the public trust; and thus, when applying the public trust doctrine to land that is not—and never has been—submerged, reviewing courts must ask only whether sufficient legislative intent exists for a given land reallocation or diversion. *See Paepcke*, 263 N.E.2d at 19.

In *Paepcke*, the court considered allowing Chicago's Public Building Commission, with the Park District's cooperation, to construct a school-park facility on never-submerged land within Washington Park. *Id*. at 14. As in this case, the land at issue derived from the 1869 Act. *Id*. at 13. There, the court affirmed the trial court's dismissal of plaintiffs' challenge under the public trust doctrine because "sufficient manifestation of legislative intent" existed to "permit the diversion and reallocation contemplated" by defendants' plan. *Id*. at 18−19. In finding the requisite

legislative intent under the Public Building Commission Act and related statutes, the court warned that "courts can serve only as an instrument of determining legislative intent as evidenced by existing legislation measured against constitutional limitations" and in "this process the courts must deal with legislation as enacted and not with speculative considerations of legislative wisdom." *Id.* at 21. Thus, courts facing public trust claims over statutorily designated parkland must ask only whether legislation "is sufficiently broad, comprehensive and definite to allow the diversion" at issue. *Id.* at 19 (citing *People ex rel. Stamos v. Public Building Com.*, 238 N.E.2d 390 (Ill. 1968)).

Here, as in *Paepcke*, sufficient legislative intent exists to permit diverting a portion of Jackson Park for the OPC. The relevant piece of legislation—the Park District Aquarium and Museum Act (Museum Act)—explicitly states that cities and park districts with control or supervision over public parks have authorization to:

> purchase, erect, and maintain within any such public park or parks edifices to be used as aquariums or as museums of art, industry, science, or natural or other history, *including presidential libraries, centers, and museums* . . .

70 ILCS 1290/1 (emphasis added).

Moreover, the Museum Act permits the City to contract with private entities to build a presidential center:

> The corporate authorities of cities and park districts . . . [may] permit the directors or trustees of any corporation or society organized for the construction or maintenance and operation of an aquarium or museum as hereinabove described to erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate its aquarium or museum within any public park . . . *and to contract with any such directors or trustees of any such aquarium or museum relative to the erection,*

25

> *enlargement, ornamentation, building, rebuilding, rehabilitation, improvement, maintenance, ownership, and operation of such aquarium or museum.*

*Id.* (emphasis added).

This clear legislative directive states a broad, comprehensive and definite intention to allow the City to contract with directors or trustees of a museum (the Foundation) to build a presidential center (the OPC) in a public park (Jackson Park). *See also People v. Pack*, 862 N.E.2d 938, 940 (Ill. 2007) ("The best indication of legislative intent is the statutory language, given its plain and ordinary meaning."). In other words, the Museum Act reflects the legislature's determination that presidential centers, as a type of museum, remain consistent with a parcel's designation as public parkland. *See also Furlong v. South Park Comm'rs*, 151 N.E. 510, 511 (Ill. 1926) (declining to enjoin South Park Commissioners' efforts to issue bonds to renovate Fine Arts Building to include a museum—now the Museum of Science and Industry—in Jackson Park, because park purposes "are not confined to a tract of land with trees, grass and seats, but mean a tract of land ornamented and improved as a place of resort for the public, for recreation and amusement of the public."); *Fairbanks v. Stratton*, 152 N.E.2d 569, 575 (Ill. 1958) (upholding construction of an exposition building and auditorium—now the McCormick Place convention center—on submerged land under the public trust doctrine).

### 1. The Museum Act Authorizes the OPC

Nevertheless, Plaintiffs argue that the Museum Act fails to "authorize the [OPC] transaction" because the Act fails to specifically cite to Jackson Park. [120-1]

26

at 32−33; [137] at 19−20; [143] at 11.[10] They rely upon *Friends of the Parks v. Chicago Park Dist.*, 160 F. Supp. 3d 1060, 1064−65 (N.D. Ill. 2016) (*Lucas II*), in which the court evaluated a Park District proposal to enter a 99-year ground lease with the Lucas Museum of Narrative Art under the Museum Act.     [120-1] at 33.  There, plaintiffs' due process and *ultra vires* claims alleged that the legislature failed to specifically reference the land subject to the ground lease; and the court denied defendants' motion to dismiss both claims.  *Friends of the Parks*, 160 F. Supp. 3d at 1064−65.

Even assuming that the *Lucas II* case was rightly decided (which this Court need not address), that ruling does not apply here.  First, that case involved formerly submerged land, rather than never-submerged parkland held in trust due to a legislative enactment, and thus warranted a different level of deference.  *Id.* at 1063. Second, *Lucas II* involved a long-term lease, and therefore a different portion of the Museum Act.  *Id.* at 1068.  Third, the court considered whether sufficient legislative authorization existed only in relation to plaintiffs' procedural due process and *ultra vires* claims, instead of their public trust claim.  *Id.* at 1064−66.  And fourth, the court evaluated the issue of legislative authorization only at the motion to dismiss stage, rather than on the merits at summary judgment:

> Plaintiffs . . . plead that the General Assembly, in enacting the [Museum Act] purportedly transferring control of the property, did not "refer

---

[10] Plaintiffs make their detailed comments regarding the absence of proper legislative authorization with respect to their due process claim [120-1] at 32−33, but they also contend that courts must apply the "heightened scrutiny" standard to all types of land in evaluating a public trust claim as well [120-1] at 16.  Because this Court finds proper legislative authorization relevant to its analysis of both the due process and the public trust doctrine claims, this Court considers Plaintiffs' authorization arguments under both counts.

> specifically to the alienation, forfeiture or disposition of the land that is subject of the ground lease." Plaintiffs have alleged that, by failing to provide specific approval for the transfer of the subject land, the General Assembly has acted in violation of Plaintiffs' right to due process. Construing the allegations in Plaintiffs' favor, Plaintiffs have sufficiently stated a procedural due-process claim under the Fourteenth Amendment.

*Id.* at 1064−65; *see also id.* at 1065−66 (articulating the same reasoning in relation to plaintiffs' *ultra vires* claim).

Most importantly, in *Paepcke*, the Illinois Supreme Court explicitly rejected plaintiffs' argument that the "legislature must clearly and specifically state with reference to the park or parks in question explicit authority to divert to new public uses." 263 N.E.2d at 19. *Paepcke* insists that courts should consider whether the legislature stated sufficiently broad, comprehensive, and definite intent. *Id.* (adopting analysis in *Stamos*, 238 N.E.2d at 398). Here, as in *Paepcke*, this Court finds that the Museum Act evinces that intent, and therefore sufficiently authorizes construction of the OPC in Jackson Park.

Plaintiffs also assert that even if the Museum Act authorizes the transaction, it cannot "release the restriction" contained in the 1869 Act that Jackson Park must remain "a public park, for the recreation, health and benefit of the public, and free to all persons forever." [120-1] at 20, 33. Plaintiffs argue that Defendants seek to reallocate "open, free public park to a more restrictive use by authorizing the Foundation to erect numerous building[s] that will not be open and free, and will have restricted and paid access." *Id.*

Certainly, the Museum Act does not lift the 1869 Act's "restriction." *See generally* 70 ILCS 1290/1. But, Illinois courts have time and again made clear that

28

museums and other structures—including those with fees—fall within permissible public park purposes and thus do not violate the 1869 Act. *Furlong*, 151 N.E.2d at 511 (recognizing the "construction and maintenance of a building for museums, art galleries, botanical and zoological gardens, and many other purposes, for the public benefit," as legitimate park purposes); *Clement v. O'Malley*, 420 N.E.2d 533, 540−41 (Ill. App. Ct. 1981) (approving construction of golf course in Jackson Park, in part because the "mere fact that a fee is charged for the use of special facilities does not as such render the facility closed to the public, provided such fees are reasonable for the general population of the community.") (internal citation omitted), *aff'd sub nom.*, *Clement v. Chi. Park Dist.*, 449 N.E.2d at 84. Moreover, the same terms of the Museum Act apply to the Museum of Science and Industry, also located in Jackson Park. [124] ¶ 31.

And even if the Museum Act did violate the 1869 Act, the *Paepcke* court— upholding construction of a school building not open to "all persons forever"—made clear that the state legislature, having created the parkland, could reallocate its use. *See* 263 N.E.2d at 18 ("[A]s far as the rights of the public in public trust lands are concerned," it would be "contrary to well established precedent" to hold that "the legislature could never, by appropriate action, change or reallocate the use in any way."); *see also Choose Life Ill., Inc. v. White*, 547 F.3d 853, 858 n.4 (7th Cir. 2008) ("It is axiomatic that one legislature cannot bind a future legislature.").

The Illinois General Assembly, through the Museum Act, sufficiently authorizes the construction and operation of the OPC in Jackson Park. As such, this

Court cannot find, as a matter of law, that the OPC violates the public trust doctrine. Nonetheless, in the alternative, this Court next analyzes the OPC site under the remaining levels of public trust scrutiny for clarity and finality.

### b. Formerly Submerged Land: No Corresponding Public Benefit Test

The next level of scrutiny (used for formerly submerged land) under the public trust doctrine also requires a finding in Defendants' favor. Under this standard, a diversion of formerly submerged parkland violates the public trust only if it: (1) does not contain sufficient legislative authorization, pursuant to *Paepcke*; and (2) primarily benefits a private entity, with no corresponding public benefit. *Friends of the Parks*, 786 N.E.2d at 169−70 (citing *Paepcke*, 263 N.E.2d at 21).

In *Friends of the Parks*, the Illinois Supreme Court considered a section of the Illinois Sports Facilities Authority Act, which permitted public financing of physical improvements to Soldier Field. *Id*. at 163. The land at issue occupied formerly navigable, or submerged, water of Lake Michigan. *Id*. at 163. There, plaintiffs argued that the Sports Facilities Authority Act violated the public trust doctrine because it allowed a private party (the Bears) to use and control Soldier Field "for its primary benefit with no corresponding public benefit." *Id*. at 169.

In upholding the lower court's grant of summary judgment, the court first distinguished two cases—both of which involve submerged land—which Plaintiffs here also rely upon: *Illinois Central* and *People ex rel. Scott v. Chicago Park District*, 360 N.E.2d 773 (Ill. 1976):

> There is little similarity between *Illinois Central* or *Scott* and the case before us. The Park District is, and will remain, the owner of the Burnham Park property, including Soldier Field. Neither the Act, the implementing agreements, nor the project documents provide for a conveyance of the Soldier Field property to the Bears. There is no abdication of control of the property to the Bears. The Park District will continue in its previous capacity as landlord under a lease agreement with the Bears and will continue in its existing role as owner of the remainder of the Burnham Park property.

*Id*. at 170. Here too, the City will retain ownership over the OPC site, as well as the OPC buildings once constructed by the Foundation. Exhibit D, §§ 2.1–.2, 4.4. And the City will not abdicate control over the site: if the Foundation ceases to use the OPC for its permitted purposes under the Use Agreement, the City may terminate the Agreement. [124] ¶ 21; [125-5] (Exhibit D, §§ 6.1, 16.2).

Second, the court invoked *Paepcke*'s language regarding legislative intent, finding it "equally applicable" that the General Assembly had authorized public financing for renovating government-owned stadiums under the Sports Facilities Authority Act. 786 N.E.2d at 170. Here, this Court again notes that such clear authorization exists in the form of the Museum Act.

And finally, the court noted that through improvements to Soldier Field, the public would enjoy "athletic, artistic, and cultural events" as well as better access to the stadium, museums, and the "lakefront generally" due to improved parking. *Id*. Because of these public benefits, the project proposal did not violate the public trust doctrine, even though the court acknowledged that the Bears, as a private entity, would also benefit from the project. *Id*. As such, even if this Court considers a for-profit sports team comparable to a non-profit foundation seeking to build a

31

presidential center, *Friends of the Parks* confirms that any benefits the Foundation receives from the OPC do not render the OPC violative of the public trust doctrine. Rather, diverting formerly submerged parkland violates the public trust only if it primarily benefits a private entity with "no corresponding public benefit." *Id.* at 169−70.

And the OPC surely provides a multitude of benefits to the public. It will offer a range of cultural, artistic, and recreational opportunities—including an educational museum, branch of the Chicago Public Library, and space for large-scale athletic events—as well as provide increased access to other areas of Jackson Park and the Museum of Science and Industry. *See* [124] ¶¶ 25−30, 39−47. In short, if improvements to a football stadium sufficiently benefit the public, the OPC must, too. Accordingly, the OPC does not violate the public trust doctrine under the level of scrutiny applied to formerly submerged lands, as articulated in *Friends of the Parks*.

### c.    Submerged Land: Primary Purpose Standard

Finally, an analysis of those cases in which courts have considered presently submerged land further demonstrates that the OPC does not violate the public trust doctrine. Under the public trust test applicable to such land, courts ask whether the "primary purpose" of a legislative grant is "to benefit a private interest." *Lake Michigan Fed'n*, 742 F. Supp. at 445; *Scott*, 360 N.E.2d at 781 (finding a public trust violation where the court could "perceive only a private purpose for the grant.").

In *Scott*, for example, the Illinois Attorney General sued to invalidate a statute authorizing U.S. Steel Corporation to purchase a portion of Lake Michigan to expand

its steel plant. 360 N.E.2d at 779−80. The relevant authorizing legislation stated that the additional facility would "result in the conversion of otherwise useless and unproductive submerged land into an important commercial benefit development to the benefit of the people of the State of Illinois." *Id*. at 781. Further, defendant steel company argued that the facility would serve the public by creating jobs and boosting the city and state economy. *Id*. The court invalidated the statute, holding that while "courts certainly should consider the General Assembly's declaration that given legislation is to serve a described purpose," the "self-serving recitation of a public purpose within a legislative enactment is not conclusive of the existence of such purpose." *Id*. (internal citation omitted). Rather, to "preserve meaning and vitality in the public trust doctrine, when a grant of submerged land beneath waters of Lake Michigan is proposed . . . the public purpose to be served cannot be only incidental and remote." *Id*.

Even if the OPC falls within the standard of review applicable to presently submerged land (which it does not), this Court cannot find the Museum Act's explanation of presidential centers' public benefits "self-serving" or "incidental and remote." The Museum Act states that presidential centers, as a type of museum, further "human knowledge and understanding, educating and inspiring the public, and expanding recreational and cultural resources and opportunities." 70 ILCS 1290/1. This explanation of the OPC's public benefits aligns with well-established caselaw. *See, e.g.*, *Furlong*, 151 N.E. 510 at 511 (finding that because parks exist as places "of resort for the public, for recreation and amusement" the "construction and

33

maintenance of a building for museums, art galleries . . . and many other purposes, for the public benefit" are legitimate park purposes); *see also Fairbank*, 152 N.E.2d at 575 (upholding construction of an exposition building and auditorium on submerged land in Burnham Park because they were "in the public interest" and thus did not violate the public trust doctrine). And the OPC's primary purpose matches this legislative directive, as its principal building and "central mission"—the Museum—seeks to educate the public by telling "the stories of the first African American President and First Lady of the United States, their connection to Chicago, and the individuals, communities, and social currents that shaped their local and national journey." [124] ¶¶ 24−25.

Unconvincingly, Plaintiffs attempt to twist this public benefit into a private purpose, arguing that the Museum's mission merely "seeks to preserve and enhance the legacy of the former President and his wife" rather than benefit the public. [120-1] at 24; [137] at 13. But this Court cannot accept such a mischaracterization; under Plaintiffs' theory, any museum with which a select group of individuals disagree could violate the public trust. This Court will not, as the *Paepcke* court cautioned against, transform itself into a legislature or zoning board and then rewrite the educational merits of any given museum or presidential center built on public trust land. 263 N.E.2d at 21; *see also Friends of the Parks*, 786 N.E.2d at 165 (where plaintiffs submitted an economics professor's affidavit to argue that authorizing legislation benefited a private interest, rather than serve the declared public objectives

announced in the Act, the trial court correctly considered the affidavit irrelevant and declined to inquire "into the merits or accuracy of the legislative findings").

The case before this Court does not involve proposals to use public trust land to expand railroad tracks, *Illinois Central*, 146 U.S. at 436−37, a steel plant, *Scott*, 360 N.E. at 775, or even a private university, *Lake Michigan Fed'n*, 742 F. Supp. at 443. Rather, Defendants seek to contract with the Foundation to build facilities such as a museum, branch of the Chicago Public Library, and outdoor recreational areas—all of which the City will own. [124] ¶¶ 23−30, 34. This project involves a public park, not a forest preserve. Accordingly, this Court relies upon controlling caselaw, constitutional limitations, the City Council's determinations, and the Museum Act in finding that the OPC's primary purpose benefits the public, rather than private interests. As such, this Court finds that the OPC survives the (inapplicable) level of scrutiny provided to presently submerged lands under the public trust doctrine.

### v. The OPC Withstands Scrutiny Under the Wisconsin Factors

In *Paepcke*, the Illinois Supreme Court found "it appropriate to refer to the approach developed by the courts of our sister State, Wisconsin, in dealing with diversion problems." 263 N.E.2d at 19. The court proceeded to list the five factors used under Wisconsin's interpretation of the public trust doctrine:

> (1) that public bodies would control use of the area in question, (2) that the area would be devoted to public purposes and open to the public, (3) the diminution of the area of original use would be small compared with the entire area, (4) that none of the public uses of the original area would be destroyed or greatly impaired and (5) that the disappointment of those wanting to use the area of new use for former purposes was

> negligible when compared to the greater convenience to be afforded
> those members of the public using the new facility.

*Id*. The court then noted that while "not controlling under the issues as presented in this case we believe that standards such as these might serve as a useful guide for future administrative action." *Id*.; *see also Friends of the Parks*, 2015 WL 1188615, at *5 (N.D. Ill. Mar. 12, 2015) (*Lucas I*) (noting that the "'Wisconsin test' . . . was not adopted as applicable in public trust cases, and the Illinois Supreme Court again declined to use the test in *Friends of the Parks*.") (citing *Friends of the Parks*, 786 N.E.2d 161).

In *Clement*, the Illinois appellate court approved the Park District's proposal to construct of a golf driving range in Jackson Park under a public trust analysis. 420 N.E.2d at 540−41. But unlike in *Paepcke*, no state authorizing legislation existed from which the court could infer sufficient legislative intent. As such, the court analyzed the Jackson Park driving range according to the five Wisconsin factors:

> The property will still be controlled by the Park District. The mere fact
> that a fee is charged for the use of special facilities does not as such
> render the facility closed to the public, provided such fees are reasonable
> for the general population of the community. In this respect, we note
> nothing in the record to indicate the charges were unreasonable.
> Moreover, the designation of 11 acres as a driving range is small
> compared to the approximately 570 total acres in Jackson Park, and the
> public uses of the original area have not been destroyed or greatly
> impaired since picnicking, casual play activities, jogging, and meadow
> bird nesting are still possible elsewhere in the park. Finally, due to the
> small amount of land taken up by the driving range relative to total park
> acreage, the disappointment of those wanting to use the area for former
> purposes is likely to be slight – particularly since the range now offers
> the same convenience to south area public which has been provided in
> the north area for many years in Lincoln Park.

*Id.* at 541 (internal citations omitted). Although this Court need not apply the Wisconsin factors here, both parties discuss them here in relation to the OPC. *See* [137] at 4; [141] at 4. As such, this Court finds, as did the *Paepcke* court, that they provide helpful guidance under the public trust doctrine.

An analysis of the OPC under the Wisconsin factors requires the same result as in *Clement*. If the Foundation ceases to use the OPC for its permitted purposes under the Use Agreement, the City may terminate the Agreement. [124] ¶ 21; [125-5] (Exhibit D, §§ 6.1, 16.2). Only a portion of the OPC will require an entrance fee, and the Use Agreement and Museum Act require: (1) free admission to all Illinois residents at least 52 days out of the year; (2) free admission for Illinois school children accompanied by a teacher; and (3) an admission fee policy for City residents and certain low-income individuals "substantially comparable" to those maintained by other museums in Jackson Park. [124] ¶ 37; [125-5] (Exhibit D, § 6.10). The OPC will comprise only 19.3 acres, or 3.5 percent of Jackson Park's total 551.52 acres. [124] ¶ 6. As in *Clement*, the site will not destroy or greatly impair the land's original use; activities such as picnicking, jogging, and meadow bird nesting will not only be accessible in other areas of the park, but also within certain parts of the OPC site. *Id.* ¶¶ 30, 47. And here, too, the small amount of land taken up by the OPC site relative to total park acreage means the disappointment of those wanting to use the area for former purposes remains slight, particularly given: (1) the OPC's proposed green space areas; and (2) that the Museum of Science and Industry already exists

within the park.  *Id.* ¶ 31.  Here, as in *Clement*, this Court finds that the OPC satisfies the Wisconsin factors.

### vi.    Plaintiffs' Alternative Legal Theories Fail

Plaintiffs offer two alternative public trust theories in support of their motion for summary judgment: (1) a comparative, benefit-maximization analysis demonstrates that the choice to locate the OPC in Jackson Park constitutes an "arbitrary" or "unreasonable" legislative decision; and (2) the Foundation will not pay "fair market value" for use of the OPC site.  [120-1] at 17−28.  Neither theory exists under Illinois law.

First, Plaintiffs argue that the City failed to perform an analysis of whether locating the OPC on public trust park land "provides any benefit whatsoever over locating the Presidential Center on non-public trust property," and thus that the decision to locate the OPC within Jackson Park remains "arbitrary" and unreasonable."  [120-1] at 17−20.  In other words, Plaintiffs dispute whether Jackson Park is "the best" location for the OPC.  *Id.* at 10, 18.  But Plaintiffs fail to cite to any instance in the public trust jurisprudence in which courts have required government entities to pick "the best" location, much less require courts to review such assessments *de novo*.  Quite simply, Illinois law imposes no obligation upon this Court to revisit the cost-benefit assessments of state and local lawmakers or otherwise sift through impact studies on its own to determine whether the UIC proposed sites, Washington Park, or Jackson Park constitutes the best location for the OPC.  *See, e.g.*, *River Park v. City of Highland Park*, 23 F.3d 164, 165 (7th Cir. 1994) ("Federal

courts are not boards of zoning appeals."). Rather, as is discussed above, courts need only look to the relevant authorizing legislation and cited public benefits for a given project within the lawmakers' own analysis; in other words, "value dependent assessment[s] of the best use of the property" are "highly subjective" and "irrelevant to an analysis of the propriety of a grant of public land." *Lake Michigan Fed'n*, 742 F. Supp. at 446.

Second, Plaintiffs argue that the Foundation's $10.00 payment, which forms part of its consideration for the Use Agreement, [125-5] (Exhibit D, Art. III), violates the public trust doctrine based upon a "line of cases involving Mississippi's treatment of public trust property known as 'sixteenth section lands.'" [120-1] at 24. According to Plaintiffs, these cases require the City to charge a "reasonable rent" with due regard" for leases of public trust property. *Id*. at 24−28. This theory is also unavailing because, in short, Illinois law controls this case. Plaintiffs do not offer any Illinois court that has cited to Plaintiffs' line of Mississippi cases or adopted those cases' reasoning or analysis. Accordingly, without addressing the possible implications of Mississippi's approach here, this Court declines to ignore controlling Illinois law in favor of an unprecedented rule. *See, e.g.*, *Insolia v. Phillip Morris, Inc.*, 216 F.3d 596, 607 (7th Cir. 2000) ("Though district courts may try to determine how the state courts would rule on an unclear area of state law, district courts are encouraged to dismiss actions based on novel state law claims."); *MindGames, Inc. v. Western Publishing Co., Inc.*, 218 F.3d 652, 655−56 (7th Cir. 2000) ("The rule is that in a case in federal

court in which state law provides the rule of decision, the federal court must predict how the state's highest court would decide the case, and decide it the same way.").

For all of these reasons, this Court grants Defendants' motion for summary judgment as to Plaintiffs' public trust claim (Count II) and denies Plaintiffs' motion for summary judgment as to Count II.

## B.      Count I: Violation of Due Process

Plaintiffs originally based their due process claim upon three theories: (1) aesthetic and environmental harm pursuant to *Sierra Club v. Morton*, 405 U.S. 727 (1972); (2) the public trust doctrine; and (3) the Fifth Amendment's Takings Clause. *See* [65-1] at 14; [91] ¶¶ 82−83, 85. This Court's prior motion to dismiss opinion found that Plaintiffs failed to establish standing based upon their aesthetic or environmental harm theory, but found that Plaintiffs established standing based upon the public trust doctrine. [92] at 11−14. Because Defendants' 12(b)(1) motion to dismiss did not challenge Plaintiffs' Takings Clause theory based upon subject matter jurisdiction, this Court did not consider it. *Id.* at 8−9. Therefore, only Plaintiffs' Takings Clause and public trust theories of due process remain.

### i.      Plaintiffs' Takings Clause Theory

As an initial matter, Plaintiffs' Takings Clause theory, to the extent it is included within Count I, fails as a matter of law. The Fifth Amendment states, in relevant part: "nor shall *private* property be taken for public use, without just compensation." U.S. Const. amend. V. (emphasis added). By the clause's plain language, no unconstitutional taking can occur where, as here, the relevant property

is already public. *See, e.g.*, *Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*, 560 U.S. 702, 715 (2010) ("In sum, the Takings Clause bars *the State* from taking private property without paying for it"); *see also Reichelderfer v. Quinn*, 287 U.S. 315, 323 (1932) (finding "[p]roperty was not taken" when legislation authorized constructing a fire house on public parkland; rather, the "taking occurred when the lands were condemned for the park."). Plaintiffs concede that Jackson Park exists as public parkland. [112-1] ¶ 15. Therefore, Plaintiffs' takings clause theory cannot survive summary judgment.

### ii.     Plaintiffs' Public Trust Theory

A procedural due process claim requires: (1) a cognizable property interest; (2) a deprivation of that interest; and (3) inadequate process. *Price v. Bd. of Educ.*, 755 F.3d 605, 607 (7th Cir. 2014); *Palka v. Shelton*, 623 F.3d 447, 452 (7th Cir. 2010). Here, Plaintiffs' public trust due process theory fails for two reasons. First, the parties spend considerable time disputing whether, under the public trust doctrine, Plaintiffs hold a sufficient property interest in the Jackson Park site to satisfy a procedural due process claim. *See* [120-1] at 28−34; [123-1] at 31−34.[11] But even assuming Plaintiffs hold a cognizable property interest, Plaintiffs' due process claim fails because they fail to demonstrate a deprivation of that interest.

---

[11] In doing so, Plaintiffs rely heavily upon this Court's prior motion to dismiss opinion, which found that they established standing for purposes of their federal due process claim, [93] at 12. [120-1] at 29. But this Court's finding that Plaintiffs have standing does not equate to success on the merits at summary judgment. *See, e.g.*, *Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 899−900 (7th Cir. 2012) ("[S]tanding and entitlement to relief are not the same thing.").

In particular, Plaintiffs argue that Defendants deprived them of adequate process because the "Illinois legislature has not authorized the transactions at issue between the Park District, the City and the Foundation, nor has the Illinois legislature released the restriction on the Jackson Park Site." [120-1] at 28. But, as discussed in detail above with respect to Plaintiffs' public trust claim under *Paepcke*, the General Assembly—through the Museum Act—has authorized the OPC; the Museum Act need not refer specifically to the alienation or disposition of the Jackson Park site itself. *See Paepcke*, 263 N.E.2d at 19. Moreover, this Court has already determined that neither the OPC nor the Museum Act violates the 1869 Act's restriction upon public parkland. *See Furlong*, 151 N.E.2d at 511; *Clement v. O'Malley*, 420 N.E.2d at 540−41. Thus, Plaintiffs fail to establish a deprivation of any interest under their procedural due process claim. For this reason alone, their public trust theory fails as a matter of law.

Second, Plaintiffs cannot base their federal due process claim solely upon violations of state statutes.[12] *See Hebert v. Louisiana*, 272 U.S. 312, 316−17 (1926) ("The due process of law clause in the Fourteenth Amendment does not take up the statutes of the several states and make them the test of what it requires"); *Tucker v. City of Chicago*, 907 F.3d 487, 495 (7th Cir. 2018) ("[F]ederal due process protection is not a guarantee that state governments will apply their own laws accurately.")

---

[12] Plaintiffs' response memorandum also argues that Defendants' deprived them of adequate process because the Illinois Property Transfer Act does not authorize the Park District's Sale. [137] at 20. As discussed below, this Court finds that the Property Transfer Act authorizes the Park District's sale. And regardless, this argument fails to establish a deprivation of any due process interest because it relies solely upon an alleged violation of a state statute.

(citing *Simmons v. Gillespie*, 712 F.3d 1041, 1044 (7th Cir. 2013)); *see also Coniston Corp. v. Vill. of Hoffman Estates*, 844 F.2d 461, 467 (7th Cir. 1988) (holding that a "violation of state law is not a denial of due process law" where plaintiffs' due process claim sought review of Board of Trustees' zoning decision under state law). Absent a cognizable due process claim separate and apart from alleged violations of the Museum Act and 1869 Act, Count I fails as a matter of law.

Accordingly, this Court grants Defendants' motion for summary judgment as to Count I, and denies Plaintiffs' motion for summary judgment as to Count I.

## C. Count III: *Ultra Vires* Action

Plaintiffs' *ultra vires* action claim, alleging that the Park District and City engaged in *ultra vires* actions for which they have no authority, rests upon two theories. [91] ¶ 99. First, Plaintiffs make the astounding argument that the OPC violates the Museum Act because it contains outdoor green spaces, in addition to buildings. [120-1] at 34. Second, Plaintiffs argue that because the City itself will not use the OPC site for the term of the Use Agreement, the Park District's transfer of land violates the Illinois Property Transfer Act. *Id*. at 40. Defendants argue that a plain reading of the relevant statutes dispels Plaintiffs' claim. [123] at 37−39. This Court agrees with Defendants.

### i. The Museum Act Authorizes the OPC's Green Space

Plaintiffs' first theory proceeds in two parts, as follows. The Museum Act contains two provisions. The first states that the corporate authorities of cities and park districts have authorization to:

> purchase, erect, and maintain within any such public park or parks *edifices* to be used as aquariums or as museums of art, industry, science, or natural or other history, including presidential libraries, centers, and museums, such aquariums and museums consisting of all facilities for their collections, exhibitions, programming, and associated initiatives …

70 ILCS 1290/1 (emphasis added).  In the same sentence, the Act clarifies that cities and park districts may also contract with directors or trustees relative to the building and operation "of such aquarium or museum."  *Id.*

The second sentence then begins:

> Notwithstanding the previous sentence, a city or park district may enter into a lease for an initial term not to exceed 99 years, subject to renewal, allowing a corporation or society as hereinabove described to erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate its aquarium or museum, *together with the grounds immediately adjacent to such aquarium or museum, and to use, possess, and occupy grounds surrounding such aquarium or museum* as hereinabove described for the purpose of beautifying and maintaining such grounds in a manner consistent with the aquarium or museum's purpose . . .

*Id.* (emphasis added).

Based upon this second provision, Plaintiffs argue that the Museum Act only authorizes the City to allow the Foundation to build and operate the OPC, together with the grounds immediately adjacent to the OPC, if the City leases the OPC site to the Foundation.  [120-1] at 37.  Because the Use Agreement does not create a lease between the City and Foundation, Plaintiffs maintain that the OPC site cannot contain any grounds surrounding the building "edifices," and thus that the Use Agreement authorizing OPC green space constitutes *ultra vires* activity.  *Id.*; [112-1] ¶ 46.

Essentially, Plaintiffs ask this Court to find that a statute authorizing the construction of a presidential center within a green space prohibits preserving green space within such a center. This Court rejects such an absurd and bizarre reading of the statutory text and context. The Museum Act's first sentence—not relating to leases—defines museums to include presidential centers. 70 ILCS 1290/1. The plain language then goes on to clarify that museums include "all facilities for their collections, exhibitions, programming, and associated initiatives." *Id*. Reading the Museum Act according to its express language, as this Court must, does not allow this Court to limit "facilities" to just buildings. *See, e.g.*, *Williams v. Staples*, 804 N.E.2d 489, 493 (Ill. 2004) (The plain language of the statute serves as "the most reliable indicator of the legislature's objectives in enacting a particular law.") (internal quotations omitted); *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (courts must give "the words used their ordinary meaning"); *Facility*, *New Oxford American Dictionary* 610 (3d ed. 2010) ("facility" defined as "space or equipment necessary for doing something," as in "facilities for picnicking, camping, and hiking.").

The Foundation's design for the OPC green space includes purposeful features such as: (1) play areas for children; (2) contemplative spaces; (3) a sledding hill; (4) a sloped lawn for picnicking, recreation and community and special events; (5) walking paths; and (6) a nature walk along the lagoon. [124] ¶ 30. According to the Museum's mission statement, these "outdoor facilities" will "beautify and enhance the recreational opportunities on the site, creating a fun, safe environment for visitors to enjoy in all seasons." [125-5] (Exhibit D, (Sub) Exhibit "C"). These features thus

comprise part of the OPC's facilities for programming and associated initiatives. Therefore, given the complete absence of any textual support for Plaintiffs' novel statutory construction, this Court cannot find that the Use Agreement, by authorizing the OPC's use of green space, constitutes *ultra vires* activity.

## ii. The Illinois Property Transfer Act Authorizes the OPC

Plaintiffs' second theory argues that the Illinois Local Government Property Transfer Act, 50 ILCS 605/0.01 *et seq.*, does not authorize the Park District's transfer of the Jackson Park site to the City.[13] Section 2 of the Property Transfer Act provides:

> If the territory of any municipality shall be wholly within, coextensive with, or partly within and partly without the corporate limits of any other municipality . . . and the first mentioned municipality (herein called "transferee municipality"), shall by ordinance declare that it is necessary or convenient *for it to use, occupy or improve* any real estate held by the last mentioned municipality (herein called the "transferor municipality") in the making of any public improvement or for any public purpose, the corporate authorities of the transferor municipality shall have the power to transfer *all of the right, title and interest* held by it immediately prior to such transfer, in and to such real estate, whether located within or without either or both of said municipalities, to the transferee municipality upon such terms as may be agreed upon by the corporate authorities of both municipalities . . .

*Id.* at 605/2 (emphasis added). Based upon this language, Plaintiffs contend that the Park District maintains authority to transfer the Jackson Park site to the City only if the City itself will "use, occupy, or improve" the site for the OPC. [120-1] at 41. Because the Use Agreement provides the Foundation with the right to occupy, use,

---

[13] Plaintiffs also argue that the Park District violates section 2(b) of the Property Transfer Act, which governs the transfer of municipality-owned land limited by restrictions. [137] at 22. This section only applies if transferee municipalities desire the use of the land "free from" the relevant restriction. 50 ILCS 605/2(b). This Court has already found that the Museum Act and OPC do not violate the 1869 Act's restriction on public parkland. Therefore, Plaintiffs' section 2(b) argument fails under Count III as well.

maintain, operate, and alter the OPC, Plaintiffs argue that the Park District's transfer constituted an *ultra vires* activity. Defendants, on the other hand, maintain that: (1) the Property Transfer Act does not prohibit the acquiring municipality from contracting with third parties to assist in improving the transferred land; and (2) the Museum Act, Intergovernmental Cooperation Act, and Article VII, section 10(a) of the Illinois Constitution authorize such a contract. This Court agrees with Defendants.

First, Article VII, section 10(a) of the Illinois Constitution permits units of local government to "contract and otherwise associate with individuals, associations, and corporations" in any manner not prohibited by law. Further, that same section allows local governments to "transfer any power or function, in any manner not prohibited by law or ordinance" to other units of local government. Likewise, the Intergovernmental Cooperation Act, 5 ILCS 220/2−3, allows units of local governments to exercise, combine, transfer, and "enjoy jointly" any of their "powers, privileges, functions, or authority," except where expressly prohibited by law. Thus, read together with the Property Transfer Act, these provisions demonstrate that: (1) each Defendant, as an individual unit of local government, can separately contract with third parties on land that they already own; and (2) either Defendant can transfer land to the other, along with their power to contract with third parties on that land.

Plaintiffs contend that none of these provisions apply, because they only allow transfers not prohibited by law. *See, e.g.*, [91] ¶¶ 63, 67. But Plaintiff fails to point

47

to any law that prohibits such transfers. For instance, the Property Transfer Act is silent as to whether municipalities can contract with third parties to improve transferred land. [14], [15] *See* 50 ILCS 605/2; *see also Wittman v. Koenig*, 831 F.3d 416, 425 (7th Cir. 2016) ("Legislative silence is ordinarily a weak indication of legislative intent."). And the Museum Act clearly authorizes the City to contract with the Foundation in constructing and operating the OPC. 70 ILCS 1290/1. Moreover, Plaintiffs' reading of the statute would create the nonsensical result of prohibiting transferee municipalities from ever contracting with engineers, architects, or builders to improve a site. This Court rejects Plaintiffs' theory and instead reads each of the relevant provisions of Illinois law within context together and gives each statute effect according to its plain terms.[16] Accordingly, this Court cannot find that

---

[14] Plaintiffs also argue that the Park District's transfer of the OPC site violates the Illinois Park District Code, 70 ILCS 1205/10-7, which governs the terms by which park districts may sell, lease, or exchange realty. [137] at 21. But the Park District Code explicitly states that it does not apply to the Chicago Park District. 70 ILCS 1205/1-2(d). Accordingly, Plaintiffs' *ultra vires* claim cannot succeed based upon this theory.

[15] Plaintiffs' amended complaint references Article VIII, Section I(a) of the Illinois Constitution in relation to their *ultra vires* claim. [91] ¶ 64. Article VIII, Section 1(a) provides that public funds, property or credit shall be used only for public purposes. Plaintiffs make no such argument in their motion for summary judgment, and thus they have waived the argument. *See generally* [120-1]. In any event, this Court finds, consistent with its public trust analysis, that the OPC's educational and recreational benefits serve a public purpose. *See, e.g.*, *Friends of the Parks*, 786 N.E.2d at 168−69 (finding that Soldier Field "has served public purposes since its dedication in 1924" and would "continue to do so after the completion of the Burnham Park project as authorized by the Act."); *Paschen v. Winnetka*, 392 N.E.2d 306, 310 (Ill. App. Ct. 1979) (under article VIII, section 1(a), courts must ask whether "governmental action has been taken which directly benefits a private interest without a corresponding public benefit").

[16] Even if the Property Transfer Act's silence could somehow be construed as ambiguous (which it is not), this Court would reach the same result by reading each provision and construing them all together (Property Transfer Act, Museum Act, Intergovernmental Cooperation Act, and Article VII, section 10(a) of the Illinois Constitution). *People v. 1946 Buick, VIN 34423520*, 537 N.E.2d 748, 750 (Ill. 1989) (Illinois recognizes the doctrine of *in pari materia*, but only to resolve statutory ambiguities).

48

the Park District's transfer of the Jackson Park site to the City constitutes an *ultra vires* act under the Property Transfer Act.

This Court grants Defendants' motion for summary judgment as to Count III and denies Plaintiffs' motion for summary judgment as to Count III.

### D.    Count IV: Declaratory Judgment As to Inapplicability of the Illinois Museum Act

Plaintiffs' theory as to Count IV also falls short.  Ostensibly, Plaintiffs contend that the portions of the Museum Act amended in 2016 constitute retroactive changes, and therefore seek a declaratory judgment that the Museum Act cannot authorize the OPC.  [91] ¶¶ 100−103.

Specifically, Plaintiffs' allegations as to Count IV proceed as follows:

101.   The 2016 Amendment to the Museum Act states on its face that it is not retroactive.  The temporal reach of the 2016 Amendment states that the amendment is "declaratory of existing law," and therefore the substance of the 2016 Amendment cannot be made retroactive.

102.   However, the 2016 Amendment is not declaratory of existing law. Existing law at the time of the 2016 Amendment does not [ ] allow aquariums and museums on formerly submerged lands, does not allow undefined "edifices" for "presidential libraries and centers" on park land, and does not allow the gifting of park land to private entities by allowing multiple 99 year leases of park land to a private entity – all of which were added in the 2016 Amendment to the Museum Act.

103.   On information and belief, the Defendants will contend that the Illinois Museum Act allows a Presidential Center to be constructed on the Jackson Park Site.  Therefore, an actual and justiciable controversy exists between the Plaintiffs and the Defendants related to the applicability of the Museum Act to the Presidential Center.

Defendants move for summary judgment on this claim, arguing that: (1) the 2016 amendment had no retroactive effect on the Operating Ordinance, as the City

Council enacted it in 2018; and (2) in any event, the General Assembly can lawfully apply the amendment retroactively. [123-1] at 39–40. Plaintiffs, however, fail to address Count IV in their response memorandum. *See generally* [137]. Failure to respond to an argument results in waiver, and thus justifies granting Defendants' motion for summary judgment as to Count IV. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

Nevertheless, this Court also agrees with Defendants that the Museum Act cannot retroactively apply to the OPC. To the extent Plaintiffs allege in their amended complaint that the Museum Act "cannot be made retroactive," the City did not enact the Operating Ordinance, which authorized the City to accept the OPC site from the Park District and enter into the Use Agreement, until two years after the 2016 amendment. [124] ¶ 19. Therefore, no record exists from which this Court can find the 2016 amendment to the Museum Act constituted an unlawful retroactive provision as applied to the OPC. This Court grants Defendants' motion for summary judgment as to Count IV.

### E.    Count V: Special Legislation

Count V seeks to void the Museum Act under the Illinois Constitution's Special Legislation Clause, which prohibits a "special or local law when a general law is or can be made applicable." Ill. Const. 1970, art. IV, § 13. According to Plaintiffs, the 2016 amendment to the Museum Act "expressly" allowed a presidential center, and thus constitutes special legislation. Defendants move for summary judgment as to

Count V because the 2016 amendment does not create an exclusionary classification. This Court agrees.

As an initial matter, Plaintiffs spend the vast majority of their amended complaint and summary judgment briefing arguing that the Museum Act fails to authorize the OPC because it lacks specificity. In the same breadth, with respect to Count V, Plaintiffs also claim that the General Assembly acted in an improperly specific manner when it included "presidential centers" within the Act. [91] ¶ 109. Count V falls, however, for the simple reason that it fails to survive Illinois courts' two-part test for special legislation claims.

The special legislation clause prohibits the General Assembly from conferring "a special benefit or privilege upon one person or group and excluding others that are similarly situated." *Crusius v. Illinois Gaming Board*, 837 N.E.2d 88, 94 (Ill. 2005). While the legislature maintains broad discretion to make statutory classifications, the special legislation clause prevents it from making classifications that arbitrarily discriminate in favor of a select group. *Id.*; *Big Sky Excavating, Inc. v. Illinois Bell Telephone Co.*, 840 N.E.2d 1174, 1183 (Ill. 2005). Illinois courts thus apply a two-part test to determine whether a law constitutes special legislation: (1) whether the statutory classification at issue discriminates in favor of a select group and against a similarly situated group; and (2) if the classification does so discriminate, whether the classification is arbitrary. *Id.*

Here, Plaintiffs object to the portion of the Museum Act which defines museums to *include* "presidential libraries, centers, and museums." [137] at 25; 70

51

ILCS 1290/1. But this language does not discriminate in favor of a select group or against a similarly situated group, nor does it create any unlawful classification whatsoever. Rather, the Act merely enumerates traditional examples of museums for purposes of the Act. *See* [91-3]; 70 ILCS 1290/1. As such, the amendment does not exclude any entity wishing to operate a museum in a public park under the Museum Act, and therefore fails the two-part test. *See, e.g.*, *Elem. Sch. Dist. 159 v. Schiller*, 849 N.E.2d 349, 363−64 (Ill. 2006) (finding no special legislation where law did not exclude any entity from a benefit received by a property owner pursuant to it). Accordingly, this Court grants Defendants' motion for summary judgment as to Count V.

## IV.     Conclusion

For the reasons explained above, this Court grants Defendants' motion for summary judgment as to Counts I through V, [122], and denies Plaintiffs' motion for summary judgment as to Counts I through III, [112]. The Clerk shall enter judgment for Defendants and against Plaintiffs. All set dates and deadlines are stricken. Civil case terminated.

Dated: June 11, 2019

Entered:

John Robert Blakey
United States District Judge

52